**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

# 14 CV   9401

---

BLACKROCK ALLOCATION TARGET
SHARES: SERIES S PORTFOLIO;
BLACKROCK BALANCED CAPITAL
PORTFOLIO (FI); BLACKROCK CORE
ACTIVE BOND FUND B; BLACKROCK
CORE ACTIVE LIBOR FUND B;
BLACKROCK CORE BOND
PORTFOLIO; BLACKROCK CORE
BOND TRUST; BLACKROCK
COREALPHA BOND FUND E;
BLACKROCK COREALPHA BOND
MASTER PORTFOLIO; BLACKROCK
COREPLUS BOND FUND B;
BLACKROCK DYNAMIC HIGH
INCOME – STRUCTURED CREDIT
PORTFOLIO; BLACKROCK
ENHANCED GOVERNMENT FUND,
INC.; BLACKROCK FIXED INCOME
GLOBALALPHA MASTER FUND LTD.;
BLACKROCK FUNDS II, INFLATION
PROTECTED BOND PORTFOLIO;
BLACKROCK INCOME TRUST, INC.;
BLACKROCK LIMITED DURATION
INCOME TRUST; BLACKROCK LOW
DURATION BOND PORTFOLIO;
BLACKROCK MANAGED
VOLATILITY V.I. FUND (FI);
BLACKROCK MASTER TOTAL
RETURN PORTFOLIO OF MASTER
BOND LLC; BLACKROCK MULTI-
ASSET INCOME – NON-AGENCY MBS
PORTFOLIO; BLACKROCK MULTI-
MANAGER ALTERNATIVE
STRATEGIES FUND – LIBREMAX;
BLACKROCK MULTI-SECTOR
INCOME TRUST; BLACKROCK
STRATEGIC INCOME OPPORTUNITIES
PORTFOLIO; BLACKROCK TOTAL
RETURN PORTFOLIO (INS – SERIES);
BLACKROCK TOTAL RETURN V.I.
PORTFOLIO (INS – VAR SER);
BLACKROCK US MORTGAGE; AST
PIMCO TOTAL RETURN BOND

Case No.

**VERIFIED DERIVATIVE
COMPLAINT AND ALTERNATIVE
CLASS ACTION AGAINST U.S.
BANK NATIONAL ASSOCIATION
FOR BREACH OF CONTRACT;
VIOLATION OF THE TRUST
INDENTURE ACT OF 1939;
BREACH OF FIDUCIARY DUTY;
BREACH OF DUTY OF
INDEPENDENCE; AND
NEGLIGENCE**

**JURY DEMAND**



RECEIVED
NOV 24 2014
U.S.D.C. S.D.N.Y.
CASHIERS

PORTFOLIO; FIXED INCOME SHARES (SERIES R); FIXED INCOME SHARES: SERIES C; FIXED INCOME SHARES: SERIES LD; FIXED INCOME SHARES: SERIES M; LVS I LLC; LVS I SPE XIV LLC; LVS II LLC; PACIFIC BAY CDO, LTD.; PACIFIC SHORES CDO, LTD.; PCM FUND, INC.; PIMCO ABSOLUTE RETURN STRATEGY 3D OFFSHORE FUND LTD.; PIMCO ABSOLUTE RETURN STRATEGY II MASTER FUND LDC; PIMCO ABSOLUTE RETURN STRATEGY III MASTER FUND LDC; PIMCO ABSOLUTE RETURN STRATEGY III OVERLAY MASTER FUND LTD.; PIMCO ABSOLUTE RETURN STRATEGY IV IDF LLC; PIMCO ABSOLUTE RETURN STRATEGY IV MASTER FUND LDC; PIMCO ABSOLUTE RETURN STRATEGY V MASTER FUND LDC; PIMCO BERMUDA TRUST II: PIMCO BERMUDA EMERGING MARKETS BOND FUND (M); PIMCO BERMUDA TRUST II: PIMCO BERMUDA EMERGING MARKETS BOND FUND II; PIMCO BERMUDA TRUST II: PIMCO BERMUDA INCOME FUND (M); PIMCO BERMUDA TRUST II: PIMCO BERMUDA JGB FLOATER FOREIGN STRATEGY FUND; PIMCO BERMUDA TRUST IV: PIMCO BERMUDA GLOBAL BOND EX-JAPAN FUND; PIMCO BERMUDA TRUST: PIMCO BERMUDA FOREIGN LOW DURATION FUND; PIMCO BERMUDA TRUST: PIMCO BERMUDA U.S. LOW DURATION FUND; PIMCO BERMUDA TRUST: PIMCO EMERGING MARKETS BOND FUND (M); PIMCO CAYMAN SPC LIMITED: PIMCO CAYMAN GLOBAL AGGREGATE BOND SEGREGATED PORTFOLIO; PIMCO CAYMAN SPC LIMITED: PIMCO CAYMAN JAPAN COREPLUS SEGREGATED PORTFOLIO; PIMCO

CAYMAN SPC LIMITED: PIMCO
CAYMAN JAPAN COREPLUS
STRATEGY SEGREGATED
PORTFOLIO; PIMCO CAYMAN SPC
LIMITED: PIMCO CAYMAN JAPAN
LOW DURATION SEGREGATED
PORTFOLIO; PIMCO CAYMAN SPC
LIMITED: PIMCO CAYMAN
UNCONSTRAINED BOND
SEGREGATED PORTFOLIO; PIMCO
CAYMAN TRUST: PIMCO CAYMAN
FOREIGN BOND FUND; PIMCO
CAYMAN TRUST: PIMCO CAYMAN
GLOBAL ADVANTAGE BOND FUND;
PIMCO CAYMAN TRUST: PIMCO
CAYMAN GLOBAL AGGREGATE
BOND FUND; PIMCO CAYMAN
TRUST: PIMCO CAYMAN GLOBAL
AGGREGATE EX-JAPAN (YEN-
HEDGED) BOND FUND II; PIMCO
CAYMAN TRUST: PIMCO CAYMAN
GLOBAL AGGREGATE EX-JAPAN
(YEN-HEDGED) INCOME FUND;
PIMCO CAYMAN TRUST: PIMCO
CAYMAN GLOBAL AGGREGATE EX-
JAPAN BOND FUND; PIMCO CAYMAN
TRUST: PIMCO CAYMAN GLOBAL
BOND (NZD-HEDGED) FUND; PIMCO
CAYMAN TRUST: PIMCO CAYMAN
GLOBAL EX-JAPAN (YEN-HEDGED)
BOND FUND; PIMCO CAYMAN
TRUST: PIMCO CAYMAN TOTAL
RETURN STRATEGY FUND; PIMCO
CAYMAN TRUST: PIMCO CAYMAN
U.S. BOND FUND; PIMCO COMBINED
ALPHA STRATEGIES MASTER FUND
LDC; PIMCO CORPORATE & INCOME
OPPORTUNITY FUND; PIMCO
CORPORATE & INCOME STRATEGY
FUND; PIMCO DISTRESSED SENIOR
CREDIT OPPORTUNITIES FUND II,
L.P.; PIMCO DYNAMIC CREDIT
INCOME FUND; PIMCO DYNAMIC
INCOME FUND; PIMCO EQUITY
SERIES: PIMCO BALANCED INCOME
FUND; PIMCO ETF TRUST: PIMCO

DIVERSIFIED INCOME ACTIVE
EXCHANGE-TRADED FUND; PIMCO
ETF TRUST: PIMCO LOW DURATION
ACTIVE EXCHANGE-TRADED FUND;
PIMCO ETF TRUST: PIMCO TOTAL
RETURN ACTIVE EXCHANGE-
TRADED FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
DIVERSIFIED INCOME DURATION
HEDGED FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
DIVERSIFIED INCOME FUND; PIMCO
FUNDS: GLOBAL INVESTORS SERIES
PLC, EM FUNDAMENTAL INDEX®
STOCKSPLUS® FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
EMERGING LOCAL BOND FUND;
PIMCO FUNDS: GLOBAL INVESTORS
SERIES PLC, EMERGING MARKETS
BOND FUND; PIMCO FUNDS: GLOBAL
INVESTORS SERIES PLC, EURO BOND
FUND; PIMCO FUNDS: GLOBAL
INVESTORS SERIES PLC, EURO
INCOME BOND FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
GLOBAL ADVANTAGE REAL
RETURN FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
GLOBAL BOND FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
GLOBAL INVESTMENT GRADE
CREDIT FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
HIGH YIELD BOND FUND; PIMCO
FUNDS: GLOBAL INVESTORS SERIES
PLC, INCOME FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
INFLATION STRATEGY FUND; PIMCO
FUNDS: GLOBAL INVESTORS SERIES
PLC, PIMCO CREDIT ABSOLUTE
RETURN FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
PIMCO DIVIDEND AND INCOME
BUILDER FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
STOCKSPLUS™ FUND; PIMCO

FUNDS: GLOBAL INVESTORS SERIES
PLC, STRATEGIC INCOME FUND;
PIMCO FUNDS: GLOBAL INVESTORS
SERIES PLC, TOTAL RETURN BOND
FUND; PIMCO FUNDS: GLOBAL
INVESTORS SERIES PLC,
UNCONSTRAINED BOND FUND;
PIMCO FUNDS: GLOBAL INVESTORS
SERIES PLC, US FUNDAMENTAL
INDEX® STOCKSPLUS® FUND;
PIMCO FUNDS: GLOBAL INVESTORS
SERIES PLC, US SHORT-TERM FUND;
PIMCO FUNDS: PIMCO
COMMODITIESPLUS® STRATEGY
FUND; PIMCO FUNDS: PIMCO
COMMODITY REAL RETURN
STRATEGY FUND®; PIMCO FUNDS:
PIMCO CREDIT ABSOLUTE RETURN
FUND; PIMCO FUNDS: PIMCO
DIVERSIFIED INCOME FUND; PIMCO
FUNDS: PIMCO EM FUNDAMENTAL
INDEXPLUS® AR STRATEGY FUND;
PIMCO FUNDS: PIMCO EMERGING
LOCAL BOND FUND; PIMCO FUNDS:
PIMCO EMERGING MARKETS BOND
FUND; PIMCO FUNDS: PIMCO
EMERGING MARKETS CURRENCY
FUND; PIMCO FUNDS: PIMCO EMG
INTL LOW VOLATILITY RAFI®-PLUS
AR FUND; PIMCO FUNDS: PIMCO
EXTENDED DURATION FUND; PIMCO
FUNDS: PIMCO FLOATING INCOME
FUND; PIMCO FUNDS: PIMCO
FOREIGN BOND FUND (U.S. DOLLAR-
HEDGED); PIMCO FUNDS: PIMCO
FOREIGN BOND FUND (UNHEDGED);
PIMCO FUNDS: PIMCO
FUNDAMENTAL ADVANTAGE
ABSOLUTE RETURN STRATEGY
FUND; PIMCO FUNDS: PIMCO
GLOBAL ADVANTAGE® STRATEGY
BOND FUND; PIMCO FUNDS: PIMCO
GLOBAL BOND FUND (U.S. DOLLAR-
HEDGED); PIMCO FUNDS: PIMCO
GLOBAL BOND FUND (UNHEDGED);
PIMCO FUNDS: PIMCO GLOBAL

MULTI-ASSET FUND; PIMCO FUNDS:
PIMCO GNMA FUND; PIMCO FUNDS:
PIMCO HIGH YIELD FUND; PIMCO
FUNDS: PIMCO INCOME FUND;
PIMCO FUNDS: PIMCO INFLATION
RESPONSE MULTI-ASSET FUND;
PIMCO FUNDS: PIMCO
INTERNATIONAL FUNDAMENTAL
INDEXPLUS® AR STRATEGY FUND;
PIMCO FUNDS: PIMCO
INTERNATIONAL STOCKSPLUS® AR
STRATEGY FUND (U.S. DOLLAR-
HEDGED); PIMCO FUNDS: PIMCO
INTERNATIONAL STOCKSPLUS® AR
STRATEGY FUND (UNHEDGED);
PIMCO FUNDS: PIMCO INTL LOW
VOLATILITY RAFI®-PLUS AR FUND;
PIMCO FUNDS: PIMCO INVESTMENT
GRADE CORPORATE BOND FUND;
PIMCO FUNDS: PIMCO LONG
DURATION TOTAL RETURN FUND;
PIMCO FUNDS: PIMCO LONG-TERM
CREDIT FUND; PIMCO FUNDS: PIMCO
LONG-TERM U.S. GOVERNMENT
FUND; PIMCO FUNDS: PIMCO LOW
DURATION FUND; PIMCO FUNDS:
PIMCO LOW DURATION FUND II;
PIMCO FUNDS: PIMCO LOW
DURATION FUND III; PIMCO FUNDS:
PIMCO LOW VOLATILITY RAFI®-
PLUS AR FUND; PIMCO FUNDS:
PIMCO MODERATE DURATION
FUND; PIMCO FUNDS: PIMCO
MORTGAGE OPPORTUNITIES FUND;
PIMCO FUNDS: PIMCO MORTGAGE-
BACKED SECURITIES FUND; PIMCO
FUNDS: PIMCO REAL ESTATE REAL
RETURN STRATEGY FUND; PIMCO
FUNDS: PIMCO REAL RETURN ASSET
FUND; PIMCO FUNDS: PIMCO REAL
RETURN FUND; PIMCO FUNDS:
PIMCO SHORT-TERM FUND; PIMCO
FUNDS: PIMCO SMALL CAP
STOCKSPLUS® AR STRATEGY FUND;
PIMCO FUNDS: PIMCO SMALL
COMPANY FUNDAMENTAL

INDEXPLUS® AR STRATEGY FUND;
PIMCO FUNDS: PIMCO
STOCKSPLUS® ABSOLUTE RETURN
FUND; PIMCO FUNDS: PIMCO
STOCKSPLUS® AR SHORT
STRATEGY FUND; PIMCO FUNDS:
PIMCO STOCKSPLUS® FUND; PIMCO
FUNDS: PIMCO STOCKSPLUS® LONG
DURATION FUND; PIMCO FUNDS:
PIMCO TOTAL RETURN FUND; PIMCO
FUNDS: PIMCO TOTAL RETURN
FUND II; PIMCO FUNDS: PIMCO
TOTAL RETURN FUND III; PIMCO
FUNDS: PIMCO TOTAL RETURN
FUND IV; PIMCO FUNDS: PIMCO
UNCONSTRAINED BOND FUND;
PIMCO FUNDS: PIMCO
UNCONSTRAINED TAX MANAGED
BOND FUND; PIMCO FUNDS: PIMCO
WORLDWIDE FUNDAMENTAL
ADVANTAGE AR STRATEGY FUND;
PIMCO FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES ASSET-BACKED
SECURITIES PORTFOLIO; PIMCO
FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES DEVELOPING
LOCAL MARKETS PORTFOLIO;
PIMCO FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES EMERGING
MARKETS PORTFOLIO; PIMCO
FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES HIGH YIELD
PORTFOLIO; PIMCO FUNDS: PRIVATE
ACCOUNT PORTFOLIO SERIES
INTERNATIONAL PORTFOLIO; PIMCO
FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES LONG DURATION
CORPORATE BOND PORTFOLIO;
PIMCO FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES MORTGAGE
PORTFOLIO; PIMCO FUNDS: PRIVATE
ACCOUNT PORTFOLIO SERIES REAL
RETURN PORTFOLIO; PIMCO FUNDS:
PRIVATE ACCOUNT PORTFOLIO
SERIES SHORT-TERM PORTFOLIO;
PIMCO FUNDS: PRIVATE ACCOUNT

PORTFOLIO SERIES U.S.
GOVERNMENT SECTOR PORTFOLIO;
PIMCO GLOBAL CREDIT
OPPORTUNITY MASTER FUND LDC;
PIMCO GLOBAL INCOME
OPPORTUNITIES FUND; PIMCO
GLOBAL STOCKSPLUS & INCOME
FUND; PIMCO HIGH INCOME FUND;
PIMCO INCOME OPPORTUNITY
FUND; PIMCO INCOME STRATEGY
FUND; PIMCO INCOME STRATEGY
FUND II; PIMCO LARGE CAP
STOCKSPLUS ABSOLUTE RETURN
FUND; PIMCO MULTI-SECTOR
STRATEGY FUND LTD.; PIMCO
OFFSHORE FUNDS - PIMCO
ABSOLUTE RETURN STRATEGY IV
EFUND; PIMCO OFFSHORE FUNDS:
PIMCO OFFSHORE FUNDS - PIMCO
ABSOLUTE RETURN STRATEGY V
ALPHA FUND; PIMCO REAL RETURN
STRATEGY FUND; PIMCO STRATEGIC
INCOME FUND, INC.; PIMCO
TACTICAL OPPORTUNITIES MASTER
FUND LTD.; PIMCO VARIABLE
INSURANCE TRUST: PIMCO
COMMODITY REAL RETURN
STRATEGY PORTFOLIO; PIMCO
VARIABLE INSURANCE TRUST:
PIMCO EMERGING MARKETS BOND
PORTFOLIO; PIMCO VARIABLE
INSURANCE TRUST: PIMCO FOREIGN
BOND PORTFOLIO (U.S. DOLLAR
HEDGED); PIMCO VARIABLE
INSURANCE TRUST: PIMCO FOREIGN
BOND PORTFOLIO (UNHEDGED);
PIMCO VARIABLE INSURANCE
TRUST: PIMCO GLOBAL
ADVANTAGE STRATEGY BOND
PORTFOLIO; PIMCO VARIABLE
INSURANCE TRUST: PIMCO GLOBAL
BOND PORTFOLIO (UNHEDGED);
PIMCO VARIABLE INSURANCE
TRUST: PIMCO GLOBAL MULTI-
ASSET MANAGED ALLOCATION
PORTFOLIO; PIMCO VARIABLE

INSURANCE TRUST: PIMCO GLOBAL MULTI-ASSET MANAGED VOLATILITY PORTFOLIO; PIMCO VARIABLE INSURANCE TRUST: PIMCO HIGH YIELD PORTFOLIO; PIMCO VARIABLE INSURANCE TRUST: PIMCO LONG TERM U.S. GOVERNMENT PORTFOLIO; PIMCO VARIABLE INSURANCE TRUST: PIMCO LOW DURATION PORTFOLIO; PIMCO VARIABLE INSURANCE TRUST: PIMCO REAL RETURN PORTFOLIO; PIMCO VARIABLE INSURANCE TRUST: PIMCO SHORT-TERM PORTFOLIO; PIMCO VARIABLE INSURANCE TRUST: PIMCO TOTAL RETURN PORTFOLIO; PIMCO VARIABLE INSURANCE TRUST: PIMCO UNCONSTRAINED BOND PORTFOLIO; TERLINGUA FUND 2, LP; CREF BOND MARKET ACCOUNT; CREF SOCIAL CHOICE ACCOUNT; TIAA GLOBAL PUBLIC INVESTMENTS, MBS LLC; TIAA-CREF BOND FUND; TIAA-CREF BOND PLUS FUND; TIAA-CREF LIFE BOND FUND; TIAA-CREF LIFE INSURANCE COMPANY; TIAA-CREF SHORT-TERM BOND FUND; PRUDENTIAL BANK & TRUST, FSB; PRUDENTIAL RETIREMENT INSURANCE AND ANNUITY COMPANY; PRUDENTIAL TRUST COMPANY; THE GIBRALTAR LIFE INSURANCE COMPANY, LTD.; THE PRUDENTIAL INSURANCE COMPANY OF AMERICA; THE PRUDENTIAL INVESTMENT PORTFOLIOS 2; THE PRUDENTIAL INVESTMENT PORTFOLIOS 9; THE PRUDENTIAL INVESTMENT PORTFOLIOS INC.; THE PRUDENTIAL INVESTMENT PORTFOLIOS, INC. 17; THE PRUDENTIAL SERIES FUND; BROOKFIELD MORTGAGE OPPORTUNITY INCOME FUND INC.; BROOKFIELD SECURITIZED CREDIT

QIF FUND; BROOKFIELD TOTAL
RETURN FUND INC.; CRYSTAL RIVER
CAPITAL INC.; MILLERTON ABS CDO
LTD.; LIICA HOLDINGS, LLC; LIICA
RE I, INC.; LIICA RE II, INC.;
MONUMENTAL LIFE INSURANCE
COMPANY – MODIFIED SEPARATE
ACCOUNT; STONEBRIDGE LIFE
INSURANCE COMPANY;
STONEBRIDGE RE COMPANY;
TRANSAMERICA INTERNATIONAL
RE (BERMUDA) LTD.;
TRANSAMERICA LIFE INSURANCE
COMPANY; TRANSAMERICA
PREMIER LIFE INSURANCE
COMPANY; KORE ADVISORS LP;
SEALINK FUNDING LIMITED; and DZ
BANK AG, derivatively, on behalf of the
Trusts Identified in Exhibit 1

                    Plaintiffs,

      -against-

U.S. BANK NATIONAL ASSOCIATION,

                  Defendant,

      -and-

The Trusts Identified in Exhibit 1,

                  Nominal Defendants.

## TABLE OF CONTENTS

**Page**

I.      NATURE AND SUMMARY OF THE ACTION ................................................................ 1

II.     PARTIES ........................................................................................................................... 9

      A.      Plaintiffs ............................................................................................................... 9

            1.      AEGON.................................................................................................. 10

            2.      BlackRock Funds .................................................................................. 10

            3.      Brookfield ............................................................................................. 13

            4.      DZ Bank ................................................................................................ 13

            5.      Kore ...................................................................................................... 13

            6.      PIMCO .................................................................................................. 14

            7.      Prudential ............................................................................................. 28

            8.      Sealink .................................................................................................. 31

            9.      TIAA ..................................................................................................... 31

      B.      Defendants .......................................................................................................... 32

            1.      U.S. Bank National Association ........................................................... 32

            2.      The Nominal Defendant Trusts ............................................................. 33

III.    OVERVIEW OF THE TRUSTS ...................................................................................... 34

IV.     JURISDICTION AND VENUE ...................................................................................... 35

V.      COMPLIANCE WITH THE NO ACTION CLAUSE IS EXCUSED ............................ 35

VI.     DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS ...................................... 37

VII.    BACKGROUND – THE TRUSTEE'S ROLE AS GATEKEEPER IN
       THE SECURITIZATION PROCESS .............................................................................. 39

VIII.   U.S. BANK'S CONTRACTUAL OBLIGATIONS ........................................................ 43

      A.      The Mortgage Loan Purchase And Sale Agreement ........................................... 43

      B.      The Pooling And Servicing Agreements ............................................................ 45

            1.      U.S. Bank's Duties And Obligations Under The PSAs ......................... 46

|  |  | a) | Duty To Provide Notice Of Breaches And To Enforce Putback Rights .......................47 |
|  |  | b) | Duties Regarding The Servicers .....................48 |
|  |  | c) | Duties Upon Knowledge Of An Event Of Default................................................48 |
|  | 2. |  | The Servicers' Duties And Obligations Under The PSAs ....................... 49 |
|  |  | a) | Duty To Provide Notice Of Breaches And To Enforce Putback Rights .......................49 |
|  |  | b) | Duty To Perform Prudent And Customary Servicing Practices.................................50 |
|  |  | c) | Duty To Perform Prudent Foreclosure Practices ..........................................51 |
|  |  | d) | Duty To Perform Prudent Servicing Advances ..........................................52 |
|  | C. |  | The Indentures And Sale Servicing Agreements .................................. 53 |
| IX. | | | THE TRUSTS SUFFERED FROM PERVASIVE BREACHES OF REPRESENTATIONS AND WARRANTIES BY THE SELLERS ............................ 56 |
|  | A. |  | High Default Rates of the Mortgage Loans And Plummeting Credit Ratings Are Indicative Of Massive Seller Breaches............................. 56 |
|  | B. |  | The Systemic Disregard Of Underwriting Standards Was Pervasive During The Relevant Period ........................................ 58 |
|  | C. |  | There Is Evidence Of Widespread Breaches Of Representations And Warranties By The Specific Originators That Sold Loans To The Trusts ......................................... 60 |
|  |  | 1. | Wells Fargo ....................................... 61 |
|  |  | 2. | WaMu and Long Beach .............................. 63 |
|  |  | 3. | Countrywide........................................ 66 |
|  |  | 4. | GreenPoint ........................................ 69 |
|  |  | 5. | New Century ....................................... 70 |
|  |  | 6. | IndyMac Bank....................................... 72 |
|  |  | 7. | Argent ............................................ 74 |
|  |  | 8. | Option One......................................... 75 |

D.     The Systemic Disregard Of Prudent Securitization Standards Was Pervasive During The Relevant Period ........................................................ 78

E.     There Is Evidence Of Widespread Breaches Of Representations And Warranties By The Specific Sponsors Of The Trusts ................................. 79

      1.     Lehman ...................................................................................... 79

      2.     Credit Suisse (DLJ Mortgage Capital) ...................................... 81

      3.     WaMu ........................................................................................ 86

      4.     Goldman Sachs .......................................................................... 91

      5.     UBS ........................................................................................... 95

      6.     Merrill Lynch ............................................................................ 97

      7.     Bear, Stearns & Co., Inc. .......................................................... 99

      8.     RBS ......................................................................................... 104

      9.     C-BASS ................................................................................... 106

      10.     Morgan Stanley ....................................................................... 109

X.     U.S. BANK KNEW THAT THE TRUSTS WERE FILLED WITH DEFECTIVE LOANS ......................................................................................... 111

A.     The Trusts' Poor Performance ............................................................ 111

B.     Credit-Rating Downgrades Of The Certificates Further Supports The Sellers' Problems .......................................................................... 114

C.     U.S. Bank Discovered Widespread Seller Breaches Of Representations And Warranties In Its Capacity As Servicer ........................... 115

D.     U.S. Bank Received Written Notice Of Pervasive And Systemic Seller Breaches From Financial Guaranty Insurers ............................. 116

E.     U.S. Bank And Its Responsible Officers Repeatedly Received Written Notice From Certificateholders Of Pervasive And Systemic Seller Breaches ......................................................................... 119

F.     U.S. Bank Selectively Asserted The Trusts' Repurchase Rights Against The Sellers ............................................................................ 124

G.     U.S. Bank Initiated Putback Litigation Against Many Of The Sellers 125

H.     U.S. Bank Attempted To Contract Around Its Liability And Obligations In Acquiring Bank of America's Trustee Business ....................... 129

XI.  THE TRUSTS ALSO SUFFERED FROM PERVASIVE SERVICER
     VIOLATIONS ................................................................................................ 130

     A.  The Servicers Failed To Give Notice Of Seller Breaches Of
         Representations and Warranties And Enforce The Sellers'
         Repurchase Obligations ..................................................................... 131

     B.  The Servicers Have Violated Their Prudent Servicing Obligations ................. 134

     C.  The Servicers Have Violated Their Foreclosure Obligations ........................... 139

     D.  The Servicers Have Violated Their Modification Obligations .......................... 143

     E.  The Servicers Have Abused Their Servicing Advances Obligations ................. 144

XII.  U.S. BANK HAS KNOWN OF SERVICER VIOLATIONS PLAGUING
      THE TRUSTS ............................................................................................... 147

     A.  U.S. Bank Itself Was Involved In Government Enforcement
         Actions And Litigation Stemming From The Servicers' Violations ................. 147

     B.  U.S. Bank And Its Responsible Officers Received Written Notice
         From Certificateholders Of Pervasive And Systemic Servicer
         Breaches ......................................................................................... 149

     C.  U.S. Bank Had Knowledge Of The Servicers' Failures Through
         The Monthly Servicer And Remittance Reports ....................................... 151

XIII.  U.S. BANK FAILED TO DISCHARGE ITS CRITICAL PRE- AND
       POST-DEFAULT DUTIES ............................................................................. 151

     A.  Failure To Enforce The Trusts' Repurchase Rights ................................... 152

     B.  Failure To Provide Notice To The Servicers Of Events Of Defaults ............... 152

     C.  Failure To Act Prudently Subsequent To The Uncured Events Of
         Defaults .......................................................................................... 153

     D.  Failure To Provide Notice To The Certificateholders Of The
         Uncured Events Of Defaults ............................................................... 154

XIV.  U.S. BANK FAILED TO PROTECT THE TRUSTS  FOLLOWING THE
      INSOLVENCY OF CERTAIN SPONSORS ....................................................... 154

XV.  U.S. BANK FAILED TO PROTECT THE TRUSTS DUE TO ITS
     CONFLICTS OF INTEREST ............................................................................ 157

     A.  U.S. Bank Was Economically Beholden To The Mortgage Loan
         Sellers 157

     B.  U.S. Bank Was Engaged In The Same Wrongful Servicing
         Activities .......................................................................................... 158

     C.  U.S. Bank Originated Defective Loans ................................................... 159

D.       U.S. Bank Refused To Discharge Its Duties In Order To Preserve
Profits 160

XVI.   CAUSATION ......................................................................... 161

XVII.  DAMAGES............................................................................ 162

XVIII. CAUSES OF ACTION ........................................................... 162

FIRST CAUSE OF ACTION  BREACH OF CONTRACT (In The Right Of The
Trustee And On Behalf Of The Trusts Against U.S. Bank) ........................................... 162

SECOND CAUSE OF ACTION  VIOLATION OF THE TRUST INDENTURE
ACT OF 1939, 53 STAT. 1171 (In The Right Of The Trustee And On
Behalf Of The Trusts Against U.S. Bank) ...................... 170

THIRD CAUSE OF ACTION  NEGLIGENCE - BREACH OF PRE-DEFAULT
DUTY OF INDEPENDENCE (In The Right Of The Trustee And On
Behalf Of The Trusts Against U.S. Bank) ...................... 173

FOURTH CAUSE OF ACTION  BREACH OF FIDUCIARY DUTY – DUTY
OF CARE (In The Right Of The Trustee And On Behalf Of The Trusts
Against U.S. Bank) ............................................................ 175

FIFTH CAUSE OF ACTION  NEGLIGENCE – DUTY OF CARE (In The Right
Of The Trustee And On Behalf Of The Trusts Against U.S. Bank).............................. 177

SIXTH CAUSE OF ACTION  BREACH OF FIDUCIARY DUTY – BREACH
OF POST-DEFAULT DUTY OF INDEPENDENCE (In The Right Of
The Trustee And On Behalf Of The Trusts Against U.S. Bank) .................................. 180

XIX.   CLASS ACTION ALLEGATIONS ........................................... 181

XX.    RELIEF REQUESTED............................................................ 183

XXI.   JURY DEMAND .................................................................... 184

Plaintiffs AEGON (as defined herein); BlackRock Funds (as defined herein); Brookfield (as defined herein); Deutsche Zentral-Genossenschaftsbank AG, New York Branch, d/b/a DZ Bank AG, New York Branch ("DZ Bank"); Kore Advisors, LP ("Kore"); PIMCO (as defined herein); Prudential (as defined herein); Sealink Funding Limited ("Sealink"); and TIAA (as defined herein) (collectively, "Plaintiffs") by and through their undersigned attorneys, hereby bring this derivative complaint (the "Complaint") in the right of the trustee and on behalf of and for the benefit of the residential mortgage-backed securities ("RMBS") Trusts listed in Exhibit 1 ("Trusts"), against U.S. Bank National Association ("U.S. Bank" or the "Trustee"), the Trustee for the Trusts to recover losses sustained by the Trusts as a result of U.S. Bank's wrongful conduct. Alternatively, Plaintiffs bring this action on their own behalf and on behalf of a class of all current owners of certificates in the Trusts (the "Class") to recover for the losses directly suffered by Plaintiffs and the Class as a result of U.S. Bank's wrongful conduct.

## I.     NATURE AND SUMMARY OF THE ACTION

1.     Defendant U.S. Bank is a national banking association and is the trustee for over 1,600 RMBS trusts originally securitized by approximately $1.3 trillion of residential mortgage loans.   Among them are the Trusts at issue in this action: 843 private-label RMBS trusts securitized between 2004 and 2007 collateralized with loans worth more than $778.6 billion at the time of securitization.   U.S. Bank, as Trustee, is the sole gatekeeper for the protection of the Trusts and their beneficial certificateholders (the "Certificateholders"), and must at all times act in the best interests of the Trusts.   As alleged herein, U.S. Bank failed to discharge its duties and obligations to protect the Trusts.   Instead, to protect its own business interests, U.S. Bank ignored pervasive and systemic deficiencies in the underlying loan pools and the servicing of those loans

and unreasonably refused to take any action.  This derivative action seeks to recover billions of dollars in damages to the Trusts caused by U.S. Bank's abdication of responsibility.[1]

2.     RMBS trusts are created to facilitate the securitization and sale of residential mortgage loans to investors.  The trust's assets consist entirely of the underlying loans, and the principal and interest ("P&I") payments on the loans are "passed through" to the certificateholders.  Between 2004 and 2008, a handful of large investment banks dominated the RMBS market and controlled the process from beginning to end.  These banks act as "sponsors" of the RMBS, acquiring the mortgage loans from originators, who often were affiliates of the sponsors, or beholden to them through warehouse lending or other financial arrangements.  Once the loans are originated, acquired and selected for securitization, the sponsor creates a trust where the loans are deposited for the benefit of the Certificateholders.  The sponsor also hand-picks the servicer, often an affiliate of the sponsor or originator, to collect payments on the loans.  Finally, a select number of these same banks that originate, securitize and service RMBS also act as trustees on other sponsor's deals.

3.     To ensure the quality of the RMBS and the underlying loans, the trust documents generally include representations and warranties from the loan sellers attesting to the quality and characteristics of the mortgages as well as an agreement to cure, substitute, or repurchase mortgages that do not comply with those representations and warranties.  Because the risk of non-payment or default on the loans is "passed through" to investors, other than these representations and warranties, the large investment banks and other players in the mortgage

---

[1] This Complaint does not allege in any way that the Trustees were or are burdened by conflicts in connection with their negotiation, evaluation, or acceptance of any investor-driven RMBS settlement, including the $8.5 billion settlement with Bank of America/Countrywide, the $4.5 billion settlement with JPMorgan, or the $1.125 billion settlement with Citibank.

securitization industry have no "skin" in the game once the RMBS are sold to certificateholders. Instead, their profits are principally derived from the spread between the cost to originate or purchase loans, how much they can sell them to investors once packaged as securities, as well as various servicing-related income. Accordingly, volume became the focus, and the quality of the loans was disregarded.

4.    The fundamental role of a trustee in an RMBS securitization is to ensure that there is at least one independent party, free from any conflicting self-interest, to protect the trust corpus. Certificateholders have no access to the underlying loan files and other documents necessary to confirm compliance with the representations and warranties, cannot monitor the servicers' conduct and performance, cannot act independently to enforce the trusts' contractual rights, and must rely on the trustee to protect their interests. U.S. Bank, as Trustee, was the sole contractual party in the Trusts' securitization process intended to be independent of the investment banks that sponsored the securitization, the lenders that originated the loans, and the servicers that were often affiliated with either the sponsors or lenders, or both. Certificateholders must rely on the Trustee to protect the rights and interests of the trusts.

5.    U.S. Bank knew that the pools of loans backing the Trusts were filled with defective mortgage loans. The abysmal performance of the Trust collateral – including spiraling defaults, delinquencies and foreclosures – is outlined on monthly remittance reports that U.S. Bank, as Trustee, publishes and publicly files with the government. The monthly remittance reports detail how, by January 1, 2009, the Trusts had suffered collateral losses exceeding $26 billion. On average, nearly one in every four loans in the Trusts was delinquent. Moreover, 280 Trusts had delinquency rates exceeding 30%, and 125 Trusts had delinquency rates of over 45%. By January 1, 2011, the Trusts' total losses had increased more than $33 billion to $59.1

billion, meaning over 7*%* of the Trusts *entire loan pool* had been written off.  By the start of 2010, nearly all of the securities issued by the Trusts had experienced multiple downgrades, with most reduced to "junk" status.

6.     A steady stream of public disclosures has linked the abject performance of the Trusts to systemic abandonment of underwriting guidelines, and the deficient and often fraudulent securitization practices of the sponsors.  Highly publicized government investigations, reports and enforcement actions; high-profile RMBS litigation by government agencies, federal banks, and institutional investors; and claims and litigation instituted by monoline insurers have repeatedly noted the "pervasive disregard" and "systemic abandonment" of underwriting guidelines in the years leading up to the financial crisis.  Voluminous complaints in these proceedings detail gross misstatements in the Trust documents of key metrics concerning the quality of the underlying loan pools, including loan-to-value ratios ("LTVs"), owner-occupancy status, and borrower credit scores – as well as the completeness of the loan files themselves.

7.     Indeed, U.S. Bank has admitted its knowledge of breaches of representation and warranties and "Events of Default."  U.S. Bank sued the same originators and sponsors in the Trusts at issue here, alleging systemic and pervasive breaches of representations and warranties. In those actions, U.S. Bank asserted that loans produced by the same originators as the Trusts at issue here were "***toxic***" and riddled with "***pervasive and severe breaches***" on a "***pool-wide basis***" at a "***startling rate***" – as high as ***99%*** in some instances.  U.S. Bank also alleged and admitted that these originators "***failed to adhere to industry-standard and reasonable underwriting guidelines in an extremely high percentage of cases***" and as a result, given these high breach rates, "***it is reasonable to infer that breaches of . . . [representations and warranties] exist throughout the entire pool of mortgage loans in the Trust***."  U.S. Bank has admitted time and

again to knowledge of these originators' "abject failure to abide by the very representations and warranties [they] consistently made to induce the purchase of [] Loans for securitizations," yet U.S. Bank failed and unreasonably refused to take any action to protect the Trusts against the same originators and their defective loans.

8.     In addition, in one of its actions against Countrywide, one of the largest originators of loans in the Trusts at issue in this action, U.S. Bank conducted a forensic review and found "an extraordinary sixty-six percent" of the sample breached one or more of the representations and warranties.  U.S. Bank claimed this was consistent with "Countrywide's abject failure to abide by the very representations and warranties it consistently made to induce the purchase of its Loans for securitizations, including the purchase of the Loans by the Trust." Despite this knowledge, U.S. Bank has not, however, taken any action to protect the Trusts at issue here, which contain billions of dollars in defective loans originated by Countrywide. Rather, U.S. Bank ignored the breaches and unreasonably refused to act while the Trusts suffered dramatic and mounting defaults, collateral losses, and other harms.

9.     U.S. Bank was further informed of pervasive and systemic deficiencies infecting the Trusts' collateral though "putback" initiatives led by many of the world's largest institutional mortgage investors.  These large-scale initiatives – several of which have yielded ***multi-billion dollar settlements*** – have targeted six of the leading sponsors of non-agency RMBS and cover wide swaths of the RMBS market, including entire labels and shelves.

10.     For example, in December 2011, a group of major institutional investors asked U.S. Bank, as trustee, to investigate large numbers of ineligible mortgages in loan pools underlying dozens of JPMorgan sponsored trusts and deficient servicing of those loans.  Together with similar instructions provided to four other trustees of the JPMorgan-sponsored trusts, the

initiative covered more than *$95 billion* of RMBS issued from 2005 to 2007.  Less than two years later, U.S. Bank and the other trustees were presented with a comprehensive $4.5 billion settlement offer covering 330 JPMorgan-sponsored trusts.  On August 1, 2014 and October 2, 2014, U.S. Bank and the other trustees involved in the putback initiative *accepted* JPMorgan's $4.5 billion offer for the vast majority of the 330 trusts included in the offer and petitioned for *court approval* of the settlement.  In January 2012, U.S. Bank received similar written instructions from a group of major institutional investors in dozens of trusts sponsored by Morgan Stanley or its affiliates (collectively, "Morgan Stanley").  Together with other Morgan Stanley-sponsored Trusts, the initiative covered more than *$25 billion* of RMBS issued from 2005 to 2007, including 23 Trusts at issue in this action.  Additionally, in January 2012, U.S. Bank received similar instructions with respect to *$45 billion* of Wells Fargo sponsored RMBS. And in yet another investor-led initiative, U.S. Bank, as trustee, gave its *approval* to an $8.7 billion settlement covering among other trusts, 570 RMBS trusts sponsored by Residential Capital and its affiliates ("ResCap") from 2004 to 2008 with an original face amount of over *$320 billion*.[2]

11.    These and other certificateholder-led initiatives sought to "putback" large quantities of loans (1) originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including Wells Fargo ($98.2 billion of loans sold to the Trusts), Countrywide ($58.6 billion of loans sold to the Trusts), and Citibank ($28.1 billion of loans sold to the Trusts); and (2) securitized by the same investment banks and financial

---

[2] In January 2014, after a nine-week trial, New York Supreme Court Justice Barbara Kapnick largely approved an $8.5 billion settlement resolving mortgage repurchase claims for 530 RMBS trusts issued by Countrywide Financial Corporation and its affiliates ("Countrywide"). That initiative began in October 2010 and covers more than *$424 billion* of RMBS issued from 2004 to 2008. Countrywide is one of the largest originators of loans in the Trusts.

institutions that sponsored the Trusts, including Wells Fargo ($63.8 billion of sponsored Trusts); Citibank ($24.9 billion of sponsored Trusts); and Bear Stearns ($20 billion of sponsored Trusts). In addition, the certificateholder-led initiatives identified and sought recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Wells Fargo (servicer to $330 billion of loans sold to the Trusts), Citibank (servicer to $24.4 billion of loans sold to the Trusts), and JPMorgan (servicer to $20.3 billion of loans sold to the Trusts).

12.     Finally, as a major player in the RMBS securitization market and through its involvement in the major putback initiatives above, U.S. Bank knew that the Trusts were plagued with servicer violations.  Indeed, many of the servicers to the Trusts have faced federal and state regulatory enforcement actions which have led to landmark settlements, including the $25 billion "National Mortgage Settlement" entered into between forty-nine state attorneys general and many of the Trusts' servicers.  Notably, without receiving certificateholder approval, many of these settlement agreements effectively permit the servicers to use trust assets to finance their settlement payments for their own wrongdoing.

13.     Moreover, U.S. Bank itself was the target of government investigations and lawsuits regarding its deficient servicing operations.  For example, during the fourth quarter of 2010, the Federal Reserve, the Office of the Comptroller of the Currency ("OCC"), the Federal Deposit Insurance Corporation ("FDIC"), and the Office of Thrift Supervision ("OTS") conducted on-site reviews of the adequacy of controls and governance over servicers' foreclosure processes at U.S. Bank.  The reviews uncovered significant problems in mortgage loan servicing foreclosure processing at U.S. Bank, including "critical weaknesses in [U.S. Bank's] foreclosure governance processes, foreclosure document preparation processes, and oversight and

monitoring of third-party vendors, including foreclosure attorneys."  Based on the deficiencies in the review and the risk of additional issues as a result of weak controls and processes, the Federal Reserve Board initiated formal enforcement actions requiring U.S. Bancorp, the corporate parent of U.S. Bank, to address its pattern of misconduct and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing.  Ultimately, U.S. Bank entered into a consent order with the Federal Reserve Board, which found that U.S. Bank had engaged in "unsafe or unsound practices with respect to the manner in which [U.S. Bank] handled various foreclosure and related activities."

14.     Under the governing Pooling and Servicing Agreements ("PSAs"), upon U.S. Bank's knowledge of an Event of Default by a servicer, U.S. Bank is obligated to provide written notice of the default to the servicer.  U.S. Bank systematically failed, however, to provide notice to the servicers of their defaults because U.S. Bank did not want to jeopardize its close business relationships with the servicers.  Moreover, U.S. Bank, which also acts as a servicer for billions of dollars of other RMBS, has itself engaged in the same improper and illicit servicing activities that plagued the Trusts.  Similarly, U.S. Bank originated hundreds of millions of dollars in loans that have been securitized in other RMBS and that contain pervasive breaches of representations and warranties.  Many of the same entities that act as servicers for the Trusts also service these defective U.S. Bank-originated loans.  Thus, U.S. Bank, acting in its own self-interest, refused to provide notice to the servicers of their defaults to avoid scrutiny of its own servicing business and evade liability for its own defective loans.

15.     Further, under the PSAs, within sixty to ninety days after the occurrence of an Event of Default, U.S. Bank is obligated to transmit by mail to all Certificateholders notice of each Event of Default known to U.S. Bank, unless the Event of Default has been cured or

waived.  Although Events of Default occurred and were not – and have not been – cured or

waived, U.S. Bank has similarly failed to provide written notice to the Certificateholders of the

Events of Default.  U.S. Bank has covered up the Events of Default for several self-interested

reasons.  Among other things, as noted above, providing notice of the servicers' default could

jeopardize U.S. Bank's close business relationships with the servicers and lead to U.S. Bank's

own potential liability in its capacity as an originator, sponsor and servicer to other RMBS trusts.

Moreover, as discussed in greater detail below, had U.S. Bank provided notice of an Event of

Default, it would have greatly increased U.S. Bank's liabilities and duties, but U.S. Bank's

compensation under the PSA would have remained the same.

16.     Finally, after the Events of Default, U.S. Bank failed to exercise its rights under

the PSAs as a prudent person would, under those circumstances, in the conduct of its own affairs.

U.S. Bank did nothing to protect the Trust and Certificateholders, choosing instead to

deliberately ignore the egregious Events of Default for its own benefit and to the detriment of the

Trusts.

## II.     PARTIES

### A.     Plaintiffs

17.     Each of the plaintiffs identified below (collectively, the "Plaintiffs") is a

Certificateholder in the Trusts as identified in Exhibit 1 attached hereto.  Each of the Plaintiffs

was a Certificateholder of the respective Trusts at the time of the transactions of which it

complains, or interests therein devolved upon it by operation of law in accordance with New

York General Obligations Law § 13-107.

18.     The Plaintiffs hold the economic and beneficial interest in their Certificates and

are the true parties in interest.  No other party has an economic or beneficial interest in the

Plaintiffs' Certificates in this matter.

### 1.   AEGON

19.    The following plaintiffs are collectively referred to as "AEGON."

20.    Plaintiff LIICA Holdings, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware.

21.    Plaintiff LIICA Re I, Inc. is a corporation organized under the laws of the State of Vermont with its principal place of business in Burlington, Vermont.

22.    Plaintiff LIICA Re II, Inc. is a corporation organized under the laws of the State of Vermont with its principal place of business in Burlington, Vermont.

23.    Plaintiff Monumental Life Insurance Company – Modified Separate Account is a corporation organized under the laws of the State of Iowa with its principal place of business in Cedar Rapids, Iowa.

24.    Plaintiff Stonebridge Life Insurance Company is a corporation organized under the laws of the State of Vermont with its principal place of business in Rutland, Vermont.

25.    Plaintiff Stonebridge Re Company is a corporation organized under the laws of State of Vermont with its principal place of business in Rutland, Vermont.

26.    Plaintiff Transamerica International Re (Bermuda) Ltd. is a corporation organized under the laws of Bermuda with its principal place of business in Hamilton, Bermuda.

27.    Plaintiff Transamerica Life Insurance Company is a corporation organized under the laws of the State of Iowa with its principal place of business in Cedar Rapids, Iowa.

28.    Plaintiff Transamerica Premier Life Insurance Company is a corporation organized under the laws of Iowa with its principal place of business at 4333 Edgewood Road NE, Cedar Rapids, Iowa.

### 2.   BlackRock Funds

29.    The following plaintiffs are collectively referred to as "BlackRock Funds."

30.     Plaintiff BlackRock Allocation Target Shares: Series S Portfolio is a Cayman Island Private trust.

31.     Plaintiff BlackRock Balanced Capital Portfolio (FI) is a registered investment company with its principal place of business in Wilmington, Delaware.

32.     Plaintiff BlackRock Core Active Bond Fund B is a collective trust fund with its principal place of business in San Francisco, California.

33.     Plaintiff BlackRock Core Active LIBOR Fund B is a collective trust fund with its principal place of business in San Francisco, California.

34.     Plaintiff BlackRock Core Bond Portfolio is a registered investment company with its principal place of business in Wilmington, Delaware.

35.     Plaintiff BlackRock Core Bond Trust is Cayman Island trust.

36.     Plaintiff BlackRock CoreAlpha Bond Fund E is a collective trust fund with its principal place of business in San Francisco, California.

37.     Plaintiff BlackRock CoreAlpha Bond Master Portfolio is a registered investment company with its principal place of business in Wilmington, Delaware.

38.     Plaintiff BlackRock CorePlus Bond Fund B is a Cayman Island Private Fund.

39.     Plaintiff BlackRock Dynamic High Income – Structured Credit Portfolio is a Cayman Island Private Fund.

40.     Plaintiff BlackRock Enhanced Government Fund, Inc. is a registered investment company with its principal place of business in Wilmington, Delaware.

41.     Plaintiff BlackRock Fixed Income GlobalAlpha Master Fund Ltd. is a Cayman LLC with its principal place of business in San Francisco, California.

42.     Plaintiff BlackRock Funds II, Inflation Protected Bond Portfolio is Cayman Island Private Fund.

43.     Plaintiff BlackRock Income Trust, Inc. is a registered investment company with its principal place of business in Wilmington, Delaware.

44.     Plaintiff BlackRock Limited Duration Income Trust is a Cayman Island Trust.

45.     Plaintiff BlackRock Low Duration Bond Portfolio is a registered investment company with its principal place of business in Wilmington, Delaware.

46.     Plaintiff BlackRock Managed Volatility V.I. Fund (FI) is a registered investment company with its principal place of business in Wilmington, Delaware.

47.     Plaintiff BlackRock Master Total Return Portfolio of Master Bond LLC is a limited liability company.

48.     Plaintiff BlackRock Multi-Asset Income – Non-Agency MBS Portfolio is a registered investment company with its principal place of business in Wilmington, Delaware.

49.     Plaintiff BlackRock Multi-Manager Alternative Strategies Fund – Libremax is a Cayman Island Private Fund.

50.     Plaintiff BlackRock Multi-Sector Income Trust is a registered investment company with its principal place of business in Wilmington, Delaware.

51.     Plaintiff BlackRock Strategic Income Opportunities Portfolio is a registered investment company with its principal place of business in Wilmington, Delaware.

52.     Plaintiff BlackRock Total Return Portfolio (Ins – Series) is a registered investment company with its principal place of business in Wilmington, Delaware.

53.     Plaintiff BlackRock Total Return V.I. Portfolio (Ins – Var Ser) is a Cayman Island Private Fund.

54.     Plaintiff BlackRock US Mortgage is a registered investment company with its principal place of business in Wilmington, Delaware.

### 3.     Brookfield

55.     The following plaintiffs are collectively referred to as "Brookfield."

56.     Plaintiff Brookfield Mortgage Opportunity Income Fund Inc. is a corporation organized under the laws of the State of Maryland.

57.     Plaintiff Brookfield Securitized Credit QIF Fund is an Irish qualifying investor fund (and a sub-fund of Brookfield Investment Funds (QIF) plc, an Irish public limited company).

58.     Plaintiff Brookfield Total Return Fund Inc. is a corporation organized under the laws of the State of Maryland.

59.     Plaintiff Crystal River Capital Inc. is a corporation organized under the laws of the State of Maryland.

60.     Plaintiff Millerton ABS CDO Ltd. is a Cayman exempted company with limited liability.

### 4.     DZ Bank

61.     Plaintiff DZ Bank is a commercial bank incorporated in Germany.  DZ Bank maintains an office at 609 Fifth Avenue, New York, New York.

### 5.     Kore

62.     Plaintiff Kore is a Delaware Limited Partnership with its principal place of business located at 1501 Corporate Drive, Suite 230, Boynton Beach, Florida.  Kore is the investment manager to Kore Fixed Income Fund Ltd., a private fund formed under the laws of the Cayman Islands and Sunrise Partners Limited Partnership, a private fund formed under the laws of Delaware (collectively, the "Private Funds").  Kore, through the Private Funds, is a

Certificateholder in the Trusts identified in Exhibit 1 attached hereto.  Kore, through the Private Funds, has been a Certificateholder of these Trusts at the time of the transactions of which it complains, or its interests therein devolved upon it by operation of law in accordance with New York General Obligations Law § 13–107.

### 6. **PIMCO**

63.     The following plaintiffs are collectively referred to as "PIMCO."

64.     Plaintiff AST PIMCO Total Return Bond Portfolio is a Cayman Islands business trust.

65.     Plaintiff Fixed Income SHares (Series R) is a Massachusetts business trust.

66.     Plaintiff Fixed Income SHares: Series C is a Massachusetts business trust.

67.     Plaintiff Fixed Income SHares: Series LD is a Massachusetts business trust.

68.     Plaintiff Fixed Income SHares: Series M is a Massachusetts business trust.

69.     Plaintiff LVS I LLC is a Delaware limited liability company.

70.     Plaintiff LVS I SPE XIV LLC is a Delaware limited liability company.

71.     Plaintiff LVS II LLC is a Delaware limited liability company.

72.     Plaintiff Pacific Bay CDO, Ltd. is a Cayman Islands exempted company.

73.     Plaintiff Pacific Shores CDO, Ltd. is a Cayman Islands exempted company.

74.     Plaintiff PCM Fund, Inc. is a corporation existing under the laws of Maryland, with its principal place of business located at 1345 Avenue of the Americas, New York, New York.

75.     Plaintiff PIMCO Absolute Return Strategy 3D Offshore Fund Ltd. is a limited partnership existing under the laws of the Cayman Islands.

76.      Plaintiff PIMCO Absolute Return Strategy II Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

77.      Plaintiff PIMCO Absolute Return Strategy III Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

78.      Plaintiff PIMCO Absolute Return Strategy III Overlay Master Fund Ltd. is a limited partnership existing under the laws of the Cayman Islands.

79.      Plaintiff PIMCO Absolute Return Strategy IV IDF LLC is a limited liability company existing under the laws of Delaware.

80.      Plaintiff PIMCO Absolute Return Strategy IV Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

81.      Plaintiff PIMCO Absolute Return Strategy V Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

82.      Plaintiff PIMCO Bermuda Trust II: PIMCO Bermuda Emerging Markets Bond Fund (M) is a business trust existing under the laws of the Cayman Islands.

83.      Plaintiff PIMCO Bermuda Trust II: PIMCO Bermuda Emerging Markets Bond Fund II is a business trust existing under the laws of the Cayman Islands.

84.      Plaintiff PIMCO Bermuda Trust II: PIMCO Bermuda Income Fund (M) is a Bermuda business trust.

85.      Plaintiff PIMCO Bermuda Trust II: PIMCO Bermuda JGB Floater Foreign Strategy Fund is a business trust existing under the laws of the Cayman Islands.

86.      Plaintiff PIMCO Bermuda Trust IV: PIMCO Bermuda Global Bond Ex-Japan Fund is a Cayman Islands business trust.

87.    Plaintiff PIMCO Bermuda Trust: PIMCO Bermuda Foreign Low Duration Fund is a business trust existing under the laws of the Cayman Islands.

88.    Plaintiff PIMCO Bermuda Trust: PIMCO Bermuda U.S. Low Duration Fund is a business trust existing under the laws of the Cayman Islands.

89.    Plaintiff PIMCO Bermuda Trust: PIMCO Emerging Markets Bond Fund (M) is a business trust existing under the laws of the Cayman Islands.

90.    Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Global Aggregate Bond Segregated Portfolio is a Cayman Islands exempted company.

91.    Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Japan CorePLUS Segregated Portfolio is a Cayman Islands business trust.

92.    Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Japan CorePLUS Strategy Segregated Portfolio is a Cayman Islands business trust.

93.    Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Japan Low Duration Segregated Portfolio is a Cayman Islands business trust.

94.    Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Unconstrained Bond Segregated Portfolio is a Cayman Islands exempted company.

95.    Plaintiff PIMCO Cayman Trust: PIMCO Cayman Foreign Bond Fund is a business trust existing under the laws of the Cayman Islands.

96.    Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Advantage Bond Fund is a business trust existing under the laws of the Cayman Islands.

97.    Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Bond Fund is a Cayman Islands business trust.

98.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Ex-Japan (Yen-Hedged) Bond Fund II is a Cayman Islands business trust.

99.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Ex-Japan (Yen-Hedged) Income Fund is a business trust existing under the laws of the Cayman Islands.

100.    Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Ex-Japan Bond Fund is a Cayman Islands business trust.

101.    Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Bond (NZD-Hedged) Fund is a business trust existing under the laws of the Cayman Islands.

102.    Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Ex-Japan (Yen-Hedged) Bond Fund is a business trust existing under the laws of the Cayman Islands.

103.    Plaintiff PIMCO Cayman Trust: PIMCO Cayman Total Return Strategy Fund is a business trust existing under the laws of the Cayman Islands.

104.    Plaintiff PIMCO Cayman Trust: PIMCO Cayman U.S. Bond Fund is a business trust existing under the laws of Cayman Islands.

105.    Plaintiff PIMCO Combined Alpha Strategies Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

106.    Plaintiff PIMCO Corporate & Income Opportunity Fund is a business trust existing under the laws of Massachusetts.

107.    Plaintiff PIMCO Corporate & Income Strategy Fund is a business trust existing under the laws of Massachusetts.

108.    Plaintiff PIMCO Distressed Senior Credit Opportunities Fund II, L.P. is a limited partnership existing under the laws of Delaware.

109.    Plaintiff PIMCO Dynamic Credit Income Fund is a business trust existing under the laws of Massachusetts.

110.    Plaintiff PIMCO Dynamic Income Fund is a business trust existing under the laws of Massachusetts.

111.    Plaintiff PIMCO Equity Series: PIMCO Balanced Income Fund is a business trust existing under the laws of Massachusetts.

112.    Plaintiff PIMCO ETF Trust: PIMCO Diversified Income Active Exchange-Traded Fund is a Cayman Islands business trust.

113.    Plaintiff PIMCO ETF Trust: PIMCO Low Duration Active Exchange-Traded Fund is a statutory trust existing under the laws of Delaware.

114.    Plaintiff PIMCO ETF Trust: PIMCO Total Return Active Exchange-Traded Fund is a statutory trust existing under the laws of Delaware.

115.    Plaintiff PIMCO Funds: Global Investors Series plc, Diversified Income Duration Hedged Fund is a business trust organized under the laws of Ireland.

116.    Plaintiff PIMCO Funds: Global Investors Series plc, Diversified Income Fund is a Cayman Islands business trust.

117.    Plaintiff PIMCO Funds: Global Investors Series plc, EM Fundamental Index® StocksPLUS® Fund is a corporation existing under the laws of Ireland.

118.    Plaintiff PIMCO Funds: Global Investors Series plc, Emerging Local Bond Fund is a corporation existing under the laws of Ireland.

119.    Plaintiff PIMCO Funds: Global Investors Series plc, Emerging Markets Bond Fund is a corporation existing under the laws of Ireland.

120.    Plaintiff PIMCO Funds: Global Investors Series plc, Euro Bond Fund is a Cayman Islands business trust.

121.    Plaintiff PIMCO Funds: Global Investors Series plc, Euro Income Bond Fund is a corporation organized under the laws of Ireland.

122.    Plaintiff PIMCO Funds: Global Investors Series plc, Global Advantage Real Return Fund is a Cayman Islands business trust.

123.    Plaintiff PIMCO Funds: Global Investors Series plc, Global Bond Fund is a Cayman Islands business trust.

124.    Plaintiff PIMCO Funds: Global Investors Series plc, Global Investment Grade Credit Fund is a Cayman Islands business trust.

125.    Plaintiff PIMCO Funds: Global Investors Series plc, High Yield Bond Fund is a corporation existing under the laws of Ireland.

126.    Plaintiff PIMCO Funds: Global Investors Series plc, Income Fund is a corporation organized under the laws of Ireland.

127.    Plaintiff PIMCO Funds: Global Investors Series plc, Inflation Strategy Fund is a corporation existing under the laws of Ireland.

128.    Plaintiff PIMCO Funds: Global Investors Series plc, PIMCO Credit Absolute Return Fund is a Cayman Islands business trust.

129.    Plaintiff PIMCO Funds: Global Investors Series plc, PIMCO Dividend and Income Builder Fund is a corporation existing under the laws of Ireland.

130.    Plaintiff PIMCO Funds: Global Investors Series plc, StocksPLUS™ Fund is a Cayman Islands business trust.

131.    Plaintiff PIMCO Funds: Global Investors Series plc, Strategic Income Fund is a Cayman Islands business trust.

132.    Plaintiff PIMCO Funds: Global Investors Series plc, Total Return Bond Fund is a corporation organized under the laws of Ireland.

133.    Plaintiff PIMCO Funds: Global Investors Series plc, Unconstrained Bond Fund is a corporation organized under the laws of Ireland.

134.    Plaintiff PIMCO Funds: Global Investors Series plc, US Fundamental Index® StocksPLUS® Fund is a Cayman Islands business trust.

135.    Plaintiff PIMCO Funds: Global Investors Series plc, US Short-Term Fund is a corporation existing under the laws of Ireland.

136.    Plaintiff PIMCO Funds: PIMCO CommoditiesPLUS® Strategy Fund is a business trust existing under the laws of Massachusetts.

137.    Plaintiff PIMCO Funds: PIMCO Commodity Real Return Strategy Fund® is a Cayman Islands business trust.

138.    Plaintiff PIMCO Funds: PIMCO Credit Absolute Return Fund is a business trust existing under the laws of Massachusetts.

139.    Plaintiff PIMCO Funds: PIMCO Diversified Income Fund is a business trust existing under the laws of Massachusetts.

140.    Plaintiff PIMCO Funds: PIMCO EM Fundamental IndexPLUS® AR Strategy Fund is a business trust existing under the laws of Massachusetts.

141.    Plaintiff PIMCO Funds: PIMCO Emerging Local Bond Fund is a business trust existing under the laws of Massachusetts.

142.    Plaintiff PIMCO Funds: PIMCO Emerging Markets Bond Fund is a business trust existing under the laws of Massachusetts.

143.    Plaintiff PIMCO Funds: PIMCO Emerging Markets Currency Fund is a business trust existing under the laws of Massachusetts.

144.    Plaintiff PIMCO Funds: PIMCO EMG Intl Low Volatility RAFI®-PLUS AR Fund is a business trust existing under the laws of Massachusetts.

145.    Plaintiff PIMCO Funds: PIMCO Extended Duration Fund is a business trust existing under the laws of Massachusetts.

146.    Plaintiff PIMCO Funds: PIMCO Floating Income Fund is a business trust existing under the laws of Massachusetts.

147.    Plaintiff PIMCO Funds: PIMCO Foreign Bond Fund (U.S. Dollar-Hedged) is a business trust existing under the laws of Massachusetts.

148.    Plaintiff PIMCO Funds: PIMCO Foreign Bond Fund (Unhedged) is a business trust existing under the laws of Massachusetts.

149.    Plaintiff PIMCO Funds: PIMCO Fundamental Advantage Absolute Return Strategy Fund is a business trust existing under the laws of Massachusetts.

150.    Plaintiff PIMCO Funds: PIMCO Global Advantage® Strategy Bond Fund is a business trust existing under the laws of Massachusetts.

151.    Plaintiff PIMCO Funds: PIMCO Global Bond Fund (U.S. Dollar-Hedged) is a business trust existing under the laws of Massachusetts.

152.    Plaintiff PIMCO Funds: PIMCO Global Bond Fund (Unhedged) is a business trust existing under the laws of Massachusetts.

153.    Plaintiff PIMCO Funds: PIMCO Global Multi-Asset Fund is a business trust existing under the laws of Massachusetts.

154.    Plaintiff PIMCO Funds: PIMCO GNMA Fund is a business trust existing under the laws of Massachusetts.

155.    Plaintiff PIMCO Funds: PIMCO High Yield Fund is a business trust existing under the laws of Massachusetts.

156.    Plaintiff PIMCO Funds: PIMCO Income Fund is a business trust existing under the laws of Massachusetts.

157.    Plaintiff PIMCO Funds: PIMCO Inflation Response Multi-Asset Fund is a business trust existing under the laws of Massachusetts.

158.    Plaintiff PIMCO Funds: PIMCO International Fundamental IndexPLUS® AR Strategy Fund is a business trust existing under the laws of Massachusetts.

159.    Plaintiff PIMCO Funds: PIMCO International StocksPLUS® AR Strategy Fund (U.S. Dollar-Hedged) is a business trust existing under the laws of Massachusetts.

160.    Plaintiff PIMCO Funds: PIMCO International StocksPLUS® AR Strategy Fund (Unhedged) is a business trust existing under the laws of Massachusetts.

161.    Plaintiff PIMCO Funds: PIMCO Intl Low Volatility RAFI®-PLUS AR Fund is a business trust existing under the laws of Massachusetts.

162.    Plaintiff PIMCO Funds: PIMCO Investment Grade Corporate Bond Fund is a business trust existing under the laws of Massachusetts.

163.    Plaintiff PIMCO Funds: PIMCO Long Duration Total Return Fund is a Massachusetts business trust.

164.    Plaintiff PIMCO Funds: PIMCO Long-Term Credit Fund is a Massachusetts business trust.

165.    Plaintiff PIMCO Funds: PIMCO Long-Term U.S. Government Fund is a Massachusetts business trust.

166.    Plaintiff PIMCO Funds: PIMCO Low Duration Fund is a Massachusetts business trust.

167.    Plaintiff PIMCO Funds: PIMCO Low Duration Fund II is a Massachusetts business trust.

168.    Plaintiff PIMCO Funds: PIMCO Low Duration Fund III is a Massachusetts business trust.

169.    Plaintiff PIMCO Funds: PIMCO Low Volatility RAFI®-PLUS AR Fund is a Massachusetts business trust.

170.    Plaintiff PIMCO Funds: PIMCO Moderate Duration Fund is a Massachusetts business trust.

171.    Plaintiff PIMCO Funds: PIMCO Mortgage Opportunities Fund is a Massachusetts business trust.

172.    Plaintiff PIMCO Funds: PIMCO Mortgage-Backed Securities Fund is a Massachusetts business trust.

173.    Plaintiff PIMCO Funds: PIMCO Real Estate Real Return Strategy Fund is a Massachusetts business trust.

174.    Plaintiff PIMCO Funds: PIMCO Real Return Asset Fund is a Massachusetts business trust.

175.    Plaintiff PIMCO Funds: PIMCO Real Return Fund is a Massachusetts business trust.

176.    Plaintiff PIMCO Funds: PIMCO Short-Term Fund is a Massachusetts business trust.

177.    Plaintiff PIMCO Funds: PIMCO Small Cap StocksPLUS AR Strategy Fund is a Massachusetts business trust.

178.    Plaintiff PIMCO Funds: PIMCO Small Company Fundamental IndexPLUS® AR Strategy Fund is a business trust existing under the laws of Massachusetts.

179.    Plaintiff PIMCO Funds: PIMCO StocksPLUS® Absolute Return Fund is a Massachusetts business trust.

180.    Plaintiff PIMCO Funds: PIMCO StocksPLUS® AR Short Strategy Fund is a Massachusetts business trust.

181.    Plaintiff PIMCO Funds: PIMCO StocksPLUS® Fund is a Massachusetts business trust.

182.    Plaintiff PIMCO Funds: PIMCO StocksPLUS® Long Duration Fund is a Massachusetts business trust.

183.    Plaintiff PIMCO Funds: PIMCO Total Return Fund is a Massachusetts business trust.

184.    Plaintiff PIMCO Funds: PIMCO Total Return Fund II is a Massachusetts business trust.

185.    Plaintiff PIMCO Funds: PIMCO Total Return Fund III is a Massachusetts business trust.

186.     Plaintiff PIMCO Funds: PIMCO Total Return Fund IV is a Massachusetts business trust.

187.     Plaintiff PIMCO Funds: PIMCO Unconstrained Bond Fund is a Massachusetts business trust.

188.     Plaintiff PIMCO Funds: PIMCO Unconstrained Tax Managed Bond Fund is a Massachusetts business trust.

189.     Plaintiff PIMCO Funds: PIMCO Worldwide Fundamental Advantage AR Strategy Fund is a Massachusetts business trust.

190.     Plaintiff PIMCO Funds: Private Account Portfolio Series Asset-Backed Securities Portfolio is a Massachusetts business trust.

191.     Plaintiff PIMCO Funds: Private Account Portfolio Series Developing Local Markets Portfolio is a Massachusetts business trust.

192.     Plaintiff PIMCO Funds: Private Account Portfolio Series Emerging Markets Portfolio is a Massachusetts business trust.

193.     Plaintiff PIMCO Funds: Private Account Portfolio Series High Yield Portfolio is a Massachusetts business trust.

194.     Plaintiff PIMCO Funds: Private Account Portfolio Series International Portfolio is a Massachusetts business trust.

195.     Plaintiff PIMCO Funds: Private Account Portfolio Series Long Duration Corporate Bond Portfolio is a Massachusetts business trust.

196.     Plaintiff PIMCO Funds: Private Account Portfolio Series Mortgage Portfolio is a Massachusetts business trust.

197.    Plaintiff PIMCO Funds: Private Account Portfolio Series Real Return Portfolio is a Massachusetts business trust.

198.    Plaintiff PIMCO Funds: Private Account Portfolio Series Short-Term Portfolio is a Massachusetts business trust.

199.    Plaintiff PIMCO Funds: Private Account Portfolio Series U.S. Government Sector Portfolio is a Massachusetts business trust.

200.    Plaintiff PIMCO Global Credit Opportunity Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

201.    Plaintiff PIMCO Global Income Opportunities Fund is a trust existing under the laws of Canada.

202.    Plaintiff PIMCO Global StocksPLUS & Income Fund is a Massachusetts business trust.

203.    Plaintiff PIMCO High Income Fund is a Massachusetts business trust.

204.    Plaintiff PIMCO Income Opportunity Fund is a Massachusetts business trust.

205.    Plaintiff PIMCO Income Strategy Fund is a Massachusetts business trust.

206.    Plaintiff PIMCO Income Strategy Fund II is a Massachusetts business trust.

207.    Plaintiff PIMCO Large Cap StocksPLUS Absolute Return Fund is a Delaware business trust.

208.    Plaintiff PIMCO Multi-Sector Strategy Fund Ltd. is a Cayman Islands Exempted Company.

209.    Plaintiff PIMCO Offshore Funds - PIMCO Absolute Return Strategy IV eFund is a Cayman Islands business trust.

210.    Plaintiff PIMCO Offshore Funds: PIMCO Offshore Funds - PIMCO Absolute Return Strategy V Alpha Fund is a Cayman Islands business trust.

211.    Plaintiff PIMCO Real Return Strategy Fund is a business trust existing under the laws of Massachusetts.

212.    Plaintiff PIMCO Strategic Income Fund, Inc. is a corporation existing under the laws of Maryland.

213.    Plaintiff PIMCO Tactical Opportunities Master Fund Ltd. is a limited partnership existing under the laws of the Cayman Islands.

214.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Commodity Real Return Strategy Portfolio is a Cayman Islands Exempted Company.

215.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Emerging Markets Bond Portfolio is a Delaware business trust.

216.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Foreign Bond Portfolio (U.S. Dollar Hedged) is a Delaware business trust.

217.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Foreign Bond Portfolio (Unhedged) is a Delaware business trust.

218.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Global Advantage Strategy Bond Portfolio is a Delaware business trust.

219.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Global Bond Portfolio (Unhedged) is a Delaware business trust.

220.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Global Multi-Asset Managed Allocation Portfolio is a Delaware business trust.

221.     Plaintiff PIMCO Variable Insurance Trust: PIMCO Global Multi-Asset Managed Volatility Portfolio is a Delaware business trust.

222.     Plaintiff PIMCO Variable Insurance Trust: PIMCO High Yield Portfolio is a Delaware business trust.

223.     Plaintiff PIMCO Variable Insurance Trust: PIMCO Long Term U.S. Government Portfolio is a Delaware business trust.

224.     Plaintiff PIMCO Variable Insurance Trust: PIMCO Low Duration Portfolio is a Delaware business trust.

225.     Plaintiff PIMCO Variable Insurance Trust: PIMCO Real Return Portfolio is a Delaware business trust.

226.     Plaintiff PIMCO Variable Insurance Trust: PIMCO Short-Term Portfolio is a Delaware business trust.

227.     Plaintiff PIMCO Variable Insurance Trust: PIMCO Total Return Portfolio is a Delaware business trust.

228.     Plaintiff PIMCO Variable Insurance Trust: PIMCO Unconstrained Bond Portfolio is a Delaware business trust.

229.     Plaintiff Terlingua Fund 2, LP is a Delaware limited partnership.

### 7.     **Prudential**

230.     The following plaintiffs are collectively referred to as "Prudential."

231.     Plaintiff Prudential Bank & Trust, FSB ("PB&T"), is a federally chartered bank with its principal place of business at 280 Trumbull Street, Hartford, Connecticut 06103. PB&T is a subsidiary of Prudential IBH Holdco., Inc., and ultimately Prudential Financial, Inc.

232.    Plaintiff Prudential Retirement Insurance and Annuity Company ("PRIAC") is an insurance company formed under the laws of Connecticut, with its principal place of business in Hartford, Connecticut.   PRIAC is a wholly owned subsidiary of The Prudential Insurance Company of America, which is owned by Prudential Holdings, LLC, and ultimately by Prudential Financial, Inc.   PRIAC established and maintains the following open-end, commingled, insurance company separate accounts: Western Asset: Enhanced Cash, Wellington: Investment Grade Fixed Income, the Core Plus Bond Fund / REAMS Fund, Core Plus Bond Pimco Fund, High Grade Bond Fund / GSAM Fund, North Carolina Fixed Income Fund - JP Morgan Chase and Union Carbide I (collectively, the "Separate Accounts").

233.    Plaintiff Prudential Trust Company ("PTC") is a corporation formed under the laws of Pennsylvania, with its principal place of business in Scranton, Pennsylvania.  PTC is a wholly owned subsidiary of Prudential Investment Management, and ultimately Prudential Financial, Inc.  PTC serves as Trustee for the Institutional Core Plus Bond Fund of the Prudential Company Master Commingled Investment Fund for Tax Exempt Trusts, the Institutional Core Bond Fund of the Prudential Trust Company Master Commingled Investment Fund for Tax Exempt Trusts, and the Prudential Merged Retirement Plan.

234.    Plaintiff The Gibraltar Life Insurance Company, Ltd. ("Gibraltar") is a life insurance company formed under the laws of Japan, with its principal place of business at Prudential Tower 2-13-10, Nagatacho, Chiyoda-ku, Tokyo, Japan 100-0014.   Gibraltar is a wholly owned subsidiary of Prudential Holdings of Japan, Inc., and ultimately Prudential Financial, Inc.

235.    Plaintiff The Prudential Insurance Company of America ("Prudential Insurance") is an insurance company formed under the laws of, and domiciled in, the State of New Jersey,

with its principal place of business at 751 Broad Street, Newark, New Jersey.  Prudential insurance is a wholly owned subsidiary of Prudential Holdings, LLC, which is a Delaware limited liability company.  Prudential Holdings, LLC is a wholly owned subsidiary of Prudential Financial, Inc.

236.    Plaintiff The Prudential Investment Portfolios 2 ("PIP 2"), formerly known as the Dryden Investment Fund, is a Delaware statutory trust with a principal place of business in Newark, New Jersey.  PIP2 is an open-ended management investment company registered with the Securities and Exchange Commission.  PIP 2 is comprised of two series funds, including the Prudential Core Short-Term Bond Fund.

237.    Plaintiff The Prudential Investment Portfolios 9 ("PIP 9"), formerly known as the Dryden Large-Cap Core Equity, is a Delaware statutory trust with a principal place of business in Newark, New Jersey.  PIP 9 is an open-ended management investment company registered with the Securities and Exchange Commission.  PIP 9 is comprised of three series funds, including the Prudential Absolute Return Bond Fund.

238.    Plaintiff The Prudential Investment Portfolios Inc. is a Maryland Corporation with a principal place of business at Gateway Center Three, 100 Mulberry Street, Newark, New Jersey 07102.  It is an open-end management investment company registered with the Securities and Exchange Commission ("SEC").  It consists of six series, including the Prudential Asset Allocation Fund.

239.    Plaintiff The Prudential Investment Portfolios, Inc. 17 ("PIP 17"), formerly known as Prudential Total Return Bond Fund, Inc., is a Maryland Corporation with a principal place of business in Newark, New Jersey.  It is an open-ended management investment company registered with the Securities and Exchange Commission.  PIP 17 consists of two series funds,

including the Prudential Total Return Bond Fund.  PIP 17, through the Prudential Total Return Bond Fund, is a Certificateholder in the Trusts identified in Exhibit 1 attached hereto.

240.    Plaintiff The Prudential Series Fund ("PSF"), formerly known as Prudential Series Fund, Inc., is an unincorporated Delaware statutory trust with a principal place of business at Gateway Center Three, 100 Mulberry Street, Newark, New Jersey.  PSF is an open-end management investment company registered with the Securities and Exchange Commission. PSF consists of eighteen series funds, including The Prudential Series Fund-Conservative Balanced Portfolio, The Prudential Series Fund-Diversified Bond Portfolio, The Prudential Series Fund-High Yield Portfolio and The Prudential Series Fund-Flexible Managed Portfolio. PSF, through The Prudential Series Fund-Conservative Balanced Portfolio, The Prudential Series Fund-Diversified Bond Portfolio, The Prudential Series Fund-High Yield Portfolio and The Prudential Series Fund-Flexible Managed Portfolio.

### 8.    Sealink

241.    Plaintiff Sealink is a company incorporated under the laws of Ireland with the registered address of Sealink Funding Limited, Fourth Floor, 3 George's Dock, IFSC, Dublin 1, Ireland.

### 9.    TIAA

242.    The following plaintiffs are collectively referred to as "TIAA."

243.    Plaintiff CREF Bond Market Account is a Delaware mutual fund with its principal place of business in the State of New York.

244.    Plaintiff CREF Social Choice Account is a New York investment company with its principal place of business in the State of New York.

245.    Plaintiff TIAA Global Public Investments, MBS LLC, a wholly owned subsidiary of TIAA-CREF Life Insurance Company, is a Delaware limited liability company with its principal place of business in the State of New York.

246.    Plaintiff TIAA-CREF Bond Fund is a Delaware mutual fund with its principal place of business in the State of New York.

247.    Plaintiff TIAA-CREF Bond Plus Fund is a Delaware mutual fund with its principal place of business in the State of New York.

248.    Plaintiff TIAA-CREF Life Bond Fund is a Delaware mutual fund with its principal place of business in the State of New York.

249.    Plaintiff TIAA-CREF Life Insurance Company is a direct wholly-owned subsidiary of Teachers Life Insurance and Annuity Association of America, a legal reserve life insurance company established under the insurance laws of the State of New York.  Through its separate accounts (General Pension Act.; TIAA Stable Value; TIAA-CREF Life Ins. GFA; General Acct PA; T-C Life Ins. PA; TIAA Stable Return Annuity), TIAA-CREF Life Insurance Company is a Certificateholder in the Trusts identified in Exhibit 1 attached hereto.  TIAA-CREF Life Insurance Company, through its managed accounts, has been a Certificateholder of these Trusts at the time of the transactions of which it complaints, or interests therein devolved upon it by operation of law in accordance with New York General Obligations Law § 13-107.

250.    Plaintiff TIAA-CREF Short-Term Bond Fund is a Delaware mutual fund with its principal place of business in the State of New York.

**B.      Defendants**

   **1.      U.S. Bank National Association**

251.    Defendant U.S. Bank is a national banking association organized and existing under the laws of the United States.  U.S. Bank's principal place of business and principal place

of trust administration is located in Minneapolis, Minnesota.  As of December 31, 2013, U.S. Bank's corporate parent, U.S. Bancorp., was the fifth largest commercial bank in the United States based on assets and the fourth largest in total branches.  U.S. Bank is U.S. Bancorp's second largest subsidiary.  U.S. Bank does business in and maintains offices in New York, including a corporate trust office at 100 Wall Street, New York, New York 10005.

252.    U.S. Bank, together with its affiliates, is involved in all aspects of the private-label RMBS market.  U.S. Bank currently administers as trustee more than $3 trillion in assets, including RMBS and operates 50 corporate trust offices across the country.  U.S. Bank currently serves as trustee for thousands of RMBS trusts with assets of over $1 trillion in original face value and is trustee for approximately 30% of all RMBS issued between 2004 and 2007.

253.    Additionally, U.S. Bank, together with its subsidiary, U.S. Bank Home Mortgage, Inc., serve as master servicers of residential mortgage loans, performing master servicing functions in two locations: Bloomington, Minnesota and Chicago, Illinois.  U.S. Bank's master servicing portfolio includes approximately 45,700 loans with an unpaid principal balance of approximately $6 billion as of January 2014.

254.    U.S. Bank Home Mortgage, Inc. has acted as a mortgage loan seller, selling over $400 million of loans in RMBS deals issued between 2004 and 2007.

## 2.    The Nominal Defendant Trusts

255.    Each Trust is named herein as a nominal defendant.  Each of the Trusts is a New York common law trust established under its respective PSA, or a Delaware statutory trust established under its respective Indenture and Sale Servicing Agreement ("SSA").  All of the Trusts are governed by the substantive laws of the state of New York, and are subject to the Trust

Indenture Act of 1939 (15 U.S.C. § 77aaa, *et seq.*) ("TIA").   The PSAs and the SSAs are collectively referred to herein as the "Governing Agreements."[3]

## III.   OVERVIEW OF THE TRUSTS

256.    The Trusts in this action, identified in the attached Exhibit 1, are 826 New York common law trusts and 17 Delaware statutory trusts, resulting from non-agency residential mortgage-backed securitizations issued between 2004 and 2008, inclusive.   The Trusts have a total original principal balance of approximately $778.6 billion, and a current principal balance of approximately $165 billion as of November 1, 2014.   To date, the Trusts have suffered total realized collateral losses of $98 billion.   As a result of defective mortgage collateral and servicer violations, the Trusts have incurred and will incur substantial losses.

257.    The Trusts have a high concentration of loans originated by eight lenders; specifically, Wells Fargo Bank ("Wells Fargo") (and affiliates), Washington Mutual Bank ("WaMu") (and related affiliates), Countrywide Financial Corporation ("Countrywide") (and affiliates), GreenPoint Mortgage ("GreenPoint"), IndyMac Bank, FSB ("IndyMac"), Option One Mortgage Corporation ("Option One"), Argent Mortgage Company ("Argent"), and New Century Mortgage Corp. ("New Century").   These lenders collectively originated nearly $339 billion in loans, representing approximately 43% of the total original face value of the mortgage loans in the Trusts.

---

[3] The Trusts' Governing Agreements set forth U.S. Bank's duties as trustee.   Over 90% of the Trusts are governed by an agreement styled as a PSA and certain related agreements that the PSA references and incorporates.   The remaining Trusts are governed by a document styled as an Indenture and certain related agreements that the Indenture references and incorporates, including the Sales and Servicing Agreement.   The Governing Agreements are all substantially similar, and generally impose the same duties on U.S. Bank as Trustee to the Trusts and Certificateholders.   Accordingly, this Amended Complaint primarily refers to the PSAs when discussing the Trustee's contractual obligations.

258.    A significant portion of the Trusts were sponsored by ten entities.  Specifically, $569.4 billion in loans were sold to the Trusts by Lehman, Credit Suisse, WaMu, Goldman Sachs, Banc of America, UBS, Merrill Lynch, Bear Stearns, RBS, C-BASS and Morgan Stanley, representing approximately 73% of the total original face value of the mortgage loans in the Trusts.

259.    An overwhelming majority of the Trusts' loans are serviced by three entities.  Specifically, $584.8 billion in loans are serviced by Wells Fargo, Aurora Loan Services, Inc. ("Aurora"), and WaMu, representing approximately 75% of the total original face value of the mortgage loans in the Trusts.

## IV.    JURISDICTION AND VENUE

260.    This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 for violations of the Trust Indenture Act of 1939 ("TIA"), and supplemental jurisdiction over the remaining claims.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1332(d).

261.    Venue is proper in this District under 28 U.S.C. §1391(b).

## V.    COMPLIANCE WITH THE NO ACTION CLAUSE IS EXCUSED

262.    Compliance with the pre-suit requirements of the Trusts' "no action" clause is excused.  For nearly all of the Trusts, the no action clause in the PSA identifies U.S. Bank, as Trustee, as the sole notice party.  If the no action clause's pre-suit requirements for these Trusts were to apply, they would require Plaintiffs to demand that U.S. Bank initiate proceedings against itself and to indemnify U.S. Bank for its own liability to the Trusts, an "absurd" requirement that the parties did not intend.  *See Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992).

-35-

263.    The no action clause for most of the remaining Trusts identifies Wells Fargo, in its capacity as either Trust Administrator, Securities Administrator or Master Servicer, as a notice party.  For these Trusts, it would be similarly absurd for Plaintiffs to demand that Wells Fargo bring the instant suit against U.S. Bank because Wells Fargo also suffers from disabling conflicts, and compliance with such a demand would require Wells Fargo to admit its own wrongdoing.  In connection with these Trusts, Wells Fargo, in its capacity as Master Servicer or primary servicer, defaulted and continues to default on its obligations to the Trusts and has harmed trust beneficiaries by failing to observe and perform covenants and agreements set forth in the PSAs, including by unreasonably refusing to provide notice of seller breaches of representations and warranties, requiring the sellers to perform their repurchase obligations and to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers.  Consequently, it would be absurd to demand that Wells Fargo bring claims against U.S. Bank in connection with these Trusts because doing so would require Wells Fargo to allege and prove its own misconduct and liability to the Trusts and may invoke Wells Fargo's indemnity obligations to the Trustee.  Likewise, it would be absurd and contravene the parties' intentions to require Plaintiffs to indemnify Wells Fargo against the costs, expenses, and liabilities incurred in a suit against U.S. Bank.  Moreover, Wells Fargo receives a direct financial benefit from not suing U.S. Bank, because any suit by Wells Fargo against U.S. Bank would expose Wells Fargo's own defaults as Master Servicer or primary servicer, would lead to its termination as servicer to the Trust and loss of servicing fees. The suit would also interfere with Wells Fargo's business relationships with U.S. Bank, including billions of dollars in servicing fees annually from U.S. Bank.  For example, Wells Fargo serves

as Master Servicer to over 566 RMBS trusts issued between 2004 and 2007 with an original face

value of over $484.2 for which U.S. Bank serves as trustee.

## VI.    DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

264.    Plaintiffs bring the claims set forth below derivatively in the right of the Trustee

and on behalf of the Trusts.  Plaintiffs have the right to bring this suit derivatively under New

York law.  All of Plaintiffs' claims relate to U.S. Bank's breach of common duties owed to the

Trusts and Certificateholders through its mismanagement of the Trusts and its failure and

unreasonable refusal to act in the best interests of the Trusts, including enforcing the Trusts'

rights against those who have harmed the Trusts.  This is a concern common to all holders of

interests in the Trusts, not just Plaintiffs, because all of the Certificateholders are paid from the

cash flow generated by the same pool of mortgages in the Trusts.  Accordingly, Plaintiffs' claims

concern a purported injury to the Trusts as a whole, and any injury sustained by the

Certificateholders is indirect and based only on their ownership of interests in the Trusts.  *See*

*Dallas Cowboys Football Club, Ltd. v. Nat'l Football League Trust*, No. 95 Civ. 9426, 1996 WL

601705, at *2-4 (S.D.N.Y. Oct. 18, 1996).

265.    The terms of the PSAs are consistent with asserting the claims derivatively, as

they specifically provide as follows:

> no one or more Holders of Certificates shall have any right in any manner
> whatever by virtue or by availing itself or themselves of any provisions of this
> Agreement to affect, disturb or prejudice the rights of the Holders of any other of
> the Certificates, or to obtain or seek to obtain priority over or preference to any
> other such Holder or to enforce any right under this Agreement, except in the
> manner herein provided *and for the common benefit of all Certificateholders*.

PSA § 12.07 (emphasis added).

266.    This is not a collusive action to confer jurisdiction on this Court which it would

not otherwise have.

267.    Plaintiffs are Certificateholders and have been beneficial owners of RMBS in each of the Trusts during all or a large portion of U.S. Bank's wrongful course of conduct alleged herein.  Moreover, by operation of law, under New York General Obligations Law §13-107, the transfer of ownership in the certificates vested in the Plaintiffs all claims or demands of the transferors of the certificates.

268.    Plaintiffs will adequately and fairly represent the interests of the Trusts and their investors in enforcing and prosecuting the rights that form the subject matter of this action.  At all relevant times, Plaintiffs have acted equitably and in good faith, without any ulterior motive, and in the belief that the Certificateholders are entitled to the relief sought on their behalf.

269.    As set forth below, Plaintiffs have not made a demand on U.S. Bank or Wells Fargo to institute this action because such demand would be futile.

270.    Any demand on U.S. Bank to institute this action would be futile because the wrongful acts alleged herein were committed by U.S. Bank and U.S. Bank would not agree to sue itself, particularly since it faces claims for losses by the Trusts in excess of $90 billion.  In addition, since U.S. Bank itself committed the wrongdoing complained of herein, and is accused of negligent and willful misconduct, it therefore is not disinterested and lacks independence to exercise business judgment.  Moreover, U.S. Bank has benefitted from, and continues to benefit from, its wrongdoing as alleged herein, (i.e., its failure to act in the best interest of the Trusts and Certificateholders), as U.S. Bank has maintained and preserved its business relationships with the Sellers and Servicers and thereby continues to derive financial benefits from serving as Trustee to Trusts, and many other RMBS trusts, due to its continuing wrongdoing as alleged herein.

271.     Any demand on Wells Fargo to institute this action on behalf of the remaining Trusts in which it is identified as a notice party under the PSAs' no action clause also would be futile because, as alleged above, Wells Fargo committed wrongdoing in its capacity as Master Servicer or servicer, has liability to the Trusts and any suit brought by Wells Fargo on behalf of the Trusts would implicate certain indemnity obligations owed to U.S. Bank.  Wells Fargo also has benefitted from, and continues to benefit from, its wrongdoing as alleged herein as it continues to derive financial benefits from serving as Master Servicer or servicer to the Trusts and to many other RMBS trusts for which U.S. Bank acts as Trustee due to Wells Fargo's continuing wrongdoing as alleged herein.  Accordingly, Wells Fargo is not disinterested and lacks independence to exercise business judgment.

## VII.    BACKGROUND – THE TRUSTEE'S ROLE AS GATEKEEPER IN THE SECURITIZATION PROCESS

272.     RMBS provide investors with an interest in the income generated by one or more designated pools of residential mortgages.  The actual securities themselves represent an interest in an "issuing trust" that holds the designated mortgage pools.  The corpus of the trust – like the Trusts at issue here – consists entirely of the underlying mortgage loans.

273.     The TIA requires that a trustee be appointed for all bond issues over $10 million so that the rights of investors are not compromised.  In an RMBS transaction, the "issuer" appoints the trustee, which is the only independent party to the PSAs.  Accordingly, the trustee serves the critical role of an independent party with access to all relevant information, including the mortgage loan files. Investors reasonably understand that the trustee is under an affirmative duty to take action to protect the interests of the trusts and their beneficiaries, the certificateholders.  As part of the RMBS transaction, the trustee is assigned "all right, title and interest" in the underlying mortgage loans.  The PSAs require the trustee, or its agent, to take

physical possession of the mortgage loans, ensure that each mortgage loan was properly conveyed and certify that the documentation for each loan was accurate and complete.

274.    The trustee is contractually responsible for the transactions of the "issuing trust." The trustee is responsible for administering the trust for the benefit of investors, including guaranteeing that the transactions are administered in accordance with the related documentation, following compliance and performance-related matters and handling cash and information processing for the investors.  The trustee must work closely with the issuer and servicer to protect the welfare of the trust.  In contrast to the roles of issuer or servicer, which can be combined, the trustee's sole purpose is to represent the investor and, therefore, the trustee must be an independent entity without any conflicts-of-interest.  The PSAs contractually obligate the trustee to oversee and manage the servicer, including granting the trustee the power to replace the service for its failure to act in accordance with the servicer's contractual obligations.

275.    Although the structure and underlying collateral of the mortgages may vary from trust to trust, RMBS trusts all function similarly: the cash flow from interest and principal payments is passed through to the trust and distributed to certificateholders in the order laid out in the securitization agreements, commonly referred to as the "waterfall."  The essential duties and responsibilities of the trustee are identical in all RMBS transactions – namely to represent the trusts and their investors as an independent third party.  Between 2003 and 2009, private-label RMBS offerings totaled more than $3 trillion.  Yet, only a handful of major American financial institutions served as RMBS trustees and contractually agreed to perform the vitally important gatekeeping functions to protect certificateholders.  Among this handful of major RMBS trustees, U.S. Bank held the second largest market share during this period.



276.   U.S. Bank is currently the largest RMBS trustee in the United States.   In December 2010, U.S. Bank completed its acquisition of Bank of America National Association's ("BANA") securitization trust business.   In turn, BANA was, by merger in 2008, the successor-in-interest to LaSalle National Association ("LaSalle"), which was the original trustee for certain Trusts.[4]   U.S. Bank succeeded BANA as trustee of these and other trusts when it acquired BANA's securitization trust business in 2010.   U.S. Bank, however, recognized the enormous trustee liability imposed under the PSAs as successor to BANA and LaSalle and expressly attempted to avoid assuming such liability in its transaction with BANA.   And, despite its knowledge of breaches of representations and warranties and servicing violations and BANA's

---

[4] As set forth in Section 8.08 of the PSAs, the duties of the original trustee pass to any successor trustee: "Any successor trustee appointed . . . shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as Trustee or Delaware Trustee herein."

failure to enforce the Trusts' rights, U.S. Bank did nothing to pursue valuable claims against BANA, as former trustee, or against the sellers and other responsible parties.

277.    The process of securitizing mortgages into RMBS involves a number of steps, each of which is critical to finalize the securitization and sell the RMBS to investors.  First, a sponsor creates a loan pool from mortgages it originated and purchased from other financial institutions.  The sponsor has the right to require the seller to repurchase or replace loans that do not meet represented quality standards after purchasing a mortgage pool.

278.    Second, the sponsor transfers the loans to a "depositor," typically a bankruptcy-remote entity setup by the sponsor, which segments the cash flows and risks in the loan pool among different levels of investment or "tranches."  Generally, cash flows from the loan pool are applied in order of seniority, going first to the most senior tranches.  In addition, any losses to the loan pool due to defaults, delinquencies, foreclosure or otherwise, are applied in reverse order of seniority, and are generally applied first to the most junior tranches.

279.    Third, the depositor transfers the mortgage pool to the issuing trust so that it can be used as collateral for RMBS that will be issued and sold to investors. The depositor then passes the RMBS to the underwriters, for sale to investors in exchange for payment.

280.    The servicer is appointed by the sponsor and is a party to the PSAs.  The servicer is often an affiliate of the sponsor or an originator of a substantial portion of the loans in the trust.  The servicer collects payments from the underlying borrowers.  After collection, the servicer sends the funds to the trustee, which then makes payments to the certificateholders.  Mortgage defaults reduce the available principal and interest payments to be paid to the trust and passed through to investors.  Mortgage delinquencies similarly reduce the available principal and interest to be paid to the trust and distributed to investors.

281.    Accordingly, if an underlying borrower does not timely make the required payments to the servicer, the servicer may have to take action to mitigate or minimize the losses to the trust, including foreclosing on the property and providing property maintenance to maximize the return on the investment to the trust and its beneficial owners – the certificateholders.  Foreclosures result in higher losses to the trust (and therefore to the RMBS investors) if the value of the collateral is lower than anticipated.  For these reasons, proper loan origination and underwriting of the mortgages underlying the RMBS, and proper and timely loan servicing and oversight are essential to the quality of the RMBS and the timely receipt of principal and interest payments to the trust for distribution to the certificateholders.

## VIII.    U.S. BANK'S CONTRACTUAL OBLIGATIONS

282.    The Trusts and Certificateholders' rights and U.S. Bank's contractual duties, as Trustee for the Trusts at issue in this action are set forth in the relevant securitization agreements, which include Mortgage Loan Purchase and Sale Agreements ("MLPAs") (or similar documents) and the Governing Agreements.

283.    Although the Governing Agreements for each of the Trusts are separate agreements that were individually negotiated and differ slightly in certain respects, the terms that are pertinent to the subject matter of this Complaint are substantially similar, if not identical, in all of the Governing Agreements and impose substantially the same, if not identical, duties and obligations on the parties to the Governing Agreements.

### A.    The Mortgage Loan Purchase And Sale Agreement

284.    The MLPA is a contract between either the originator and the sponsor, or the sponsor and the depositor.  The MLPA governs the terms of the sale of the mortgage loans acquired for securitization.  In its capacity as "seller" under the MLPA, the originator or sponsor

makes extensive representations and warranties concerning the characteristics, quality, and risk profile of the mortgage loans.

285.    The seller's typical representations and warranties in the MLPAs include, *inter alia*, the following: (i) the information in the mortgage loan schedule is true and correct in all material respects; (ii) each loan complies in all material respects with all applicable local, state and federal laws and regulations at the time it was made; (iii) the mortgaged properties are lawfully occupied as the principal residences of the borrowers unless specifically identified otherwise; (iv) the borrower for each loan is in good standing and not in default; (v) no loan has a LTV ratio of more than 100%; (vi) each mortgaged property was the subject of a valid appraisal; and (vii) each loan was originated in accordance with the underwriting guidelines of the related originator.  To the extent mortgages breach the seller's representations and warranties, the mortgage loans are worth less and are much riskier than represented.

286.    Under the MLPAs, upon discovery or receipt of notice of any breach of the seller's representations and warranties that has a material and adverse effect on the value of the mortgage loans in the Trusts or the interests of the Certificateholders therein, the seller is obligated to cure the breach in all material respects.  The MLPAs do not specify what constitutes "discovery" of a breach or what evidence must be presented to the seller in providing notice of a breach.

287.    If a breach is not cured within a specified period of time, the seller is obligated to either substitute the defective loan with a loan of adequate credit quality, or repurchase the defective loan at a specified purchase price (the "Repurchase Price") equal to the outstanding principal balance and all accrued but unpaid interest on the loan to be paid to the Trust.  For breaches related to a mortgage loan or acquired property already sold from the Trust (for

example, as a result of foreclosure), the seller must pay to the Trust the amount of the Repurchase Price that exceeds the net liquidation proceeds received upon the sale of the mortgage loan or acquired property.

288.    The MLPA's repurchase provisions ensure that the Trust need not continue to hold mortgage loans for which the seller breached its representations and warranties. Thus, the repurchase provisions transfer from the Trusts to the sellers the risk of any decline, or further decline, in the value of those mortgage loans.

289.    Under the MLPAs, the demanding party must merely show that the breach has a material and adverse effect on the value of the mortgage loans in the Trusts or the interests of the Certificateholders in the loans.  The seller's cure, substitute and repurchase obligations do not require any showing that the seller's breach of representations caused any realized loss in the related mortgage loan in the form of default or foreclosure, or that the demanding party prove reliance on servicing and origination documents.

290.    Upon the sale of the mortgage loans to the Trust, the rights under MLPAs, including the sellers' representations and warranties concerning the mortgage loans, were assigned to U.S. Bank, as Trustee for the benefit of the Trust and all the Certificateholders, in accordance with the PSAs.

### B.    The Pooling And Servicing Agreements

291.    The PSAs are contracts between, among others, the depositor, the servicer, and U.S. Bank, as Trustee, which govern the Trusts that issued certificates.  Plaintiffs, as investors in the Trusts, are third party beneficiaries of the PSAs.

292.    The PSAs for each of the Trusts are substantially similar and memorialize (i) the transfer and conveyance of the mortgage loans from the depositor to the Trust; (ii) the Trusts'

issuance of beneficial certificates of interests in the Trusts to raise the funds to pay the depositor for the mortgage loans; and (iii) the terms of those certificates.

### 1.   U.S. Bank's Duties And Obligations Under The PSAs

293.   The PSAs set forth U.S. Bank's contractual duties and obligations, which are substantially similar for each Trust governed by a PSA.  Further, upon information and belief, U.S. Bank employed the same general set of policies and procedures to oversee and manage the Trusts regardless of variations among the PSAs.

294.   Most importantly, each of the PSAs requires that U.S. Bank acquire and protect the trust corpus for the benefit of Certificateholders.[5]

295.   The PSAs also require U.S. Bank to oversee and enforce the sellers' and the servicers' obligations.  In performing these contractual obligations, U.S. Bank is required to act in the best interests of and for the protection of the Trusts and their Certificateholders. Certificateholders, unlike the trustee, have no direct contact with the sellers and servicers and have no ability to influence or examine the servicers' decisions.  Moreover, under the PSAs, Certificateholders do not have the right to directly enforce the responsible party's representations and warranties, or the servicers' duties, absent satisfaction of the collective action provisions. Thus, Certificateholders must rely on U.S. Bank to protect their interests.

296.   The PSAs require the depositor to deliver to and deposit with, or cause to be delivered to and deposited with, U.S. Bank, the mortgage files, which must at all times be identified in the records of U.S. Bank as being held by or on behalf of the Trust.  Furthermore, the PSAs require U.S. Bank to acknowledge receipt of the mortgage files on behalf of the Trust

---

[5] This duty typically is expressed in Section 2.2 of the PSAs.

and to acknowledge that all mortgage pool assets, mortgage files and related documents and property held by it at any time are held by it as trustee of the Trust.

297.    Once the mortgage files are in U.S. Bank's possession, the PSAs require U.S. Bank to ensure that the underlying mortgage loans were properly conveyed to the Trusts, and that the Trusts have perfected enforceable title to the mortgage loans by reviewing the mortgage files for each of the mortgage loans.  U.S. Bank is required to review each mortgage file within a certain time period after the "Closing Date" and deliver to the depositor a certification that all documents required have been executed and received.

298.    If U.S. Bank identifies any defect in a mortgage loan file for an underlying mortgage loan contained in a Trust, U.S. Bank must promptly notify either the servicer or depositor, and that party shall promptly notify the applicable seller of the defect and take appropriate steps on behalf of the Trust to enforce such seller's obligation to correct or cure the defect or repurchase or substitute such mortgage loan.

### a)    Duty To Provide Notice Of Breaches And To Enforce Putback Rights

299.    Under the PSAs, U.S. Bank is entrusted to ensure that mortgage loans in the Trusts were properly underwritten, were of a certain risk profile, and had characteristics of a certain quality as represented by the sellers in the MLPAs.  The Trusts were assigned all of the rights under the MLPAs pertaining to the mortgage loans, including the right to put back loans that breached the sellers' representations and warranties.

300.    To protect the Trusts and all Certificateholders, the PSAs require U.S. Bank to give prompt written notice to all parties to the PSA upon its discovery of a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Certificateholders in any

loan, and to take such action as may be necessary or appropriate to enforce the rights of the Trusts with respect to the breach.[6]

### b)     Duties Regarding The Servicers

301.    Under the PSAs, U.S. Bank, as Trustee, has certain duties with respect to enforcing the obligations of the servicers, whose authority and responsibilities are delegated by U.S. Bank.  In particular, the PSAs set forth U.S. Bank's obligations upon occurrence of an "Event of Default," which is defined as a specified failure of the servicer to perform its servicing duties and cure this failure within a specified time period.  The PSAs identify several types of failures by the servicer that may give rise to an Event of Default.  Such failures include, breach of servicer representations and warranties and failure to observe or perform in any material respect any other covenants or agreements, which continues unremedied for no more than thirty to sixty days after written notice of such failure shall have been given to the servicer by the trustee requiring the same to be remedied, or knowledge of such failure by a "Servicing Officer" of the servicer, whichever is earlier.[7]

302.    The remedies for uncured servicer Events of Default include termination of the servicer and reimbursement for trust assets lost as a result of the servicers' violations.  As detailed herein, U.S. Bank did not perform its duties to monitor the servicers and did not initiate any action against the servicers for the benefit of the Trusts and Certificateholders.

### c)     Duties Upon Knowledge Of An Event Of Default

303.    The PSAs impose additional obligations upon U.S. Bank once a responsible officer of U.S. Bank has knowledge of the occurrence of an Event of Default.  *First*, U.S. Bank

---

[6] With modest variation among the PSAs, this duty typically is expressed in Sections 2.3 and 2.8 of the PSAs.

[7] These duties are typically expressed in Section 7 of the PSAs.

must give written notice to the relevant servicer of the occurrence of such an event within the specified time period after U.S. Bank obtains knowledge of the occurrence.  **Second**, within sixty to ninety days after the occurrence of any Event of Default, U.S. Bank is required to provide written notice to all Certificateholders of the Event of Default, unless the Event of Default has been cured or waived.  **Third**, and most importantly, the PSAs require U.S. Bank to exercise the rights and powers vested in it by the PSA using "the same degree of care and skill . . . as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs."[8]

304.    U.S. Bank's failure to give notice to the servicers of an Event of Default does not prevent the triggering of an Event of Default should U.S. Bank's failure result from its own negligence or willful misconduct.

### 2.    The Servicers' Duties And Obligations Under The PSAs

305.    The PSAs also establish the servicers' duties and obligations to the Trusts and all Certificateholders.  In essence, the servicers' contractual role is to manage the mortgage loans for the benefit of the Trust and its Certificateholders.[9]

### a)    Duty To Provide Notice Of Breaches And To Enforce Putback Rights

306.    The PSAs require the servicers to notify all parties to the PSAs if the servicers discover a breach of any of the seller's representations and warranties that adversely and materially affects the value of the mortgage loan or the interests of the Trusts.   The PSAs

---

[8] This duty is typically expressed in Section 8.1 of the PSAs.

[9] The servicer duties described below are generally found in Section 3 of the PSAs.

generally require the servicers, on behalf of the Trusts, to enforce the sellers' obligation to repurchase, substitute, or cure such defective mortgage loans or mortgage loan files.

307.    The servicers are greatly disincentivized to enforce these contractual duties related to the sellers' repurchase obligations.  The servicer is selected by the sponsor, and therefore risks losing future business and becoming adverse to the seller if it vigilantly enforces the seller's repurchase obligations.  Additionally, the servicers often are affiliates of the sellers because in connection with the sale of a loan pool, the seller typically retains the loan servicing rights for its own servicing division.  In addition, due to the fact that the servicers' affiliates, in their capacity as sellers, likewise sold loans in breach of specific representations and warranties to other RMBS Trusts and face similar repurchase liability, the servicers were disincentivized from enforcing these contractual duties.

308.    Consequently, it is crucial that the Trustee monitor the servicer to ensure that the servicer is enforcing the Trusts' repurchase rights against the sellers so that the Trusts hold mortgage loans of the same credit quality and characteristics as bargained for.  Moreover, where the servicers fail to enforce the Trusts' repurchase rights, the Trustee must step in and exercise the Trusts' rights.

### b)    Duty To Perform Prudent And Customary Servicing Practices

309.    The PSAs require the servicers to service and administer the mortgage loans for and on behalf of the Trusts and the Certificateholders (i) in the same manner in which they service and administer similar mortgage loans for their own portfolio or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans, (ii) with a view to maximizing the recoveries with respect to such mortgage loans on a net present value basis, and (iii) without regard to, among

other things, the right of the servicers to receive compensation or other fees for its services under the PSA, the obligation of the servicers to make servicing advances under the PSA, and the servicers' ownership, servicing or management for others of any other mortgage loans.

310.    In truth, the servicers' financial interests in managing the Trusts' loans often diverge from those of the Trusts.  Servicers typically pay upfront for mortgage servicing rights. To make a profit, servicers must recoup their outlay based on their net servicing income (i.e., gross servicing income minus servicing costs).  The amount of servicers' compensation in the form of servicing fees, float, and retained interests varies based on factors beyond the servicers' control, particularly mortgage prepayment speeds, which are largely a function of interest rates. Accordingly, a servicer's ability to maximize its net servicing income depends in large part on its ability to levy ancillary fees and to control servicing costs.  For this reason, servicers are incentivized to aggressively pursue ancillary fees and to pursue loss mitigation strategies that minimize costs, even if they are inconsistent with – or contrary to – the interests of the Trusts and the Certificateholders.

311.    Accordingly, it is essential that the Trustee takes action where it learns of imprudent servicing activities to ensure that servicers: (i) maintain accurate and adequate loan and collateral files so as not to prejudice the interests of the Trusts and the Certificateholders in the mortgages by fostering uncertainty as to the timely recovery of collateral; and (ii) avoid incur unnecessary servicing fees to maintain mortgaged property.

### c)      Duty To Perform Prudent Foreclosure Practices

312.    The PSAs require the servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing the mortgage loans as they come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments.  Moreover, the

PSAs contemplate that foreclosures and liquidations of defaulted mortgages will proceed forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties.

313.    In truth, the servicers' financial interests in managing loans often diverge from those of the Trusts.  For example, to minimize the costs of foreclosures, servicers from 2007 through 2010 pervasively cut corners in the discharge of their servicing duties at the expense of the accuracy, reliability and currency of loan documents and information.

314.    Thus, it is essential that trustees the Trustee takes action where it learns of imprudent foreclosure practices subsequent to borrower defaults to ensure the servicers function in a way that maximizes value for the Trusts and the Certificateholders.

### d)    Duty To Perform Prudent Servicing Advances

315.    The PSAs provide that the servicers may recover servicing advances.  Servicers are required to advance monthly P&I and taxes and insurance payments on delinquent loans. Servicers also advance legal fees, maintenance, and preservation costs on properties that have already been foreclosed and become wholly owned by the Trust (or "REO"), rather than sold to a third party.  Servicers are able to recover these advances from the net proceeds of the property when sold.

316.    Under the PSAs, the servicer's advancing obligations are subject to a deemed non-recoverability standard where the servicer has the right to curtail additional advances based on a reasonable analysis that the servicer could not otherwise recover its advances based on projected, probable net liquidation proceeds.  Thus, if a servicer believes that the P&I advances will exceed the net proceeds of a foreclosure on the mortgaged property, the servicer generally has the right to cease making the P&I advances and to look to the rest of the Trust's loan pool for recovery of any excess paid.  This means that servicers' P&I advances are functionally the most

senior claim on the Trusts and the servicers get paid **first** before any certificateholder.  As explained by Ocwen Financial Corporation ("Ocwen"), a major subprime servicer: "Most of our advances have the highest reimbursement priority (i.e., they are on 'top of the waterfall') so that we are entitled to repayment [from loan proceeds] before any interest or principal is paid on the bonds."[10]  In the majority of cases, the servicer may recover advances in excess of loan proceeds from pool-level proceeds.  Additionally, under the PSAs, the servicers are only entitled to recoup customary, reasonable and necessary out-of-pocket costs and expenses incurred in the performance by the servicer of its servicing obligations.

317.    In practice, servicers are incentivized to abuse their advancing obligations by incurring unnecessary or inflated expenses related to delinquent loans because those advances are the senior-most claims on the Trusts and will almost always be recoverable.

318.    Thus, it is critical that the Trustee monitor the servicers and, in particular, servicing advances to ensure servicers do not manipulate the recoverable and "reasonable and necessary" designations to their own advantage and to the Trusts' detriment.

### C.    The Indentures And Sale Servicing Agreements

319.    The minority of the trusts have a different structure—they issued notes pursuant to an indenture (collectively, the "Indentures") on which U.S. Bank serves as indenture trustee.  A separate agreement, such as a Sale and Servicing Agreement ("SSA"), governs other terms of these transactions.  As evinced below, although there are some differences between the PSA and Indenture structures, with regard to this Complaint, both the nature of the claims asserted and U.S. Bank's duties and obligations are similar under the two structures.

---

[10]   Ocwen, Annual Report (Form 10-K) at 40 (Mar. 13, 2008), available at http://www.sec.gov/Archives/edgar/data/873860/000101905608000419/ocn_10k07.htm.

320.    The Indentures are contracts between, among others, the Trust, as issuer, and U.S. Bank, as Trustee.  In this agreement, the issuer (i.e. the Trust) pledges the mortgage loan assets of the Trust to U.S. Bank, the Indenture Trustee.  U.S. Bank accepts the pledge of the mortgage loans and holds the assets of the Trust in trust for the Noteholders.  The Trust, in turn, issues the notes to investors.

321.    The Indentures set forth duties on the part of the Trust as issuer.  Such duties, which must be punctually performed and observed, include taking all action necessary or advisable to cause the Trust or the Indenture Trustee to: (i) enforce any of the rights to the mortgage loans; and (ii) preserve or defend title to the Trust estate and the rights of the Indenture Trustee and the Noteholders in such Trust estate against the claims of all persons and parties.

322.    The Indentures set forth U.S. Bank's contractual duties and obligations, which are substantially similar to U.S. Bank's contractual duties and obligations in the PSAs.  For example, as pledgee of the mortgage loans, U.S. Bank, as Indenture Trustee, has the benefit of the representations and warranties made by the sellers in the MLPAs.  If a responsible officer of U.S. Bank has actual knowledge of any breach of representation or warranty made by the seller in the MLPA, U.S. Bank shall promptly notify the seller of the breach and the sellers' obligation to cure such defect or repurchase or substitute for the related mortgage loan.

323.    Like the PSAs, the Indentures impose similar obligations on the trustee following an "Event of Default."  However, pursuant to the Indenture, only the conduct of the issuer, the Trust, can constitute an Event of Default.  An Event of Default occurs under the Indenture, when, among other things, a default occurs in the observance or performance of any covenant or agreement of the Trust made in the Indenture, and such default is not cured within a specified period of time after notice is given to the Trust by U.S. Bank or to the Trust and U.S. Bank by a

requisite number of Noteholders.  The Indentures define a "default" as "[a]ny occurrence which is or with notice or the lapse of time or both would become an Event of Default."

324.    Once U.S. Bank has actual knowledge of an Event of Default, U.S. Bank must enforce the rights of the Noteholders, whether for the specific performance of any covenant, agreement or right under the Indenture, or to enforce any other proper remedy or legal or equitable right vested by law.  In carrying out these post-Event of Default duties, U.S. Bank must exercise its rights and obligations under the Indenture using the same degree of care and skill as a prudent person would, under the circumstances, in the conduct of his or her own affairs.

325.    The Sale and Servicing Agreements are contracts between, among others, the depositor, the trust (typically a Delaware statutory trust), as issuer, U.S. Bank, as Indenture Trustee, and the master servicer.  The SSAs contain substantially similar if not identical provisions to the PSAs.  Like the PSAs, the SSAs call for the depositor's conveyance of mortgage loans to the Trust in which the notes participate and establish the rights and obligations of the master servicer for the notes.

326.    Like the PSAs, the SSAs for each of the Trusts are substantially similar and provide for nearly identical obligations on the part of master servicers with respect to servicing the mortgage loans, including covenants (i) to provide notice of seller breaches; (ii) to administer the Mortgage Loans consistently with industry practice, (iii) to use reasonable efforts to collect all payments owed on the Mortgage Loans, including with respect to foreclosure, and to follow the same collection procedures it follows for servicing mortgage loans in its own portfolio, and (iv) to make proper servicing advances.

327.    The SSAs also define "Master Servicer Events of Default," which include a failure to observe or perform material covenants and agreements set forth in the SSA to be

performed by the master servicer, which materially affects the rights of the Noteholders, and such failure continues unremedied for a specified period after written notice was given.  If a Servicer Event of Default occurs under the SSA which a responsible officer of U.S. Bank, as Indenture Trustee, has received written notice or has actual knowledge of, U.S. Bank must immediately terminate the Master Servicer and either substitute in as master servicer or find a successor.  U.S. Bank must also give prompt written notice to all Noteholders of Servicer Event of Defaults.

## IX.   THE TRUSTS SUFFERED FROM PERVASIVE BREACHES OF REPRESENTATIONS AND WARRANTIES BY THE SELLERS

328.   Each of the Trusts' loan pools contained high percentage of loans that materially breached the sellers' representations and warranties, which adversely affected the value of those mortgage loans and the Trusts' and Certificateholders' rights in those mortgage loans. Specifically, the representations and warranties regarding the originators' compliance with underwriting standards and practices, owner occupancy statistics, appraisal procedures, LTV and combined loan to value ("CLTV") ratios were systemically and pervasively false. The falsity of these representations and omissions is demonstrated by the high default rates of the mortgage loans, the plummeting credit ratings of the RMBS and certificates, the results of forensic reviews and re-underwriting of loans within the Trusts in other litigation, and evidence highlighting the originators' abandonment of underwriting standards.

### A.   High Default Rates of the Mortgage Loans And Plummeting Credit Ratings Are Indicative Of Massive Seller Breaches

329.   The extremely high default rates of the mortgage loans within the Trusts and the decline in the credit ratings of the RMBS to below investment grade are strong evidence of the

originators' misrepresentation of the credit quality and characteristics of the mortgage loans they sold to the Trusts.

330.    The Trusts have experienced payment problems significantly beyond what was expected for loan pools that were properly underwritten, and which contained loans that actually had the characteristics originators represented and warranted.  For example, as of January 1, 2009, over 24% of the relevant mortgage loans across all 843 of the Trusts were delinquent. Within certain RMBS sponsor labels, such as the Lehman-label Trusts, approximately 32% of the relevant mortgage loans were delinquent.  Moreover, an astounding 25% or more of the relevant mortgage loans were delinquent in at least 343 of the individual Trusts.  Further, 179 of the Trusts have delinquency rates of above 40% for the mortgage loans remaining in the Trusts.

331.    Not only have the mortgage loans experienced extraordinary rates of delinquency and default, but the ratings of the RMBS supported by them have significantly deteriorated.  Because of the high delinquency, foreclosure, and default rates of the underlying mortgage loans, more than 80% of all certificates within the Trusts have been downgraded.

332.    The economic downturn cannot explain the abnormally high percentage of defaults, foreclosures, and delinquencies observed in the loan pools ultimately backing the Certificates.   Loan pools that were properly underwritten and contained loans with the represented characteristics would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies.  The significant rating downgrades experienced by the RMBS are also strong evidence that they were improperly underwritten, and that they did not have the credit risk characteristics the sellers represented and warranted.

B.     **The Systemic Disregard Of Underwriting**
       **Standards Was Pervasive During The Relevant Period**

333.    During the height of the mortgage and securitization boom in the U.S. market between 2004 and 2008, originators of residential mortgage loans sold and securitized loans in RMBS in violation of their stated underwriting guidelines and in breach of the representations and warranties provided to the purchasers of the loan pools.

334.    Government reports and investigations and newspaper reports have uncovered the extent of pervasive abandonment of underwriting standards.  The Permanent Subcommittee on Investigations in the United States Senate ("PSI") released a report detailing the causes of the financial crisis.  Using WaMu as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets. The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans. These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.[11]

335.    The Financial Crisis Inquiry Commission ("FCIC") issued its final report in January 2011 that detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy.[12]   The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics." "Unfortunately − as has been the case in past speculative booms and busts − we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis." *Id*. at xxii. The FCIC found:

---

[11] *Wall Street And The Financial Crisis: Anatomy Of A Financial Collapse*, United States Senate Permanent Subcomm. on Investigations, 112th Cong. 50 (2011).

[12] *Final Report Of The National Commission Of The Causes Of The Financial And Economic Crisis In The United States*, Fin. Crisis Inquiry Comm'n ("FCIC Report") (2011).

> [I]t was the collapse of the housing bubble − fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages − that was the spark that ignited a string of events, which led to a full-blown crises in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id*. at xvi.

336.    During the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan.  The FCIC Report found "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id*. at xxii.  Early Payment Default is a significant indicator of pervasive disregard for underwriting standards.  The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards . . . ." *Id*.

337.    Recent landmark settlements between the government and major financial institutions have further detailed the systemic and pervasive disregard of underwriting standards by lenders during the relevant time period, and have confirmed that these practices infiltrated the Trusts.  For example, on November 19, 2013, the Justice Department, along with federal and state regulators, announced a $13 billion settlement with JPMorgan − the largest settlement with a single entity in American history − to resolve federal and state civil claims arising out of the packaging, marketing, sale and issuance of 1,128 RMBS offerings by JPMorgan, Bear Stearns and Washington Mutual prior to January 1, 2009, including 192 of the Trusts.  As part of the settlement, JPMorgan acknowledged that it regularly included loans within the securitizations "***that did not comply*** with the originator's underwriting guidelines" and breached the originator's representations and warranties.

338.    On July 14, 2014, the Justice Department, together with federal and state regulators, announced a $7 billion settlement with Citigroup Inc. to resolve federal and state civil claims related to Citigroup's conduct in the packaging, securitization, marketing, sale and issuance of 633 RMBS offerings issued prior to January 1, 2009, including 75 of the Trusts.  The settlement included an agreed upon statement of facts wherein Citigroup acknowledged that significant percentages of the mortgage loans within the securitizations contained material defects.

339.    On August 21, 2014, the Justice Department, together with federal and state regulators, announced a $16.65 billion settlement with Bank of America Corporation, and Banc of America Mortgage Securities, as well as their current and former subsidiaries and affiliates (collectively, "Bank of America") to resolve federal and state civil claims related to Bank of America's conduct in the packaging, securitization, marketing, sale and issuance of 2,000 RMBS offerings issued prior to January 1, 2009, including 114 of the Trusts.  The settlement included an agreed upon statement of facts wherein Bank of America acknowledged that significant percentages of the mortgage loans within the securitizations contained material defects.

**C.      There Is Evidence Of Widespread Breaches Of
          Representations And Warranties By The Specific
          Originators That Sold Loans To The Trusts**

340.    Much like other RMBS trusts of the same vintage, the Trusts have been materially and adversely impacted by the loan origination industry's rampant underwriting failures.  The originators' systemic and pervasive sale to the Trusts of residential mortgage loans in breach of representations and warranties is confirmed through numerous federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described rampant underwriting failures throughout the period in

which the Trusts were created and, more specifically, failures by the same originators whose mortgage loans were sold to the Trusts.

341.   A summary of testimonial and documentary evidence as to each of the major originators of the mortgage loans to the Trusts is set forth below.

### 1.   **Wells Fargo**

342.   Wells Fargo originated approximately $98.2 billion of residential mortgage loans sold to the Trusts and sponsored approximately $63.8 billion of mortgage loans securitized in 59 of the Trusts.   Wells Fargo's origination practices have been the subject of numerous governmental investigations and reports and private RMBS lawsuits.   For example, the FCIC Report revealed, for the first time, findings in a confidential 2005 "peer group" study conducted by examiners from the Federal Reserve and other agencies of mortgage practices at six companies, including Wells Fargo.   Notably, the study observed "a very rapid increase in the volume of [] irresponsible loans, very risky loans" by Wells Fargo and these five other lenders, and that a "large percentage of their loans issued were subprime and Alt-A mortgages, and the underwriting standards for these products had deteriorated."   FCIC Report at 172.   The FCIC Report further revealed for the first time that the Federal Home Loan Mortgage Corporation ("Freddie Mac") "put back" $1.2 billion in ineligible mortgage loans to Wells Fargo during 2009 and 2010, while the Federal National Mortgage Association ("Fannie Mae") put back $2.3 billion ineligible mortgage loans to Wells Fargo from 2007 through 2010.   *Id.* at 225.

343.   Wells Fargo systemic violations of representations and warranties concerning loans it originated have also been the subject of several highly publicized RMBS lawsuits.   For instance, in *General Retirement System of the City of Detroit v. The Wells Fargo Mortgage Backed Securities 2006-AR18 Trust et al.*, No. 09-cv-1376 (N.D. Cal. Mar. 27, 2009), the court found that the private investor plaintiffs had adequately pled that "variance from the stated

-61-

[underwriting] standards was essentially [Wells Fargo's] norm" and that this conduct "infected the entire underwriting process." *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 971-72 (N.D. Cal. 2010). In 2011, Wells Fargo agreed to pay $125 million to settle the litigation. The FDIC made similar allegations in *FDIC v. Chase Mortgage Finance Corp., et al.*, No. 12-cv-6166 (S.D.N.Y. Aug. 10, 2012), contending that Wells Fargo and other originators overstated the values of properties such that virtually every representation about the LTV ratios of the loans was untrue or misleading in CMSI 2006-6, CMALT 2007-A2, CMALT 2007-A3 and CMALT 2007-A5, four of the Trusts at issue here.

344. The results of loan file reviews conducted by investors have further confirmed Wells Fargo's abandonment of their underwriting standards and pervasive and systemic breach of representations and warranties. For example, in *FHFA v. Citigroup Inc., et al.*, the FHFA reviewed 1,851 loan files in the CMLTI 2006-WF1 and CMLTI 2006-WF2 securitizations, which are substantially similar to Trusts at issue here. Wells Fargo originated all of the loans in these two trusts. The FHFA found that a stunning **79%** of the reviewed mortgage loans in these securitizations were not underwritten in accordance with the underwriting guidelines or otherwise breached the representations contained in the transaction documents. *FHFA v. Citigroup Inc., et al.*, No. 11-cv-6196 (S.D.N.Y June 28, 2012). Amended Compl. ¶136.

345. In addition, there is ample public evidence of Wells Fargo's failure to originate loans in compliance with federal and state law. For example, on July 20, 2011, the Federal Reserve announced that it had levied a record $85 million fine against Wells Fargo for pushing borrowers with good credit into expensive subprime mortgages and falsifying loan applications. Similarly, in late 2012, the U.S. Attorney for the Southern District of New York claimed that Wells Fargo engaged in a "longstanding and reckless trifecta of deficient training, deficient

underwriting and deficient disclosure, all while relying on the convenient backstop of government insurance." *Manhattan U.S. Attorney Files Mortgage Fraud Lawsuits Against Wells Fargo Bank, N.A. Seeking Hundreds of Millions of Dollars in Damages for Fraudulently Certified Loans*, U.S. Attorney's Office Southern District of New York (Oct. 9, 2012).

### 2.   **WaMu and Long Beach**

346.   WaMu, together with its affiliate Long Beach Mortgage Co. ("Long Beach"), originated approximately $79.7 billion of the loans included in the Trusts.  WaMu was ranked as the third worst mortgage originator by the OCC "Worst Ten in the Worst Ten" list based on 2005-2007 originations as of March 29, 2009.

347.   WaMu's abandonment of its represented underwriting practices and systemic origination of defective loans during the same time period as the WaMu loans securitized in the Trusts were detailed in the FCIC Report and the U.S. Senate Permanent Subcommittee on Investigations' April 13, 2011 bipartisan report on the financial crisis, "*Wall Street and the Financial Crisis: Anatomy of a Financial Collapse*," issued under Chairman Carl Levin and Ranking Minority Member Tom Coburn ("Senate Report").  The FCIC Report concluded that firms, including WaMu, originated a vast number of "high-risk, nontraditional mortgages that were in some cases deceptive, in many cases confusing, and often beyond borrowers' ability to repay."  FCIC Report at 418.  WaMu also conducted a "post mortem" review of 213 Long Beach loans that experienced first-payment defaults in March, April, and May 2005, which found that many early defaults were not only preventable, but that in some instances "fraud should have been easily detected from the presence of 'White Out' on an application of a borrower having two different signatures."  Senate Report at 78.

348.   According to the Senate Report, WaMu and Long Beach turned increasingly to higher-risk loans over a four-year period, increasing their subprime loans from nearly $4.5

billion in 2003, to $29 billion in 2006. *Id*. at 2-3. WaMu and Long Beach violated their own lending standards; allowed excessive loan-error and exception rates; exercised weak oversight over the third-party mortgage brokers who supplied half or more of their loans; and tolerated the issuance of loans with fraudulent or erroneous borrower information. *Id*. at 3. Moreover, WaMu and Long Beach securitized not just poor-quality loans, "but also loans that its own personnel had flagged as containing fraudulent information." *Id*. at 125. Finally, in September 2008, WaMu's Corporate Credit Review team released a report which found that internal controls intended to prevent the sale of fraudulent loans to investors were ineffective and that of "the 25 loans tested, 11 reflected a sale date after the completion of the investigation which confirmed fraud." *Id*. In other words, even loans marked with a red flag indicating fraud were being sold to investors.

349.    WaMu's poor underwriting practices and defective loans have also been the subject of numerous well-publicized lawsuits brought by government agencies. For example, in March 2011, the FDIC accused WaMu executives of reckless lending before the 2008 collapse of what was the nation's largest savings bank. The FDIC settled the action for $64 million in December 2011. *See Ex-Bank Executives Settle F.D.I.C. Lawsuit*, N.Y. Times (Dec. 13, 2011). Similarly, the FHFA sued J.P. Morgan Chase ("JP Morgan"), which had acquired WaMu in September 2011, alleging that JP Morgan and WaMu had misled Fannie Mae and Freddie Mac about the quality of nearly 129 mortgage-related securities for which they paid about $33 billion. JP Morgan settled the FHFA case in October 2013 for $4 billion, including approximately $1.2 billion relating to claims against WaMu. *See J.P. Morgan Settles With FHFA*, Wall St. J. (Oct. 25, 2013).

350.     WaMu's acquirer, JP Morgan, also entered into a $13 billion settlement with the National Credit Union Administration ("NCUA") and U.S. Department of Justice ("DOJ") over sales of defective RMBS.  As part of the settlement, the NCUA received $1.4 billion for losses incurred by corporate credit unions as a result of purchases of the toxic securities.  The NCUA's pre-settlement investigation found that of the 187 loans sampled by WaMu's internal review in late 2007: (i) *31 percent* had appraisal discrepancies that raised concerns that the value was not supported; (ii) *47 percent* exceeded program parameters in place at the time of approval; (iii) *70 percent* were identified with red flags that were not addressed by the business unit; (iv) *71 percent* were stated-income loans that were identified for lack of reasonableness of income; and (v) *71 percent* had credit-evaluation or loan-decision errors.  *See Nat'l Credit Union Admin. Bd. v. Credit Suisse Sec. (USA) LLC, et. al.*, No. 13-cv-6736 (S.D.N.Y. Sept. 23, 2013) Compl. ¶204.

351.     WaMu's improper lending practices were also detailed in a highly publicized class action lawsuit brought by RMBS investors.  *See In re Washington Mutual, Inc. Sec., Derivative & ERISA Litig.*, No. 08-md-1919 (W.D. Wash. July 23, 2010). In 2011, *The Wall Street Journal* reported that WaMu agreed to settle the class-action lawsuit for $208.5 million.  *See WaMu Settles Lawsuit, To Pay $208.5 Million*, Wall St. J. (July 2, 2011).

352.     In August 2009, Deutsche Bank, as the trustee for 99 trusts in which WaMu sold, sponsored, and serviced loans, sued the FDIC (as the receiver for WaMu) on behalf of the trusts and the investors in the related RMBS seeking to enforce the trusts' and investors' rights. Deutsche Bank's complaint detailed WaMu's systemically deficient origination practices and pervasive sale of mortgage loans that failed to comply with WaMu's representations and warranties between 2004 and 2008.  *See Deutsche Bank Nat'l Trust Co. v. FDIC*, No. 1:09-cv-01656 (D.D.C. Aug. 26, 2009).

-65-

### 3.    **Countrywide**

353.    Countrywide similarly is among the largest originators of mortgage loans underlying the Trusts at issue – originating approximately $58.6 billion in mortgage loans.  It is beyond dispute that Countrywide was one of the most notorious and worst loan originators from 2004 through 2008, routinely abandoning its stated underwriting standards while pumping billions of dollars of toxic loans into the United States RMBS securitization market.   Indeed, the OCC List ranked Countrywide the fourth worst mortgage originator as of March 29, 2009, and blamed the lender for 10,254 foreclosures in the worst 10 metro areas based on 2005-2007 originations.

354.    Countrywide's abandonment of sound underwriting standards and deplorable origination practices have been exposed by highly publicized government investigations and reports.  For example, the FCIC Report noted that as early as September 2004, "Countrywide executives recognized that many of the loans they were originating could result in 'catastrophic consequences.'  Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in 'financial and reputational catastrophe' for the firm.  But they did not stop."  FCIC Report at xxii.  The Countrywide executives' concerns regarding its defective loan pools came to full fruition.  The FCIC Report states that in January 2011, Bank of America reached a deal with Fannie Mae and Freddie Mac, settling claims relating to ineligible Countrywide-originated loans with a payment of more than $2.5 billion.  And, from 2007 through 2010, Fannie Mae "put back" $6.9 billion in loans to Bank of America, despite the fact that its random sample review of 2% to 5% of the loan pools revealed higher rates for delinquent loans.  *See* FCIC Report at 225.

355.    The Senate Report similarly addressed Countrywide's systemic violations of underwriting guidelines resulting in billions of dollars of defective loans originated during the

same time period as the Countrywide loans securitized in the Trusts.  For example, the Senate Report disclosed that after reviewing certain loans purchased from Countrywide, Goldman Sachs personnel found that about 50% of the loans reviewed were candidates for "return to the lender." Senate Report at 487.

356.    Countrywide's origination practices have also been the focus of regulatory enforcement actions.  For example, on June 4, 2009, the Securities Exchange Commission ("SEC") filed an enforcement action against the three most senior Countrywide executives, including Chief Executive Officer Angelo Mozilo ("Mozilo"), charging them with fraudulently misleading investors by representing that Countrywide had issued loans primarily to "prime" or low risk borrowers, when it had actually originated increasingly risky loans that senior executives knew would result in substantial defaults and delinquencies.  The investigation and enforcement action uncovered telling evidence regarding the quality and characteristics of Countrywide-originated loans.  For example, in a March 28, 2006 email sent by Mozilo to Countrywide's President David Sambol and others, Mozilo stated that Countrywide's 100% LTV (also known as 80/20) subprime product is "the most dangerous product in existence and there can be nothing more toxic . . . ."  On October 15, 2010, the SEC announced that Mozilo would pay a then record $22.5 million penalty to settle the SEC charges.

357.    Countrywide-originated loans have been the subject of numerous putback demands as a result of pervasive and systemic breaches of representations and warranties.  As of October 2010, Bank of America, which acquired Countrywide in January 2008, had received more repurchase requests than any other bank, *due almost exclusively to Countrywide's systematic abandonment of sound underwriting practices*.  Likewise, on June 29, 2011, Bank of America announced an $8.5 billion settlement with trustee The Bank of New York Mellon,

resolving, among other things, claims that Countrywide violated the representations and warranties when it sold loans securitizing to over 530 RMBS trusts.  This unprecedented RMBS settlement put the world, including U.S. Bank, on notice of the magnitude of Countrywide's fraudulent conduct.  In January 2014, New York Supreme Court Justice Barbara Kapnick largely approved the settlement, resolving putback claims across all 530 Countrywide RMBS trusts.

358.    Loan file reviews of Countrywide-originated loans sold to RMBS trusts during the period 2004 through 2008, conducted by monoline insurers provide additional evidence of Countrywide's pervasive and systemic breaches of representations and warranties.  For example, Syncora, an insurance company that insured Countrywide's securitizations, conducted a re-review and analysis of defaulted loans in the securitizations that it insured to determine whether the loans had been originated in accordance with Countrywide's representations. Syncora found that **75% of the loans it reviewed "were underwritten in violation of Countrywide's own lending guidelines**, lack any compensating factors that could justify their increased risk, and should never have been made."  Similarly, monoline insurer MBIA's re-underwriting review of Countrywide securitizations during this period revealed that almost **90%** of defaulted or delinquent loans in the Countrywide securitizations showed material discrepancies from underwriting guidelines, such as lack of key documentation, invalid or incomplete appraisals, fraud on the face of the loan applications and misrepresentations regarding borrower income, FICO score, debt to income ratio and CLTV ratios.

359.    Forensic reviews conducted in other litigation of Countrywide-originated loans sold to many of the Trusts at issue have corroborated the monoline insurers' findings.  In *In re Countrywide Financial Corp. Mortgage-Backed Securities Litigation*, No. 11-ml-02265 (C.D. Cal. Aug. 30, 2011), plaintiff's review of 188 Countrywide-originated loans from SARM 2006-

10, one of the Trusts at issue here, "revealed violations of underwriting guidelines in over 90% of the loans, including blatant misrepresentations of employment, and breaches of guidelines." Similarly, plaintiff's review of SASC 2006-BC4, a securitization containing a large percentage of Countrywide originated loans and one of the Trusts at issue here, revealed that Countrywide falsely represented the number of owner-occupied properties in the Trust by over 17 percentage points.

### 4.   GreenPoint

360.    GreenPoint is another prolific originator of mortgage loans sold to the Trusts – originating approximately $25.2 billion in mortgage loans.   GreenPoint systematically disregarded its underwriting standards, granted exceptions in the absence of compensating factors, required less documentation, and granted no documentation or limited-documentation loans to individuals without sound credit histories.  Indeed, in November 2008, *Business Week Magazine* reported that GreenPoint's employees and independent mortgage brokers targeted borrowers who were less able to afford the loan payments they were required to make, and many had no realistic ability to pay back the loans.  Likewise, GreenPoint was identified 7th worst in Stockton, California, and 9th worst in both Sacramento, California, and Las Vegas, Nevada. In the 2009 "Worst Ten in the Worst Ten" Report, GreenPoint was listed as 3rd worst in Modesto, California, 4th worst in Stockton, Merced, and Vallejo-Fairfield-Napa, California, 6th worst in Las Vegas, Nevada, and 9th worst in Reno, Nevada.

361.    Loan file reviews of GreenPoint-originated loans sold to RMBS trusts during the period 2004 through 2008, conducted by monoline insurers and RMBS trustees have confirmed GreenPoint's pervasive breach of mortgage loan representations and warranties.   Monoline insurer MBIA's forensic review of loan files pertaining to a Bear Stearns securitization primarily containing GreenPoint-originated mortgage loans revealed a breach rate of *88%*.  In a similar

action against GreenPoint, monoline insurer CIFG Assurance North America, Inc. reviewed 110 loans and found that 90 (or *82%*) of the loans failed to comply with one or more of the representations and warranties.  *See CIFG Assurance N. Am., Inc. v. GreenPoint Mortg. Funding, Inc.*, Index No. 653449/2012 (N.Y. Sup. Ct. Mar. 4, 2013) Compl. ¶38.

362.   Similarly alarming breach rates in securitizations of GreenPoint-originated mortgage loans have been confirmed in RMBS trustee putback lawsuits.  For example, in *U.S. Bank Nat'l Ass'n v. GreenPoint Mortgage Funding, Inc*., Index No. 600352/2009 (N.Y. Sup. Ct. Apr. 22, 2009), a consultant's investigation concluded that *93%* of the loans that GreenPoint sold contained errors, omissions, misrepresentations, and negligence related to origination and underwriting.  The investigation found that GreenPoint loans suffered from serious defects including pervasive breaches of representations and warranties concerning credit scores debt-to-income and/or LTV ratios, and the borrower's intent to occupy the mortgaged property.

### 5.   New Century

363.   New Century originated approximately $21.2 billion in mortgage collateral included in the Trusts.  As of March 29, 2009, New Century was ranked as the worst mortgage originator by the OCC's "Worst Ten in the Worst Ten" list based on originations from 2005 to 2007.   Multiple highly publicized government investigations and lawsuits exposed New Century's improper loan origination practices and pervasive noncompliance with its underwriting guidelines.

364.   New Century's systemic origination of defective loans during the same time period as the New Century loans were originated and sold to the Trusts was detailed in the FCIC Report and the Senate Report.  The Senate Report found that "[s]ubprime lenders like New Century were known for issuing poor quality subprime loans." Senate Report at 21.  The Senate Report identified a number of [New Century's] harmful mortgage practices, "including

'increasing loan originations, without due regard to the risks associated with that business strategy'; risk layering in which it issued high risk loans to high risk borrowers, including originating in excess of 40% of its loans on a stated income basis; allowing multiple exceptions to underwriting standards; and utilizing poor risk management practices that relied on the company's selling or securitizing its high risk mortgages rather than retaining them." *Id*. at 236.

365.    The FCIC Report concluded that "New Century − once the nation's second-largest subprime lender − ignored early warnings that its own loan quality was deteriorating and stripped power from two risk-control departments that had noted the evidence." FCIC Report at 157.  For instance, "[i]n a June 2004 presentation, the Quality Assurance staff reported they had found severe underwriting errors, including evidence of predatory lending, federal and state violations, and credit issues, in 25% of the loans they audited in November and December 2003. In 2004, Chief Operating Officer and later CEO Brad Morrice recommended these results be removed from the statistical tools used to track loan performance, and in 2005, the department was dissolved and its personnel terminated." *Id.*

366.    Such massive underwriting failures led to high default rates and eventually New Century's collapse.  According to the Bankruptcy Court Examiner for New Century, Michael J. Missal, "New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy. . . .  Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels."

367.    The New Century Bankruptcy Report also found that in June 2005, the Internal Audit Department audited the company's loan origination process at its Sacramento wholesale fulfillment center and found that 45% of the loans had improper RESPA disclosures, 32% of the

loans did not have approval stipulations fully satisfied, 39% of the loans had noted exceptions with income calculations and/or verification of income, and 23% had appraisal exception problems. *Id.* at 152.

368.    New Century's poor underwriting practices and defective loans have also been the subject of well publicized lawsuits brought on behalf of government agencies.  In December 2009, the SEC charged three former New Century executives, including the CEO, "with fraudulent accounting that misled investors about the company's finances." Senate Report at 236. The SEC alleged that the New Century executives were "downplaying the riskiness of the company's loans and concealing their high delinquency rates."   The complaint stated that, although New Century had represented itself as a prudent subprime lender, it "soon became evident that its lending practices, far from being 'responsible,' were the recipe for financial disaster." *Id*.

369.    Loan file reviews confirm New Century's pervasive and systemic breach of representations and warranties.  For example, in *FHFA v. HSBC, et al.*, the FHFA reviewed a sample of loan files in the HASC 2005-I1 and HASC 2006-NC1 securitizations.  New Century originated all of the loans in these two trusts.  The FHFA found that 17.53% of the loans in HASCC 2005-I1 and 18.12% of the loans in HASC 2006-NC1 had LTV ratios over 100%. *FHFA v. HSBC N. Am. Holdings Inc., et al.*, No. 11-cv-06189 (S.D.N.Y. June 28, 2012) Amended Compl. ¶113.

### 6.    IndyMac Bank

370.    IndyMac Bank originated approximately $18.5 billion of residential mortgage loans sold to the Trusts.  IndyMac's systemic and pervasive origination of loans that breached representations and warranties is well documented through federal investigations and reports, investor litigation, insurer lawsuits, and news media sources.  For example, the OCC's "Worst

Ten in the Worst Ten" list included IndyMac as the eleventh worst mortgage originator based on 2005 through 2007 loan originations as of March 29, 2009.

371.    Litigation brought by federal agencies exposed IndyMac's deficient loan origination practices.  On October 4, 2012, the NCUA sued Credit Suisse and IndyMac in connection with the packaging and sale of $715 million in RMBS and alleged IndyMac systematically abandoned the stated underwriting guidelines in the offering documents, making the mortgage-backed securities significantly riskier than indicated.  *See Nat'l Credit Union Admin. Bd. v. Credit Suisse (USA) LLC, et al.*, No. 12-cv-02648 (D. Kan. Oct. 4, 2012).

372.    On July 6, 2011, the FDIC filed the action *Federal Deposit Insurance Corp. v. Michael Perry*, No. 11-cv-05561 (C.D. Cal. July 6, 2011) against IndyMac's former Chairman and Chief Executive on claims that he overloaded the thrift with risky and fraudulent home loans before it collapsed in July 2008.  In *Securities and Exchange Commission v. S. Blair Abernathy*, No. 11-cv-01308 (C.D. Cal. Feb. 11, 2011), the SEC alleged that despite receiving monthly internal reports revealing that 12 to 18 percent of IndyMac's loans contained misrepresentations regarding important loan and borrower characteristics, no such disclosure was made in the offering documents.  These types of actions were widely followed by news media.  *See*, *e.g.*, *The FDIC Claims An IndyMac Victory*, Bloomberg Businessweek (Dec. 10, 2012); *Former IndyMac CEO Michael Perry to Pay $1 Million in Settlement*, L.A. Times (Dec. 15, 2012).

373.    Similarly, in *MBIA Insurance Corp. v. IndyMac Bank, F.S.B., et al.,* No. 09-cv-01011 (D.D.C. May 29, 2009), bond insurer MBIA sought indemnification from IndyMac in connection with substantial losses it incurred on IndyMac securitized mortgage loans from 2006 and 2007 due to spiraling borrow defaults on loans originated in violation of stated underwriting guidelines and standard representations and warranties.

374.    A class action lawsuit brought by two pension fund investors on May 14, 2009, similarly alleged that IndyMac failed to follow its own underwriting guidelines on securitized mortgage loans. *See In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-cv-04583 (S.D.N.Y. May 14, 2009).

### 7.    Argent

375.    Argent originated approximately $28.1 billion loans sold to the Trusts.[13]    As detailed below, between 2004 to 2008, Argent systemically originated loans in violation of its stated underwriting guidelines and in breach of the representations and warranties it provided to the purchasers of its loans.  By 2011, this became apparent to all players in the RMBS industry, including Deutsche Bank.

376.    Argent's deficient origination practices were well documented through government investigations and published reports, investor litigation, insurer actions, and nationally published news articles.  For example, the OCC's "Worst Ten in the Worst Ten" list included Argent as the *eighth worst mortgage originator* based on 2005-2007 loan originations as of March 29, 2009.  During his April 7, 2010 testimony before the FCIC, Richard Bowen, the former Business Chief Underwriter at Citibank, testified that he advised against the acquisition of Argent because "we sampled loans that were originated by Argent, and we found large numbers that did not – that were not underwritten according to the representations that were there."  *Subprime Lending and Securitization and Government Sponsored Entities: Hearing Before the Financial Crisis Inquiry Commission,* (Apr. 7, 2010), Hearing Transcript at 239.

---

[13] In September of 2007, Citibank acquired Argent, including its wholesale mortgage origination division and the servicing rights to collect on more than $45 billion in home loans. Argent merged into CitiMortgage shortly thereafter.

377.    Litigation by government sponsored entities also shed light on Argent's loan origination problems.  In September of 2011, the FHFA sued Citigroup seeking $3.6 billion concerning certain mortgage-backed securities purchased by Fannie Mae and Freddie Mac. *See FHFA v. Citigroup, Inc., et al*., No. 11-cv-06196 (S.D.N.Y. Sept. 2, 2011).  The lawsuit accused Citigroup of misleading Fannie Mae and Freddie Mac about the risks embedded in ten mortgage-backed securities, including significantly overstating borrowers' abilities to repay the loans. Argent was one of the largest sources of loans at issue in this action.

378.    Reports from national and local news media also revealed systemic and pervasive origination of loans that breached representations and warranties.  For example, on October 20, 2009, *Bloomberg* reported that about 60% of mortgages originated by Argent were connected to homes in default, according to MDA DataQuick.  *See Countrywide Mortgages Lead California in Defaults*, Bloomberg (Oct. 20, 2009).

379.    Finally, the *Miami Herald* reported that a Vice President at Argent "spent three years during the height of the housing boom tutoring Florida mortgage brokers in the art of fraud" and "taught them how to doctor credit reports, coached them to inflate income on loan applications, and helped them invent phantom jobs for borrowers."  *Home Loan Racket Flourished in Florida*, Miami Herald (Jan. 29, 2009).  According to the news report, out of 129 loan applications obtained by the *Miami Herald* from a local broker that were funded by Argent, "103 contained red flags: non-existent employers, grossly inflated salaries and sudden, drastic increases in the borrower's net worth."  *Id*.

### 8.    Option One

380.    Option One, a wholly owned subsidiary of H&R Block, Inc. ("H&R Block"), originated approximately $9.5 billion in mortgage collateral included in the Trusts.  Option One was ranked as the sixth worst mortgage originator by the OCC's "Worst Ten in the Worst Ten"

list based on originations from 2005 to 2007.   Government actions, investor litigation, and putback actions made public Option One's pervasive noncompliance with its own underwriting standards.

381.    On August 9, 2011, H&R Block, Option One's parent company, agreed to settle a suit initiated by the Massachusetts State Attorney General for $125 million.  *See* Massachusetts Attorney General Press Release, *H&R Block Mortgage Company Will Provide $125 Million in Loan Modifications and Restitutions* (Aug. 9, 2011).   In announcing the August 9, 2011 settlement, Massachusetts's Attorney General stated that Option One engaged in "***ultra-risky practices***," a "***blatant disregard*** for prudent underwriting standards," and "made loans that it knew were likely to fail."   At bottom, in making loans – including loans that were sold into the Trusts – Option One "did not take into account anything [such as a borrower's ability to repay] but the fees that were to be generated."

382.    Investors in significant RMBS lawsuits against underwriting banks have made similar allegations regarding Option One's abusive origination and securitization practices, and systemic abandonment of underwriting guidelines, which resulted in large percentages of defective Option One loans being securitized and sold in private-label RMBS trusts.  *See, e.g.*, *The Prudential Ins. Co. of Am. v. Bank of Am., et al.*, No. 13-cv-01586 (D.N.J. Mar. 14, 2013) (alleging Option One systematically abandoned its underwriting guidelines); *Royal Park Investments SA/NV v. The Royal Bank of Scotland*, Index No. 653541/2013 (N.Y. Sup. Ct. Oct. 11, 2013) (alleging that "Option One had completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, without any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral").

-76-

383.   The results of loan file reviews conducted by investors have further confirmed Option One's pervasive and systemic breach of material representations and warranties regarding quality and characteristics of the loans it originated.  In *Phoenix Light SF Ltd. v. J.P. Morgan Securities LLC*, Option One originated all the mortgage loans in OOMLT 2007-3, OOMLT 2007-4, OOMLT 2007-5, SVHE 2007-OPT4, and ABFC 2006-OPT2. *Phoenix Light SF Limited, et al. v. J.P. Morgan Sec. LLC, et al.*, Index No. 651755/2012 (N.Y. Sup. Ct. Oct. 5, 2012) Amended Compl. ¶322. The plaintiff's forensic review found that: (i) for OOMLT 2007-3, 29.50% of the loans had LTVs over 100% and owner occupancy was overstated by 8.83%. *Id*. at ¶¶778, 792; (ii) for OOMLT 2007-4, 30.51% of the loans had LTVs over 100% and owner occupancy was overstated by 7.17%. *Id*. at ¶¶777, 791; (iii) for OOMLT 2007-5, 28.90% of the loans had LTVs over 100% and owner occupancy was overstated by 10.06%. *Id*. at ¶¶777, 791; (iv) for SVHE 2007-OPT4, 21.51% of the loans had LTVs over 100% and owner occupancy was overstated by 5.87%. *Id*. at ¶¶777, 791; and (v) for ABFC 2006-OPT2, 24.59% of the loans had LTVs over 100% and owner occupancy was overstated by 7.64%. *Id*. at ¶¶778, 792.

384.   Similarly, in *Nomura Asset Acceptance Corp. v. Nomura Credit & Capital*, a putback action brought by HSBC as trustee, the plaintiff's "[i]nvestigation into origination files for the Mortgage Loans and publicly available data concerning the Mortgage Loans [] revealed a significant number of breaches of the Mortgage Representations . . . . [O]ver 91.8% (519 individual loans with an aggregate principal balance of over \$41 million) of the Mortgage Loan Files . . . reviewed contain[ed] information discovered to be false or inaccurate or which, even if true, constitute[d] a breach of the Mortgage Representations." *Nomura Asset Acceptance Corp. Alternative Loan Trust, Series 2005-S4, by HSBC Bank USA, Nat'l Ass'n, in its capacity as Trustee v. Nomura Credit & Capital, Inc.*, Index No. 653541/2011 (N.Y. Sup. Ct. Aug. 24, 2012)

First Amended Compl. ¶4. Option One originated approximately 10% of the loans in this trust. *Id.* at ¶69.

### D. The Systemic Disregard Of Prudent Securitization Standards Was Pervasive During The Relevant Period

385.   It is equally well documented that between 2004 and 2008, the sponsors that securitized the residential mortgages and transferred them into the RMBS trusts failed to conduct adequate due diligence reviews of the mortgage pools to ensure the mortgage loans were of the same credit quality as represented and complied with federal and state law, as well as that the purported mortgaged property's appraised value was accurate.

386.   As the FCIC Report noted:

> The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

387.   As made clear in the FCIC Report, in their zeal to keep the securitization machine going and at the behest of originators, RMBS sponsors and their third party due diligence providers failed to analyze adequate sample sizes of the loan pools, sometimes reviewing as little as 2%-3% of the entire loan pools.  Moreover, when the sponsors' and their due diligence firms identified high percentages of mortgage loans in their sample reviews as deficient, sponsors pervasively "waived in" mortgage loans to preserve their business relationships with the originators or to keep the defective loans off their own books.  Consequently, by 2011, it was apparent to all players in the United States mortgage and securitization industry that the mortgage loans deposited in RMBS trusts issued between 2004 and 2008 materially breached the sponsors' representations and warranties.

-78-

### E.    There Is Evidence Of Widespread Breaches Of Representations And Warranties By The Specific Sponsors Of The Trusts

388.    As with other RMBS trusts of the same vintage, the Trusts have been materially impacted by the sponsors' faulty securitization practices.  The sponsors' systemic and pervasive sale of residential mortgage loans in the Trusts in breach of representations and warranties is confirmed through several federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described endemic due diligence failures throughout the period in which the Trusts were created and, more specifically failures by the same sponsors whose mortgage loans were deposited into the Trusts. A summary of testimonial and documentary evidence as to each of the major sponsors of the mortgage loans to the Trusts is set forth below.

### 1.    Lehman

389.    Lehman sponsored approximately **$163 billion** of mortgage loans securitized in 144 of the Trusts and originated approximately $68.7 billion in mortgage loans sold to the Trusts. Lehman acquired the mortgage loans either from Lehman's own loan origination affiliates and subsidiaries, Aurora and BNC Mortgage ("BNC"), whose underwriting abuses are well documented, or in direct purchases (including auctions) from third-party loan originators, some of which are among the most notorious lenders, including GreenPoint, Countrywide, IndyMac Bank, F.S.B., First Franklin, EquiFirst Mortgage and Aegis Mortgage.  By January 1, 2009, it was evident that the credit quality of underlying loan collateral for Lehman-label Trusts did not match Lehman's and originators' representations and warranties. At this time, nearly a third of all the loans within the Lehman Trusts were delinquent.  Moreover, the Lehman Trusts had incurred realized losses of over $8.4 billion.  The Lehman Trusts' realized losses more than doubled over the next two years, reaching $17.7 billion in January 1, 2011.  As of November 1, 2014, the

Lehman Trusts have suffered staggering realized losses of over **$27.5 billion**, meaning that over 16% of the Lehman Trust loan pools have been written off.

390.    Lehman's faulty due diligence practices with respect to RMBS Securitization is well known to U.S. Bank.   Lehman's "due diligence" principally occurred not during the underwriting phase of the offering, but while Lehman was inspecting smaller bulk loans for possible purchase from third-party loan originators after successfully bidding on the loans at auction. Accordingly, at that stage, there was a disincentive for Lehman to reject, or "kick-back," loans as non-compliant with stated guidelines since the originator would be less likely to select Lehman as the winning bidder in future auctions. Indeed, according to the FCIC Report, in connection with securitizing loans, Lehman used a third-party due diligence firm, Clayton Holdings, Inc. ("Clayton"), to perform due diligence services.   Clayton found that 26% of the total loans underwritten by Lehman failed to meet the underwriting standards, but that Lehman waived its right to reject 37% of these non-conforming loans, and included them in the RMBS it securitized anyway.   Further, the motto among Lehman's residential mortgage-backed securities origination sales group became "there are no bad loans only badly priced loans" – meaning loans found not to comply with underwriting guidelines were generally not rejected, but simply negotiated to be purchased more cheaply.

391.    Over the past six years, Lehman's securitization practices have been the focus of several, significant RMBS lawsuits.   For example, in their Consolidated Securities Class Action Complaint filed on February 23, 2009, in *In re Lehman Brothers Mortgage-Backed Securities Litigation*, No. 08-cv-6762 (S.D.N.Y.), the class plaintiffs described in detail Lehman's faulty due diligence practices in securitizing loans in in Lehman-label trusts issued under, among other shelves, the SARM and SASC shelves.

392.    The results of file reviews conducted by investors further confirmed Lehman's faulty due diligence practices and pervasive and systemic breach of representations and warranties.   For example, in *In re Countrywide Fin. Corp.*, No. 11-ml-02265-MRP, AIG reviewed 188 loans originated by Countrywide from the SARM 2006-10 securitization, one of the Lehman Trusts here at issue, which demonstrated that the mortgage pools contain loans rife with fraud and other violations of representations and warranties.   Specifically, AIG's review revealed violations of underwriting guidelines in over 90% of the loans, including blatant misrepresentations of employment.   AIG's loan level analysis of SASC 2006-BC4, another Lehman Trust at issue in this action demonstrated that the originators and Lehman overstated the percentage of owner-occupied properties by 17.5 percentage points.

## 2.    Credit Suisse (DLJ Mortgage Capital)

393.    Credit Suisse, through its affiliate DLJ Mortgage Capital ("DLJ Mortgage"), was a major loan seller to the Trusts.   DLJ originated over $37.1 billion in mortgage loans sold to the Trusts.   Credit Suisse sponsored more than **$95.7 billion** in mortgage loans securitized in 101 of the Trusts under the ABSHE, ARMT, CSAB, CSFB, CSMC, HEAT, HEMT, and IRWHE shelves.   The poor performance of the Credit Suisse-label Trusts is indicative of the widespread breach of representations and warranties made by Credit Suisse and the originators. By January 1, 2009, nearly a quarter of all loans within the Credit Suisse-label Trusts were delinquent, including HEAT 2005-7 which was plagued with a 53.7% delinquency rate.   By January 1, 2011, as a result of these delinquencies, losses had mounted to $5.3 billion.   As of November 1, 2014, the Credit Suisse-label Trusts has suffered collateral losses of over $9.4 billion, representing nearly 10% of the entire loan collateral for these securitizations.

394.    It is now well known that during the relevant time period, Credit Suisse was willing to sacrifice quality for quantity and was motivated to maintain a good relationship with

originators for fears it could be locked out of the next auction and would not be unable to fuel its securitization machine. Credit Suisse reported that, from 2003 to 2005, it nearly doubled the value of residential mortgage loans it securitized, from approximately $27 billion to approximately $50 billion. Credit Suisse RMBS securitization continued to explode thereafter. From January 2004 through late 2007, Credit Suisse securitized (either itself or by selling mortgage loans to other sponsors) approximately $128.5 billion in residential mortgage loans. As detailed herein, to accomplish this tremendous volume growth, Credit Suisse abandoned sound underwriting practices and knowingly securitized defective loans.

395.    The extensive public record confirms that DLJ Mortgage securitizations, including many of the Trusts, contain extensive breaches of material representations and warranties. In particular, (1) public investigations and disclosures have revealed that DLJ Mortgage pervasively and systematically disregarded its own underwriting guidelines and, as a result, issued mortgages that did not meet stated criteria in the offering documents; and, (2) loan file reviews by insurers of transactions that included DLJ Mortgage-sponsored loans have demonstrated pervasive breaches of underwriting standards.

396.    For example, the FCIC and states' attorneys general have investigated Credit Suisse, and specifically, DLJ Mortgage, in the wake of the housing market collapse. In July 2010, Oregon Treasurer Ted Wheeler and Attorney General John Kroger joined several other plaintiffs in suing Credit Suisse on several RMBS.

397.    In September 2010, Clayton's trending reports were publicly disclosed. The reports reveal that Clayton found that 32% of the 56,300 loans that it reviewed for Credit Suisse received the worst possible grade and failed to meet guidelines. Despite Clayton's determination

that these loans failed to meet applicable underwriting standards, Credit Suisse "waived in" 33% of these defective loans into securitizations.

398.    Other significant RMBS investigations and lawsuits and discovery in actions uncovered internal reports, emails, and memoranda clearly demonstrating that DLJ Mortgage committed widespread abuses and made material misrepresentations in the governing documents.   For example, discovery in RMBS litigation has uncovered evidence that Credit Suisse devised a scheme whereby it was able to profit on defective loans twice: first, by securitizing them and selling the resulting securities to investors; and second, by (i) demanding that the originators of the defective loans repurchase the loans because the defects breached the originators' representations and warranties, (ii) settling the repurchase demands by "repricing" the loans, and (iii) pocketing the proceeds of those settlements instead of passing the money on to or repurchasing the defective loans from the trusts.

399.    A review of loan files by MBIA in *MBIA v. Credit Suisse Securities (USA) LLC, et at.*, Index No. 603751/2009 (N.Y. Sup. Ct. Dec. 14, 2009), which wrote insurance on DLJ Mortgage certificates, demonstrates that DLJ Mortgage routinely misrepresented the quality of loans included in the securitizations.   In carrying out its review of the approximately 1,386 DLJ defaulted loan files, MBIA found that 87% of the defaulted or delinquent loans in those securitizations contained breaches of DLJ Mortgage's representations and warranties. These findings demonstrated "a complete abandonment of applicable guidelines and prudent practices such that the loans were (i) made to numerous borrowers who were not eligible for the reduced documentation loan programs through which their loans were made, and (ii) originated in a manner that systematically ignored the borrowers' inability to repay the loans." Moreover, "the rampant and obvious nature of the breaches confirms that Credit Suisse made intentional

misrepresentations concerning its mortgage loans and the due diligence that Credit Suisse purported to perform regarding the quality of those loans."

400.    Investors have reached similar conclusions regarding the defective loan collateral underlying Credit Suisse securitizations in their review of loans from the Credit Suisse-label Trusts at issue here.  In *FHFA v. Credit Suisse Holdings (USA), Inc.*, No. 11-cv-06200 (S.D.N.Y. Sept. 2, 2011), FHFA conducted a forensic review of close to 10,000 loan files from 43 Credit Suisse securitizations, including 11 of the Trusts at issue in this action.[14]  The forensic review "revealed that for a majority of the loans reviewed in those Securitizations, there were numerous breaches of the originators' underwriting guidelines, such as failure to evaluate the reasonableness of the borrower's stated income or to correctly account for the borrower's debt, both key factors bearing on eligibility for a mortgage loan."

401.    In November 2011, Allstate Insurance Company ("Allstate") filed a complaint alleging fraud against Credit Suisse, DLJ Mortgage and other affiliates in connection with the sale of approximately $232 million in "highly-rated certificates" (the "Allstate Complaint").  The trusts at issue in the Allstate Complaint included six Credit Suisse-label Trusts: HEMT 2006-2, ARMT 2005-6A, ARMT 2007-1, CSMC 2006-8, CSMC 2007-3 and CSMC 2007-5.  Allstate performed a forensic review of sampling of loans from the loan pools, which showed that the loans were riddled with defects constituting pervasive breaches of representations and warranties.  For example, Allstate found that Credit Suisse systematically and significantly overstated the number of owner-occupied properties, understated the loans' LTV and CLTV ratios, and "routinely included" loans that "failed to conform to the originator's stated

---

[14] The eleven Credit Suisse-label Trusts are the following: HEAT 2006-1, HEAT 2006-3, ABSHE 2005-HE8, ABSHE 2006-HE5, ARMT 2005-10, ARMT 2005-11, ARMT 2005-12, ARMT 2006-1, CSFB 2005-11, CSFB 2005-12, and HEAT 2006-4.

underwriting standards."   Moreover, Allstate's forensic analysis found that Credit Suisse loan originators – which also originated many of the mortgage loans in the Trusts, including DLJ Mortgage, Credit Suisse, Countrywide, Option One, TBW) – "systematically abandoned underwriting standards."[15]

402.   In *Prudential Insurance Company of America v. Credit Suisse Securities (USA) LLC et al.*, No. 12-cv-07242 (D. N.J. Nov. 21, 2012), Prudential's loan level "analysis revealed systematic failures in Credit Suisse's loan underwriting and assignment practices." Specifically, Prudential found that across the twenty-three Credit Suisse securitizations that it tested, including 16 Credit Suisse-label Trusts at issue here, a staggering 48.67% of the mortgage loans contained at least one material defect.[16]   In a host of other cases, monoline insurers and investors have reached similar findings of Credit Suisse's widespread breach of representations and warranties concerning the loans securitized in the Trusts. *See, e.g., Assured Guaranty Municipal v. DLJ*, Index No. 652837/2011 (N.Y. Sup Ct. Oct. 17, 2011) (forensic review of at least six of the Trusts, including CSAB 2006-2, CSAB 2006-3, CSAB 2006-4, CSAB 2007-1, CSMC 2007-3 and TBW 2007-2, confirmed that DLJ "repeatedly and pervasively" breached representations about the loans and that a "massive number" of defective mortgages were packaged into securities); *FGIC v. Credit Suisse*, No. 651178/2013 (N.Y. Sup.Ct. Apr. 2, 2013) (forensic review of at least one Trust, HEMT 2006-2, confirmed that "Credit Suisse's pre-closing representations were fraudulent, the warranties it made in the insurance agreement were false, and it willfully

---

[15] In the same case, Allstate found systemic breaches of representations and warranties within the loan pools for TBW 2006-4, one of Trust at issue here that was sponsored by Taylor Bean Whittaker.

[16] The 16 Credit Suisse-label Trusts are: ABSHE 2007-HE1; CSFB 2005-1; HEAT 2004-3; HEAT 2004-6; HEAT 2004-8; HEAT 2005-1; HEAT 2006-1; HEAT 2006-3; ABSHE 2005-HE1; HEAT 2004-2; HEAT 2004-4; HEAT 2004-5; HEAT 2005-3; HEAT 2005-5; HEAT 2005-6; and HEAT 2006-2.

disregarded and frustrated its contractual covenants."); *Mass. Mutual v. DLJ Mortg.*, No. 11-cv-30047 (D. Mass. Feb. 25, 2011) (analysis of at least seven Trusts, including CSAB 2006-1, CSAB 2006-2, CSAB 2006-3, CSAB 2006-4, CSAB 2007-1, CSMC 2007-1 and CSMC 2007-3 confirmed "Credit Suisse Defendants abandoned or disregarded disclosed underwriting guidelines, often originating or acquiring loans issued to borrowers regardless of the borrowers' ability to repay."); *Minnesota Life Ins. Co. v. Credit Suisse First Boston Mortg. Sec. Corp. et al.*, No. 12-cv-2671 (Dist. Minn. Oct 18, 2012)  (plaintiff's review of loans from three Trusts, CSAB 2006-2, CSAB 2006-3, and CSMC 2007-4, demonstrated "systemic abandonment of [Credit Suisse's] stated underwriting practices."); *NCUA v. Credit Suisse Sec. (USA) LLC et al.*, No. 13-cv-6736 (S.D.N.Y. Sept. 23, 2013) (plaintiff's analysis of loans from at least three Trusts, ARMT 2006-3, ARMT 2007-1 and HEMT 2006-2, revealed that "the Originators had systematically abandoned the stated underwriting guidelines in the Offering Documents", and that [b]ecause the mortgages in the pools collateralizing the RMBS were largely underwritten without adherence to the underwriting standards in the Offering Documents, the RMBS were significantly riskier than represented."); *Texas County Dist. Ret. v. J.P. Morgan*, No. 1-GN-14-000998 (W.D. Tex.) (analysis of ARMT 2005-10 and CSMC 2006-8, two Trusts at issue here, provided strong evidence that "Credit Suisse knowingly and purposefully included defective loans in its RMBS that failed to meet the applicable standards, systematically disregarded warnings from Due Diligence Firms, and then misrepresented the quality of those loans to investors to induce them into purchasing the RMBS").

### 3. **WaMu**

403.    WaMu, together with its affiliates, including Long Beach was one of the Trusts largest loan sellers.  WaMu originated over $79.7 billion of mortgage collateral included in the Trusts.  Additionally, WaMu sponsored nearly **$88 billion** of loans sold to 86 separate Trusts

under the WAMMS, WAMU, WMABS, and WMALT shelves.  The poor performance of the WaMu-label Trusts is strong evidence of pervasive breaches of representations and warranties. By January 1, 2009, collateral losses in the Trusts had already reached over $1.3 billion.  Further, approximately 22% of all loans within the WAMU-label Trusts were delinquent, including 27 separate Trusts that had delinquency rates in excess of 25%.  By January 1, 2011, as a result of these severe delinquencies, realized losses increased to $5.7 billion.  To date, the WaMu-label Trusts have suffered collateral losses of over $11.6 billion, representing over 13% of the entire loan collateral for these securitizations.

404.    WaMu's widespread breach of its representations and warranties to the Trusts is further evidenced by immense record compiled through governmental investigations and reports as well as private litigation establishing widespread breaches of representations and warranties. For example, WaMu was ranked as the third worst mortgage originator by the OCC's "Worst Ten in the Worst Ten" list based on 2005-2007 originations as of March 29, 2009.

405.    WaMu's abandonment of its represented underwriting practices and systemic origination of defective loans during the same time period as the WaMu loans securitized in the Trusts were also detailed in the FCIC Report and the Senate Report.  The FCIC Report concluded that firms, including WaMu, originated a vast number of "high-risk, nontraditional mortgages that were in some cases deceptive, in many cases confusing, and often beyond borrowers' ability to repay."  FCIC Report at 418.  WaMu also conducted a "post mortem" review of 213 Long Beach loans that experienced first payment defaults in March, April, and May of 2005, which found that many early defaults were not only preventable, but that in some instances "fraud should have been easily detected from the presence of 'White Out' on an application or a borrower having two different signatures."  Senate Report at 78.

406.    According to the Senate Report, WaMu and Long Beach turned increasingly to higher risk loans over a four-year period, increasing its subprime loans from nearly $4.5 billion in 2003, to $29 billion in 2006.  *Id*. at 2-3.  WaMu and Long Beach failed to enforce compliance with their own lending standards; allowed excessive loan error and exception rates; exercised weak oversight over the third party mortgage brokers who supplied half or more of their loans; and tolerated the issuance of loans with fraudulent or erroneous borrower information.  *Id*. at 3. Moreover, WaMu and Long Beach securitized not just poor quality loans, "but also loans that its own personnel had flagged as containing fraudulent information." *Id*. at 125.  Finally, in September 2008, WaMu's Corporate Credit Review team released a report which found that internal controls intended to prevent the sale of fraudulent loans to investors were ineffective and that of "the 25 loans tested, 11 reflected a sale date after the completion of the investigation which confirmed fraud." *Id*.  In other words, even loans marked with a red flag indicating fraud were being sold to investors.

407.    WaMu's poor origination and securitization practices have been exposed in numerous well-publicized lawsuits, including many involving the WaMu Trusts at issue here. For example, in *FHFA v. JPMorgan Chase & Co*., No. 11-cv-06188 (S.D.N.Y. Sept. 2, 2011), the FHFA brought an action to recover losses suffered on 103 securitizations sponsored by JPMorgan and its affiliates, including WaMu.  Notably, the FHFA found misstatements and omissions of material fact concerning the quality of the underlying mortgage loans, the creditworthiness of the borrowers, and the practices used to originate such loans for 14 of the WaMu-label Trusts at issue here.[17]  Specifically, the FHFA found that with limited exception,

---

[17] These 14 WaMu-label Trusts are: WAMU 2007-OA3, WMABS 2006-HE3, WMABS 2006-HE5, WMABS 2007-HE1, WMABS 2007-HE2, WMALT 2005-10, WMALT 2005-9, WMALT

WaMu materially understated owner occupancy in these securitizations by approximately 10 percent points or more.  The data also revealed that WaMu materially understated LTV ratios.

408.    A host of other investors in other litigation involving WaMu-label Trusts at issue here have reached similar findings of widespread breaches after conducting forensic analyses. *See Allstate Bank, et al. v. JPMorgan Chase Bank, et al.*, Index No. 650398/2011 (N.Y. Sup. Ct. Feb. 15, 2011) (plaintiff's forensic analysis of WAMU 2005-AR5, WAMU 2006-AR11, WAMU 2007-HY7, WAMU 2007-OA1, WAMU 2007-OA3 and WMALT 2005-4 "disclosed underwriting standards were systematically ignored in originating or otherwise acquiring non-compliant loans");[18] *CMFG v. J.P. Morgan Sec.*, No. 13-cv-00580 (W.D. Wis. Aug. 15, 2013) (plaintiff's review of WAMU 2005-AR15 confirmed WaMu "misrepresent[ed] the fundamental attributes of, and thus the credit risk associated with, the pools of mortgage loans collateralizing the RMBS"); *Western Southern Life Ins. Co. v. Bank of America N.A.*, No. 11-cv-00667 (S.D. Ohio Sept. 26, 2011) (forensic review of WMALT 2005-7, WMALT 2005-9, WMALT 2006-4, WMALT 2006-5 and WMALT 2007-OA3 revealed WaMu and originators had "abandoned or disregarded underwriting guidelines and failed to conduct adequate due diligence so that they could purchase as many loans as possible for securitization"); *Fed. Home Loan Bank of SF v. Deutsche Bank Sec. Inc. et al.*, No. 10-cv-03039 (N.D. Cal. July 12, 2010) (plaintiff's loan level analysis of WMALT 2005-5, WMALT 2005-8 and WMALT 2006-3 confirmed "Defendants

---

2006-7, WMALT 2006-AR4, WMALT 2006-AR5, WMALT 2006-AR8, WMALT 2007-OA1, WMALT 2007-OA2, and WMALT 2007-OA3.  Notably, in this action the FHFA's forensic review uncovered extensive breaches of representations in two other Trusts at issue in this action, AABST 2005-5 and AHM 2005-4.

[18] In a separate action, *Allstate v. CitiMortgage*, Index No. 650432/2011 (N.Y. Sup. Ct. Feb. 17, 2011), Allstate's forensic review uncovered extensive breaches of representations and warranties in CRMSI 2006-3 and CRMSI 2007-2, two Trusts sponsored by CitiMortgage that are the subject of this action.

made untrue statements, or omitted important information, about such material facts as the Loan-to-Value ratios of the mortgage loans, the number of borrowers who did not live in the houses that secured their loans . . . and the extent to which the entities that made the loans departed from their own standards in doing so"); *Mass Mutual v. DLJ Mortg.,* No. 11-cv-30047 (plaintiff's forensic review demonstrated that "loans were issued on the basis of overstated incomes, inflated appraisals, false verifications of employment, and exceptions to underwriting criteria that had no proper justification"); *Texas County Dist. Ret. v. J.P. Morgan*, No. 1-GN-14-000998 (finding pervasive breaches of representations and warranties in WAMU 2005-AR15, WAMU 2006-AR16, WAMU 2007-HY3, WAMU 2007-OA4, WAMU 2007-OA5, and WMALT 2007-OA4).[19]

409.    On August 26, 2009, Deutsche Bank, which was the trustee for 99 trusts in which WaMu sold, sponsored and serviced loans, filed a federal lawsuit against the FDIC (as the receiver for WaMu) and others to enforce the trusts' and certificateholders' rights (the "Deutsche Bank Litigation").  Deutsche Bank commenced its action because the FDIC failed to respond to its proof of claim filed the preceding year.  Deutsche Bank's complaint detailed WaMu's systemically deficient origination practices and pervasive sale of mortgage loans that failed to comply with representations and warranties between 2004 and 2008.  *See Deutsche Bank Nat'l Trust Co. v. FDIC, as receiver for Washington Mutual Bank, et. al.*, No. 09-cv-01656 (D.D.C. Aug. 26, 2009).  Here, despite having access to the same information and being governed by the same set of obligations set forth in the PSAs and pursuant to the TIA, U.S. Bank failed to file a timely proof of claim in WaMu's bankruptcy, failed to submit a late-filed claim pursuant to FDIC rules, failed to enforce the Trusts' rights against either the FDIC or JPMorgan (as receiver and

---

[19] In the same action, Texas County found that large percentages of defective loans were included in AHM 2005-4, BAYV 2004-C, BAYV 2007-A, CMALT 2007-A8 and DSLA 2004-AR1, which are also Trusts at issue here.

successor in interest, respectively), and failed to take any other acts to protect the WaMu-sponsored Trusts as required by the PSAs and the TIA.

410.   On November 19, 2013, JPMorgan and the Justice Department agreed to a landmark $13 billion settlement – the largest settlement with a single entity in American history – to resolve federal and state civil claims arising out of the packaging, marketing, sale and issuance of RMBS by JPMorgan, Bear Stearns and WaMu prior to January 1, 2009.  As part of the settlement, JPMorgan acknowledged it made serious misrepresentations concerning the mortgage collateral backing numerous RMBS transactions, including 78 of the WaMu deals at issue here.

### 4.   Goldman Sachs

411.   Goldman Sachs ("Goldman"), through its affiliate Goldman Sachs Mortgage Company, sponsored nearly **$70 billion** in mortgage loans securitized in 66 Trusts.  Given the astounding delinquencies within the Goldman-label Trusts, it was evident by January 1, 2009, that Goldman had dumped toxic loans within these trusts.  By 2009, 18% of all loans within these securitizations were delinquent.  Twenty-three Trusts had delinquency rates exceeding 25%, including GSAMP 2006-HE3 where over 50% of the loan pool was delinquent.  As a result, the Goldman-label Trusts' realized losses increased exponentially over the next two years, more than doubling from approximately $2.2 billion in January 2009 to $4.8 billion by January 2011.  As of November 1, 2014, the Goldman-label Trusts have suffered over $7.6 billion in collateral losses, signifying that over 12% of the entire Goldman-label loan pool has been written off.

412.   The FCIC Report and the Senate Report are replete with findings that Goldman routinely securitized defective loan pools and performed little or no due diligence of the loans underlying the Trusts.  For example, according to an internal Clayton trending report, an average

of 22.9% of these loans did not comply with the stated underwriting guidelines and did not have compensating factors that would merit approval; yet, Goldman "waived" back in between 30%-40% of these defective loans.  While Clayton reviewed only a sample of the Goldman-securitized loan pools, as the FCIC concluded based on its own sample, "one could reasonably expect [the untested loans] to have many of the same deficiencies, and at the same rate, as the sampled loans."  Senate Report at 170.

413.    In May 2009, Goldman entered into a settlement with Massachusetts to resolve a related investigation, agreeing to pay approximately $50 million in relief to homeowners and an additional $10 million to the State.  In announcing the settlement, the Massachusetts Attorney General stated that Goldman did not take "sufficient steps to avoid placing problem loans in securitization pools."

414.    In addition, Goldman's securitization practices have been investigated by the SEC.  On July 15, 2010, the SEC announced that Goldman had agreed to pay a then-record $550 million to settle SEC charges that Goldman misled investors in a subprime mortgage product just as the U.S. housing market was starting to collapse.  In agreeing to the largest-ever SEC penalty paid by a Wall Street firm, Goldman acknowledged that its marketing materials for the subprime product contained incomplete information.

415.    Over the past five years, Goldman has also been a defendant in at least 12 significant RMBS investor lawsuits. Apart from actions alleging Goldman engaged in widespread breach of representations[20], forensic investigations and loan level reviews conducted

---

[20] *See, e.g.*, *W. S. Life Ins. v. Bank of Am.*, No. 11-cv-00667 (alleging that Goldman abandoned its disclosed underwriting guidelines in connection with GSR 2006-1F, a Trust at issue in this action); *W.S. Life Ins.. v. Goldman*, No. A1106193 (Ohio Com. Pl.) (alleging loans in GSR 2007-1F, a Trust at issue in this action were often issued on the basis of overstated incomes, inflated

by investors in these actions on loans included in the Goldman-label Trusts or substantially similar offerings confirmed Goldman's own characterizations of these securitizations as "junk," "dogs," "crap," and "lemons."  For example, on September 28, 2010, Federal Home Loan Bank of Seattle ("FHLB-Seattle") filed a securities fraud action against Goldman and related affiliates concerning four Goldman-sponsored RMBS offerings.  In FHLB-Seattle's analysis of the quality of the loans included in these offerings, it found that Goldman made untrue or misleading statements regarding LTV ratios, owner occupancy, and/or underwriting guidelines for between *50% and 60%* of the loans.

416.   Similarly, on June 13, 2012, the FHFA filed a securities fraud action against Goldman, its affiliates and executives concerning 40 RMBS offerings in which Fannie Mae and Freddie Mac had invested, including 10 Goldman-label Trusts at issue in this action.[21]   The FHFA's review revealed that, for each securitization, Goldman's and the originators' representations and warranties regarding owner occupancy were materially inaccurate, understating the percentage of non-owner occupied properties by at least 5.9%, and for many securitizations by 10% or more.  The data review further revealed that Goldman's representations and warranties concerning the LTV ratios of the mortgage loans in each of the securitizations were materially understated.  For 28 of the 42 Trusts, the data review revealed that at least 10% of the mortgages had a true LTV ratio over 100%. For 10 of the 42 Trusts, the data review revealed that at least 20% of the mortgages had a true LTV ratio over 100%.

---

appraisals, false verifications of employment, and other departures from the disclosed underwriting criteria that had no proper justification, often purchasing loans issued to borrower's regardless of their ability to repay).

[21] These 10 Goldman Sachs-label Trusts are the following: GSAA 2005-11, GSAA 2006-5, GSAMP 2005-AHL2, GSAMP 2006-HE3, GSAMP 2006-HE4, GSAMP 2006-HE7, GSAMP 2006-HE8, GSAMP 2007-HE1, GSAMP 2007-HE2, and GSAMP 2007-NC1.

417.    Many other investors' forensic reviews of loans within the Goldman-label Trusts have confirmed Goldman's systemic practice of packaging defective loans.  *See, e.g., Prudential Ins. Co. v. Goldman Sachs & Co. et al.*, No. 12-cv-06590 (D. N.J. Oct. 16, 2012) (plaintiff's forensic review of GSAMP 2006-HE2, GSAMP 2006-HE3, GSAMP 2006-HE7 and GSAMP 2007-HE2 confirmed that "lenders that originated and sold Mortgage Loans had systematically abandoned the stated underwriting guidelines"); *Royal Park v. Goldman Sachs*, Index No. 652454/2013 (N.Y. Sup. Ct. July 12, 2013) (plaintiff's forensic review of GSAA 2006-3, GSAA 2006-5, GSAA 2006-9, GSAMP 2005-AHL2, GSAMP 2006-HE2, GSAMP 2006-HE3 and GSAMP 2006-HE8 proved originators had "completely abandoned its stated underwriting guidelines and was simply seeking to originate as many loans as possible, without any regard for its borrowers' actual repayment abilities or the true value and adequacy of its mortgaged properties to serve as collateral"); *Deutsche Zentral-Genossenschaftsbank AG v. Goldman Sachs Group*, Index No. 653134/2012 (N.Y. Sup. Ct. Apr. 5, 2013) (plaintiff's "extensive investigation and analysis by Plaintiff into a large sample of the Loan Pools revealed that [Goldman] materially misrepresented the loan-to-value ("LTV") and combined loan-to-value ("CLTV") ratios, and the rates of owner-occupancy for the Loan Pools" for GSAA 2006-1, GSAA 2006-3, GSAA 2006-9 and GSAMP 2006-HE3); *FDIC v. Ally Sec. LLC, et. al.*, No. 12-cv-00872 (W.D. Tex. Sept. 20, 2012) (analysis of loans within GSR 2004-11 confirmed that Goldman "pushed and sold the securities with false statements about the quality of the underlying mortgages"); *Texas County Dist. Ret. v. J.P. Morgan*, No. 1-GN-14-000998 (plaintiff's loan level review of GSAMP 2006-HE7, GSR 2005-AR2 and GSR 2005-AR3 showed that "Goldman Sachs included recklessly underwritten loans in its RMBS that failed to meet the applicable standards,

systematically disregarding its own and third-party due diligence, and then misrepresented the quality of those loans to investors to induce them into purchasing the RMBS").

> 5.   **UBS**

418.   UBS, through its affiliate UBS Real Estate Securities, Inc., sponsored more than **$29.9 billion** in mortgage loans sold and securitized in 39 Trusts.  By January 2009, it was clear that UBS had deposited a large percentage of toxic loans in the UBS-label Trusts.  Preliminarily, the UBS-label Trusts had already suffered collateral losses of $1.9 billion.  Moreover, the UBS Trusts had severe delinquencies, as 36.5% of the loans within these Trusts were delinquent. Over the next two years, realized losses more than doubled to over $4.8 billion.  The Trusts continue to suffer tremendous collateral writedowns, as the UBS-label Trusts have suffered over **$5 billion** in realized losses as of November 1, 2014.

419.   UBS's deficient due diligence practices are well known.  For example, Clayton's trending reports revealed that in the period from the first quarter of 2006 to the first quarter of 2007, 20% of the mortgage loans UBS submitted to Clayton to review in RMBS groups were rejected by Clayton as falling outside the applicable underwriting guidelines.  Of the mortgage loans that Clayton found defective, 33% of the loans were subsequently waived in by UBS without proper consideration and analysis of compensating factors and included in securitizations.

420.   Over the past five years, UBS's securitization practices have been the focus of at least nineteen significant RMBS lawsuits, including actions by the FHFA, Federal Home Loan Banks, monoline insurers and RMBS holders.  Forensic investigations and loan level reviews of the UBS-label Trusts and substantially similar UBS securitizations conducted by plaintiffs in these actions have confirmed pervasive breaches of representations and warranties.  For example, on July 27, 2011, the FHFA filed suit against UBS alleging UBS made untrue or misleading

statements regarding the mortgage loans' LTV ratios, owner occupancy status, and/or compliance with underwriting guidelines in connection with sixteen UBS-sponsored trusts, fourteen of which are at issue here.  *See FHFA v. UBS Americas Inc. et al.*, No. 11-cv-05201 (S.D.N.Y. July 27, 2011).[22]  The FHFA's review of at least 1,000 randomly selected mortgage loans from each trust revealed that approximately 78% of the reviewed loans were not underwritten in accordance with the applicable underwriting guidelines.  On July 25, 2013, the FHFA announced that it had reached an agreement to settle the UBS case for $885 million.

421.    In *Prudential v. UBS*, No. ESX-L2489-13. (Sup. Ct. N.J.), Prudential's loan level analysis of seven UBS-label Trusts at issue in this action "revealed that across all of the Offerings that Prudential tested, 44.93% of the Mortgage Loans contained at least one material defect", which "means that nearly 12,600 of the Mortgage Loans underlying the tested Certificates alone were materially defective."[23]   *See also*, *Royal Park v. UBS,* Index No. 653901/2013 (N.Y. Sup. Ct. Nov. 7, 2013) (forensic analysis of MABS 2005-WF1, MABS 2006-HE4, MABS 2006-WMC1, MABS 2006-WMC2 and MARM 2007-1 demonstrated that UBS and the originators "affirmatively misrepresented material information regarding the very nature and credit quality of the certificates and their underlying loans").

422.    The results of these loan level reviews of UBS securitizations were corroborated by the findings of the Association of Financial Guaranty Insurers ("AFGI"), which wrote to UBS on November 30, 2011, on behalf of its industry members.  In the letter, the AFGI stated that its

---

[22] These fourteen UBS-label Trusts are the following: MABS 2005-FRE1, MABS 2005-HE2, MABS 2005-WF1, MABS 2006-FRE2, MABS 2006-HE2, MABS 2006-NC2, MABS 2006-NC3, MABS 2006-WMC2, MABS 2006-WMC3, MABS 2007-HE2, MARM 2006-2, MARM 2007-1, and MARM 2007-3.

[23] These 7 UBS-label Trusts are the following: MABS 2004-WMC3, MABS 2005-WMC1, MABS 2006-FRE2, MABS 2006-HE4, MABS 2006-NC1, MABS 2006-NC3, and MABS 2006-WMC3.

members had performed sufficient sampling of loans within UBS securitizations and "***have
concluded that well more than half of the 2005/2006/2007 vintage first and second lien
residential mortgage loans backing such RMBS were ineligible for securitization***."  The AFGI
concluded that "[g]iven that a large percentage of the loan pools securitized by UBS are
comprised of loans originated by discredited originators (such as IndyMac), well-known to have
originated high percentage of fraudulent and other ineligible residential mortgage loans, this high
percentage of ineligible loans should not be surprising."  See also, *Assured Guaranty Municipal
Corp. v. UBS Real Estate Sec. Inc.*, No. 12-cv-01579 (S.D.N.Y. Mar. 5, 2012) (monoline
insurer's analysis of three UBS securitizations, including MARM 2007-1 and MARM 2007-3 at
issue here, revealed that between 80% to 95% of the loans breached one or more of UBS's
representations and warranties).

### 6.   Merrill Lynch

423.    Merrill Lynch, through its affiliate Merrill Lynch Mortgage Lending, sponsored
more than **$26.9 billion** mortgage loans securitized in 38 Trusts (the "Merrill Lynch-label
Trusts").  By virtue of the staggering delinquencies and collateral losses, it was clear that by
January 1, 2009, Merrill Lynch-sponsored Trusts were filled with toxic loan pools.  By that time,
the Merrill Lynch-label Trusts averaged delinquency rates of 36%, with 22 of the 38 Trusts
experiencing delinquency rates in excess of 35%, including MLMI 2006-RM1 which had
delinquencies of over 69% of its entire loan pool.  As a result of these delinquencies, realized
losses grew from $2.6 billion in January 2009 to $4 billion in January 2011, a 35% increase.  In
total, as of November 1, 2014, the Merrill Lynch-label Trusts have suffered collateral losses of
over **$5.7 billion**, signifying that over 21% of these Trusts' loans have been written off.

424.    The poor credit quality of the Merrill Lynch-label Trusts is consistent with the
highly publicized government reports and RMBS litigation that have exposed Merrill Lynch's

deficient securitization practices and systemic breach of representations and warranties.  For instance, Clayton's trending reports showed that in the period from the first quarter of 2006 to the second quarter of 2007, 23% of the mortgage loans that Merrill Lynch submitted to Clayton to review in RMBS groups were rejected by Clayton as falling outside the applicable underwriting guidelines.  Of the mortgage loans that Clayton found defective, 32% of the loans were subsequently waived in by Merrill Lynch without proper consideration and analysis of compensating factors.

425.    Over the past five years, Merrill Lynch's false representations regarding the quality and characteristics of the mortgage loans it securitized have been the focus of several significant RMBS individual and class actions.  For example, on September 2, 2011, the FHFA filed suit against Merrill Lynch in connection with 72 Merrill Lynch-sponsored or underwritten securitizations, including 17 of the Merrill Lynch-label Trusts at issue in this action.[24]  *FHFA v. Merrill Lynch & Co., Inc. et al.*, No. 11-cv-06202 (S.D.N.Y. Sept. 2, 2011).  The FHFA's review of at least 1,000 randomly selected mortgage loans from each trust revealed that, for each securitization, Merrill Lynch understated the percentage of non-owner-occupied properties by more than 6 percent, and for some securitizations, by more than 10 percent.  In addition, the percentage of mortgage loans with a LTV ratio over 100 percent was over 10% in 63 of 72

---

[24] These Merrill Lynch-label Trusts are the following: MLMI 2005-A8, MLMI 2006-FF1, MLMI 2006-FM1, MLMI 2006-HE6, MLMI 2006-MLN1, MLMI 2006-RM1, MLMI 2006-RM5, MLMI 2006-WMC2, SURF 2006-AB3, SURF 2006-BC1, SURF 2006-BC2, SURF 2006-BC3, SURF 2006-BC4, SURF 2006-BC5, SURF 2007-AB1, SURF 2007-BC1 and SURF 2007-BC2.

securitizations, and for 20 securitizations over 20% of the mortgages had a true LTV ratio over 100%.[25]

426.     The FHFA's findings of systemic and pervasive breaches of representations and warranties by both Merrill Lynch and the originators that supplied the loans for Merrill Lynch-label Trusts are supported by several other loan level analyses conducted by investors in several other actions.  *See, e.g., Allstate v. Merrill Lynch*, Index No. 650559/2011 (N.Y. Sup. Ct. Jan. 3, 2011) (the high breach rates found within MLMI 2005-A2, MLMI 2006-RM1, MLMI 2006-RM5, MLMI 2006-WMC2, SURF 2006-BC2 and SURF 2006-BC3 was strong evidence that "Merrill actually knew the pool was a toxic mix of loans given to borrowers that could not afford the properties, and thus were highly likely to default"); *Prudential v. Bank of America*, No. 13-cv-01586 (forensic analysis of MLMI 2006-HE2, MLMI 2006-MLN1, MLMI 2007-HE3, SURF 2006-BC1, SURF 2006-BC2 and SURF 2007-BC1 demonstrated that originators "systematically abandoned its underwriting guidelines"); *AIG v. Bank of America*, No. 652199/2011 (N.Y. Sup. Ct. Aug. 8, 2011) (concluding that Merrill Lynch "made systemic misrepresentations regarding LTV, CLTV, and owner-occupancy" with respect to the loans securitized in MLMI 2006-HE3).

### 7.     Bear, Stearns & Co., Inc.

427.     Bear Stearns, through its affiliates, sponsored more than **$20 billion** of the loans in 28 Trusts.  Although the Bear Stearns-label Trusts were marketed to investors as conservative, AAA credit rated investments, it was clear by January 1, 2009, that the underlying loan collateral for these Trusts was not of the quality represented.  By that time, approximately 20.2% of the loans within the Bear Stearns-label Trusts were delinquent, and more than $310 million had been

---

[25] The FHFA's loan level review also found alarming breach rates in OWNIT 2006-4 and OWNIT 2006-6, securitizations sponsored by Ownit Mortgage which are also the subject of this action.

written off.  By January 2011, collateral losses across these trusts had increased over 1.5 times to **$462.7 million**.  As of November 1, 2014, the Bear Stearns-label Trusts have suffered collateral losses of over **$683.4 million**.

428.    Bear Stearns' poor securitization practices have been well publicized through government reports and private investor and insurer RMBS litigation.  Bear Stearns' goal was to securitize and sell as many loans to RMBS trusts as possible, by whatever means necessary, even if this meant sacrificing quality.  As Jo-Karen Whitlock, Senior Vice President of Conduit Operations for EMC Mortgage LLC ("EMC") wrote in an April 4, 2006 email, "[I]f we have 500+ loans in this office we MUST find a way to underwrite them and buy them . . . I was not happy when I saw the funding numbers and I knew that NY would NOT BE HAPPY.  I expect to see 500+ each day . . . I'll do whatever is necessary to make sure you're successful in meeting this objective."

429.    Likewise, the FCIC Report noted that "Ruhi Maker, a lawyer who worked on foreclosure cases at the Empire Justice Center in Rochester, New York, told Fed Governors Bernanke, Susan Bies, and Roger Ferguson in October 2004 that she suspected that some investment banks – she specified Bear Stearns and Lehman Brothers – were producing such bad loans that the very survival of the firms was put in question . . . . She urged the Fed to prod the Securities and Exchange Commission to examine the quality of the firms' due diligence; otherwise, she said, serious questions could arise about whether they could be forced to buy back bad loans that they had made or securitized."  FCIC Report at 15-16.

430.    Similarly, the NCUA filed two suits against Bear Stearns on behalf of failed credit unions, alleging that Bear Stearns, as sponsor, made numerous misrepresentations and omissions of material facts in the offering documents of RMBS sold to the failed corporate credit unions.

*See Nat'l Credit Union Admin. Bd. v. Bear, Stearns & Co. Inc.*, 12-cv-2781 (D. Kan. Dec. 14, 2012); *Nat'l Credit Union Admin. Bd. v. Bear, Stearns & Co. Inc.*, No. 13-cv-6707 (S.D.N.Y. Sept. 23, 2013).  The complaints alleged that Bear Stearns "abandoned" underwriting guidelines and securitized loans that were "destined from inception to perform poorly."  *NCUA Sues J.P. Morgan and Bear, Stearns over $3.6 Billion in Faulty Securities*, NCUA Press Release (Dec. 17, 2012).   In November 2013, JP Morgan settled the claims against Bears Stearns, and other JP Morgan affiliates, for $1.4 billion.

431.    On August 21, 2013, JPMorgan agreed to settle a lawsuit brought by bond-insurer Assured regarding misrepresentations by Bear Stearns as sponsor of a RMBS trust for an undisclosed amount.  In the complaint, Assured alleged that "Bear Stearns concealed the incredibly high breach rates uncovered through the sparse quality control it performed between 2002 and September 2005, which had revealed underwriting defects in 43 percent of the GreenPoint loans reviewed by Bear Stearns' own third-party quality control vendor." *Assured Guaranty Corp. v. EMC Mortgage LLC, et al.*, Index No. 650805/2012 (N.Y. Sup. Ct. Mar. 15, 2012) Compl. ¶14.

432.    In a similar suit brought by Ambac Assurance Corporation against Bear Stearns, the court filings identified multiple emails among Bear Stearns' employees that indicated Bear Stearns knew the loans it was securitizing were defective.  For example, "Bear deal manager Nicolas Smith wrote an e-mail on August 11th, 2006 to Keith Lind, a Managing Director on the trading desk, referring to a particular bond, SACO 2006-8, as 'SACK OF SHIT [2006-]8' and said, 'I hope your [sic] making a lot of money off this trade.'" *E-mails Suggest Bear Stearns Cheated Clients Out of Billions*, The Atlantic, January 25, 2011.  "Jeffrey Verschleiser even said in an e-mail that he knew this [due diligence] was an issue.  He wrote to his peer Mike

Nierenberg in March 2006, '[we] are wasting way too much money on Bad Due Diligence.' Yet a year later nothing had changed. In March 2007, Verschleiser wrote to Nierenberg again about the same due diligence firm, '[w]e are just burning money hiring them.'" *Id*.

433.   Similarly, in *Syncora Guarantee Inc. v. J.P. Morgan Securities LLC*, the plaintiff alleged that: "After observing this initial performance deterioration, Syncora retained an independent third-party consultant to reunderwrite samples of the securitized loans. The consultant performed loan-level analyses of 1,431 mortgage loans in the Transaction, with an outstanding principal balance of $131 million. The results evidence a staggering **92%** overall breach rate. The 1,431 loans reviewed include 400 that Syncora's consultant randomly selected, regardless of their payment status, which had an outstanding principal balance of $28 million. The findings on the random sample were astounding; **85.5%** of these 'random' loans breached one or more of the contractual warranties that EMC had made to Syncora." *Syncora Guarantee Inc. v. J.P. Morgan Securities LLC f/k/a Bear, Stearns & Co. Inc.*, Index No. 651566/2011 (N.Y. Sup. Ct. June 6, 2011) Compl. ¶7.

434.   Investors' forensic analysis of loans within the Bear Stearns-label Trusts have corroborated Bear Stearns' abusive securitization practices and provide further evidence that Bear Stearns breached its representations and warranties to each of the Bear Stearns-label Trusts. For example, in *Prudential Ins. Co. of Am. v. JPMorgan Sec. LLC et al.*, No. 12-cv-03489 (D.N.J. Aug. 30, 2012), Prudential conducted a forensic analysis of loans in seven Bear Stearns-label Trusts at issue here: BSABS 2004-HE11, BSABS 2004-HE5, BSABS 2004-HE7, BSABS 2004-HE8, BSABS 2004-HE9, BSABS 2004-FR3, and BSABS 2004-HE6.   The loan level analysis revealed that many of Bear Stearns' representations and warranties regarding the owner-occupancy were false, as Bear Stearns had overstated the percentage of owner occupancy by

approximately 10% or more for each securitization.  Prudential also found that these Bear Stearns-label Trusts had a much greater percentage of the loans with CLTVs higher than 90% and 100% than Bear Stearns represented.  Prudential concluded that "the consistency and size of these misrepresentations [] confirms that the abandonment of sound underwriting practices was systematic."

435.    Similarly, in *Texas County Dist. Ret. v. J.P. Morgan*, No. 1-GN-14-000998, plaintiff conducted a forensic review of loans within BSARM 2004-8, and found that Bear Stearns had understated the number of loans with a LTV ratio exceeding 80% by nearly 48 percentage points, and loans with a LTV ratio exceeding 100% by nearly 12 percentage points.[26]

436.    On November 15, 2013, JPMorgan announced that it had reached a $4.5 billion agreement with an institutional investor group to settle, among other things, mortgage repurchase claims for 330 RMBS trusts issued by JPMorgan, Bear Stearns and Chase.  Many of the trusts are of the same vintage and label as Bear Stearns-sponsored Trusts at issue in this action. Notably, this settlement was reached two years after the institutional investor group asked the trustees for the trusts, including U.S. Bank, to open an investigation into potential mortgage repurchase and servicing claims held by the RMBS trusts on December 15, 2011, and subsequent to the trustees obtaining forbearance agreements on mortgage repurchase claims for these Trusts. On August 1, 2014 and October 2, 2014, all of the trustees involved in the repurchase initiative, including U.S. Bank, accepted JPMorgan's $4.5 billion offer to resolve claims for the vast

---

[26] Forensic reviews of loans within Trusts where Bear Stearns served in the lead underwriter capacity in other litigation have also revealed pervasive and systemic breaches.  *See, e.g.*, *Sealink Funding v. Bear Stearns*, No. 652681/2011 (N.Y. Sup. Ct.) (plaintiff's review found that Bear Stearns' percentage understatement of non-owner occupied loans in AABST 2005-5 was 278%, and that contrary to Bear Stearns representation 14% of the loans in SGMS 2006-FRE2 had LTVs exceeding 100%).

majority of the 330 trusts and petitioned the Supreme Court of the State of New York for approval of the settlement.

437.    As noted above, on November 19, 2013, the DOJ announced its $13 billion settlement with JPMorgan, wherein JPMorgan acknowledged it made serious misrepresentations to the investing public about numerous RMBS transactions.   Significantly, 64 of the Bear Stearns-label Trusts at issue in this action were the subject of this settlement.

### 8.    RBS

438.    The Royal Bank of Scotland Group PLC ("RBS"), through its affiliates RBS Financial Products, Inc. (f/k/a Greenwich Capital Financial Products, Inc.) and Soundview, sponsored more than **$15.7 billion** in mortgage loans securitized in 11 of the Trusts.  Given the poor performance of the Trusts, it was clear by January 1, 2009, that the mortgage collateral backing the Trusts was of extremely poor quality.  For example, at this time, over 31% of the RBS-Trusts' loans were delinquent, and the RBS-Trusts had suffered collateral losses in excess of $221.3 million.  Realized losses increased over three times by January 2011 to $718.1 million. As of November 1, 2014, the RBS-label Trusts have suffered collateral losses of over $1.8 billion.

439.    RBS's poor mortgage securitization practices have been the subject of government investigations, reports and significant RMBS investor lawsuits.  The FCIC Report noted that Clayton acted as a due diligence provider for RBS's RMBS offerings.  According to testimony to the FCIC, for the loans Clayton tested for the RBS from at least January 1, 2006 through June 30, 2007, Clayton informed RBS that at least 18.4% of the loans did not comply with the underwriting guidelines, did not have compensating factors otherwise meriting approval, and/or had defective appraisals. Notwithstanding being informed of this, RBS knowingly and deliberately waived well over half of those defective loans (53.3%) into their

offerings.  The FCIC Report further reported that at the same time RBS was securitizing the Trusts, it was selling RMBS short, including RBS's own securitizations.  RBS received $1.1 billion in payments from AIG and AIG-related entities alone for their shorting activities.

440.    In *FHFA v. Royal Bank of Scotland Group PLC, et al.*, No. 11-cv-01383 (Dist. Conn. Sept. 2, 2011), the FHFA performed a forensic analysis of 68 RBS-sponsored and/or underwritten securitizations, including five RBS-label Trusts at issue here: HVMLT 2005-12, HVMLT 2005-13, HVMLT 2005-16, HVMLT 2006-1, and HVMLT 2006-4.  The FHFA found that "at least 3.12 percent of the mortgage loans for each Securitization had a LTV ratio over 100 percent, and for most Securitizations this figure was much larger."  Amended Compl. ¶113.  The FHFA also found that "the Prospectus Supplement for each Securitization was grossly inaccurate, understating the percentage of non-owner occupied properties by at least six percent, and for many Securitizations by ten percent or more."  Amended Compl. ¶107.

441.    On January 19, 2012, CUNA Mutual Group sued RBS Securities Inc., seeking a rescission of 15 certificates in 10 separate RMBS offerings, including RBSGC 2005-A, a Trust at issue in this action.  Before filing the suit, CUNA Mutual commissioned a forensic investigation of the loan pools collateralizing the 10 RMBS to test the accuracy of RBS's representations. *CMFG Life Ins. Co. v. RBS Sec. Inc.*, No. 12-cv-00037 (W.D. Wis. Jan. 17, 2012).  CUNA Mutual analyzed 17,947 loans or about 40% of all the loans in the pools.  "The results of CUNA Mutual's forensic investigation revealed that RBS's quantitative representations in the offering documents of all 10 RMBS were false at the time they were made."[27]

---

[27] In a separate action, *CMFG Life Ins. Co. v. Banc of America*, No. 13-cv-00579 (W.D. Wis. Aug. 15, 2013), CUNA's loan level analysis revealed systemic seller breaches of representations and warranties in STALT 2005-1F, which is also a Trust at issue in this case.

442.    Many other forensic analyses of RBS securitizations have confirmed RBS's widespread breach of representations and warranties to the Trusts.  *See, e.g., Royal Park v. RBS*, No. 653541/2013 (N.Y. Sup. Ct. Oct. 11, 2013) (forensic review of HVMLT 2005-1, HVMLT 2005-13, HVMLT 2005-16, HVMLT 2006-1 and HVMLT 2006-4 demonstrated pervasive breaches of representations and warranties concerning compliance with underwriting guidelines, owner occupancy, LTV ratios and assignment of title); *Texas County Dist. Ret. v. J.P. Morgan*, No. 1-GN-14-000998 (plaintiff's forensic review of HVMLT 2005-1 and HVMLT 2005-16 proved that the lien data, owner-occupancy statistics, and LTV ratios reported by RBS were materially misstated).

### 9.    C-BASS

443.    C-BASS was a mortgage investment and servicing company that specialized in the purchase and securitization of subprime mortgages.  C-BASS sponsored over **$11.6 billion** in mortgage loans sold and securitized to 22 Trusts, a high percentage of which were defective.  By January 1, 2009, it became clear that the C-BASS-label Trusts were afflicted by pervasive breach of representations and warranties made by C-BASS and the originators that supplied the loans for securitizations.  At that time, the C-BASS Trusts averaged delinquencies of over 35%.  To date, the C-BASS Trusts have incurred losses of over **$2.9 billion** in realized losses.

444.    C-BASS did not originate loans, but instead served as "Sponsor" of securitizations, often purchasing and securitizing loan pools from originators notorious for failing to adhere to sound underwriting guidelines.  Indeed, Fitch Ratings described C-BASS's general business strategy as one that "targeted investment in 'scratch and dent' sub-performing and nonperforming whole loans, subprime whole loans, subordinate RMBS and servicing rights .
. . ."  Similarly, the American Banker described C-BASS as a firm "best known for buying 'scratch-and-dent' home loans."  "Scratch-and-dent loans" are loans or mortgages that have one

or more combination of "defects" stemming from originations made outside a lender's implemented credit guidelines, deficiencies in loan documentation, errors made in following regulatory compliance laws, irregular payment history or borrower defaults.

445.    As a significant underwriter of RMBS, C-BASS was a customer of Clayton and its due diligence services.  Clayton found that 29% of the total loans underwritten by C-BASS failed to meet the stated underwriting guidelines, but that C-BASS waived its right to reject 43% of these non-conforming loans, and included them in the RMBS it securitized anyway.

446.    Investor lawsuits have similarly shined the light on C-BASS's faulty securitization practices during the 2004 through 2007 timeframe.  In its Amended Complaint filed on March 18, 2010, in *Fulton County Employees' Retirement System v. MGIC Investment Corporation*, No. 08-cv-00458 (E.D. Wisc. May 22, 2008), a securities fraud class action against MGIC, a controlling shareholder of C-BASS, the class plaintiffs quoted several former senior executives of C-BASS confirming C-BASS's flawed due diligence practices.  For example, a senior forensic underwriting analyst at C-BASS from 2004 until mid-2008 who was responsible for reviewing defaulted loans estimated that "75% of [the defaulting loans] were fraudulent." Similarly, a Due Diligence Underwriter Contractor for C-BASS from 2004 through 2007 stated that, "from about 2004 on forward through the 2005 – 2007 timeframe, the quality of loans was falling and consequently the risk component was rising."  He explained that occasionally he would "find pools of loans that were all 'very poor,'" and that "'it looked like they [C-BASS] were just slapping loans together.'"  He recalled that in some cases the pools were "so bad that 80% to 90% of the loans in the pool were 'no good,'" noting that the continued decrease in underwriting guidelines [loan quality] resulted from a decrease in the integrity of the seller/originator, such as Countrywide."  (Bracketed terms in original.)

447.     Similarly, in *FHFA v. Barclays Bank PLC et al.*, No. 11-cv-06190 (S.D.N.Y. Sept. 2, 2011), the FHFA alleged systemic misrepresentations regarding occupancy status, LTV and CLTV ratios and chain of title representations in connection with, among other things, the underlying loans for two C-BASS-label Trusts, CBASS 2006-CB1 and CBASS 2007-CB2. FHFA determined that CBASS had understated non-owner occupied properties by 7.5% and 11.14% for these Trusts, respectively.   The FHFA also determined that 12% of the sample of loans included in the data review for CBASS 2006-CB1 and 29% for CBASS 2007-CB2 had LTV ratios above 100 percent.   Moreover, the FHFA reviewed 100 loan files from CBASS 2007-CB2, and determined that at least 83% of the reviewed loans were not underwritten in accordance with the underwriting guidelines.   The FHFA's complaint described specific defective loans where had the loan underwriter performed a reasonableness test, the unreasonableness of the borrower's stated income would have been evident.

448.     Loan level reviews conducted in other actions have further confirmed the existence of widespread breaches within the C-BASS-label Trusts.   For example, in *FHFA v. JPMorgan Chase & Co. et al.*, 11-cv-06188 (S.D.N.Y. Sept. 2, 2011), an initial forensic review of 100 loan files for loans in CBASS 2006-CB7 revealed that approximately 79% of the reviewed loans were not underwritten in accordance with the underwriting guidelines or otherwise breached the representations contained in the transaction documents.   Similarly, in *IKB International v. JPMorgan Chase & Co.*, No. 12-cv-04617 (S.D.N.Y. June 13, 2012), the plaintiff determined that contrary to C-BASS representation that no loans would have a LTV/CLTV ratios exceeding 100%, over 34% of the sampled loans had CLTV/LTV over 100%.   *See also*, *In re Countrywide Fin. Corp.*, No. 11-ml-02265-MRP (loan level review of CBASS 2007-CB4 revealed CBASS "materially misrepresented [LTV/CLTV ratios] and the rates of owner-

occupancy for the various pools of loans purportedly underlying the Securitization[]");
*Prudential v. Goldman Sachs*, No. 12-cv-06590 (forensic review of CBASS 2006-CB9 indicated
"the systemic abandonment of underwriting standards and the resulting inclusion of highly risky
or outright fraudulent Mortgage Loans"); *Texas County Dist. Ret. v. J.P. Morgan*, No. 1-GN-14-
000998 (finding that 11.65% of the loans reviewed from CBASS 2006-CB9 had a LTV greater
than 100%).

### 10. **Morgan Stanley**

449.    Morgan Stanley & Co., Inc. ("Morgan Stanley"), through its affiliates Morgan
Stanley Mortgage Capital, Inc. and Saxon Capital, Inc., sponsored over **$15 billion** in mortgage
loans securitized in 22 Trusts.   By January 1, 2009, it was evident that the Morgan Stanley
Trusts' loan pools were heavily populated with toxic loans.   At that time, nearly 30% of the loans
within these Trusts were delinquent.   Notably, 13 of the Morgan Stanley-label Trusts had
delinquency rates in excess of 25%, including MSM 2006-8AR and MSM 2006-6AR where
more than 50% of the securitized loans were delinquent.   Moreover, collateral losses in these
Trusts were in excess of $500.7 million.   As of November 1, 2014, the Morgan Stanley-label
Trusts have suffered collateral losses of more than **$2.3 billion**.

450.    According to the FCIC, Morgan Stanley devoted minimal resources to due
diligence on loans it securitized.   For instance, the head of due diligence was based in Boca
Raton, Florida and had, at any one time, only two to five individuals reporting to him directly—
and they were actually employees of a personnel consultant, Equinox.   FCIC Report at 168.

451.    Internal Clayton documents show that a startlingly high percentage of loans
reviewed by Clayton for Morgan Stanley were defective, but were nonetheless included by
Morgan Stanley in loan pools sold to the Trusts.   According to Clayton's data, 37% (or 23,154)
of the 62,940 loans that it reviewed for Morgan Stanley failed to conform to Morgan Stanley's

stated underwriting standards.  Of the 37% of loans identified by Clayton as non-compliant, Morgan Stanley "waived in" 56% (or 20% of the total pool), including toxic loans in the Trusts' securitization pools.

452.    Government investigations and lawsuits involving Morgan Stanley-sponsored Trusts further exposed its poor due diligence.  For example, in 2010, Morgan Stanley was forced to pay $102 million to settle claims asserted by the Massachusetts Attorney General and agreed to drastic changes in its underwriting practices.  *Id.* at ¶¶45-52; FCIC Report at 226.  Similarly, in *FHFA v. Morgan Stanley*, a forensic review conducted by the FHFA of 210 loans from the MSM 2007-2AX and SAST 2007-1, securitizations substantially similar to the Trusts at issue here, revealed that approximately 93% of the reviewed loans had not been underwritten in accordance with the applicable underwriting guidelines.  *FHFA v. Morgan Stanley et al.*, No.11-cv-6739 (S.D.N.Y. June 13, 2012) Amended Compl. ¶112.  During an 18-month period ending June 31, 2007, Clayton, rejected 16% of the loans it reviewed for Morgan Stanley.  This information was provided to Morgan Stanley, but it overruled Clayton's findings and "waived in" approximately 56% of those loans. (*See* Clayton All Trending Report at 8, *available at* http://fcic.law.stanford.edu/hearings/testimony/the-impact-of-the-financial-crisissacramento# documents.)  *Id*. at ¶201.

453.    Lawsuits involving many of the Morgan Stanley-label Trusts illuminating Morgan Stanley's pervasive and systemic securitization abuses provide further evidence of breaches of representations and warranties.  For example, on February 13, 2013, the NCUA filed a highly detailed complaint against Morgan Stanley asserting Morgan Stanley made misrepresentations in connection with the underwriting and subsequent sale of MSM 2006-16AX, MSM 2006-3AR, MSM 2006-8AR, MSM 2007-11AR, and MSM 2007-5AX, all of which are Trusts at issue in

this action.  In particular, the NCUA alleged that originators and Morgan Stanley systematically abandoned the stated underwriting guidelines in the offering documents, causing the securities to be significantly riskier than represented.  In *Western and Southern Life Insurance Company et al. v. Morgan Stanley Mortgage Capital, Inc. et al.*, No. 11-cv-00576 (S.D. Ohio Aug. 22, 2011), the plaintiff made nearly identical allegations of Morgan Stanley's widespread breaches of representations and warranties with respect to MSM 2006-11, MSM 2006-12XS, MSM 2006-17XS and MSM 2007-3XS, all Trusts at issue in this action.

## X.   U.S. BANK KNEW THAT THE TRUSTS WERE FILLED WITH DEFECTIVE LOANS

454.   There is ample evidence that beginning in 2009 and by 2011, U.S. Bank "discovered" that each of the Trusts' loan pools contained high percentages of mortgage loans that materially breached the originators' and sponsors' representations and warranties regarding their characteristics and credit quality.  As discussed above, since 2009 there has been a steady stream of public disclosures regarding the originators' systemic underwriting abuses and the sponsors' faulty securitization practices.   In addition to the highly publicized government investigations, reports and enforcement actions, as well as high profile RMBS litigation involving the originators and sponsors, as explained below there is a plethora of other evidence demonstrating U.S. Bank's and its responsible officers' knowledge that the Trusts' loan pools contained high percentages of mortgage loans that materially breached seller representations and warranties.

### A.   The Trusts' Poor Performance

455.   U.S. Bank and its responsible officers had discovered by 2009 that the Trusts' loan pools were afflicted by severe and pervasive breaches of seller representations and warranties by virtue of the Trusts' abject performance.  It was evident by January 2009 that given

the extremely high mortgage loan default rates within the Trust loan pools the mortgage loans sold to the Trusts were not as the sellers had represented and warranted.

456.    For example, by January 1, 2009, over 24% of the relevant mortgage collateral across all 843 of the Trusts were delinquent. Within certain RMBS sponsor labels, such as the Lehman-label Trusts, over 32% of the relevant mortgage collateral were delinquent, and delinquencies in trusts sponsored by Merrill Lynch averaged more than 36%. Moreover, an astounding 25% or more of the relevant mortgage loans were delinquent in 343 of the individual Trusts. Further, 280 of the Trusts had delinquency rates of above 30% for the remaining mortgage loans. Astonishingly, in 75 Trusts, over half of the collateral was delinquent, with the MLMI 2006-RM1 reaching nearly 69.8%.

457.    These high default rates were no surprise to U.S. Bank by January 2009. Among other things, U.S. Bank, as Trustee, published monthly remittance reports, that were publicly filed with the SEC on Form 10-D, outlining the credit performance of the mortgage loans in the Trusts. Moreover, the delinquency rates had been steadily rising up to and through 2009. By about July 2008, the first harbingers of the violations of the representations and warranties regarding the credit quality of the loans started to appear. The Trustees' monthly reports started to show increases in the trends of loan delinquencies, and by January 2009 these trends had become pronounced:



458.     These high losses and delinquency rates, known to U.S. Bank through monthly Service Reports and Trustee Remittance Reports, indicated, along with the facts detailed above, that the underlying mortgage loans in the Trusts systemically breached the sellers' representations and warranties.  By about July 2008, the Trustees' monthly reports started to show increases in the trends of loan delinquencies, and by January 2009, these trends had become pronounced.

459.     Additionally, U.S. Bank was provided regular reports regarding loan modifications granted by the servicers to borrowers that failed to timely make P&I payments on their loans to the Trusts.  In general, loan modifications change the terms of the original mortgage contract agreed to by the lender and borrower, typically to ease the borrower's monthly payment obligation so the borrower may remain current and avoid default.  Loan modifications often include changes to the loan's interest rate, term, and/or outstanding principal.  As with delinquency rates, the extent of loan modifications is indicative of breaches of representations and warranties for at least two reasons.  First, escalating loan modifications correlate to misstated

borrower income and creditworthiness.  Second, the servicers' decisions to modify rather than foreclose on loans indicates that the underlying collateral is not adequate security to satisfy the outstanding balance, because the original LTV ratio (or CLTV ratio) was not as represented because the appraised property value was misstated and additional liens encumbered the mortgaged property.

460.    As indicated below, loan modifications in the Trusts dramatically increased beginning in early 2009, providing U.S. Bank further information regarding the systemic breaches of representations and warranties in the Trusts:

**Cumulative Loan Modifications in U.S. Bank Trusts**



Source: Bloomberg

**B.    Credit-Rating Downgrades Of The Certificates Further Supports The Sellers' Problems**

461.    At the time of securitization, all of the Trusts' senior tranches were rated "investment grade."  Bond rating firms, such as Standard & Poor's, use different designations consisting of upper- and lower-case letters 'A' and 'B' to identify a bond's credit quality rating. "AAA" and "AA" (high credit quality) and "A" and "BBB" (medium credit quality) generally

are considered investment grade.   An investment grade rating signifies that the bond has a relatively low risk of default and are judged by the rating agencies as likely to meet payment obligations such that banks and institutional investors are permitted to invest in them.   Credit ratings for bonds below investment grade designations (i.e., "BB", "B", "CCC", etc.) are considered low credit quality, and are commonly referred to as "junk bonds."

462.    However, as public disclosures revealed the originators' and sponsors' systemic underwriting and securitization abuses and U.S. Bank began reporting severe collateral losses in the Trusts, the Trusts' certificates' credit ratings were drastically downgraded.   By December 31, 2009, approximately 70% of the senior tranches in the Trusts had been downgraded at least once. Across all Trusts, over 80% of all certificates had been downgraded by at least one credit rating agency.   Finally, over 50% of the senior certificates had been downgraded to junk bond status, a startling number.

### C.    U.S. Bank Discovered Widespread Seller Breaches Of Representations And Warranties In Its Capacity As Servicer

463.    In addition to acting as a trustee, U.S. Bank is among the largest mortgage loan servicers to the RMBS industry during the relevant period.   Indeed, U.S. Bank's master servicing portfolio includes approximately 45,700 loans with an unpaid principal balance of approximately $6 billion as of January 2014.   Many of these loans were originated and sponsored by the mortgage loan sellers to the Trusts.   In servicing these loans, U.S. Bank was in a front row seat to view mortgage loan sellers' abusive underwriting and securitization practices.   For example, as servicer to RMBS trusts containing loan pools originated and securitized by the same mortgage loan sellers to the Trusts, U.S. Bank prepared monthly reports for the trustees detailing the similarly poor performance of the loan pools.   Additionally, as servicer, U.S. Bank knew of the credit agencies' similar downgrading of these trusts as a result of the poor credit quality of these

same originators' and sponsors' loan pools.  Further, in servicing and administrating the loans, including during the modification process, U.S. Bank examined the loan files of mortgage loans originated and sponsored by these entities and in the process discovered systemic and pervasive breaches of representations and warranties in the loan pools.

464.    Because the problems U.S. Bank discovered regarding these common originators and sponsors in its capacity as servicer to other RMBS trusts revealed systemic and pervasive violation of underwriting and securitization guidelines, U.S. Bank knew that these same defective underwriting and securitization practices applied to the Trusts.

### D.    U.S. Bank Received Written Notice Of Pervasive And Systemic Seller Breaches From Financial Guaranty Insurers

465.    U.S. Bank also discovered that the Trusts' loan pools contained high percentages of mortgage loans that materially breached the originators' and sponsors' representations and warranties through its involvement in financial guaranty insurer litigation involving these same originators and sponsors, in its capacity as either trustee or master servicer.

466.    Financial guaranty insurers provide financial guaranty insurance for RMBS issued from many of the Trusts.  Under the Governing Agreements for these insured RMBS, the mortgage loan sellers to the Trusts made numerous representations and warranties concerning quality and origination practices for the mortgage loans.  The Governing Agreements for the insured RMBS also create a repurchase protocol pursuant to which the monoline insurers must provide notice of a breach of representation and warranty to the responsible mortgage loan seller and the parties to the Governing Agreement (including the Trustee), in order to compel the responsible mortgage loan seller to repurchase loans that breach representations and warranties.

467.    Monoline insurers have initiated at least ten lawsuits against responsible mortgage loan sellers for breach of their representations and warranties in connection with other RMBS

trusts to which U.S. Bank serves either as master servicer or trustee.[28]  Prior to filing suit against the originators and/or sponsors, the monoline insurers (unlike certificateholders) were often able to obtain access to the specific loan files or conduct a forensic loan level review of the loans, which showed systemic and pervasive breaches of the representations and warranties in securitizations with the same sponsors to the Trusts (e.g., Bank of America, Bear Stearns, Credit Suisse, First Franklin, UBS and Morgan Stanley); same RMBS labels; same RMBS shelves; same vintage; same loan product type; and/or the same originators (e.g., Countrywide, GreenPoint, and DLJ).

468.    Plaintiffs are informed and believe that consistent with the repurchase protocol under the Trusts' governing documents, U.S. Bank was notified by both the responsible mortgage loan sellers and the parties to the PSAs (including Wells Fargo as Master Servicer) of these sellers' systemic and pervasive breaches of representations and warranties.

469.    The monoline insurers' findings from loan level reviews set forth both in their breach notices and subsequent publicly available lawsuits made U.S. Bank and its responsible officers aware of the systemic violation of underwriting and related standards in the mortgage securitization industry between 2004 and 2008, and informed them of specific originators' and

---

[28] *See, e.g., CIFG Assurance N. Am., Inc. v. Bank of Am., N.A. et al.*, No. 654028/2012 (N.Y. Sup. Ct.); *Assured Guaranty Corp. v. EMC Mortg. LLC*, No. 1:12-cv-01945 (S.D.N.Y.); *Assured Guaranty Municipal Corp. v. DLJ Mortg. Capital*, No. 652837/2011 (N.Y. Sup Ct.); *Ambac Assurance Corp. et al. v. First Franklin et al.*, No. 651217/2012 (N.Y. Sup. Ct.); *U.S. Bank Nat'l Assoc. v. GreenPoint Mortg. Funding, Inc.*, No. 600352/2009 (N.Y. Sup. Ct.); *MBIA Ins. Corp. v. Credit Suisse Sec. (USA), LLC et al.*, No. 603751/2009 (N.Y. Sup. Ct.); *Assured Guaranty Municipal Corp. v. UBS Real Estate Sec. Inc.*, No. 1:12-cv-01579 (S.D.N.Y.); *MBIA Ins. Corp. v. Morgan Stanley et al.*, No. 29951/2010 (N.Y. Sup. Ct.); *Fin. Guaranty Ins. Co. v. Ally Fin., Inc.*, No. 12-cv-0338 (S.D.N.Y.); *Assured Guaranty Municipal Corp. v. DLJ Mortg. Capital*, No. 652837/2011 (N.Y. Sup Ct.).

sponsors' systemic and pervasive practice of misrepresenting the credit quality and characteristics of mortgage loans to keep the RMBS machine running.

470.    For example, in *CIFG v. Bank of America,* Index No. 654028/2012 (N.Y. Sup. Ct. Nov. 20, 2012), the plaintiff CIFG, a New York-based monoline insurer, wrote insurance relating to two structured transactions arranged by Bank of America, which in turn were backed by twenty-two Bank of America securitizations.  CIFG alleged that "Bank of America had these securities in its inventory because it had been unable to sell them when it served as underwriter on the original RMBS offerings."  CIFG claimed that "Bank of America knew of the poor quality of the Mortgage Loans, and knew the unsold Original RMBS were a ticking time bomb on the bank's books."  According to CIFG, Bank of America, unable to sell the securities in pieces, then "hatched a new plan of financial engineering," repackaged the bonds, and induced CIFG to provide more than $150 million in insurance to make them marketable to investors.  CIFG alleged that Bank of America gave it "garbage data" that made the loans and the certificates they backed appear less risky than they actually were, including with respect to LTV, CLTV and the percentage of the mortgages where the property would be occupied by the borrowers.

471.    To highlight the falsity of the originators' and Bank of America's representations and warranties regarding the underlying loans, CIFG revealed the findings of its loan level analysis of over 31,000 mortgage loans from the twenty-two securitizations showing that a staggering **_64.37%_** of the mortgage loans contained at least one material defect.  A summary of testimonial and documentary evidence demonstrates widespread breaches of representations and warranties by each of the major originators of the mortgage loans for those trusts.

472.    Because these monoline insurers' findings from loan level reviews set forth both in their breach notices and subsequent publicly available lawsuits reflected these mortgage loan

sellers' systemic and pervasive violation of underwriting and securitization guidelines, U.S. Bank discovered that these same defective underwriting and securitization practices applied equally to the other Trusts containing loans originated and securitized by these same originators and sponsors.

**E.**     **U.S. Bank And Its Responsible Officers Repeatedly Received Written Notice From Certificateholders Of Pervasive And Systemic Seller Breaches**

473.   U.S. Bank, its capacity as Trustee to many Trusts at issue herein, as well as in its capacity as trustee to other RMBS trusts that are not the subject of this action but which are secured by loans originated and sponsored by the very same entities that originated and sponsored the loans underlying the Trusts at issue herein, has repeatedly received notice from certificateholders of pervasive and systemic violations of representations and warranties by the loan sellers.  Based on the sheer volume of the defective mortgage loans identified, together with the systemic and pervasive faulty origination and securitization practices complained of in the certificateholders' breach notices, U.S. Bank and its responsible officers knew that the Trusts' loan pools similarly contained high percentages of defective mortgage loans.

474.   For example, on October 17, 2011, a group of major institutional mortgage investors in several dozen RMBS trusts sponsored by Citigroup or its affiliates alleged widespread violations of representations and warranties contained in the Governing Agreements for sixty-eight RMBS trusts sponsored by Citigroup from 2005 to 2008 (the "Citi Putback Initiative"), including at least sixty of the Trusts at issue in this action.  The trustees for these Citigroup-sponsored trusts are U.S. Bank, HSBC, Deutsche Bank, and Wells Fargo.  On April 7, 2014, Citigroup announced that it had reached an agreement with the investor group to resolve representation and warranty repurchase claims.  Under the agreement, Citigroup agreed to make a binding offer to the trustees to pay $1.125 billion to the trusts, plus certain fees and

expenses.  According to Citigroup's press release announcing the agreement, the sixty-eight

trusts covered by the agreement issued in the aggregate $59.4 billion of RMBS "and represent all

of the trusts established by Citi's legacy Securities and Banking business during 2005-2008 for

which Citi affiliates made representations and warranties to the trusts."  The trustees' approval of

the Citigroup settlement remains pending.

475.    The Citi Putback Initiative identified and seeks to compel the repurchase of large

quantities of loans (1) originated by many of the same lenders that also originated large

quantities of the loans sold to the Trusts, including Wells Fargo ($98.2 billion of loans sold to the

Trusts) and Countrywide ($58.6 billion of loans sold to the Trusts); and (2) securitized by the

same investment banks and financial institutions that sponsored the Trusts, including Citibank

($24.9 billion of sponsored Trusts). In addition, the Citibank Putback Initiative identified and

seeks recovery of losses relating to servicing deficiencies by many of the same major servicers of

loans backing the Trusts, including Wells Fargo (original servicer to $330 billion of loans sold to

the Trusts).

476.    Similarly, on December 16, 2011, a group of major institutional mortgage

investors in hundreds of RMBS trusts sponsored by JPMorgan or its affiliates issued written

instructions to Wells Fargo, The Bank of New York Mellon ("BNYM"), Deutsche Bank, HSBC,

and U.S. Bank, as trustees, to open investigations into large numbers of ineligible mortgages in

the loan pools securing those trusts and deficient servicing of those loans (the "JPMorgan

Putback Initiative").  The notices covered more than $95 billion of RMBS issued by JPMorgan

from 2005 to 2007, including 179 trusts for which U.S. Bank serves as trustee.  Less than two

years later, U.S. Bank and the other trustees were presented with a $4.5 billion settlement offer

covering 330 JPMorgan-sponsored RMBS trusts.  On August 1, 2014 and October 2, 3014, all of

the trustees involved in the JPMorgan Putback Initiative – including U.S. Bank – accepted JPMorgan's $4.5 billion settlement offer for the vast majority of the 330 trusts and petitioned the Supreme Court of the State of New York for approval of the settlement.

477.    The JPMorgan Putback Initiative identified and seeks to compel the repurchase of large quantities of loans (1) originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including Wells Fargo ($98.2 billion of loans sold to the Trusts); and (2) securitized by the same investment banks and financial institutions that sponsored the Trusts, including Bear Stearns ($20 billion of sponsored Trusts) and Morgan Stanley ($15 billion of sponsored Trusts). In addition, the JPMorgan Putback Initiative identified and seeks recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Wells Fargo (original servicer to $330 billion of loans sold to the Trusts) and JPMorgan (original servicer to $20.3 billion of loans sold to the Trusts).

478.    Similarly, on January 31, 2012, a group of major institutional mortgage investors in several dozen RMBS trusts sponsored by Morgan Stanley or its affiliates issued written instructions to U.S. Bank, Wells Fargo, and Deutsche Bank, as trustees, to open investigations into large numbers of ineligible mortgages in the loan pools securing those trusts and the deficient servicing of those loans (the "Morgan Stanley Putback Initiative").  The notices covered more than $89 billion of RMBS issued by Morgan Stanley from 2005 to 2007, including at least 27 of the Trusts at issue herein.

479.    The Morgan Stanley Putback Initiative identified and seeks to compel the repurchase of large quantities of loans (1) originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including Wells Fargo ($98.2 billion of

loans sold to the Trusts); and (2) securitized by the same investment banks and financial institutions that sponsored the Trusts, including Morgan Stanley ($15 billion of sponsored Trusts). In addition, the Morgan Stanley Putback Initiative identified and seeks recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Wells Fargo (original servicer to $330 billion of loans sold to the Trusts) and JPMorgan (original servicer to $20.3 billion of loans sold to the Trusts).

480.    Similarly, on January 5, 2012, a group of major institutional mortgage investors in several dozen RMBS trusts sponsored by Wells Fargo or its affiliates issued written instructions to U.S. Bank and HSBC, as trustees, to open investigations into large numbers of ineligible mortgages in the loan pools securing those trusts and the deficient servicing of those loans (the "Wells Fargo Putback Initiative").  The notices covered more than $19 billion of RMBS issued by Wells Fargo from 2005 to 2007, including at least eighty-eight of the Trusts at issue herein.

481.    The Wells Fargo Putback Initiative identified and seeks to compel the repurchase of large quantities of loans (1) originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including Wells Fargo ($98.2 billion of loans sold to the Trusts); and (2) securitized by the same investment banks and financial institutions that sponsored the Trusts, including Wells Fargo ($63.8 billion of sponsored Trusts). In addition, the Wells Fargo Putback Initiative identified and seeks recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Wells Fargo (original servicer to $330 billion of loans sold to the Trusts).

482.    Further, U.S. Bank received a letter dated April 10, 2012, regarding "MASTR Adjustable Rate Mortgages Trust 2006-OA1" from counsel representing FHFA entitled "Request to Institute Action, Suit, or Proceeding."  By this letter, the FHFA formally requested that U.S.

Bank, "institute an action, suit, or proceeding in its own name in its capacity as Trustee under the PSA" against UBS [as seller] for breaching representations and warranties concerning the mortgage loans and for failing to repurchase the mortgage loans at a price equal to the purchase price.

483.    In addition to the above letter, the FHFA sent U.S. Bank (as trustee) and Wells Fargo (as master servicer) a second letter regarding the same offering entitled "Notice of Master Servicer Event of Termination." In this notice, the FHFA informed U.S. Bank, as the trustee, that the Master Servicer, Wells Fargo, had failed to observe and perform its duties under the PSA, including, among other things, to mitigate losses experienced by the Trust from breaches of representations and warranties.  Despite receiving the FHFA's written notice and request, U.S. Bank failed to adequately protect the interests of the Trusts at issue in this action.

484.    Finally, on May 14, 2012, a group of major institutional mortgage investors in several hundred RMBS trusts sponsored by ResCap or its affiliates reached agreement with ResCap and its affiliated debtors to resolve claims for breaches of representations and warranties concerning large numbers of loans in the pools securing those trusts (the "ResCap Putback Initiative").  The settlement covered more than $320 billion of RMBS largely issued between 2004 and 2008, including 127 trusts for which U.S. Bank serves as trustee.  The trustees for these ResCap-sponsored trusts, which were aware of the repurchase and servicing claims through, among other things, the bankruptcy proceedings, are U.S. Bank, Wells Fargo, Deutsche Bank, and BNYM.

485.    The ResCap Putback Initiative identified and sought to compel the repurchase of large quantities of loans originated by many of the same lenders that also originated large

quantities of the loans sold to the Trusts, including Wells Fargo ($25.2 billion of loans sold to the Trusts).

486.     Despite U.S. Bank's actual notice of widespread loan defaults and breaches, as the examples above illustrate, U.S. Bank failed to act in accordance with its obligations under the Governing Agreements and TIA to enforce the originators' and sponsors' obligations to cure, substitute or repurchase defective mortgage loans.

### F.     U.S. Bank Selectively Asserted The Trusts' Repurchase Rights Against The Sellers

487.     U.S. Bank's knowledge of pervasive breaches of representations and warranties by the originators and sponsors at issue herein is also demonstrated by its own actions in 2009. For example, in 2008, Lehman, a major sponsor for the Trusts filed for bankruptcy.    In connection with Lehman's bankruptcy, U.S. Bank, Wilmington Trust Company, Wilmington Trust, National Association, Law Debenture Trust Company of New York, and Deutsche Bank National Trust Company, in their capacity as trustee, separate trustee or indenture trustee (collectively, the "Lehman Bankruptcy RMBS Trustees"), filed proofs of claims, asserting that Lehman was liable to 405 trusts for breaches of representations and warranties for all 1 million of the mortgage loans underlying these Trusts.  U.S. Bank was the trustee for at least 232 of these 405 trusts, 146 of which are Trusts at issue here. In pursuing these claims, the Lehman Bankruptcy RMBS Trustees undertook a re-underwriting and a detailed review of a sample of nearly 5,000 loans in 255 of the 405 RMBS trusts that suffered a loss. The Lehman Bankruptcy RMBS Trustees' experts found breaches of representations and warranties in approximately 57% of the sampled loans.  U.S. Bank was the trustee for 168 of the 255 trusts subject to this review. U.S. Bank made these claims even though Lehman was not liable for all of the mortgage loans in most of those Trusts', in fact, there were many other solvent originators to those Trusts who had

made representations and warranties for those mortgage loans and were thus liable for them. U.S. Bank's "omnibus" claim for breach of representations and warranties as to all of the mortgage loans in all of those Trusts, including for mortgage loans that Lehman was not even potentially liable for, and in fact other originators were, demonstrates U.S. Bank's knowledge of pervasive breaches by all of the originators to those Trusts. Nonetheless, U.S. Bank has not pursued any of those third party originators to enforce representation and warranty claims as to the thousands of breaching mortgage loans in Lehman-sponsored Trusts.[29]

### G.   U.S. Bank Initiated Putback Litigation Against Many Of The Sellers

488.   U.S. Bank participated in at least twenty-eight actions to enforce putback rights for other RMBS trusts that involved the same originators, sponsors, sellers and servicers as the Trusts at issue in this action.[30]  Based on its involvement in these putback actions, which alleged pervasive and systemic breaches of representations and warranties, U.S. Bank was aware of similarly pervasive and systemic breaches of representations and warranties in the Trusts.

489.   In each of the putback actions, loan level reviews were conducted which identified breach rates **exceeding 50%** in every offering, including those sponsored by the same

---

[29] Given that U.S. Bank filed claims against Lehman in the bankruptcy case for at least 232 Trusts, Plaintiffs do not allege that U.S. Bank breached the governing agreements by failing to make representation and warranty claims against Lehman for the Trusts. However, Plaintiffs do allege that U.S. Bank breached the governing agreements by failing to make representation and warranties claims against the many other responsible parties, including, solvent sellers and solvent servicers to the Lehman-label Trusts.

[30] Trusts at issue in the limited putback claims pursued by U.S. Bank are not included in this action, except for those trusts where putback claims have been adjudged or are subject to dismissal as untimely-filed by U.S. Bank.

sponsors as the Trusts and involving loans originated and sold by the same originators and sponsors as the Trusts.[31]

490. For example, in *U.S. Bank National Association, as Trustee for HarborView Mortgage Loan Trust, Series 2005-10 v. Countrywide Home Loans, Inc. et al.*, Index No. 652388/2011 (N.Y. Sup. Ct. Aug. 29, 2011), Countrywide originated all 4,000 loans included in HVMLT 2005-10. Notably, in its complaint filed at the instruction of certificateholders, U.S. Bank stated that "[s]oon after being sold to the Trust, Countrywide's Loans began to become delinquent and default at a ***startling rate***." As a result, U.S. Bank conducted a forensic review of a 786-loan sample, which revealed that 520 of the loans, or what U.S. Bank characterized as "an extraordinary sixty-six percent" of the sample – breached one or more of the representations and warranties. U.S. Bank claimed that this was consistent with "Countrywide's abject failure to abide by the very representations and warranties it consistently made to induce the purchase of its Loans for securitizations, including the purchase of the Loans by the Trust." Because of the "pervasiveness and severity of these breaches," U.S. Bank demanded in its complaint that Countrywide repurchase all 4,000 loans in the offering.

491. Likewise, U.S. Bank has instituted several putback actions against GreenPoint at the instruction of certificateholders. For instance, in *U.S. Bank N.A. ex rel. Lehman XS Trust, Series 2006-GP2 et al. v. GreenPoint Mortgage Funding Inc. et al.*, Nos. 12-cv-7935, 12-cv-7942 and 12-cv-7943 (S.D.N.Y. Jan. 25, 2013), U.S. Bank sued GreenPoint for its failure to comply with its repurchase obligations under PSAs governing the transfer of 9,594 mortgage loans exceeding $3.39 billion. U.S. Bank alleges that it has uncovered evidence of "pervasive

---

[31] Trusts at issue in the limited putback litigation pursued by U.S. Bank are not included in this action, except for lawsuits that were brought untimely.

breaches" of GreenPoint's representations and warranties.  Specifically, U.S. Bank's "forensic analysis and re-underwriting of a significant number of the Loans has revealed that GreenPoint has breached one or more of its R&Ws with respect to approximately 98 percent of those loans." U.S. Bank alleged that it anticipated similar breaches and, further, that because GreenPoint made "pool-wide breaches of R&Ws" which "effectively defeated the object and purpose of the MLPAs," U.S. Bank is entitled to rescissionary damages.

492.    U.S. Bank came to the same conclusions regarding the credit quality of GreenPoint originated loans in *U.S. Bank National Association, solely in its capacity as Trustee of the Morgan Stanley Mortgage Loan Trust 2007-2AX (MSM 2007-2Ax) v. Morgan Stanley Mortgage Capital Holdings LLC et al.*, Index No. 650339/2013 (N.Y. Sup Ct. July 8, 2013). There, a forensic analysis of 56 home loans in a putback action against Morgan Stanley and GreenPoint revealed that all 56 loans (i.e., ***100%***) breached representations and warranties, with each loan breaching on the average more than three.  A loan level review of an additional 758 loans in the trust confirmed that the principal originators "***failed to adhere to industry-standard and reasonable underwriting guidelines in an extremely high percentage of cases***" and as a result, given these high breach rates, "***it is reasonable to infer that breaches of Defendants' R&Ws exist throughout the entire pool of Mortgage Loans in the Trust***."  *U.S. Bank v. Morgan Stanley et al.,* Index No. 650339/2013 (N.Y. Sup Ct. July 8, 2013), Compl. ¶5.

493.    U.S. Bank, at the insistence of certificateholders, has also brought several putback actions against DLJ Mortgage.  For example, in *U.S. Bank National Association, solely in its capacity as Trustee of the CSMC Asset-Backed Trust 2007-NC1 (CSMC 2007-NC1) v. DLJ Mortgage Capital, Inc.*, Index No. 652699/2013 (N.Y. Sup. Ct. Jan. 6, 2014), U.S. Bank's forensic review revealed that of 1,684 of the 1,686 loan files reviewed from a DLJ Mortgage

sponsored offering – a staggering **99%** of the loans – breached one or more of the representations and warranties.  U.S. Bank noted that "[b]ased on the information derived from these reviews, it reasonably can be inferred that breaches of DLJ's representations and warranties exist throughout the entire pool of Mortgage Loans in the Trust."  U.S. Bank made similar allegations against DLJ Mortgage in *Home Equity Mortgage Trust 2006-1 et al. v. DLJ Mortgage Capital, Inc. et al.*, Index No. 156016/2012 (N.Y. Sup. Ct. Jan. 29, 2012), where "the Re-underwriting Review showed that 796 of 806 [i.e., 99%] of the examined Mortgage Loans had defects constituting a breach of one or more of DLJ's representations and warranties under the PSAs"), and in *Home Equity Mortgage Trust Series 2006-5 v. DLJ Mortgage Capital, Inc. et al.*, Index No. 653787/2012 (N.Y. Sup. Ct. April 8, 2013), where U.S. Bank's independent loan review uncovered material breaches in 93.8 percent of the reviewed mortgage loans.

494.   U.S. Bank has drawn telling conclusions regarding UBS's faulty securitization practices.  For example, in *MASTR Adjustable Rate Mortgages Trust 2006-OA2 et al. v. UBS Real Estate Securities Inc.*, No. 12-cv-7322 (S.D.N.Y. Sept. 28, 2012), U.S. Bank sued UBS for breach of its repurchase obligations in connection with three securitizations that UBS sponsored containing a total of 4,642 defective mortgage loans.  U.S. Bank has demanded that UBS repurchase at least 3,616 of the mortgage loans, and has alleged that the securitizations at issue were "***assembled from toxic mortgage loans***" and presented "***a materially greater risk of delinquency and default***."  Compl. ¶41.

495.   In short, the incredibly high rates of defaults cited by U.S. Bank in support of certain putback actions demonstrates U.S. Bank was well aware of the pervasive and systemic breaches of representations and warranties of the loans underlying the Trusts at issue here as well.

**H.    U.S. Bank Attempted To Contract
Around Its Liability And Obligations In
Acquiring Bank of America's Trustee Business**

496.    On November 15, 2010, U.S. Bank announced that it would acquire Bank of America's U.S. and European corporate trust business, including its RMBS trust business.  The $35 million cash transaction closed on or about January 5, 2011, and significantly increased U.S. Bank's market share in the residential RMBS market.  In addition to providing U.S. Bank with an additional $8 billion in deposits, U.S. Bank's Corporate Trust Services unit absorbed approximately 2,150 active securitization and related transactions, more than 2.4 million residential mortgage cases, and $1.1 trillion in assets under administration.  The acquisition made U.S. Bank the largest RMBS trustee by dollar amount and number of trusts under administration.

497.    Through its acquisition of Bank of America's trustee business, U.S. Bank also inherited the legacy securitization trust business of LaSalle, which Bank of America had previously acquired in October 2007.  Through the transaction, U.S. Bank succeeded to Bank of America and LaSalle as Trustee for certain Trusts.

498.    Upon information and belief, prior to acquiring Bank of America's corporate trust business, U.S. Bank learned that Bank of America faced significant liability for its own and LaSalle's failure to take action to protect the RMBS trusts for which they served as trustees.  In particular, U.S. Bank learned through its due diligence on the transaction (and otherwise) that Bank of America and LaSalle had failed and unreasonably refused to enforce the rights of the trusts with respective defective mortgage loans and deficient loan servicing.  U.S. Bank knew that the loans underlying the trusts were in material breach of representations and warranties and were not being properly serviced, and would thus cause the trusts to incur (and continue to incur) substantial losses.  Nevertheless, U.S. Bank proceeded with the acquisition to solidify its position at the top of the securitization trustee business with the greatest market share.  U.S. Bank

attempted to avoid the substantial liability of its predecessor trustees and avoid its prospective obligations to the subject trusts and certificateholders by negotiating with Bank of America for certain indemnifications and other provisions purporting to provide protection regarding its successor liability.  U.S. Bank's attempt to insulate itself from successor liability in connection with the acquisition of the corporate trust business of Bank of America further confirms its knowledge that the Trusts were plagued with defective loans and servicer violations. Furthermore, U.S. Bank's failure to take action against Bank of America to enforce the Trusts rights against Bank of America's and LaSalle's contractual breaches and statutory violations was unreasonable and an additional breach of U.S. Bank's duties and obligations as Trustee for the Trusts.

## XI.    THE TRUSTS ALSO SUFFERED FROM PERVASIVE SERVICER VIOLATIONS

499.    In the aftermath of the financial crisis, the mortgage loan servicing industry has received increased scholarly, popular, regulatory and political attention as a result of rampant servicing abuses in connection with the administration of and foreclosing on mortgage loans backing private-label RMBS.

500.    Much like other private-label RMBS trusts of the same vintage, each of the Trusts suffer from ongoing Events of Default caused by the servicers' failure to observe and perform, in material respects, the covenants and agreements imposed on them by the PSAs.  The servicers' breach of their covenants is confirmed through federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described RMBS servicers' systemic and pervasive deviation from usual, customary and lawful servicing practices in their administration of mortgages and, more specifically, illegal and illicit servicing activities by the same servicers who service the loans held by the Trusts.

**A.     The Servicers Failed To Give Notice Of Seller
Breaches Of Representations and Warranties
And Enforce The Sellers' Repurchase Obligations**

501.    As with the Trustee, the PSAs require the servicers to give prompt written notice to all parties to the PSAs of a breach of a representation or warranty made by a seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Certificateholders in any such mortgage loan, upon the servicer's discovery of such breach.   Moreover, the servicers are required under the PSAs to enforce the sellers' obligation to repurchase, substitute, or cure such defective loans.

502.    In many cases, the servicers are affiliates of the sellers because in connection with the sale of a loan pool, the seller secured the retention of servicing rights to loans for its servicing division.   These servicers had actual knowledge of their affiliate mortgage loan sellers' abusive underwriting and securitization practices, and therefore had actual knowledge at the time of the Trusts' purchase of these loans that the sellers included high percentages of defective loans within the loan pools.   These servicers failed to notify parties to the PSAs of the discovery of mortgages that were in violation of applicable representations and warranties at the time they were purchased by the Trusts, and failed to enforce the sellers' repurchase obligations, despite their awareness of loans that were in violation of representations and warranties.

503.    Additionally, for the benefit of the Trusts, and pursuant to the PSAs, the sponsors acquired primary mortgage guaranty insurance ("PMI") policies for loans that had a LTV ratio in excess 80% which served as a "credit enhancement" in order to offer additional security to Certificateholders in the Trusts and to induce rating services to provide a higher credit rating for the Certificates, thereby making the Certificates more attractive to potential purchasers.   In the aftermath of the financial crisis, servicers have tendered claims to mortgage insurers under the PMI policies on the Trusts' behalf on defaulted loans.   The mortgage insurers have denied

coverage, canceled or rescinded the mortgage insurance policies, or invoked policy exclusions for a high percentage of claims as a result of misrepresentations regarding the insured mortgage loans, including on the basis that the originator engaged in predatory lending or systemic fraud in the underwriting of the mortgage loans. After these mortgage insurance claim denials, the servicers failed to observe or perform in a material respect their covenants and/or agreements under in the PSAs by failing to notify parties to the PSAs that the mortgage loan sellers violated representations and warranties at the time they sold loans to the Trusts.. Moreover, the servicers failed to tender the defective, defaulted loans to the sellers for repurchase. Instead, the servicers charged the over-collateralized accounts for losses, causing damage to the Trusts and their Certificateholders.

504. Further, as noted above, the servicers have regularly modified mortgage loans held by the Trusts. Plaintiffs are informed and believe that in the process of modifying these mortgage loans, the servicers have discovered that specific loans breached applicable seller representations and warranties because the loan modification process involves scrutinizing the underlying origination and mortgage loan files, and any supplemental information provided by the borrower to assess the borrower's ability to pay. Thus, in the process of performing loan modifications, the servicers had to have discovered breaches of representations and warranties regarding the characteristics of the loan, the creditworthiness of the borrower, the adequacy of the collateral and the title status of the mortgages. Nevertheless, the servicers systemically failed to notify the other parties of these breaches.

505. For example, since the closing of the securitizations, Wells Fargo has modified 761 mortgage loans that represented approximately $162.7 million in scheduled balances in the SABR 2006-NC1 Trust (or over 20% of the original face value), and Aurora has modified 1,745

mortgage loans that represented approximately $216.6 million in scheduled balances in the SAIL 2005-HE3 Trust (or approximately 10% of the original face value).  It is highly unlikely that these servicers could have modified these mortgage loans without becoming aware of breaches of representations and warranties.

506.    As also set forth above, there has been widespread public evidence of the originators' abandonment of underwriting guidelines and the sponsors' faulty securitization practices that made the servicers aware of material seller breaches representations and warranties within the Trusts loan pools.  Nevertheless, the servicers have not notified the other parties to the PSAs of these seller breaches or enforced the sellers' repurchase obligations.

507.    Further, the servicers have been specifically notified by monoline insurers of pervasive breaches by the sellers.  For instance, Countrywide is one of the leading servicers of the Trusts, administrating approximately **$19.9 billion** in mortgage loans securitized in the Trusts. Countrywide has been notified in litigation by MBIA, Ambac, FGIC, Assured Guaranty, and other mortgage and monoline insurers of pervasive and systemic breaches of representations and warranties by Countrywide entities in their capacity as originators.  Likewise, in *MBIA v. Credit Suisse*, Index No. 603751/2009, MBIA named, alleged that, Select Portfolio Servicing, Inc., which services over $10 billion in mortgage loans held by the Trust,  had engaged in a number of improper servicing activities, and MBIA reported that 79% of randomly selected loans and 87% of adversely selected loans breached representations and warranties in a Credit Suisse securitization.  Similarly, in *MBIA Ins. Corp. v. Morgan Stanley, et al.*, Index No. 29951/2010 (N.Y. Sup. Ct. Feb. 2, 2011), MBIA sued, among other parties, Saxon Mortgage Service Inc., which services over $6 billion in mortgage loans held by the Trust.  MBIA reported that 93% of

randomly selected loans and 98% of adversely selected loans breached representations and warranties in a Morgan Stanley securitization.

508.   Notwithstanding the servicers' "discovery" of material breaches of representations and warranties, the servicers have not notified the other parties to the PSAs of these breaches. Moreover, although aware of specific mortgage loans that breach applicable representations and warranties, the servicers have failed to enforce the seller's obligation to repurchase, substitute, or cure such defective loans as required under the PSAs.

509.   The servicers' systemic and pervasive failure to give notice of the sellers' material breaches of representations and warranties and to enforce the sellers' repurchase obligations have materially affected the rights of the Trusts and all Certificateholders under the PSAs in that they have deprived the Trusts of mortgage loans of adequate credit quality, or alternatively funds representing the "Repurchase Price" under the PSAs, with respect to each defective mortgage loan.

### B.   The Servicers Have Violated Their Prudent Servicing Obligations

510.   The PSAs require that the servicer service and administer the mortgage loans for and on behalf of the Certificateholders, and, consistent with the terms of the PSAs, (i) in the same manner in which it services and administers similar mortgage loans for its own portfolio or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans, (ii) with a view to maximizing the recoveries with respect to such mortgage loans on a net present value basis, and (iii) without regard to, among other things, the right of the servicer to receive compensation or other fees for its services under the PSA, the obligation of the servicer to make servicing advances under the

PSA, and the servicer's ownership, servicing or management for others of any other mortgage loans.

511.    Highly publicized government enforcement actions and settlements reached with the servicers demonstrate that the servicers have systemically and pervasively violated these prudent servicing obligations.  For example, on June 7, 2010, the Federal Trade Commission ("FTC") filed a civil enforcement action against Countrywide and BAC Home Loans Servicing, LP (f/d/b/a Countrywide Home Loans Servicing, LP), a wholly owned subsidiary of Bank of America, National Association, (collectively, "Countrywide/BAC") for their "unlawful acts and practices in servicing mortgage loans."  *See Fed. Trade Commission v. Countrywide Home Loans, Inc. et al.*, No. 10-cv-4193 (C.D. Cal. June 7, 2010).  In March 2008, prior to being acquired by Bank of America Corporation, Countrywide was ranked as the top mortgage servicer in the United States and had a servicing portfolio with a balance of over $1.4 trillion.  In September 2009, after its acquisition of Countrywide, Bank of America was ranked as the nation's top mortgage servicer with a servicing portfolio of over $2.1 trillion.  Countrywide/BAC are servicers for many of the Trusts.  The FTC emphasized that many of the loans improperly serviced by Countrywide/BAC are the same "risky, high-cost loans that had been originated or funded by Defendants' parent company, Countrywide Financial Corporation [], and its subsidiaries []."

512.    According to the FTC, when borrowers fell behind on their payments, Countrywide/BAC imposed a number of default-related services (such as property inspections and foreclosure trustee services) "by funneling the work through panoply of Countrywide subsidiaries."  In its mortgage servicing operation, Countrywide/BAC follows a so-called "vertical integration strategy" to generate default-related fee income.  Rather than obtain default-

related services directly from third-party vendors and charge borrowers for the actual cost of these services, Countrywide/BAC formed subsidiaries to act as middle-men in the default services process.  These subsidiaries exist solely to generate revenues for Countrywide/BAC and do not operate at arms-length with Countrywide/BAC.  Countrywide/BAC and their subsidiaries – "[a]s a matter of practice" – added a substantial mark-up to their actual costs for the services and then charged the borrowers the marked-up fees.  The inflated fees were both contrary to prudent servicing standards and violated the mortgage contracts, which limit fees chargeable to the borrower to actual costs of the services and as are reasonable and appropriate to protect the note holder's interest in the property and rights under the security instrument.

513.    Countrywide/BAC similarly breached servicing standards and mortgage contracts when servicing loans for borrowers who sought to save their homes through a Chapter 13 bankruptcy.  According to the FTC, Countrywide/BAC made various representations to those borrowers about their mortgage loans that were false or lacked a reasonable basis, and failed to disclose to borrowers during their bankruptcy case when fees and escrow shortages and deficiencies accrued on their loan.  After the bankruptcy cases have closed and borrowers no longer have the protection of the bankruptcy court, Countrywide/BAC collected those amounts, including through foreclosure actions.

514.    By way of further example, in February 2012, forty-nine state attorneys general and the federal government announced a historic $25 billion state-federal settlement with the country's five largest mortgage servicers and their affiliates for misconduct related to their origination and servicing of single family residential mortgages: (i) Residential Capital, LLC, Ally Financial, Inc., and GMAC Mortgage, LLC; (ii) Bank of America Corporation, Bank of America, N.A., BAC Home Loans Servicing, LP, Countrywide Financial Corporation,

Countrywide Home Loans, Inc., Countrywide Mortgage Ventures, LLC, and Countrywide Bank FSB; (iii) Citigroup Inc., Citibank, N.A., and CitiMortgage, Inc.; (iv) JP Morgan Chase & Company and JP Morgan Chase Bank, N.A.; and (v) Wells Fargo & Company and Wells Fargo Bank, N.A.

515.    In their corresponding complaint filed on March 14, 2012, the state attorneys general and the federal government alleged that these servicers had engaged in unfair, deceptive and unlawful servicing processes, including (i) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (ii) charging excessive or improper fees for default-related services; (iii) failing to properly oversee third party vendors involved in servicing activities on behalf of the Banks; (iv) imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage; (v) providing borrowers false or misleading information in response to borrower complaints; and (vi) failing to maintain appropriate staffing, training, and quality control systems.

516.    Similarly, on December 19, 2013, the Consumer Financial Protection Bureau ("CFPB"), authorities in forty-nine states, and the District of Columbia filed a proposed court order requiring the country's largest nonbank mortgage loan servicer, Ocwen and its subsidiary, Ocwen Loan Servicing, to provide $2 billion in first lien principal reduction to underwater borrowers in order to compensate for years of systemic misconduct at every stage of the mortgage servicing process.   The consent order also covered two companies previously purchased by Ocwen, Litton Loan Servicing LP ("Litton") and Homeward Residential Holdings LLC (previously known as American Home Mortgage Servicing, Inc. or AHMSI).   According to the CFPB and the attorneys general's complaint, Ocwen violated state consumer law in a number of ways, including (i) failing to timely and accurately apply payments made by borrowers and

failing to maintain accurate account statements; charging borrowers unauthorized fees for default-related services; imposing force-placed insurance on consumers when Ocwen knew or should have known that they already had adequate home-insurance coverage; and providing false or misleading information in response to consumer complaints.

517.   High profile class actions against the servicers have further revealed violations of prudent servicing violations. For example, in June 2012, nationwide class actions were brought on behalf of million homeowners against JPMorgan, Wells Fargo, Bank of America, Citibank N.A., and HSBC Bank Inc. who claimed that they were overcharged for force-placed insurance. The borrowers specifically alleged that these servicers imposed policies for forced-place insurance that were far more expensive than market rates and received hundreds of millions of dollars in clandestine commissions from the insurance companies writing the policies. The servicers' practice of imposing expensive forced place insurance increased the borrowers' monthly payment by a large amount. As a result, homeowners who were already behind in payments or were facing financial difficulties went into foreclosure. The plaintiff borrowers have also entered into several well publicized settlements with these servicers, including settlements of $300 million settlement with JPMorgan, $110 million with Citibank, $32 million with HSBC and $19.3 million with Wells Fargo.[32]

518.   Notably, the Ally/GMAC, Bank of America, Citi, JPMorgan, Wells Fargo, Ocwen and HSBC entities subject to the above-mentioned settlements collectively service and administer over **$392 billion** in mortgage loans held by the Trusts. Plaintiffs are informed and

---

[32] *Alfred Herrick et al. v. JPMorgan Chase Bank N.A. et al.*, 13-21107 (S.D. Fla.); *Hall v. Bank of Am., N.A.*, 12-22700 (S.D. Fla.), *Lopez v. HSBC Bank USA, N.A. et al.*, 13-21104 (S.D. Fla.), and *Fladell et al. v. Wells Fargo Bank N.A., et al.*, 13-60721 (S.D. Fla.); *Casey, et al., v. Citibank, N.A., et al.*, 12-00820 (N.D.N.Y.)

believe that these servicers and other servicers to the Trusts have engaged in the same violations of their prudent servicing obligations in servicing and administrating the mortgage loans for the Trusts.

519.    The servicers' systemic and pervasive failure to observe their prudent servicing obligations have materially affected the rights of the Trusts and all Certificateholders under the PSAs in that the violations have exacerbated the Trusts' losses and have fostered uncertainty as to the timely recovery of collateral.

### C.    The Servicers Have Violated Their Foreclosure Obligations

520.    The PSAs require the servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing such of the mortgage loans as they come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments. Moreover, each of the PSAs contemplate that foreclosures and liquidations of defaulted mortgages will proceed forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties.

521.    Highly publicized government enforcement actions and settlements reached with the servicers similarly have revealed the servicers have breached their foreclosure obligations. For example, in the fourth quarter of 2010, the Federal Reserve System, the OCC, the FDIC, and the OTS (collectively, the "Agencies") conducted on-site reviews of foreclosure processing at fourteen federally regulated mortgage servicers which represented more than two-thirds of the servicing market.  These servicers included Ally Bank/GMAC, Aurora, Bank of America, Citibank, EverBank, HSBC, JPMorgan, MetLife, OneWest, PNC, Sovereign Bank, SunTrust, U.S. Bank, and Wells Fargo, many of which are servicers to the Trusts. In April 2011, the Agencies issued a joint report entitled "Interagency Review of Foreclosure Policies and

Practices," summarizing the findings of their reviews and providing an overview of the potential impacts associated with instances of foreclosure-processing weaknesses that occurred industrywide. Notably, the Agencies' reviews found "critical weaknesses in [each of the] servicers' foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys." Based on the deficiencies identified in these reviews and the risks of additional issues as a result of weak controls and processes, the Agencies initiated formal enforcement actions against each of the fourteen servicers subject to the review to address those weaknesses and risks. The enforcement actions detailed the weaknesses at each servicer and required each servicer, among other things, to conduct a more complete review of certain aspects of foreclosure actions that occurred between January 1, 2009, and December 31, 2010.

522.    Similarly, as noted above, on March 14, 2012, following an extensive investigation of Wells Fargo, Bank of America, Citigroup, Countrywide, JPMorgan, Ally Financial, Inc., and GMAC Mortgage, LLC – some of the same servicers for the Trusts – the DOJ, the Department of Housing and Urban Development and forty-nine state attorneys general filed a complaint against these servicers and announced the $25 billion National Mortgage Settlement of the claims set forth in the complaint. In the complaint, the attorneys general and federal government alleged that these servicers had engaged in wrongful conduct related to foreclosures, including failing to properly identify the foreclosing party, charging improper fees related to foreclosures, preparing, executing, notarizing or presenting false and misleading documents and engaging in robosigning.

523.    Likewise, as noted above, on December 19, 2013, following an extensive investigation of Ocwen and certain of its acquired entities, the CFPB, authorities in forty-nine

states, and the District of Columbia filed a complaint against Ocwen and announced a $2 billion settlement of the claims stated in the complaint. The CFPB's and attorneys general's complaint alleged that Ocwen engaged in the same wrongful conduct related to foreclosures described in the complaint against the servicers leading to the National Mortgage Settlement.

524. In addition, private litigation has shined the light on servicers' wrongful foreclosure practices. For example, in a California class action case that has survived a motion to dismiss, plaintiffs alleged that Aurora, a major servicer of loans in the Trusts, foreclosed on homes without any notice that loan modifications were denied and without allowing borrowers access to any "cure method" despite promises in an agreement to do so. *Mauder et al. v. Aurora Loan Services, LLC*, No. 10-cv-03383 (N.D. Cal. Aug. 2, 2010) Class Action Compl. ¶2.

525. Servicers have also frequently wrongfully foreclosed on properties owned by military servicemembers who were protected under the Servicemembers Civil Relief Act ("SCRA"). Based on a federal government complaint accusing Countrywide Home Loans Servicing LP, a major servicer of loans in the Trusts, of violating the SCRA on approximately 160 properties, Countrywide consented to pay $20 million to the victims. *United States v. BAC Home Loans Servicing, LP F/K/A Countrywide Home Loans Servicing, LP And Any Successors In Interest*, No. 11-cv-04534 (C.D. Cal. May 26, 2011) Consent Order ¶18.

526. The servicers have also routinely kept defaulted mortgages on their books, rather than foreclose or liquidate them. Indeed, in several states, the average days for delinquent loans in foreclosure in the Trusts have doubled or quadrupled.



Sources: RealtyTrac, Moody's Analytics

527. The servicers' delay in foreclosing has allowed the servicers to charge unearned and unwarranted servicing fees, as well as unauthorized fees for default-related services, on mortgages that would have been liquidated but for the servicers' breach of their duties. For example, in the complaint that led to the National Mortgage Settlement discussed above, the federal government and forty-nine states accused Citigroup, Wells Fargo, Bank of America, JPMorgan, Countrywide, and Ally Financial, Inc. (many of which were servicers of loans in the Trusts) of unfair and deceptive practices in the discharge of its loan servicing activities for, among other things, "charging excessive or improper fees for default-related services." *See United States et al. v. Bank of America Corp. et al.*, No. 12-cv-0361 (D.D.C. Mar. 12, 2012) Compl. ¶51.

528. The servicers' systemic and pervasive violation of their foreclosure obligations have materially affected the rights of the Trusts and all Certificateholders under the PSAs in that the Trusts have incurred costs of remedying procedural errors and re-filing affidavits and other foreclosure documents. The Trusts have also been forced to bear costs related to disputes over

note ownership or authority to foreclose, and to allegations of procedural violations through the use of inaccurate affidavits and improper notarizations.  The Trusts have further incurred losses as a result of delays or other damages caused by the weaknesses in the servicers' foreclosure processes.

### D.   The Servicers Have Violated Their Modification Obligations

529.   The PSAs provide that the servicers agree to a modification of any mortgage loan only in certain specified circumstances. When modifications are required to remedy predatory lending violations, the PSAs require that the seller – and not the Trusts or the Certificateholders – bear the costs to cure such breach.

530.   The servicers have breached the PSAs by agreeing to modify loans held in the Trusts for the purpose of settling predatory lending claims made by various attorneys general against their parent companies while breaching their obligation to demand that the offending mortgage seller (their parent companies) bear the costs of curing the violation, as well as the expenses reasonably incurred in enforcement of the seller's obligation to cure predatory mortgages. For instance, on October 6, 2008, attorneys general for eleven states announced a landmark, $8.68 billion settlement with Countrywide Home Loans, Countrywide Financial Corporation and Full Spectrum Lending of predatory lending claims. The settlement enabled eligible subprime and pay-option mortgage borrowers whose loans serviced by Countrywide to obtain loan modifications valued at up to $3.4 billion worth of reduced interest payments and, for certain borrowers, reduction of their principal balances.

531.   The servicers have also breached the PSAs by agreeing to modify loans held in the Trusts for the purpose of settling claims related to their wrongful servicing and foreclosure practices made by various attorneys general.  For example, with respect to the National Mortgage

Settlement, in meeting their payment obligations, the settling servicers receive credit for writing down principal of, and providing forbearance for, mortgage loans held by the Trusts.

532.    The servicers' violation of their modification obligations have materially affected the rights of the Trusts and all Certificateholders under the PSAs in that the servicers and their parent companies have been unjustly enriched to the detriment of the Trusts and Certificateholders by using Trust collateral to settle claims that are not, and could never be, made against the Trusts.

### E.    The Servicers Have Abused Their Servicing Advances Obligations

533.    The PSAs provide that the servicers are to advance principal and interest on a loan only if they determine that the advance payment is recoverable.  The PSAs further provide that the servicers may only recover servicing advances that are customary, reasonable and necessary out-of-pocket costs and expenses incurred in the performance by the servicers of their servicing obligations. The servicers have abused their advancing obligations to enrich themselves to the direct detriment of the Trusts.   In particular, the servicers have manipulated the recoverable designation to their advantage.   During low interest rate environments, the servicers have designated severely delinquent loans as recoverable so that the loans would be kept in the Trusts' loan pools and the servicers could continue to earn their servicing fees on these loans, which exceed the relatively low cost of financing the advances on these delinquent loans.   However, when interest rates have increased, the servicers have strategically switched the mortgage loans' designation from recoverable to unrecoverable. The switch in designation enables the servicers to recoup all prior advances as a senior claim of the Trusts.

534.    The servicers' manipulation of the recoverable designation was illustrated in the May 2013 remittance reports for many of the Trusts.  Following the Federal Reserve's May 11, 2013 announcement of its plan for tapering its bond-buying program, interest rates quickly shot

up.  In a transparent response to the increase in the financing of their advances, the servicers switched the designation from recoverable to unrecoverable for an unprecedented amount of delinquent mortgage loans within the Trusts.  Specifically, the servicers wrote down an amazing $6.6 billion in May 2013 alone, representing a 96% increase over the prior reporting period.  The servicers' massive writedowns are particularly suspicious, given that the mortgaged property values had been steadily rising for the past twelve months.

535.    The Trusts and their Certificateholders are harmed by the servicers' manipulation of the recoverable designation because the Trusts incur more interest rate risk exposure than expected since the servicers' recoverability designations are strategically determined as a function of interest rates, as opposed to the value of the mortgaged property as required under the PSAs.

536.    The servicers' abuse of their servicing advancing obligations is further illustrated by their increasing use of "unrecognized forbearances." The servicers modify delinquent mortgage loans by granting forbearances to the borrowers for extended periods of time which act to reduce the principal amount of the mortgage loan.  The forbearances allow the servicers to lower their advanced principal payments on the loans.   Nevertheless, the servicers do not formally write-down the loan balance or make any recognition on the Trusts' accounts.  Thus, the mortgage loans remain in the Trusts at full value, thereby allowing the servicers to earn full servicing fees, which are calculated as a percentage of the total principal amount of the mortgage loans in the Trusts' loan pools, although the loans are accruing interest at a lower principal amount and without the servicers having to make any advances.

537.    According a Credit Suisse study, unrecognized forbearances in the Trusts totaled over $1.5 billion as of April 2013.[33]   At least 574 Trusts had some amount of unrecognized forbearance, and more than 30 of these Trusts had unrecognized forbearance amounts exceeding 3% of the Trust's current collateral balance:

**Top 10 U.S. Bank Trusts By Share Of Current Balance Forborne**

Data as of April 2013 distributions. 1st lien only

| Trust | Original Face Amount | Then Current Balance | Estimated Unrecognized Forbearance | Unrecognized Forbearance as % of Current Balance |
|---|---|---|---|---|
| CBASS 2006-CB1 | $808,679,656 | $115,960,658 | $14,092,239 | 12.15% |
| ARMT 2007-1 | $1,417,518,363 | $456,953,465 | $42,410,823 | 9.28% |
| CSMC 2007-1 | $1,223,703,100 | $466,183,943 | $37,123,538 | 7.96% |
| CBASS 2005-CB7 | $423,019,000 | $62,121,407 | $3,793,600 | 6.11% |
| BAYV 2007-B | $368,301,000 | $148,188,829 | $8,531,071 | 5.76% |
| TBW 2006-6 | $571,696,142 | $198,208,715 | $10,415,185 | 5.25% |
| SASC 2006-ZA | $207,142,000 | $70,546,832 | $3,600,571 | 5.10% |
| CBASS 2006-CB2 | $937,292,000 | $167,636,710 | $8,450,932 | 5.04% |
| CSAB 2007-1 | $689,079,047 | $312,970,233 | $14,816,635 | 4.73% |
| TBW 2006-4 | $419,077,050 | $129,859,360 | $5,696,001 | 4.39% |

Source: Credit Suisse, Loan Performance

538.    The servicers' pervasive use of "unrecognized forbearances" harm the Trusts and their Certificateholders since they pay higher servicing fees to the servicers and are not informed in a timely manner about impairments to mortgage loans in the underlying loan pools.

539.    Finally, despite the requirement that servicing advances were to be incurred only for reasonable and necessary out-of-pocket costs, the servicers instead utilized affiliated vendors – who marked up their services to a level 100% or more above the market price – to provide services related to the preservation, restoration, and protection of mortgaged property, in a

---

[33] Credit Suisse estimated that, as of April 2013, unrecognized forbearances on non-agency RMBS deals issued after 2000 (first lien only) totaled around $8.3 billion.

fraudulent, unauthorized, and deceptive effort to supplement its servicing income.  These improper servicing advancing have exacerbated the Trusts' losses.

## XII.   U.S. BANK HAS KNOWN OF SERVICER VIOLATIONS PLAGUING THE TRUSTS

540.   There is ample evidence that, beginning in early 2009 and continuing to the present, U.S. Bank and its responsible officers have known of the above described widespread and severe failures on the part of the servicers to observe or perform in material respects their obligations under the PSAs.  Preliminarily, as discussed above, since 2009 and continuing to the present there has been a steady stream of public disclosures regarding the servicers' violations.  Nevertheless, apart from the highly publicized government investigations, reports and enforcement actions, as well as high profile litigation involving the servicers, as explained below there is a host of additional evidence demonstrating U.S. Bank's and its responsible officers' knowledge that the servicers have materially breached their contractual obligations.

### A.   U.S. Bank Itself Was Involved In Government Enforcement Actions And Litigation Stemming From The Servicers' Violations

541.   U.S. Bank and its responsible officers knew of the servicers' improper servicing practices because, as described in greater detail below (Section XIII), U.S. Bank and its affiliates, in their capacity as servicers to other RMBS trusts, were targets together with many of the servicers for the Trusts in highly publicized governmental investigations, prosecutions and settlements.  For example, along with thirteen other of the nation's largest servicers, the Agencies similarly found deficiencies in U.S. Bank's servicing and foreclosure processes, brought a formal enforcement action against U.S. Bank, and participated in a joint settlement including Aurora, Bank of America, Citibank, Goldman, HSBC, JPMorgan, MetLife Bank, Morgan Stanley, PNC, Sovereign, SunTrust, U.S. Bank, and Wells Fargo. U.S. Bank's involvement in such proceedings

would have made it acutely aware of the deficiencies of each of the other servicers subject to these actions.

542.    U.S. Bank and its responsible officers also knew of the servicers' improper servicing practices through its involvement in litigation highlighting servicing failures, such as in judicial foreclosure proceedings exposing the servicers' failure to correct irregularities in the chain of title.  For example, in *Naranjo v. SBMC Mortgage*, No. 11-cv-2229-L(WVG), 2012 WL 3030370 (S.D. Cal. July 24, 2012), the court declined U.S. Bank's motion to dismiss plaintiff's claims that the purported assignment of her mortgage loan serviced by WaMu (a Servicer to the Trust) was not completed by the date required by the PSA and, therefore, a subsequent assignment, substitution, and notice of default and election to sell was improper.  Similarly, Massachusetts courts have repeatedly prohibited U.S. Bank from foreclosing on mortgaged properties due to irregularities in the chain of title, which prevented U.S. Bank from foreclosing on mortgages in Bear Stearns-label RMBS trusts.  *U.S. Bank Nat'l Ass'n v. Githira*, 08 MISC 386385 (CWT), 2009 WL 3530024 (Mass. Land Ct. Oct. 30, 2009) (refusing to quiet title to mortgaged property in U.S. Bank's favor "because the entire foreclosure was fatally defective" in that "U.S. Bank was not even the holder of the mortgage on the day the foreclosure took place, either of record or in fact"); *U.S. Bank Nat. Ass'n v. Ibanez*, 458 Mass. 637, 941 N.E.2d 40 (2011) (affirming trial court's ruling that U.S. Bank did not demonstrate that it was the holder of the mortgage at the time that it foreclosed on a mortgaged properties, and therefore failed to demonstrate that U.S. Bank, on behalf of the trust, acquired fee simple title to the property by purchasing it at the foreclosure).

543.    These and other public enforcement actions and private litigation highlighting the servicers' improper servicing practices were well known throughout the RMBS industry,

including by U.S. Bank and the other principal financial crisis-era trustees.  For example, in October 2010, Deutsche Bank – which serves as trustee for more than 1,000 RMBS trusts – issued a notice to all RMBS certificateholders in trusts for which Deutsche Bank served as trustee confirming Deutsche Bank's awareness of ongoing government investigations into improper servicing practices.  Deutsche Bank's notice acknowledged that it had been "widely reported in the news media" that "several major U.S. loan servicers" had "suspended certain foreclosures in some or all states" due to allegations and investigations regarding "defects in foreclosure practices, procedures and/or documentation."  Also in October 2010, Deutsche Bank sent an "urgent and time sensitive" memorandum to all servicers of mortgage loans included in any RMBS trust for which Deutsche Bank acts as trustee.  In the memorandum, Deutsche Bank discussed "an urgent issue requiring your [the servicers] immediate attention" – specifically, the same "serious . . . defects in foreclosure practices, procedures and/or documentation" discussed in Deutsche Bank's notice to certificateholders.  The memorandum referred to the expansive scope of the reported servicer deficiencies, and admitted that foreclosure abuses such as the execution and filing by servicers or their agents of documents containing untrue assertions of fact "would constitute a breach of that Servicer's obligations under the [PSAs] and applicable law."

**B.    U.S. Bank And Its Responsible Officers Received Written Notice From Certificateholders Of Pervasive And Systemic Servicer Breaches**

544.    In its capacity as trustee to other RMBS trusts that are not the subject of this action, U.S. Bank and its responsible officers repeatedly received written notice from Certificateholders of the same systemic servicing violations described above perpetrated by the very same servicers for the Trusts.  Based on the systemic and pervasive practices complained of in the Certificateholders' breach notices, U.S. Bank and its responsible officers knew that

servicers were engaged in the same wrongful conduct in connection with their servicing of the loans for the Trusts.

545.    For example, on December 16, 2011, investors provided notice to U.S. Bank and four other RMBS trustees of, among other things, master servicer violations by JPMorgan and JPMorgan predecessor entities (Bear Stearns and WaMu) in connection with $95 billion of RMBS issued by various affiliates of JPMorgan from 243 trusts issued between 2005 and 2007 under the BALTA, BSABS, BSARM, BSMF, CFLX, CHASE, JPALT, JPMAC, JPMMT, PRIME, SACCO, SAMI, WAMU and WMALT labels.  The investors demanded that U.S. Bank open an investigation of ineligible mortgages and deficient servicing of these loans.  The December 16, 2011 notice put U.S. Bank on notice of systemic deficient servicing practices by JPMorgan and its affiliates, some of the largest servicers for the Trusts.  Indeed, as discussed above, this same investor group reached an agreement with JPMorgan that called for the payment of $4.5 billion in cash to 330 trusts issued under these JPMorgan RMBS labels to settle mortgage repurchase and servicing claims, as well as for the implementation of substantial servicing changes to mortgage loans in the covered trusts to rectify the pervasive servicing deficiencies by JPMorgan and its affiliates.   On August 1, 2014 and October 2, 2014, all of the trustees involved in the JPMorgan Putback Initiative – including U.S. Bank – accepted JPMorgan's $4.5 billion offer for the vast majority of the 330 trusts and petitioned the Supreme Court of the State of New York for approval of the settlement.

546.    Similarly, on January 31, 2012, an investor group issued instructions to Wells Fargo, Deutsche Bank, and U.S. Bank, as trustees, to open investigations of ineligible mortgages in pools securing over $25 billion of RMBS issued by various affiliates of Morgan Stanley and deficient servicing of those loans.

547.   On September 19, 2012, the same investor group sent a Notice of Non-Performance ("September 19, 2012 Notice") to U.S. Bank and other RMBS trustees, as well as Wells Fargo, the servicer, identifying breaches by Wells Fargo of specific servicing covenants in PSAs for 149 trusts from the WFALT, WFMBS and WMLT shelves.  The September 19, 2012 Notice alleged that each of these servicing failures had materially affected the rights of the certificateholders and constituted ongoing events of default in the servicer's performance under the relevant PSAs.  The April 10, 2012 Notice, coupled with the September 19, 2012 Notice put U.S. Bank on notice of systemic deficient servicing practices by Wells Fargo, which is one of the largest originators, sponsors and servicers of loans in the Trusts.

### C.   U.S. Bank Had Knowledge Of The Servicers' Failures Through The Monthly Servicer And Remittance Reports

548.   U.S. Bank and its responsible officers also knew of the servicers' improper servicing practices through the servicers' servicing reports and the monthly remittance reports, which U.S. Bank itself published.  These reports detailed the Trusts' increasing modifications, staggering losses and write-downs due to the poor credit quality of the loans, but did not show action by the servicers' actions to enforce the sellers' repurchase obligations.  The reports also reflected the servicers' abuse of servicing advances.

## XIII.   U.S. BANK FAILED TO DISCHARGE ITS CRITICAL PRE- AND POST-DEFAULT DUTIES

549.   Despite U.S. Bank's knowledge of the Trusts' high default rates and poor performance, breaches of representations and warranties made by the originators, sellers, depositors, and sponsors, and servicer violations, U.S. Bank failed to perform its duties as Trustee to protect the Trusts and Certificateholders.

### A.    Failure To Enforce The Trusts' Repurchase Rights

550.    As set forth above, beginning in 2009 and by 2011, U.S. Bank and its responsible officers discovered the Trusts contained loans that materially breached the sellers' representations and warranties, which adversely affected the value of those mortgage loans and the Trusts' and Certificateholders' interests in those mortgage loans.  U.S. Bank further knew that the servicers had failed to take appropriate steps to enforce the sellers' obligations to cure, replace or repurchase the affected loans, and that the failure on the part of the servicers to take appropriate steps against the sellers was material.

551.    U.S. Bank breached its contractual and statutory duties under TIA and was negligent by failing to (i) provide notice to the servicers and/or the responsible sellers upon its discovery of these breaches, and (ii) take any action to enforce the sellers' repurchase of the defective mortgage loans.

### B.    Failure To Provide Notice
### To The Servicers Of Events Of Defaults

552.    As set forth above, beginning in 2009 and continuing to the present, U.S. Bank and its responsible officers knew of failures on the part of the servicers to observe or perform in material respects their covenants or agreements in the PSAs, including the servicers' (i) failure to give notice to the other parties of seller breaches of representations and warranties upon discovery thereof and enforce the sellers' repurchase obligations; (ii) violations of prudent servicing obligations; (iii) violations of foreclosure obligations; (iv) violations of modification obligations; and (v) improper servicing advances.  These breaches by the servicers constituted "Events of Defaults" as defined by the PSAs.  U.S. Bank knew that these servicers' breaches were material.

553.    U.S. Bank breached its contractual and statutory duties under TIA and was negligent by failing to provide notice to the servicers of these Events of Defaults or terminating the servicers.

**C.    Failure To Act Prudently Subsequent
        To The Uncured Events Of Defaults**

554.    As set forth above the Events of Default occurred, remained uncured for the requisite period of time and are continuing.   Consequently, under the PSAs, U.S. Bank had and continues to have the obligation to exercise the rights and powers vested in it by the PSAs, and to use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

555.    A prudent person would have taken action to protect the Trusts and their Certificateholders from the known seller breaches of representations and warranties by exercising all of its rights under the PSAs to enforce the sellers' repurchase obligations, including timely conducting an investigation to determine all of the materially breaching mortgage loans and suing the sellers for specific performance to compel their repurchase of those loans.   U.S. Bank breached its contractual, statutory and fiduciary duties and was negligent by failing to act prudently and take these actions.

556.    A prudent person would have also taken action to protect the Trusts and its Certificateholders from the known servicer violations by exercising all of its rights under the PSAs to enforce the servicers' prudent servicing obligations, including ensuring that all Events of Default were cured, terminating the servicers, substituting itself in as the substitute servicer or replacing the servicers, and enforcing the servicers obligations to reimburse the Trusts for losses caused as a result of their breaches through suit if necessary.   U.S. Bank breached its contractual,

statutory and fiduciary duties and was negligent by failing to act prudently and taking these actions.

### D. Failure To Provide Notice To The Certificateholders Of The Uncured Events Of Defaults

557.    As set forth above, the Events of Default occurred, remained uncured for the requisite period of time and are continuing.  Consequently, under the PSAs, U.S. Bank also had and continues to have the obligation to provide all Certificateholders with notice of these Events of Default.

558.    U.S. Bank had no good faith reason for failing to provide notice of these Events of Defaults to the Certificateholders.  Consequently, U.S. Bank breached its contractual, statutory and fiduciary duties and was negligent by failing to provide all Certificateholders with notice of these Events of Default.

### XIV.  U.S. BANK FAILED TO PROTECT THE TRUSTS FOLLOWING THE INSOLVENCY OF CERTAIN SPONSORS

559.    U.S. Bank failed to protect the Trusts after Trust Sponsors or Originators filed for bankruptcy or otherwise became insolvent.  In these instances, U.S. Bank only acted to assert the Trusts' rights when it was in U.S. Bank's interests and only to the limited extent consistent with U.S. Bank's interests.  In particular, U.S. Bank failed to adequately and comprehensively pursue relief against numerous solvent third parties that were also contractually liable under the PSAs for servicing violations or representation and warranty violations.  Finally, U.S. Bank failed to provide notice of seller defaults, Events of Defaults, and otherwise notify Certificateholders of information known only to U.S. Bank that was necessary for Certificateholders to take action to protect their rights and avoid or mitigate losses.

560.    U.S. Bank has failed to adequately protect the Trusts against pervasive violations in the servicing of loans collateralizing Trusts sponsored by failed entities.  Loans collateralizing

these Trusts were serviced (and continue to be serviced) by third parties unaffiliated with the bankrupt or insolvent sponsors.  As discussed herein, servicers have independent duties and obligations under the PSAs, and their liability for breach of those duties and obligations is untethered to solvency of the sponsor.

561.    For example, Wells Fargo was a major servicer of loans securitizing insolvent sponsors American Home Mortgage, Taylor Bean & Whitaker and Thornberg.  Wells Fargo serviced over $5.2 billion of loans collateralizing these sponsors' RMBS at issue in this action. There is ample evidence that Wells Fargo engaged in rampant, industry-wide servicing abuses in connection with loans backing private-label RMBS, including these trusts.  Despite U.S. Bank's knowledge of such systemic and pervasive servicing violations, including Wells Fargo, U.S. Bank took no action and failed to adequately protect the rights of these Trusts against these solvent servicers.

562.    Similarly, JPMorgan Chase is a major servicer of loans securitizing Terwin-sponsored RMBS at issue in this action, servicing $791.5 million of loans that Terwin sponsored. There is ample evidence that JPMorgan engaged in rampant, industry-wide servicing abuses in connection with loans backing private-label RMBS, including trusts sponsored by Terwin. Despite U.S. Bank's knowledge of such systemic and pervasive servicing abuses by solvent third party servicers, including Terwin, U.S. Bank failed to adequately protect the rights of Terwin-sponsored Trusts against solvent servicers.

563.    Additionally, as noted above, in 2008, Lehman, a major sponsor for the Trusts filed for bankruptcy.  In connection with Lehman's bankruptcy, U.S. Bank, Wilmington Trust Company, Wilmington Trust, National Association, Law Debenture Trust Company of New York, and Deutsche Bank National Trust Company, in their capacity as trustee, separate trustee

or indenture trustee (collectively, the "Lehman Bankruptcy RMBS Trustees"), filed proofs of claims, asserting that Lehman was liable to 405 trusts for breaches of representations and warranties for all one million of the mortgage loans underlying these Trusts.  U.S. Bank was the trustee for at least many of the 405 trusts.  In pursuing these claims, the Lehman Bankruptcy RMBS Trustees undertook a re-underwriting and a detailed review of a sample of nearly 5,000 loans in 255 of the 405 RMBS trusts that suffered a loss. The Lehman Bankruptcy RMBS Trustees' experts found breaches of representations and warranties in approximately 57% of the sampled loans.  U.S. Bank was the trustee for 168 of the 255 trusts subject to this review.  U.S. Bank has not, however, pursued solvent originators to enforce representation and warranty claims as to the thousands of breaching mortgage loans in those Trusts.  Examples of such solvent third party loan sellers include Bank of America, Countrywide, GreenPoint, OptionOne and Wells Fargo, which sold billions of dollars of loans securitizing Lehman-sponsored Trusts at issue in this action.

564.    Prime Mortgage, a sponsor of RMBS trusts in the years leading up to the financial crisis, filed for bankruptcy in 2008.  Prime Mortgage issued over $1.8 billion of RMBS at issue in this action.  These Trusts were filled with significant amounts of defective loans.  While U.S. Bank filed proofs of claim in the Prime Mortgage bankruptcy, U.S. Bank failed to adequately or comprehensively enforce the rights of Prime Mortgage-sponsored Trusts against solvent responsible parties, including third party loan sellers that U.S. Bank knew had systematically and pervasively engaged in abusive mortgage origination and lending practices and that bore contractual repurchase liability for defective mortgage collateral in the same Trusts.  Examples of such solvent third party loan sellers include Wachovia, which sold over $1.5 billion of loans securitizing Prime Mortgage-sponsored Trusts at issue in this action.

565.   U.S. Bank also failed to discharge its contractual and statutory obligations concerning Trusts sponsored by failed entities by neglecting to provide written notice to Certificateholders of defaults in the form of rampant breaches of representations and warranties by the sellers and servicer violations (including continuing Events of Default), including with respect to deficient loans sold by solvent responsible parties.  Proper notice would have enabled Certificateholders to, among other things, determine whether to take independent or collective action to protect their interests against such breaches of representations and warranties, including against solvent responsible parties and others engaged in abusive securitization practices.

## XV.   U.S. BANK FAILED TO PROTECT THE TRUSTS DUE TO ITS CONFLICTS OF INTEREST

566.   U.S. Bank failed and unreasonably refused to discharge its critical pre- and post-default duties owed to the Trusts and the Certificateholders because acting to diligently protect the interests of the Trusts would have conflicted with U.S. Bank's own interests.

### A.   U.S. Bank Was Economically Beholden To The Mortgage Loan Sellers

567.   Trustees are selected by the sponsor, which is often an affiliate of the servicer. While U.S. Bank was charged with representing the interests of the Trusts and all Certificateholders, it was economically beholden to the sponsors.  Indeed, U.S. Bank had close, repeat business relationships with most if not all of the sponsors.  For example, U.S. Bank received approximately 30% of its private-label residential mortgage securitization trusteeship appointments from just three banks (Lehman Brothers, WaMu, and Wells Fargo) based on the cumulative original face value of the offerings.  And, the vast percentage of these banks' servicing business was conducted by their respective affiliates: Aurora (91.79%), Long Beach/WaMu (96.99%), and Wells Fargo (95.32%).  Accordingly, U.S. Bank was incentivized to *not* require servicers to take necessary action because the servicers were affiliated with the

-157-

sponsors that provided U.S. Bank with valuable trustee appointments.  In short, U.S. Bank failed

to protect the Trusts because it did not want to risk losing significant business from the sponsors

of the Trusts.

  **B.**  **U.S. Bank Was Engaged In The**
     **Same Wrongful Servicing Activities**

  568.  U.S. Bank failed and unreasonably refused to take action to protect the Trusts and

Certificateholders against seller breaches and servicer violations because it would have exposed

that U.S. Bank itself was engaged in the same servicing misconduct in its role as servicer for

other mortgages and RMBS trusts.

  569.  As noted above, during the fourth quarter of 2010, the Agencies conducted on-site

reviews of the adequacy of controls and governance over servicers' foreclosure processes at U.S.

Bank.  The reviews uncovered significant problems in foreclosure processing at U.S. Bank,

including "critical weaknesses in [U.S. Bank's] foreclosure governance processes, foreclosure

document preparation processes, and oversight and monitoring of third-party vendors, including

foreclosure attorneys."[34]

  570.  On April 13, 2011, based on the deficiencies in the review and the risk of

additional issues as a result of weak controls and processes, the Federal Reserve Board initiated

formal enforcement actions requiring U.S. Bancorp, the corporate parent of U.S. Bank, to

address its pattern of misconduct and negligence related to deficient practices in residential

mortgage loan servicing and foreclosure processing.  According to the Federal Reserve Board

press release, "[t]hese deficiencies represent significant and pervasive compliance failures and

---

[34] *See* Interagency Review of Foreclosure Policies and Practices (Apr. 2011), *available at*
http://www.federalreserve.gov/boarddocs/rptcongress/interagency_review_foreclosures_201104
13.pdf.

unsafe and unsound practices at [U.S. Bancorp]." The enforcement action required U.S. Bancorp to improve its residential mortgage loan servicing and foreclosure practices.

571.   As part of the enforcement action, U.S. Bank entered into a consent order with the Federal Reserve Board, which found that U.S. Bank had engaged in "unsafe or unsound practices with respect to the manner in which [U.S. Bank] handled various foreclosure and related activities."

572.   In addition, the OCC entered into consent orders with U.S. Bank and several other servicers (the "OCC Consent Orders").   In the OCC Consent Order with U.S. Bank, the government found, among other things, that beginning in 2009 U.S. Bank filed false or otherwise defective affidavits in connection with foreclosure proceedings and failed to exercise adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training for its foreclosure-related services.

573.   In short, because U.S. Bank itself was engaging in the same illicit and improper acts as the servicers for the Trusts, U.S. Bank failed to enforce the servicer violations, or even alert the Certificateholders to the servicers' misconduct.

### C.   U.S. Bank Originated Defective Loans

574.   U.S. Bank, as an originator for other RMBS trusts, sold hundreds of millions of dollars of loans, many of which materially breached representations and warranties.  Many of the same banks or their affiliate entities that act as servicers to the Trusts, similarly act as servicers to these trusts backed by U.S. Bank loans, including MSM 2004-5AR, MSM 2004-6AR, MSM 2005-4, and SARM 2007-4.   All of these trusts, like the Trusts at issue in this action, have suffered write-downs and are afflicted by high delinquency rates.

575.   Accordingly, because U.S. Bank itself faced enormous repurchase liability for hundreds of millions of dollars of loans sold in breach of representations and warranties,

including U.S. Bank-originated loans in RMBS trusts serviced by the same servicers as the Trusts, U.S. Bank was disincentivized to take any action against the servicers for the Trusts, or even alert the Certificateholders to servicer misconduct.

### D. U.S. Bank Refused To Discharge Its Duties In Order To Preserve Profits

576.    U.S. Bank was also conflicted because discharging its critical pre- and post-default duties owed to the Trusts and all Certificateholders would have necessarily diminished U.S. Bank's profits.  Specifically, such conduct would have directly impaired U.S. Bank's profits by increasing costs and expenses while revenue remained unchanged.  Indeed, rather than act pursuant to its proscribed contractual, statutory, and common law duties, U.S. Bank failed and unreasonably refused to enforce the sellers' repurchase obligations and servicers' prudent servicing requirements in order to avoid the associated transactional costs of exercising the Trusts' rights against these entities – or provoke the servicers to shine the light on U.S. Bank's own wrongful conduct.

577.    For example, prior to a "default" under the TIA or an "Event of Default" under the PSAs, U.S. Bank had minimal ministerial duties to perform.[35]  Following a default under the TIA or Event of Default under the PSAs, however, U.S. Bank's obligations expand such that it must act as a prudent person.  This requirement carries with it significant and more costly responsibilities, including seeking direction from the Certificateholders regarding the appropriate actions it should take on behalf of the Trusts.  However, fulfilling these greater duties increases costs while U.S. Bank's compensation under the PSAs – a fixed fee rate based on the unpaid principal balance of the trust (typically less than one basis point) – would remain unchanged.

---

[35] New York common law still imposed certain non-waivable duties on U.S. Bank both before and after a "default" under the TIA or an "Event of Default" under the PSAs.

578.    Additionally, the occurrence of an Event of Default could lead to the termination of the master servicer, which would have profound financial implications on U.S. Bank.  If the master servicer were terminated, U.S. Bank would have to retain a successor master servicer or substitute itself in as the master servicer.  The compensation that U.S. Bank or the successor master servicer could obtain would be heavily restricted.  For example, typical – and more lucrative – servicing income, such as float, excess spread, and ancillary fees are prohibited for a successor master servicer under the PSAs.  Nevertheless, U.S. Bank or the successor master servicer would be required to hold regulatory capital against the servicing rights.

579.    Further, the occurrence of a default under the TIA or an Event of Default under the PSAs requires U.S. Bank to provide notice of these defaults to the Certificateholders.  In addition to alerting Certificateholders to seller and servicer violations, the default notice would expose U.S. Bank's negligence in carrying out its ministerial duties, including its failure to receive, process, maintain and hold all or part of the mortgage loan files as required under the PSAs.  Consequently, U.S. Bank's providing notice to the Certificateholders of defaults could lead to potential liability or its removal as trustee of the Trusts.

580.    Accordingly, the increased duties, costs and liability risk associated with enforcing the Trusts' rights against the above-described seller and servicer violations would make U.S. Bank's trusteeships less profitable and possibly unprofitable.  For these reasons, U.S. Bank failed and unreasonably refused to enforce the Trusts' rights against the sellers and servicers.

## XVI.   CAUSATION

581.    U.S. Bank's failure and unreasonable refusal to enforce the Trusts' rights against the sellers and servicers, and its violations of its other contractual, statutory, fiduciary and independence duties, along with its negligence, have directly and proximately caused billions of

dollars in Trust assets to waste away. The mortgage loans conveyed to the Trusts did not comply with seller representations and warranties, but were instead of a lower quality, which increased the risk of defaults in the principal and interest payments owed to the Trusts. Moreover, servicer violations have exacerbated the Trusts' losses. Had U.S. Bank performed its duties as Trustee, in particular, had it adequately enforced the obligations of the sponsors and originators to cure, substitute, or repurchase mortgage loans that breached representations and warranties, it would have prevented the Trusts from incurring substantial losses and Trust assets from wasting away. Had U.S. Bank enforced the Trusts' rights against servicers for reimbursement of losses caused by their misconduct as required, it would have benefited the Trusts and their Certificateholders.

## XVII. <u>DAMAGES</u>

582. The Trusts have incurred substantial damages attributable to U.S. Bank's breaches of its contractual, statutory, fiduciary, and common law duties. In particular, the Trusts' loan pools are filled with loans of inadequate credit quality, which increased the risk of delinquency. As a result of the loans' poor credit quality, the Trusts have experienced enormous delinquency rates, collateral write-downs, and losses, and have incurred and continued to incur significant losses in connection with servicer violations. Damages incurred by the Trusts and caused by the Trustee's violation of law will be the subject of expert testimony for proof at trial.

## XVIII. <u>CAUSES OF ACTION</u>

### <u>FIRST CAUSE OF ACTION</u>

**BREACH OF CONTRACT**
**(In The Right Of The Trustee And On Behalf Of The Trusts Against U.S. Bank)**

583. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

584.    The PSAs are valid contracts that memorialize the issuance of certificates of beneficial interests in the Trusts, and establish U.S. Bank's contractual duties and obligations, in its capacity as trustee, to the Trusts and all their respective Certificateholders.  Each of the relevant contractual provisions is substantively similar if not identical in all of the PSAs, and imposes substantially the same if not identical duties and obligations on U.S. Bank in its capacity as trustee.

585.    The Trusts and each of the Plaintiffs have performed all of the conditions, covenants, and promises required in accordance with each of the PSAs.

586.    Under each PSA, U.S. Bank owed a duty to the Trusts and all Certificateholders (i) to give prompt written notice to all parties to the PSA of a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Certificateholders in any such mortgage loan, upon U.S. Bank's discovery of the breach; and (ii) to take such action with respect to the breach as may be necessary or appropriate to enforce the rights of the Trusts with respect to the breach.

587.    As set forth above, U.S. Bank materially breached each PSA by (i) failing to provide prompt written notice to all parties to the PSA and related responsible parties of breaches of the sellers' mortgage loan representations and warranties, upon [U.S. Bank's] discovery of the breaches; and (ii) failing to enforce the sellers' obligation to repurchase, substitute, or cure such defective mortgage loans.

588.    In addition, the PSAs required U.S. Bank, upon an "Event of Default" to (i) provide written notice to all Certificateholders of the Event of Default within sixty days of its occurrence, unless the Event of Default was cured or waived; and (ii) exercise the rights and

powers vested in U.S. Bank by the PSA using the same degree of care and skill as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

589.    The PSAs define an "Event of Default" to include the failure by the servicer to observe or perform in any material respect the covenants or agreements by the servicer set forth in the PSA, which continues unremedied for no more than thirty to sixty days after written notice of the failure has been given to the servicer by the trustee requiring the same to be remedied, or actual knowledge of the failure by a "Servicing Officer" of the servicer, whichever is earlier.

590.    Events of Default have occurred, remained uncured for the applicable period of time, and are continuing as a result of the servicers' failure to observe and perform, in material respects, the covenants and agreements imposed on them by the PSAs.

591.    The servicers have failed and refused to do the following, each of which has materially impaired the rights of the Trusts and all Certificateholders:

- Breaches of Representations and Warranties.  As with the Trustee, the PSAs required the servicers to give prompt written notice to all parties to the PSAs of a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Certificateholders in any such mortgage loan, upon the servicer's discovery of such breach.  The servicers have failed to give notice to the other parties of the following information, which has exacerbated losses experienced by the Trusts:

    (i)     although servicers often modify mortgage loans, and in the process of doing so have discovered that specific loans breached applicable

representations and warranties, the servicers have not notified the other parties of these breaches;

(ii)     although there has been widespread public evidence of pervasive breaches of applicable representations and warranties, and although the servicers have been specifically notified by insurers and Certificateholders of these pervasive breaches, the servicers have not notified the other parties to the PSAs (including U.S. Bank) of these breaches; and

(iii)    although aware of specific mortgage loans that breach applicable representations and warranties, the servicers have failed to enforce the sellers' obligation to repurchase, substitute, or cure the defective loans as required under the PSAs.

- <u>Violation of Prudent Servicing Obligations.</u>  The PSAs require the servicer service and administer the mortgage loans for and on behalf of the Certificateholders, and, consistent with the PSAs, (i) in the same manner in which it services and administers similar mortgage loans for its own portfolio or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans, (ii) with a view to maximizing the recoveries with respect to the mortgage loans on a net present value basis, and (iii) without regard to, among other things, the servicer's right to receive compensation or other fees for its services under the PSA, the servicer's obligation to make servicing advances under the PSA, and the servicer's ownership,

servicing or management for others of any other mortgage loans.   In violation of their prudent servicing obligations under the PSAs, the servicers have:

(i)    failed to maintain accurate and adequate loan and collateral files in a manner consistent with prudent mortgage servicing standards;

(ii)   failed to timely and accurately apply payments made by borrowers and maintain accurate account statements;

(iii)  failed to demand that the sellers cure deficiencies in mortgage records when deficient loan files and lien records are discovered;

(iv)   imposed force-placed insurance when the servicers knew or should have known that borrowers already had adequate coverage;

(v)    incurred completely avoidable and unnecessary servicing fees and servicing advances to maintain the mortgaged properties; and

(vi)   prejudiced the interests of the Trusts and the Certificateholders in the mortgages by fostering uncertainty as to the timely recovery of collateral.

- Violation of Foreclosure Obligations.  The PSAs require the servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing mortgage loans that come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments.   Moreover, each of the PSAs contemplates that foreclosures and liquidations of defaulted mortgages will proceed

-166-

forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties.  Despite these covenants, the servicers have:

(i)     continued to keep defaulted mortgage loans on their books, rather than foreclose or liquidate the loans, in order to wrongfully maximize their servicing fees, at the expense of the Trusts' and Certificateholders' best interests, including the right to recover from pool or financial guaranty insurance policies;

(ii)    failed to maintain records in an accurate, appropriate and adequate manner, which has impeded the process of foreclosure and liquidation of defaulted mortgages and caused wholly avoidable delays that have injured the Trusts and Certificateholders;

(iii)   continued to charge unearned and unwarranted servicing fees on mortgages that would have been liquidated but for the servicers' breach of their duties, as well as unauthorized fees for default-related services; and

(iv)    failed to place the interests of the Trusts and Certificateholders before their own interests.

- Violation of Modification Obligations.   The PSAs provide that the servicers agree to a modification of any mortgage loan only in specified circumstances.   When modifications are required to remedy predatory lending violations, the PSAs require the seller – not the Trusts or the Certificateholders – to bear the costs to cure the violations.  The servicers

-167-

have breached the PSAs by agreeing to modify loans held in the Trusts to settle predatory lending claims made by various attorneys' general against their parent companies while breaching their obligation to demand that the offending mortgage sellers (their parent companies) bear the costs of curing the violations, as well as the expenses reasonably incurred in enforcement of the seller's obligation to cure predatory mortgages. The servicers have also unjustly enriched their parent companies by using Trust collateral to settle claims that were not, and could never be, made against the Trusts, in a manner that has materially and adversely affected the interests of the Certificateholders. The servicers have therefore failed:

(i)     to demand that the originators and sponsors comply with their obligation to cure or repurchase predatory and ineligible loans that the servicers agreed to modify in the attorneys general settlements; and

(ii)    to deliver to the trustees a certification of a servicing officer that all requirements have been satisfied with respect to the modified mortgage loan.

- Improper Servicing Advances: The PSAs provide that the servicers may recover servicing advances that are customary, reasonable and necessary out-of-pocket costs and expenses incurred in the performance by the servicer of its servicing obligations, including but not limited to the cost of the preservation, restoration, and protection of a mortgaged property. Despite the requirement that servicing advances be incurred only for

reasonable and necessary out-of-pocket costs, the servicers instead utilized affiliated vendors – which marked up their services to a level 100% or more above the market price – to provide services related to the preservation, restoration, and protection of mortgaged property, in a fraudulent, unauthorized, and deceptive effort to supplement the servicers' servicing income.

592.    U.S. Bank and its responsible officers had knowledge of these and other defaults by the servicers through, among other things, public reports, lawsuits, exception reports, remittance reports, and the increasing delinquency and loss rates for the Trusts.  Nevertheless, U.S. Bank failed to deliver written notices to the servicers of the defaults or terminate the servicers.  Similarly, U.S. Bank failed to provide Certificateholders with notice of these Events of Default.  By failing to take these actions, U.S. Bank materially breached the PSAs.

593.    These Events of Default occurred, remained uncured for the requisite period of time and are continuing.  Consequently, under the PSAs, U.S. Bank had and continues to have the obligation to exercise the rights and powers vested in it by the PSAs, and to use the same degree of care and skill in their exercise as a prudent person would use under the circumstances in the conduct of the person's own affairs.  A prudent person would have exercised all of the trustee's rights to recover for these Events of Default, and would have done so promptly.  By failing to take this action, U.S. Bank materially breached the PSAs.

594.    U.S. Bank's material breaches of the PSAs have directly and proximately caused damages to the Trusts in that they have deprived the Trusts of valuable remedies and allowed billions of dollars in Trust assets to waste away.  For example, had U.S. Bank protected the rights of the Trusts by enforcing the sellers' obligation to cure, repurchase, or substitute mortgage loans

affected by breaches of representations and warranties, the Trusts would have received either cured or substitute mortgage loans of adequate credit quality or funds representing the "Repurchase Price" with respect to each defective mortgage loan.  U.S. Bank's inaction with respect to the sellers has allowed the Trusts to be filled with defective mortgage loans of poor credit quality that have increased the severity of the Trusts' losses.  Similarly, had U.S. Bank enforced the servicers' prudent servicing obligations, the Trusts would have been able to avoid incurring unnecessary losses and expenses.  U.S. Bank's inaction with respect to the servicing violations has exacerbated losses experienced by the Trusts.

595.    U.S. Bank's material breaches of the PSAs have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

## SECOND CAUSE OF ACTION

**VIOLATION OF THE TRUST INDENTURE ACT OF 1939, 53 STAT. 1171**
**(In The Right Of The Trustee And On Behalf Of The Trusts Against U.S. Bank)**

596.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

597.    Congress enacted the TIA to ensure, among other things, that investors in certificates, bonds, and similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees.

598.    Each of the PSAs is an "indenture," and U.S. Bank is an "indenture trustee," within the meaning of the TIA. 15 U.S.C. § 77ccc(7), (10).  As noted above, each of the PSAs is substantially similar and imposes substantially the same duties on U.S. Bank in its capacity as Trustee.  Moreover, the TIA applies to and is deemed to be incorporated into each of the PSAs

and the related Trusts. 15 U.S.C. § 77ddd(a)(1).  U.S. Bank has violated multiple provisions of the TIA.

599.    First, the TIA requires that, before default, the indenture trustee shall be liable for any duties specifically set out in the indenture. 15 U.S.C. § 77000(a)(1).  As set forth above, U.S. Bank has failed to comply, in good faith, with numerous duties specifically assigned to it by each of the PSAs, including the duties:

- to provide prompt written notice to all parties to the PSA and related responsible parties of breaches of the sellers' representations and warranties, upon U.S. Bank's discovery of the breaches;

- to enforce the sellers' obligations to repurchase, substitute, or cure defective mortgage loans; and

- to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including requiring the originators and sponsors to perform their respective obligations and to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers.

600.    By failing to comply with these specific duties, U.S. Bank violated the TIA.

601.    In addition, the TIA requires that U.S. Bank inform Certificateholders of defaults within ninety days after their occurrence. 15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)). Here, there were numerous defaults, including (i) the failure of originators and sponsors to repurchase or substitute defective or nonconforming loans in the Trusts; and (ii) the failure on the part of the servicers to observe and perform covenants and agreements set forth in the PSAs,

including requiring the originators and sponsors to perform their respective obligations and servicing and administering the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers.  Given the great importance of those defaults to the Certificateholders' interests, U.S. Bank had no good faith reason for failing to provide notice of those defaults.  Accordingly, by failing to provide this notice, U.S. Bank violated the TIA.

602.    Second, in case of default, the TIA requires that U.S. Bank exercise its rights and powers under the PSA as a prudent person would, under those circumstances, in the conduct of the persons' own affairs. 15 U.S.C. § 77000(c).  Again, given the obvious importance of the defaults set forth in the preceding paragraph, which impaired the rights of the Trusts, any prudent person under those circumstances would have exercised all of the Trustee's rights to, among other things, enforce the sponsors' and originators' obligation to repurchase, substitute, or cure defective mortgage loans, and a prudent person would have exercised those rights promptly. Indeed, with the number of delinquent and defaulting mortgages in the Trusts increasing, as a result, *inter alia*, of these defects, the Trusts could only have been protected from the resulting losses through the Trustee's prompt exercise of those rights, which were designed precisely to limit the number of delinquent and defaulting mortgages in the Trusts.  By failing to exercise its rights in those circumstances, U.S. Bank violated the TIA.

603.    U.S. Bank's violations of the TIA have directly and proximately caused damages to the Trusts in that they have deprived the Trusts of valuable remedies and allowed billions of dollars in Trust assets to waste away.  For example, had U.S. Bank protected the rights of the Trusts by enforcing the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans affected by breaches of representations and warranties, as it was contractually

obligated to do under the PSAs, the Trusts would have received either cured or substitute mortgage loans of adequate credit quality or funds representing the "Repurchase Price" of the defective mortgage loans.  U.S. Bank's inaction with respect to the originators and sponsors has allowed the Trusts to be filled with defective mortgage loans of poor credit quality that have increased the severity of the Trusts' losses.  Similarly, had U.S. Bank enforced the servicers' servicing obligations, the Trusts would have been able to avoid unnecessary losses.  U.S. Bank's inaction with respect to the servicers has exacerbated losses experienced by the Trusts.

604.    U.S. Bank's violations of the TIA have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

### THIRD CAUSE OF ACTION

### NEGLIGENCE - BREACH OF PRE-DEFAULT DUTY OF INDEPENDENCE
### (In The Right Of The Trustee And On Behalf Of The Trusts Against U.S. Bank)

605.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

606.    Under New York law, U.S. Bank, as Trustee, had certain extra-contractual, pre-default duties to the Trusts and all Certificateholders.  These duties include the absolute, unwaivable duty to give the Trusts and their Certificateholders undivided loyalty, free from any conflicting self-interest.  Trustees like U.S. Bank must discharge their obligations "with absolute singleness of purpose" because of the inability of the Trusts and dispersed Certificateholders to enforce their rights.  This common law duty to avoid conflicts of interest applies notwithstanding the terms of the instrument that purports to define the duties of the trustee.

607.    Under each of the PSAs, U.S. Bank holds the loans for the benefit of the Trusts and all Certificateholders, including Plaintiffs.

608.    Under each of the PSAs, U.S. Bank had the discretion to enforce the sellers' repurchase obligations and to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans that U.S. Bank held for the benefit of the Trusts and the Certificateholders.

609.    As alleged in detail above, U.S. Bank knew of seller breaches of representations and warranties and that the servicers were engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with regard to their servicing and administration of the mortgage loans in the Trusts.

610.    As alleged herein, however, U.S. Bank was economically beholden to the sellers. In addition, as originator and sponsor with regard to other mortgage loans and RMBS trusts, U.S. Bank or its affiliates sold significant amounts of loans in breach of specific representations and warranties to RMBS trusts in which many of the same sellers, servicers or their affiliates were serving as servicers or trustees.

611.    Because U.S. Bank was economically beholden to the sellers and faced repurchase liability for the sale and securitization of its own loans in breach of its representations and warranties, U.S. Bank failed to take any action against the servicers, or even alert the Certificateholders that the servicers were engaged in misconduct.

612.    U.S. Bank's negligent breach of its pre-default duty of independence has directly and proximately caused damages to the Trusts.  For example, had U.S. Bank not been conflicted, it would have enforced the sellers' repurchase obligations and exercised its discretion to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicing.  U.S. Bank's inaction has relieved the sellers' of their repurchase liability, and allowed the servicers to charge improper fees that have been passed along to the

Trusts and to delay in foreclosing on mortgage loans, which has increased the costs of foreclosure.

613.    U.S. Bank's negligent breaches of its pre-default duty of independence have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

## FOURTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY – DUTY OF CARE
### (In The Right Of The Trustee And On Behalf Of The Trusts Against U.S. Bank)

614.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

615.    Under New York law, after the occurrence of an Event of Default, U.S. Bank's duties expanded to include a fiduciary duty owed to the Trusts and all Certificateholders.  This fiduciary duty included the obligation to exercise its contractually conferred rights and powers in good faith and to bring all available claims for the benefit of the Trusts and the Certificateholders following an Event of Default.  Following the Events of Defaults described above, U.S. Bank breached its fiduciary duties to the Trusts and all Certificateholders in several respects.

616.    First, U.S. Bank, in its capacity as Trustee, had standing to bring claims against the sellers of the Trusts for breach of their representations and warranties under the Governing Agreements.  At the time of the Events of Default, meritorious claims existed against the sellers for breach of their representations and warranties under the Governing Agreements.  U.S. Bank, however, failed to promptly enforce the sellers' obligation to cure, repurchase, or substitute mortgage loans that had defective mortgage files or were affected by breaches of the sponsors' and originators' representations and warranties, including by filing suits on behalf of the Trusts

-175-

against the sponsors and originators.   Moreover, U.S. Bank failed to provide notice to the Certificateholders of the breaches or of its intention not to enforce the originators' and sponsors' obligation to cure, repurchase, or substitute the loans with defective mortgage files and breaches of representations and warranties.

617.    U.S. Bank's failure to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, as well as its failure to provide notice to the Certificateholders of its intention not to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, constituted breaches of U.S. Bank's fiduciary duty to the Trusts and to all Certificateholders.

618.    Second, U.S. Bank, in its capacity as Trustee, presently has standing to bring meritorious claims against the servicers to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers.   U.S. Bank, however, has refused and continues to refuse to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including by filing suits on behalf of the Trusts against the servicers for compensatory and injunctive relief for harm caused to the Trusts as a result of servicing violations.   Moreover, U.S. Bank has failed to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs.   U.S. Bank's failure to enforce the

servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, as well as its failure to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, constitutes breaches of U.S. Bank's fiduciary duty to the Trusts and to all Certificateholders.

619.    U.S. Bank's breach of its fiduciary duty has directly and proximately caused damages to the Trusts.  Specifically, the Trusts' injury includes the loss of verdicts, settlements, or awards, and the interest that the Trusts would have recovered against the sellers and servicers but for U.S. Bank's breach of its fiduciary duty.

620.    U.S. Bank's breaches of its fiduciary duty have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

## FIFTH CAUSE OF ACTION

### NEGLIGENCE – DUTY OF CARE
**(In The Right Of The Trustee And On Behalf Of The Trusts Against U.S. Bank)**

621.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

622.    Under New York law, after the occurrence of an Event of Default, U.S. Bank owed duties to the Trusts and all Certificateholders, which included the obligation to bring all available claims for the benefit of the Trusts and the Certificateholders.  Following the Events of Default described above, U.S. Bank breached its duties to the Trusts and to all Certificateholders in several respects.

623.    First, U.S. Bank, in its capacity as Trustee, had standing to bring claims against the sellers of the Trusts for breach of their representations and warranties under the Governing Agreements.  At the time of the Events of Default, meritorious claims existed against the sellers for breach of their representations and warranties under the Governing Agreements.  U.S. Bank, however, negligently failed to promptly enforce the sellers' obligation to cure, repurchase, or substitute mortgage loans that had defective mortgage files or were affected by breaches of the sponsors' and originators' representations and warranties, including by filing suits on behalf of the Trusts against the sponsors and originators.   Moreover, U.S. Bank negligently failed to provide notice to the Certificateholders of the breaches or of its intention not to enforce the originators' and sponsors' obligation to cure, repurchase, or substitute the loans with defective mortgage files and breaches of representations and warranties.

624.    U.S. Bank's failure to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, and failure to provide notice to the Certificateholders of the breaches or of its intention not to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, constituted negligence.

625.    Second, U.S. Bank, in its capacity as Trustee, presently has standing to bring meritorious claims against the servicers to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers.  U.S. Bank, however, has refused and continues to refuse

to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including by filing suits on behalf of the Trusts against the servicers for compensatory and injunctive relief for harm caused to the Trusts as a result of servicing violations. Moreover, U.S. Bank has negligently failed to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs. U.S. Bank's failure to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, as well as its failure to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, constitutes breaches of its duty to the Trusts and all Certificateholders.

626. U.S. Bank's negligence has directly and proximately caused damages to the Trusts. Specifically, the Trusts' injury includes the loss of verdicts, settlements, or awards, and the interest that the Trusts would have recovered against the originators and sponsors but for U.S. Bank's negligence.

627. U.S. Bank's negligence has injured all Certificateholders, including Plaintiffs, in that it has diminished the value of the certificates held by the Certificateholders and has prevented the Certificateholders from protecting the rights of the Trusts.

## SIXTH CAUSE OF ACTION

**BREACH OF FIDUCIARY DUTY –**
**BREACH OF POST-DEFAULT DUTY OF INDEPENDENCE**
**(In The Right Of The Trustee And On Behalf Of The Trusts Against U.S. Bank)**

628.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

629.     Under New York law, U.S. Bank, as Trustee, had certain extra-contractual, post-default duties to the Trusts and all Certificateholders.  These duties include the absolute, unwaivable duty to give the Trusts and their Certificateholders undivided loyalty, free from any conflicting self-interest.  Trustees like U.S. Bank must discharge their obligations "with absolute singleness of purpose" because of the inability of the Trusts and dispersed Certificateholders to enforce their rights.  This common law duty to avoid conflicts of interest applies notwithstanding the terms of the instrument that purports to define the duties of the trustee.

630.     Under each of the PSAs, U.S. Bank holds the loans for the benefit of the Trusts and all Certificateholders, including Plaintiffs.

631.     Under each of the PSAs, U.S. Bank had the discretion to enforce the sellers' repurchase obligations and to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans that U.S. Bank held for the benefit of the Trusts and all Certificateholders.

632.     As alleged in detail above, after Events of Defaults, U.S. Bank knew of seller breaches of representations and warranties and that the servicers were engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with regard to their servicing and administration of the mortgage loans in the Trusts.

633.    As alleged herein, however, U.S. Bank was economically beholden to the sellers. In addition, in their capacity as originator and sponsor with regard to other mortgage loans and RMBS trusts, U.S. Bank's affiliates had sold loans in breach of specific representations and warranties to RMBS trusts in which many of the same sellers, servicers or their affiliates were serving as servicers or trustees.

634.    Because U.S. Bank was economically beholden to the sellers and faced repurchase liability for the sale and securitization of its own loans in breach of its specific representations and warranties, U.S. Bank has failed to take any action against the servicers, or even notify the Certificateholders that the servicers were engaged in this misconduct.

635.    U.S. Bank's breach of its post-default fiduciary duty of independence has directly and proximately caused damages to the Trusts.  For example, had U.S. Bank not been conflicted, it would have enforced the sellers' repurchase obligations and exercised its discretion to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans.  U.S. Bank's inaction has relieved the sellers' of their repurchase liability, and allowed the servicers to charge improper fees that have been passed along to the Trusts and to delay in foreclosing on mortgage loans, which has increased the costs of foreclosure.

636.    U.S. Bank's breaches of its post-default fiduciary duty of independence have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

## XIX.   CLASS ACTION ALLEGATIONS

637.    Alternatively, in the event the Court does not permit this action to proceed as a derivative action, Plaintiffs bring this action as a class action on behalf of themselves and a class

consisting of all current owners of certificates in the Trusts (the "Class") that have suffered damages as a result of U.S. Bank's misconduct alleged herein.  Excluded from the Class are Defendant U.S. Bank, the Sellers and the Servicers, and, for each of them, their respective officers and directors, legal representatives, successors or assigns, and any entity in which they respectively have or had a controlling interest.

638.    The members of the Class are so numerous that joinder of all members is impractical.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained though appropriate discovery, Plaintiffs believe that there are at least hundreds of members of the proposed Class.  Record beneficial owners and other members of the Class may be identified from records maintained by U.S. Bank or third parties and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

639.    Plaintiffs' claims are typical of the claims of the members of the Class as (i) Plaintiffs and the members of the Class all acquired certificates in the Trusts, and held them at or after the time of U.S. Bank's misconduct; (ii) all the claims are based upon the Governing Agreements, which are substantially in the same form, common law and the TIA; (iii) U.S. Bank's alleged misconduct was substantially the same with respect to all class members; (iv) and all class members suffered similar harm as a result.  Thus, all members of the class are similarly affected by U.S. Bank's statutory, contractual, and common law breaches and violations that are alleged of herein.

640.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and asset-backed securities litigation.

641.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- Whether U.S. Bank breached its contractual and common law duties to Plaintiffs and the Class under the Governing Agreements.

- Whether U.S. Bank violated the TIA.

- Whether and to what extent Plaintiffs and members of the Class have suffered damages as a result of U.S. Bank's breaches of its statutory, contractual, and common law duties and the proper measure of damages.

642.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  There will be no difficulty in the management of this action as a class action.

## XX.    RELIEF REQUESTED

**WHEREFORE**, Plaintiffs demand judgment as follows:

(a)    Determining that this action is a proper derivative action maintainable under law and demand is excused;

(b)    Awarding to the Trusts money damages against U.S. Bank for all losses suffered as a result of U.S. Bank's breaches of contractual, statutory, common law and fiduciary duties, and U.S. Bank's negligence;

(c)    Requiring U.S. Bank to take corrective actions, including taking all necessary actions to reform and improve its internal policies and procedures to comply with its trustee obligations under the PSAs and applicable laws, and to protect the Trusts and the Certificateholders from a repeat of the damaging events described herein;

-183-

(d)     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

(e)     In the event the Court determines that this action is not a proper derivative action, determining that this action is a class action pursuant to Rule 23; and

(e)     Granting any other and further relief that the Court deems just and proper.

## XXI.   JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: November 24, 2014

BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP

JEROEN VAN KWAWEGEN

JEROEN VAN KWAWEGEN (JV 1010)
JAI CHANDRASEKHAR (JC 3789)
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444


*Counsel for Plaintiffs*

BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP

BLAIR A. NICHOLAS

BLAIR A. NICHOLAS (pro hac vice pending)
TIMOTHY A. DELANGE (pro hac vice pending)
BENJAMIN GALDSTON (pro hac vice pending)
BRETT M. MIDDLETON (pro hac vice pending)
DAVID R. KAPLAN (pro hac vice pending)
LUCAS E. GILMORE (pro hac vice pending)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323