**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLACKROCK CORE BOND PORTFOLIO; BLACKROCK CORE BOND TRUST; BLACKROCK ENHANCED GOVERNMENT FUND, INC.; BLACKROCK INCOME TRUST, INC.; BLACKROCK MASTER TOTAL RETURN PORTFOLIO OF MASTER BOND LLC; BLACKROCK MULTI-ASSET INCOME - NON-AGENCY MBS PORTFOLIO; FIXED INCOME SHARES: SERIES C; FIXED INCOME SHARES: SERIES M; LVS I LLC; LVS II LLC; PACIFIC BAY CDO, LTD.; PIMCO ABSOLUTE RETURN STRATEGY 3D OFFSHORE FUND LTD.; PIMCO ABSOLUTE RETURN STRATEGY IV IDF LLC; PIMCO ABSOLUTE RETURN STRATEGY IV MASTER FUND LDC; PIMCO ABSOLUTE RETURN STRATEGY V MASTER FUND LDC; PIMCO BERMUDA TRUST IV: PIMCO BERMUDA GLOBAL BOND EX-JAPAN FUND; PIMCO BERMUDA TRUST: PIMCO EMERGING MARKETS BOND FUND (M); PIMCO CAYMAN SPC LIMITED: PIMCO CAYMAN GLOBAL AGGREGATE BOND SEGREGATED PORTFOLIO; PIMCO CAYMAN SPC LIMITED: PIMCO CAYMAN JAPAN COREPLUS STRATEGY SEGREGATED PORTFOLIO; PIMCO CAYMAN SPC LIMITED: PIMCO CAYMAN JAPAN LOW DURATION SEGREGATED PORTFOLIO; PIMCO CAYMAN TRUST: PIMCO CAYMAN TOTAL RETURN STRATEGY FUND; PIMCO DISTRESSED SENIOR CREDIT OPPORTUNITIES FUND II, L.P.; PIMCO ETF TRUST: PIMCO TOTAL RETURN ACTIVE EXCHANGE-TRADED FUND; PIMCO FUNDS: | Case No. 14-cv-9401-KBF<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br><u>**JURY DEMAND**</u> |

GLOBAL INVESTORS SERIES PLC, DIVERSIFIED INCOME DURATION HEDGED FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, DIVERSIFIED INCOME FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, GLOBAL BOND FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, GLOBAL INVESTMENT GRADE CREDIT FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, INCOME FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, PIMCO CREDIT ABSOLUTE RETURN FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, TOTAL RETURN BOND FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, UNCONSTRAINED BOND FUND; PIMCO FUNDS: PIMCO COMMODITIESPLUS® STRATEGY FUND; PIMCO FUNDS: PIMCO COMMODITY REAL RETURN STRATEGY FUND®; PIMCO FUNDS: PIMCO DIVERSIFIED INCOME FUND; PIMCO FUNDS: PIMCO EM FUNDAMENTAL INDEXPLUS® AR STRATEGY FUND; PIMCO FUNDS: PIMCO FLOATING INCOME FUND; PIMCO FUNDS: PIMCO FOREIGN BOND FUND (U.S. DOLLAR-HEDGED); PIMCO FUNDS: PIMCO FOREIGN BOND FUND (UNHEDGED); PIMCO FUNDS: PIMCO GLOBAL ADVANTAGE® STRATEGY BOND FUND; PIMCO FUNDS: PIMCO GLOBAL BOND FUND (U.S. DOLLAR-HEDGED); PIMCO FUNDS: PIMCO GLOBAL BOND FUND (UNHEDGED); PIMCO FUNDS: PIMCO INCOME FUND; PIMCO FUNDS: PIMCO INTERNATIONAL FUNDAMENTAL INDEXPLUS® AR STRATEGY FUND; PIMCO FUNDS: PIMCO INTL LOW VOLATILITY RAFI®-PLUS AR FUND; PIMCO FUNDS: PIMCO LONG-TERM

CREDIT FUND; PIMCO FUNDS: PIMCO LOW DURATION FUND; PIMCO FUNDS: PIMCO LOW DURATION FUND II; PIMCO FUNDS: PIMCO LOW VOLATILITY RAFI®-PLUS AR FUND; PIMCO FUNDS: PIMCO MORTGAGE OPPORTUNITIES FUND; PIMCO FUNDS: PIMCO MORTGAGE-BACKED SECURITIES FUND; PIMCO FUNDS: PIMCO REAL ESTATE REAL RETURN STRATEGY FUND; PIMCO FUNDS: PIMCO REAL RETURN ASSET FUND; PIMCO FUNDS: PIMCO REAL RETURN FUND; PIMCO FUNDS: PIMCO SHORT-TERM FUND; PIMCO FUNDS: PIMCO SMALL COMPANY FUNDAMENTAL INDEXPLUS® AR STRATEGY FUND; PIMCO FUNDS: PIMCO STOCKSPLUS® ABSOLUTE RETURN FUND; PIMCO FUNDS: PIMCO STOCKSPLUS® AR SHORT STRATEGY FUND; PIMCO FUNDS: PIMCO TOTAL RETURN FUND; PIMCO FUNDS: PIMCO TOTAL RETURN FUND II; PIMCO FUNDS: PIMCO TOTAL RETURN FUND IV; PIMCO FUNDS: PIMCO UNCONSTRAINED BOND FUND; PIMCO FUNDS: PIMCO UNCONSTRAINED TAX MANAGED BOND FUND; PIMCO FUNDS: PIMCO WORLDWIDE FUNDAMENTAL ADVANTAGE AR STRATEGY FUND; PIMCO FUNDS: PRIVATE ACCOUNT PORTFOLIO SERIES MORTGAGE PORTFOLIO; PIMCO GLOBAL CREDIT OPPORTUNITY MASTER FUND LDC; PIMCO INCOME OPPORTUNITY FUND; PIMCO OFFSHORE FUNDS - PIMCO ABSOLUTE RETURN STRATEGY IV EFUND; PIMCO VARIABLE INSURANCE TRUST: PIMCO FOREIGN BOND PORTFOLIO (U.S. DOLLAR HEDGED); PIMCO

VARIABLE INSURANCE TRUST:
PIMCO FOREIGN BOND PORTFOLIO
(UNHEDGED); PIMCO VARIABLE
INSURANCE TRUST: PIMCO REAL
RETURN PORTFOLIO; PIMCO
VARIABLE INSURANCE TRUST:
PIMCO TOTAL RETURN PORTFOLIO;
PIMCO VARIABLE INSURANCE
TRUST: PIMCO UNCONSTRAINED
BOND PORTFOLIO; TIAA GLOBAL
PUBLIC INVESTMENTS, MBS LLC;
TIAA-CREF BOND PLUS FUND; TIAA-
CREF LIFE INSURANCE COMPANY;
TIAA-CREF SHORT-TERM BOND
FUND; PRUDENTIAL RETIREMENT
INSURANCE AND ANNUITY
COMPANY; THE PRUDENTIAL
INSURANCE COMPANY OF
AMERICA; THE PRUDENTIAL
INVESTMENT PORTFOLIOS 9; THE
PRUDENTIAL INVESTMENT
PORTFOLIOS, INC. 17; BROOKFIELD
TOTAL RETURN FUND INC.;
TRANSAMERICA LIFE INSURANCE
COMPANY; TRANSAMERICA
PREMIER LIFE INSURANCE
COMPANY; KORE ADVISORS LP,

Plaintiffs,

-against-

U.S. BANK NATIONAL
ASSOCIATION,

Defendant.

# TABLE OF CONTENTS

TABLE OF EXHIBITS ................................................................................................... v

I.      NATURE AND SUMMARY OF THE ACTION ............................................... 6

II.     PARTIES ........................................................................................................ 15

III.    JURISDICTION AND VENUE ...................................................................... 16

IV.     COMPLIANCE WITH THE NO ACTION CLAUSE IS EXCUSED ............................ 17

V.      OVERVIEW OF THE TRUSTS ..................................................................... 17

VI.     BACKGROUND ............................................................................................ 18

        A.      The Critical Enforcement Function Of The Indenture Trustee ........................... 18

        B.      Securitization Process ......................................................................... 20

VII.    THE GOVERNING AGREEMENTS .............................................................. 21

        A.      The Mortgage Loan Purchase And Sale Agreement ............................................ 21

        B.      The Trust Agreement ........................................................................... 23

        C.      The Sale And Servicing Agreement ...................................................... 23

        D.      The Indenture ...................................................................................... 24

VIII.   U.S. BANK'S DUTIES UNDER THE GOVERNING AGREEMENTS ........................ 24

        A.      Duty To Hold Trust Assets For The Benefit Of Noteholders ............................... 24

        B.      Duties To Provide Notice Of Breaches And To Enforce Seller
                Repurchase Obligations ...................................................................... 24

        C.      Duties Regarding The Servicers ........................................................... 25

        D.      Duties Upon An Indenture Event Of Default ........................................ 26

IX.    THE TRUSTS SUFFERED FROM PERVASIVE BREACHES OF

REPRESENTATIONS AND WARRANTIES BY THE SELLERS ............................. 28

A.    The Trusts' Mortgage Loans Have Experienced High Delinquency,

Modification, And Loss Severity Rates ................................................. 28

B.    The Notes Have Experienced Massive Credit Downgrades ................................. 30

C.    The Systemic Disregard Of Underwriting Standards Was Pervasive

During The Relevant Period ................................................................. 31

D.    There Is Evidence Of Widespread Breaches Of Representations

And Warranties By The Trusts' Originators ........................................... 33

E.    The Systemic Disregard Of Prudent Securitization Standards Was

Pervasive During The Relevant Period .................................................. 34

F.    There Is Evidence Of Widespread Breaches Of Representations

And Warranties By The Specific Sponsors Of The Trusts ................................. 35

G.    Several Of The Trusts Have Been The Subject Of Litigation

Uncovering Evidence Of Rampant Breaches Of Representations

And Warranties By The Sellers .......................................................... 36

X.    U.S. BANK KNEW THAT THE TRUSTS WERE FILLED WITH

DEFECTIVE LOANS ................................................................................. 36

A.    Reports, Investigations And Litigation Involving The Sellers ........................... 36

B.    U.S. Bank Monitored The Performance Of The Trusts ....................................... 37

C.    U.S. Bank Received Written Notice Of Pervasive And Systemic

Seller Breaches From Financial Guaranty Insurers ............................... 37

D.     U.S. Bank And Its Responsible Officers Received Written Notice From Holders Of Pervasive And Systemic Seller Breaches .................................. 39

E.     U.S. Bank Selectively Asserted The Trusts' Repurchase Rights Against Insolvent Sellers ..................................................................... 40

F.     U.S. Bank Initiated Putback Litigation Against Many Of The Sellers ........................................................................................................ 41

G.     U.S. Bank Attempted To Contract Around Its Liability And Obligations In Acquiring Bank Of America's Trustee Business ......................... 42

H.     U.S. Bank Learned Of Widespread Seller Breaches Of Representations And Warranties In Its Capacity As Servicer .............................. 43

XI.    THE TRUSTS SUFFER FROM PERVASIVE SERVICER VIOLATIONS ...................................................................................................... 44

A.     The Servicers Failed To Give Notice Of Seller Breaches Of Representations And Warranties ......................................................................... 45

B.     The Servicers Have Violated Their Prudent Servicing Obligations .................... 46

C.     The Servicers Have Violated Their Foreclosure Obligations ............................... 47

D.     The Servicers Have Violated Their Modification Obligations ............................ 48

E.     The Servicers Have Abused Their Servicing Advances Obligations .................. 49

XII.   U.S. BANK HAS KNOWN OF SERVICER VIOLATIONS PLAGUING THE TRUSTS .............................................................................................................. 50

A.     Reports, Investigations And Litigation Involving The Servicers ......................... 50

B.     U.S. Bank Was Involved In Government Enforcement Actions And Private Litigation Stemming From The Servicers' Violations .................... 50

C.      U.S. Bank And Its Responsible Officers Received Written Notice From RMBS Investors Of Pervasive And Systemic Servicer Breaches ........................................................................................... 52

D.      U.S. Bank Had Knowledge Of The Servicers' Failures Through The Monthly Servicer And Remittance Reports .................................... 54

XIII.    NUMEROUS INDENTURE EVENTS OF DEFAULT HAVE OCCURRED ............................................................................................. 55

XIV.    U.S. BANK HAS KNOWN OF THE OCCURRENCE OF NUMEROUS INDENTURE EVENTS OF DEFAULT ......................................................... 55

XV.    U.S. BANK FAILED TO DISCHARGE ITS CRITICAL PRE- AND POST-DEFAULT DUTIES ...................................................................... 56

A.      Failure To Enforce The Trusts' Repurchase Rights Against Responsible Sellers ............................................................................. 56

B.      Failure To Provide Notice To The Servicers Of Servicer Events Of Defaults ......................................................................................... 56

C.      Failure To Act Prudently Subsequent To Indenture Events Of Defaults ......................................................................................... 57

D.      Failure To Provide Notice To Noteholders Of The Uncured Indenture Events Of Defaults ............................................................. 58

XVI.    U.S. BANK FAILED TO PROTECT THE TRUSTS DUE TO ITS CONFLICTS OF INTEREST ..................................................................... 58

A.      U.S. Bank Was Engaged In The Same Wrongful Servicing Activities ....................................................................................... 59

B. U.S. Bank Originated Defective Loans..................................................................... 61

C. U.S. Bank Was Economically Beholden To The Mortgage Loan

Sellers.......................................................................................................................... 61

XVII. CAUSATION ............................................................................................................. 62

XVIII. DAMAGES.................................................................................................................. 62

XIX. CAUSES OF ACTION ................................................................................................ 63

FIRST CAUSE OF ACTION (Breach Of Contract) .................................................... 63

SECOND CAUSE OF ACTION (Violation Of The Trust Indenture Act Of 1939,

15 U.S.C. §§ 77ooo(b) And (c)) ...................................................................................... 66

THIRD CAUSE OF ACTION (Breach Of Fiduciary Duty) ........................................ 68

FOURTH CAUSE OF ACTION (Breach Of Duty To Avoid Conflicts Of Interest)................... 70

XX. CLASS ACTION ALLEGATIONS .............................................................................. 72

XXI. RELIEF REQUESTED................................................................................................. 73

XXII. JURY DEMAND ......................................................................................................... 74

Plaintiffs AEGON (as defined herein); BlackRock Funds (as defined herein); Brookfield (as defined herein); Kore Advisors LP ("Kore"); PIMCO (as defined herein); Prudential (as defined herein); and TIAA (as defined herein) (collectively, "Plaintiffs"), bring this action on their own behalf and on behalf of a class (the "Class") of all current owners of notes issued by the trusts listed in Exhibit 1 (the "Trusts"), against U.S. Bank National Association ("U.S. Bank" or the "Indenture Trustee"), the Indenture Trustee for the Trusts, to recover for the losses sustained by the Trusts and the Class as a result of U.S. Bank's wrongful conduct.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      Defendant U.S. Bank is a national banking association and currently the largest corporate trustee in the United States with nearly one-third of all structured finance trust business. U.S. Bank administers more than 1,600 residential mortgage-backed securities ("RMBS") trusts originally securitized by approximately $1.3 trillion of residential mortgage loans.  Among them are the Trusts at issue in this action: 27 Delaware statutory trusts created between 2004 and 2007 that issued notes secured by loans worth more than $19.9 billion at the time of securitization.  As Indenture Trustee, U.S. Bank administers the Trusts as the sole representative for the beneficial owners of the notes (the "Noteholders") to enforce their rights, and must at all times administer the Trusts solely in the interests of the Noteholders.  As alleged herein, U.S. Bank failed to discharge its duties and obligations to protect Noteholders.  Instead, to protect its own business interests, U.S. Bank ignored pervasive and systemic deficiencies in the underlying loan pools and the servicing of those loans and unreasonably refused to take any action.  This action seeks to

recover billions of dollars in damages to the Trusts and their Noteholders caused by U.S. Bank's abdication of responsibility.[1]

2. The Trusts, like other RMBS trusts, were created to facilitate the securitization and sale of residential mortgage loans to investors. The Trusts' assets consist entirely of the underlying loans. The Trusts issue classes of notes that are sold to investors that represent obligations of the Trusts, which are secured by the underlying loans. Payments of principal and interest ("P&I") on the notes paid to investors are made from the amounts collected from the Trusts' loan pools.

3. Between 2004 and 2008, a handful of large investment banks dominated the RMBS market and controlled the process from beginning to end. These banks act as "sponsors" of the RMBS, acquiring the mortgage loans from originators, who often were affiliates of the sponsors, or beholden to them through warehouse lending or other financial arrangements. Once the loans are originated, acquired and selected for securitization, the seller, through an affiliate called the depositor, creates a trust where the loans are deposited for the benefit of the Noteholders. The sponsor also hand-picks the servicer, often an affiliate of the seller or originator, to collect payments on the loans. Finally, a select number of these same banks that originate, securitize and service RMBS also act as trustees on other sponsor's deals.

4. To ensure the quality of the RMBS and the underlying loans, the trust documents include representations and warranties from the loan sellers attesting to the quality and characteristics of the mortgages as well as an agreement to cure, substitute, or repurchase

---

[1] This Amended Class Action Complaint ("Complaint") does not allege in any way that U.S. Bank or any other RMBS trustee was or is burdened by conflicts in connection with its negotiation, evaluation, or acceptance of any investor-driven RMBS settlement, including the $8.5 billion settlement with Bank of America/Countrywide, the $4.5 billion settlement with JPMorgan, or the $1.125 billion settlement with Citibank.

mortgages that do not comply with those representations and warranties. Because the risk of non-payment or default on the loans is "passed through" to investors, other than these representations and warranties, the large investment banks and other players in the mortgage securitization industry have no "skin" in the game once the RMBS are sold to investors. Instead, their profits are principally derived from the spread between the cost to originate or purchase loans, how much they can sell them to investors once packaged as securities, as well as various servicing-related income. Accordingly, volume became the focus, and the quality of the loans was disregarded.

5. The fundamental role of an indenture trustee is to ensure that there is at least one independent party, free from any conflicting self-interest, to protect the trust corpus, and to enforce the noteholders' rights. Noteholders have no access to the underlying loan files and other documents necessary to confirm compliance with the representations and warranties, cannot monitor the servicers' conduct and performance, cannot act independently to enforce the trusts' contractual rights, and must rely on the trustee to protect their interests. U.S. Bank, as Indenture Trustee, was the sole contractual party in the Trusts' securitization process intended to be independent of the investment banks that sponsored the securitization, the lenders that originated the loans, and the servicers that were often affiliated with either the sponsors or lenders, or both. Noteholders must rely on the Indenture Trustee to protect their rights. The Governing Agreements (as defined herein) therefore require the Indenture Trustee, among others, to enforce the sellers' obligation to cure, substitute, or repurchase such mortgage loans for the benefit of the Noteholders.

6. As described more fully below, U.S. Bank has had considerable knowledge that the pools of loans backing the Trusts were filled with defective mortgage loans in breach of seller representations and warranties, and the significant harm that this has caused the Noteholders.

Nevertheless, U.S. Bank regularly disregarded its contractual and statutory duties to enforce the rights of the Trusts as against the responsible parties.

7.　　The abysmal performance of the Trusts' collateral – including spiraling defaults, delinquencies and foreclosures – is outlined on monthly remittance reports that U.S. Bank, as Indenture Trustee, publishes and publicly files with the government. These monthly remittance reports showed U.S. Bank that, by January 1, 2009, the Trusts had suffered collateral losses exceeding $500.4 million. By January 1, 2009, an average of one in every five loans in the Trusts was delinquent. Moreover, nine Trusts had delinquency rates exceeding 20%, and three Trusts had delinquency rates of over 40%. By January 1, 2011, the Trusts' total losses had doubled from January 1, 2009, to $1 billion, meaning over *5%* of the Trusts *entire loan pool* had been written off. By the start of 2010, nearly all of the securities issued by the Trusts had experienced multiple downgrades, with most reduced to "junk" status.

8.　　A steady stream of public disclosures has linked the abject performance of the Trusts to systemic abandonment of underwriting guidelines, and the deficient and often fraudulent securitization practices of the sponsors. Highly publicized government investigations, reports and enforcement actions; high-profile RMBS litigation by government agencies, federal banks, and institutional investors; and claims and litigation instituted by monoline insurers have repeatedly noted the "pervasive disregard" and "systemic abandonment" of underwriting guidelines in the years leading up to the financial crisis. Voluminous complaints in these proceedings detail gross misstatements in the Trust documents of key metrics concerning the quality of the underlying loan pools, including loan-to-value ratios ("LTVs"), owner-occupancy status, and borrower credit scores – as well as obvious deficiencies in the completeness of the loan files themselves.

9.      Indeed, U.S. Bank has admitted its knowledge of breaches of representation and warranties and "Events of Default."  On behalf of other RMBS trusts in which U.S. Bank serves as trustee, U.S. Bank has initiated litigation over defective loans originated, sponsored and serviced by many of the same entities that similarly sold and improperly serviced defective loans for the Trusts at issue here, including GreenPoint, Lehman, Argent, Credit Suisse, Countrywide, Merrill Lynch, Aegis and Wachovia.  In those actions, U.S. Bank alleged systemic and pervasive breaches of representations and warranties.  Specifically, U.S. Bank asserted that loans produced by the same originators and sponsors as the Trusts at issue here were riddled with "***pervasive and material breaches***" on a "***pool-wide basis***" at a "***startling rate***" – as high as ***100%*** in some instances.  U.S. Bank also alleged and admitted that these originators "***failed to adhere to industry-standard and reasonable underwriting guidelines in an extremely high percentage of cases***" and as a result, given these high breach rates, "***it is reasonable to infer that breaches of . . . [representations and warranties] exist throughout the entire pool of mortgage loans in the Trust***."  U.S. Bank has admitted time and again to knowledge of these sellers' "abject failure to abide by the very representations and warranties [they] consistently made to induce the purchase of [] Loans for securitizations," yet U.S. Bank failed and unreasonably refused to take any action to protect the Trusts against these same sellers and their defective loans.

10.      Indeed, in one of U.S. Bank's actions against GreenPoint, a major originator of loans in the Trusts at issue in this action, a forensic review of hundreds of loans GreenPoint supplied for three Lehman-label trusts revealed to U.S. Bank that 93.5%, 99.8% and 100% of the sampled loans for these trusts, respectively, breached GreenPoint's representations and warranties. U.S. Bank characterized GreenPoint's breach of representations and warranties as "***systemic***," and concluded that "it is reasonable to infer that breaches of GreenPoint's R&Ws exist throughout the

entire pool of Mortgage Loans remaining in the Trusts." Despite this knowledge, U.S. Bank has not, however, taken any action to protect the Trusts at issue here, which contain several hundred millions of dollars in defective loans originated by GreenPoint. Rather, U.S. Bank ignored the breaches and unreasonably refused to act while the Trusts suffered dramatic and mounting defaults, collateral losses, and other harms.

11.     U.S. Bank was further informed of pervasive and systemic deficiencies infecting the Trusts' collateral though "putback" initiatives led by many of the world's largest institutional mortgage investors. These large-scale initiatives – several of which have yielded ***multi-billion dollar settlements*** – have targeted six of the leading sponsors of non-agency RMBS and cover wide swaths of the RMBS market, including entire labels and shelves.

12.     For example, in December 2011, a group of major institutional investors asked U.S. Bank, as trustee, to investigate large numbers of ineligible mortgages in loan pools underlying dozens of JPMorgan-sponsored trusts and deficient servicing of those loans. Together with similar instructions provided to four other trustees of the JPMorgan-sponsored trusts, the initiative covered more than ***$95 billion*** of RMBS issued from 2005 to 2007. Less than two years later, U.S. Bank and the other trustees were presented with a comprehensive $4.5 billion settlement offer covering 330 JPMorgan-sponsored trusts. On August 1, 2014 and October 2, 2014, U.S. Bank and the other trustees involved in the putback initiative ***accepted*** JPMorgan's $4.5 billion offer for the vast majority of the 330 trusts included in the offer and petitioned for ***court approval*** of the settlement. In January 2012, U.S. Bank received similar written instructions from a group of major institutional investors in dozens of trusts sponsored by Morgan Stanley or its affiliates (collectively, "Morgan Stanley"). Together with other Morgan Stanley-sponsored trusts, the initiative covered more than ***$25 billion*** of RMBS issued from 2005 to 2007. Additionally, in

January 2012, U.S. Bank received similar instructions with respect to ***$19 billion*** of Wells Fargo-sponsored RMBS. And in yet another investor-led initiative, U.S. Bank, as trustee, gave its ***approval*** to an $8.7 billion settlement covering among other trusts, 570 RMBS trusts sponsored by Residential Capital and its affiliates ("ResCap") from 2004 to 2008 with an original face amount of over ***$320 billion***.[2]

13.     These and other RMBS investor-led initiatives sought to "putback" large quantities of loans (1) originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including Wells Fargo ($271.3 million of loans sold to the Trusts) and Countrywide ($341.4 million of loans sold to the Trusts); and (2) securitized by the same investment banks and financial institutions that sponsored the Trusts, including GreenPoint ($475.9 million of loans sold to the Trusts). In addition, the RMBS investor-led initiatives identified and sought recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Wells Fargo (servicer to $15.7 billion of loans sold to the Trusts).

14.     As a major player in the RMBS securitization market and through its involvement in the major putback initiatives above, U.S. Bank also knew that the Trusts were plagued with systemic servicer violations. Indeed, many of the servicers to the Trusts have faced federal and state regulatory enforcement actions which have led to landmark settlements, including the $25 billion "National Mortgage Settlement" entered into between forty-nine state attorneys general and

---

[2] In January 2014, after a nine-week trial, New York Supreme Court Justice Barbara Kapnick largely approved an $8.5 billion settlement resolving mortgage repurchase claims for 530 RMBS trusts issued by Countrywide Financial Corporation and its affiliates ("Countrywide"). That initiative began in October 2010 and covers more than ***$424 billion*** of RMBS issued from 2004 to 2008. Countrywide is an originator of loans in the Trusts.

many of the Trusts' servicers. Notably, without receiving holder approval, many of these settlement agreements effectively permit the servicers to use trust assets to finance their settlement payments for their own wrongdoing.

15. Moreover, U.S. Bank itself was the target of government investigations and lawsuits regarding its deficient servicing operations. For example, during the fourth quarter of 2010, the Federal Reserve Board, the Office of the Comptroller of the Currency ("OCC"), the Federal Deposit Insurance Corporation ("FDIC"), and the Office of Thrift Supervision ("OTS") conducted on-site reviews of the adequacy of controls and governance over servicers' foreclosure processes at U.S. Bank. The reviews uncovered significant problems in mortgage loan servicing foreclosure processing at U.S. Bank, including "critical weaknesses in [U.S. Bank's] foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys." Based on the deficiencies in the review and the risk of additional issues as a result of weak controls and processes, the Federal Reserve Board initiated formal enforcement actions requiring U.S. Bancorp, the corporate parent of U.S. Bank, to address its pattern of misconduct and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing. Ultimately, U.S. Bank entered into a consent order with the Federal Reserve Board, which found that U.S. Bank had engaged in "unsafe or unsound practices with respect to the manner in which [U.S. Bank] handled various foreclosure and related activities." Despite pledging to reform its servicing misconduct and foreclosure abuses four years ago, U.S. Bank has still failed to comply with applicable federal regulatory standards. On June 17, 2015, the OCC announced that it was imposing further restrictions on the mortgage servicing operations of U.S. Bank and five other banks, including Wells Fargo & Co. – the largest servicer for loans in the Trusts – for failing to meet the

requirements of the prior consent orders and "continu[ing] to engage in unsafe and unsound practices" in violation of the prior consent orders.[3] Among other penalties imposed under amended consent orders, U.S. Bank, Wells Fargo and the other banks are prohibited from (i) acquiring new servicing rights on existing securitizations; (ii) entering into new contracts to perform residential mortgage servicing for other parties; (iii) outsourcing or sub-servicing new residential mortgage servicing activities to other parties; (iv) off-shoring new residential mortgage servicing activities; and (v) making any new appointments of senior officers responsible for residential mortgage servicing or residential mortgage servicing risk management and compliance.

16.     Furthermore, U.S. Bank knew of numerous defaults by the Issuers (*i.e.*, the Delaware Statutory Trusts).  In particular, in light of these rampant and uncured seller and servicer breaches, U.S. Bank knew that the Issuers were breaching their obligations under the Indentures to require (i) the Sellers to abide by their representations and warranties with respect to the mortgage loans and to cure, substitute, or repurchase nonconforming mortgage loans; and (ii) the Servicers to comply with their prudent servicing violations and remedy servicing breaches. Additionally, U.S. Bank knew of the Issuers' failures to provide written notice to U.S. Bank of these seller and servicer defaults.

17.     When U.S. Bank learned of these seller, servicer and issuer violations, U.S. Bank had the duty to notify Noteholders of them.  U.S. Bank systematically failed, however, to provide notice of their defaults because U.S. Bank did not want to jeopardize its close business relationships with the sellers and servicers.  Moreover, U.S. Bank, which also acts as a servicer for

---

[3] *See* Press Release, Office of Comptroller of the Currency, *OCC to Escheat Funds from the Foreclosure Review, Terminates Orders Against Three Mortgage Servicers, Imposes Restrictions on Six Others* (June 17, 2015), *available at* http://www.occ.gov/news-issuances/news-releases/2015/nr-occ-2015-85.html.

billions of dollars of other RMBS, has itself engaged in the same improper and illicit servicing activities that plagued the Trusts. Similarly, U.S. Bank originated hundreds of millions of dollars in loans that have been securitized in other RMBS and that contain pervasive breaches of representations and warranties. Many of the same entities that act as servicers for the Trusts also service these defective U.S. Bank-originated loans. Thus, U.S. Bank, acting in its own self-interest, refused to take action against responsible parties and provide notice to Noteholders of defaults to avoid scrutiny of its own servicing business and evade liability for its own defective loans.

18.     Finally, once there were Events of Default, U.S. Bank had the duty to exercise its rights and obligations under the Governing Agreements using the same degree of care and skill as a prudent person would, under the circumstances, in the conduct of his or her own affairs. U.S. Bank failed to do so. U.S. Bank did nothing to protect the Noteholders, choosing instead to deliberately ignore the Events of Default for its own benefit and to the detriment of the Trusts and Noteholders. The Trusts and in turn Noteholders have experienced substantial losses which would not have occurred but for U.S. Bank's failure to perform its responsibilities under the Governing Agreements, the Trust Indenture Act of 1939, 15 U.S.C. § 77ooo ("TIA") and common law. By failing to perform its duties, U.S. Bank has caused the Trusts and Noteholders to suffer billions of dollars in losses.

## II.     PARTIES

19.     Each of the plaintiffs identified in Exhibit 2 attached hereto (collectively, the "Plaintiffs") is a Noteholder in the Trusts as identified in Exhibit 1 attached hereto. The Plaintiffs hold the economic and beneficial interest in their Notes and are the true parties in interest. No other party has an economic or beneficial interest in the Plaintiffs' Notes in this matter.

20.     Defendant U.S. Bank is a national banking association organized and existing under the laws of the United States.  U.S. Bank's principal place of business and principal place of trust administration is located in Minneapolis, Minnesota.  As of December 31, 2013, U.S. Bank's corporate parent, U.S. Bancorp., was the fifth largest commercial bank in the United States based on assets and the fourth largest in total branches.  U.S. Bank is U.S. Bancorp's second largest subsidiary.  U.S. Bank does business in and maintains offices in New York, including a corporate trust office at 100 Wall Street, New York, New York 10005.

21.     U.S. Bank, together with its affiliates, is involved in all aspects of the private label RMBS market.  U.S. Bank currently administers as trustee more than $3 trillion in assets, including RMBS, and operates fifty corporate trust offices across the country.  U.S. Bank currently serves as trustee for thousands of RMBS trusts with assets of over $1 trillion in original face value and is trustee for approximately 30% of all RMBS issued between 2004 and 2008.

22.     Additionally, U.S. Bank, together with its subsidiary, U.S. Bank Home Mortgage, Inc., serves as master servicers of residential mortgage loans, performing master servicing functions in two locations: Bloomington, Minnesota and Chicago, Illinois.  U.S. Bank's master servicing portfolio includes approximately 45,700 loans with an unpaid principal balance of approximately $6 billion as of January 2014.

23.     U.S. Bank Home Mortgage, Inc. has acted as a mortgage loan seller, selling over $400 million of loans in RMBS deals issued between 2004 and 2007.

## III.     <u>JURISDICTION AND VENUE</u>

24.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 for violations of the TIA, and supplemental jurisdiction over the remaining claims.

25.     Venue is proper in this District under 28 U.S.C. § 1391(b).

## IV.    COMPLIANCE WITH THE NO ACTION CLAUSE IS EXCUSED

26.    Compliance with the pre-suit requirements of the Trusts' "no action" clause is excused.  For all of the Trusts, the no action clause in the Indenture identifies U.S. Bank, as Indenture Trustee, as the sole notice party.  If the no action clause's pre-suit requirements for these Trusts were to apply, they would require Plaintiffs to demand that U.S. Bank initiate proceedings against itself and to indemnify U.S. Bank for its own liability to the Trusts, an "absurd" requirement that the parties did not intend.  *See Cruden v. Bank of N.Y.*, 957 F.2d 961, 968 (2d Cir. 1992).

## V.    OVERVIEW OF THE TRUSTS

27.    The Trusts in this action, identified in the attached Exhibit 1, are 27 Delaware statutory trusts, resulting from non-agency residential mortgage-backed securitizations issued between 2004 and 2007, inclusive. The Trusts have a total original principal balance of approximately $19.9 billion, and a current principal balance of approximately $4.2 billion as of May 1, 2015.  *See* Exhibit 4.  To date, the Trusts have suffered total realized collateral losses of $2 billion.  *See* Exhibit 3.  As a result of defective mortgage collateral and servicer violations, the Trusts have incurred and will continue to incur substantial losses.

28.    Eighteen lenders were disclosed to have originated loans sold to the Trusts.  In particular, the Trusts have a high concentration of loans originated by twelve lenders; specifically, HomeBanc Mortgage Corporation ("HomeBanc") (and affiliates), Aegis Mortgage Corporation ("Aegis") (and related affiliates), GreenPoint, Accredited Home Lenders, Inc. ("Accredited"), Thornburg Mortgage Home Loans ("Thornburg"), Countrywide, Wells Fargo Bank, N.A. ("Wells Fargo") (and affiliates), Merrill Lynch, Irwin Union Bank and Trust Company ("Irwin Union"), Lehman Brothers Holdings Inc. ("Lehman"), Credit Suisse, and Option One Mortgage Corporation

("Option One"). These lenders collectively originated nearly $17.2 billion in loans, representing approximately 86.4% of the total original face value of the mortgage loans in the Trusts.

29.     The Trusts were sponsored by ten entities: HomeBanc, Thornburg, Bayview Financial, Aegis, Accredited, Merrill Lynch, Credit Suisse, GreenPoint, Lehman and New York Mortgage Company.

30.     Seven entities served as Master Servicers to the Trusts. An overwhelming majority of the Trusts' loans, however, are serviced by three entities. Specifically, $18.2 billion in loans are serviced by Wells Fargo, Accredited and its successors, Select Portfolio Servicing and Ocwen Loan Servicing, and Irwin Union, representing approximately 91.4% of the total original face value of the mortgage loans in the Trusts.

## VI.   **BACKGROUND**

### A.   **The Critical Enforcement Function Of The Indenture Trustee**

31.     RMBS notes are debt instruments issued to investors by an issuing trust that holds one or more mortgage pools. The corpus of the trust – like the Trusts at issue here – consists entirely of the underlying mortgage loans.

32.     A RMBS indenture trustee has certain contractual and common law obligations to the trust and its noteholders. By comparison, unlike the indenture trustee, noteholders have no right to act independently on behalf of the Trusts. Moreover, it is extremely difficult for noteholders to act as a cohesive group where individual bondholder investments are relatively small, minimizing the economic incentive to take action or cooperate. This is exacerbated by the fact that the identities of the trust's noteholders are confidential and constantly change, as notes are actively traded.

33.     For each RMBS note issue, an indenture trustee is appointed to act as a type of agent on behalf of the noteholders collectively to ensure the "efficient centralized enforcement" of

the sellers' and servicers' obligations. The governing agreements and the law mandate that an indenture trustee administer the trust as a representative of noteholders to help enforce their rights.

34. The essential duties and responsibilities of the trustee are identical in all RMBS transactions – namely to represent the trusts and their investors as an independent third party. Between 2003 and 2009, private label RMBS offerings totaled more than $3 trillion. Yet, only a handful of major American financial institutions served as RMBS trustees and contractually agreed to perform the vitally important enforcement functions to protect RMBS investors. Among this handful of major RMBS trustees, U.S. Bank held the second largest market share during this period.



35. U.S. Bank is currently the largest RMBS trustee in the United States. In December 2010, U.S. Bank completed its acquisition of Bank of America National Association's ("BANA") securitization trust business. In turn, BANA was, by merger in 2008, the successor-in-interest to

LaSalle National Association ("LaSalle"), which was the original trustee for certain Trusts.[4]  U.S. Bank succeeded BANA as trustee of these and other trusts when it acquired BANA's securitization trust business in 2010.

## B.    Securitization Process

36.    The process of securitizing mortgages involves a number of steps, each of which is critical to finalize the securitization and sell the RMBS to investors.  First, a sponsor creates a loan pool from mortgages it originated or purchased from other financial institutions.

37.    Second, the sponsor transfers the loans to a "depositor," typically a bankruptcy-remote entity setup by the sponsor, which segments the cash flows and risks in the loan pool among different levels of investment or "tranches."  Generally, cash flows from the loan pool are applied in order of seniority, going first to the most senior tranches.  In addition, any losses to the loan pool due to defaults, delinquencies, foreclosure or otherwise, are applied in reverse order of seniority, and are generally applied first to the most junior tranches.

38.    Third, the depositor conveys the mortgage pool to the trust in exchange for the transfer of the RMBS to the depositor.

39.    Finally, the depositor sells the RMBS to an underwriter, and provides the revenue from the sale to the seller.  The underwriter markets and sells the RMBS to investors.

40.    After the transaction closes, the servicer collects payments from the underlying borrowers.  After collection, the servicer sends the funds to the trust, which then makes payments to the noteholders.  Mortgage defaults reduce the available P&I payments to be paid to the trust

---

[4] As set forth in Section 6.08 of the Indentures, the duties of the original trustee pass to any successor trustee: "Thereupon the resignation or removal of the retiring Indenture Trustee shall become effective, and the successor Indenture Trustee shall have all the rights, powers and duties of the Indenture Trustee under this Indenture."

and passed through to investors. Mortgage delinquencies similarly reduce the available P&I to be paid to the trust and distributed to investors.

41.     Accordingly, if an underlying borrower does not timely make the required payments to the servicer, the servicer may have to take action to mitigate or minimize the losses to the trust, including foreclosing on the property and providing property maintenance to maximize the return on the investment to the noteholders. Foreclosures result in higher losses to the trust (and therefore to the noteholders) if the value of the collateral is lower than anticipated. For these reasons, proper loan origination and underwriting of the mortgages underlying the RMBS, and proper and timely loan servicing and oversight are essential to the quality of the RMBS and the timely receipt of P&I payments to the trust for distribution to the noteholders.

## VII.    THE GOVERNING AGREEMENTS

42.     Noteholders' rights and U.S. Bank's contractual duties, as Indenture Trustee for the Trusts at issue in this action are set forth in the relevant securitization agreements, which include Mortgage Loan Purchase and Sale Agreements ("MLPAs"), the Trust Agreement, the Sale and Servicing Agreement ("SSA"), and the Indentures (or similar agreements) (collectively, the "Governing Agreements").

43.     Although the Governing Agreements for each of the Trusts are separate agreements that were individually negotiated and differ slightly in certain respects, the terms that are pertinent to the subject matter of this Complaint are substantially similar, if not identical, in all of the Governing Agreements and impose substantially the same, if not identical, duties and obligations on the parties to the Governing Agreements.

### A.      The Mortgage Loan Purchase And Sale Agreement

44.     The MLPA is a contract between either the originator and the sponsor, or the sponsor and the depositor. The MLPA governs the terms of the sale of the mortgage loans acquired

for securitization. In its capacity as "seller" under the MLPA, the originator or sponsor makes extensive representations and warranties concerning the characteristics, quality, and risk profile of the mortgage loans.

45. The seller's typical representations and warranties in the MLPAs include, *inter alia*, the following: (i) the information in the mortgage loan schedule is true and correct in all material respects; (ii) each loan complies in all material respects with all applicable local, state and federal laws and regulations at the time it was made; (iii) the mortgaged properties are lawfully occupied as the principal residences of the borrowers unless specifically identified otherwise; (iv) the borrower for each loan is in good standing and not in default; (v) no loan has a LTV ratio of more than 100%; (vi) each mortgaged property was the subject of a valid appraisal; and (vii) each loan was originated in accordance with the underwriting guidelines of the related originator. To the extent mortgages breach the seller's representations and warranties, the mortgage loans are worth less and are much riskier than represented.

46. Under the MLPAs, upon discovery or receipt of notice of any breach of the seller's representations and warranties that has a material and adverse effect on the value of the mortgage loans in the Trusts or the interests of the RMBS investors therein, the seller is obligated to cure the breach in all material respects. The MLPAs do not specify what constitutes "discovery" of a breach or what evidence must be presented to the seller in providing notice of a breach.

47. If a breach is not cured within a specified period of time, the seller is obligated to either substitute the defective loan with a loan of adequate credit quality, or repurchase the defective loan at a specified purchase price (the "Repurchase Price") equal to the outstanding principal balance and all accrued but unpaid interest on the loan to be paid to the Trust. For breaches related to a mortgage loan or acquired property already sold from the Trust (for example,

as a result of foreclosure), the seller must pay to the Trust the amount of the Repurchase Price that exceeds the net liquidation proceeds received upon the sale of the mortgage loan or acquired property.

48.     The MLPA's repurchase provisions ensure that the Trust need not continue to hold mortgage loans for which the seller breached its representations and warranties. Thus, the repurchase provisions transfer from the Trusts to the sellers the risk of any decline, or further decline, in the value of those mortgage loans.

49.     Under the MLPAs, the demanding party must merely show that the breach has a material and adverse effect on the value of the mortgage loans in the Trusts or the interests of the Noteholders in the loans.  The seller's cure, substitute and repurchase obligations do not require any showing that the seller's breach of representations and warranties caused any realized loss in the related mortgage loan in the form of default or foreclosure, or that the demanding party prove reliance on servicing and origination documents.

50.     Upon the sale of the mortgage loans to the Trust, the rights under the MLPAs, including the sellers' representations and warranties concerning the mortgage loans, were assigned to U.S. Bank, as Indenture Trustee for the benefit of the Noteholders, in accordance with the Indentures.

**B.     The Trust Agreement**

51.     The Trust Agreement is a contract between the Depositor, an entity known as the Owner Trustee, and other entities, which creates a Delaware statutory trust known as the "Issuer," which issues the notes.

**C.     The Sale And Servicing Agreement**

52.     The SSA (sometimes called a Transfer and Servicing Agreement) is a contract between the Depositor, the Master Servicer, the Issuer, the Sponsor and U.S. Bank, as the Indenture

Trustee, among others, pursuant to which: (i) the Depositor conveys its right, title, and interest in the mortgage loans to the Issuer; (ii) the Issuer conveys to the Depositor certificates of the Issuer; and (iii) the Master Servicer agrees to supervise, monitor, and oversee the obligations of the servicer to service the loans.

### D.     The Indenture

53.     The Indenture is a contract between the Issuer and U.S. Bank, as the Indenture Trustee, among others, pursuant to which the Issuer issues notes, which it conveys to the Depositor, again in exchange for the certificate described above. Subsequently, the notes are sold to investors. As part of the same agreement, the Issuer pledges its rights relating to the certificates to the Indenture Trustee to secure its P&I payment obligations on the notes. U.S. Bank, as the Indenture Trustee, holds this pledge on behalf of investors who purchase the notes.

## VIII.     U.S. BANK'S DUTIES UNDER THE GOVERNING AGREEMENTS

54.     The Governing Agreements, and in particular the SSAs and Indentures, set forth U.S. Bank's contractual duties and obligations to the Noteholders, which are substantially similar for each Trust. Further, upon information and belief, U.S. Bank employed the same general set of policies and procedures to oversee and manage the Trusts regardless of variations among the Governing Agreements.

### A.     Duty To Hold Trust Assets For The Benefit Of Noteholders

55.     The Governing Agreements require that U.S. Bank hold the Trust assets for the use and benefit of all present and future Noteholders. *See* Exhibit 5, Chart 1.

### B.     Duties To Provide Notice Of Breaches And To Enforce Seller Repurchase Obligations

56.     The Governing Agreements require U.S. Bank to give prompt written notice to all parties upon its discovery of a breach of a representation or warranty made by a seller that

materially and adversely affects the value of any mortgage loan or the interests of the Noteholders in any loan, and to take such action as may be necessary or appropriate to enforce the rights of the Trusts with respect to the breach.  *See* Exhibit 5, Chart 2.[5]

### C. Duties Regarding The Servicers

57.     Under the Governing Agreements, U.S. Bank, as Indenture Trustee, has certain duties with respect to enforcing the obligations of the servicers.  In particular, where U.S. Bank learns of a servicer's failure to observe or perform in any material respect any other covenants or agreements under the SSAs, U.S. Bank must promptly provide written notice to the servicer.  *See* Exhibit 5, Chart 3.

58.     The SSAs also set forth U.S. Bank's obligations upon occurrence of a Servicer "Event of Default," which is defined as a specified failure of the servicer to perform its servicing duties and cure this failure within a specified time period.  *See* Exhibit 5, Chart 4.  The SSAs identify several types of failures by the servicers that may give rise to a Servicer Event of Default. Such failures include, the servicer's failure to observe or perform in any material respect any covenants or agreements in the SSA, including, among other things, the failure to service loans in accordance with prudent servicing standards or the failure to supervise and oversee the servicing of the mortgage loans, which continues unremedied for sixty days after written notice of such failure shall have been given to the servicer by the Indenture Trustee.  *See* Exhibit 5, Chart 3.  U.S. Bank's failure to give notice to the servicers of an Event of Default does not prevent the triggering

---

[5] Some of the Trusts' Indentures are silent as to which entity is responsible for enforcing the sellers' compliance with their repurchase obligations, prior to an Event of Default.  To the extent U.S. Bank argues that some other entity is responsible for enforcing these rights, this contractual variance is insignificant since Plaintiffs allege the occurrence of Events of Default, upon which U.S. Bank has a duty to act as a prudent person and must exercise its right to enforce seller repurchase obligations.

of an Event of Default should U.S. Bank's failure result from its own negligence or willful misconduct.  *See* Exhibit 5, Chart 5.

59.     If a Servicer Event of Default occurs under the SSA which a responsible officer of U.S. Bank, as Indenture Trustee, has received written notice or has actual knowledge of, U.S. Bank must give prompt written notice to all Noteholders of the Servicer Event of Default.  *See* Exhibit 5, Chart 6.[6]

60.     The remedies for uncured Servicer Events of Default include termination of the servicer and recoupment of Trust assets lost as a result of the servicers' violations.  *See* Exhibit 5, Chart 8.  As detailed herein, U.S. Bank did not perform its duties to enforce the obligations of the servicers, did not provide written notice of Servicer Events of Defaults to Noteholders and did not initiate any action against the servicers for the benefit of Noteholders.

**D.     Duties Upon An Indenture Event Of Default**

61.     The Indenture requires the Issuer to enforce any rights with respect to the Trust and preserve and defend title to the Trust and the rights of the Indenture Trustee and the Noteholders in such Trust against the claims of all persons and parties.  *See* Exhibit 5, Chart 9.

62.     The Indentures define a "default" as "[a]ny occurrence which is or with notice or the lapse of time or both would become an Event of Default."  *See* Exhibit 5, Chart 10.  An Event of Default occurs under the Indenture, when, among other things, the Issuer fails to observe or perform any covenants or agreements made in the Indenture, and such default is not cured within

---

[6] Some of the Trusts' Indentures do not specifically set forth this provision.  However, this variance is insignificant given that all the Trusts' Indentures incorporate the Indenture Trustee's duties under the TIA, whether or not they are physically contained in the Indenture, including the Indenture Trustee's duty to give notice to Noteholders upon knowledge of a default.  *See* Exhibit 5, Chart 7; 15 U.S.C. § 77ooo(b).

a specified period of time after notice is given to the Trust by U.S. Bank, as Indenture Trustee. *See* Exhibit 5, Chart 11.[7]

63.    Upon learning of the occurrence of a default, the Indenture requires the Issuer to provide written notice to U.S. Bank of the status of the default and what action the Issuer is taking or proposes to take with respect thereto. *See* Exhibit 5, Chart 12. The Indenture also requires the Issuer to provide U.S. Bank with prompt written notice of each Event of Default under the Indenture. *Id.*

64.    If an Event of Default under the Indenture has occurred and is continuing, U.S. Bank must exercise the rights and powers vested in it by the Indenture and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs. *See* Exhibit 5, Chart 13. Such rights and powers under the Indenture expressly include U.S. Bank's ability to enforce the rights of the Trusts and Noteholders as against all parties responsible for harming the Trusts, including by instituting litigation against responsible sellers and servicers. *See* Exhibit 5, Chart 14.

65.    Under the Indenture, U.S. Bank must also promptly mail to each Noteholder notice of the Event of Default unless such Event of Default shall have been waived or cured, or in certain circumstances, if in good faith it determines that withholding the notice is in the best interests of Noteholders. *See* Exhibit 5, Chart 15.

---

[7] For the great majority of the Trusts, only the conduct of the Issuer constitutes an Event of Default. For three of the Trusts, however, U.S. Bank's post-Event of Default duties to act prudently and provide notice to Noteholders are triggered by a "Rapid Amortization Event," which definition is much broader than an Issuer Event of Default. A Rapid Amortization Event occurs upon the failure of the issuer, originator, sponsor, or servicer to observe or perform any covenants or agreements in the Indenture or the SSA or if any representation or warranty made by the issuer, originator, sponsor, or servicer proves incorrect when made.

## IX. THE TRUSTS SUFFERED FROM PERVASIVE BREACHES OF REPRESENTATIONS AND WARRANTIES BY THE SELLERS

66. Each of the Trusts' loan pools contains a high percentage of loans that materially breached the sellers' representations and warranties, which adversely affected the value of those mortgage loans and the Trusts' and Noteholders' rights in those mortgage loans. Specifically, the representations and warranties regarding the originators' compliance with underwriting standards and practices, owner-occupancy statistics, appraisal procedures, LTV and combined loan-to-value ("CLTV") ratios were systemically and pervasively false. The falsity of these representations and omissions is demonstrated by: (1) the high default rates of the mortgage loans; (2) the collateral losses suffered by the Trusts; (3) the plummeting credit ratings of the RMBS; (4) evidence highlighting the Sellers' (i) routine abandonment of their underwriting guidelines, (ii) widespread fabrication of borrower and loan information, (iii) massive breaches of their representations and warranties, and (iv) engagement in predatory and abusive lending; and (5) the results of forensic reviews and re-underwriting of loans within the Trusts in other litigation.

### A. The Trusts' Mortgage Loans Have Experienced High Delinquency, Modification, And Loss Severity Rates

67. The extremely high delinquency, modification and collateral loss rates of the mortgage loans within the Trusts are strong evidence of the Sellers' misrepresentation of the credit quality and characteristics of the mortgage loans they sold to the Trusts. As reflected by Exhibits 6 and 7, the Trusts have experienced payment problems significantly beyond what was expected for loan pools that were properly underwritten, and which contained loans that actually had the characteristics the Sellers represented and warranted. As reflected by Exhibit 4, as of January 1, 2009, approximately 20% of the relevant mortgage loans across the Trusts were seriously delinquent. Within certain RMBS-sponsor labels, such as the Aegis-label Trusts, approximately 43% of the relevant mortgage loans were delinquent. Moreover, an astounding 20% or more of

the relevant mortgage loans were delinquent in at least nine of the Trusts. Further, five of the Trusts have delinquency rates of above 35% for the mortgage loans remaining in the Trusts.

68.     As reflected by Exhibit 8, loan modifications in the Trusts also dramatically increased beginning in early 2009, providing further evidence of systemic seller breaches of representations and warranties in the Trusts. In general, loan modifications change the terms of the original mortgage contract agreed to by the lender and borrower, typically to ease the borrower's monthly payment obligation so the borrower may remain current and avoid default. Loan modifications often include changes to the loan's interest rate, term, and/or outstanding principal. As with delinquency rates, the extent of loan modifications is indicative of breaches of representations and warranties for at least two reasons. First, escalating loan modifications correlate to misstated borrower income and creditworthiness. Second, the servicers' decisions to modify rather than foreclose on loans indicates that the underlying collateral is not adequate security to satisfy the outstanding balance, because the original LTV ratio (or CLTV ratio) was not as represented because the appraised property value was misstated and additional liens encumbered the mortgaged property.

69.     As a result of the severe delinquencies, modifications, borrower defaults and foreclosures, the Trusts incurred tremendous collateral losses. By January 1, 2009, collateral losses in the Trusts had already reached over $500.4 million. By January 1, 2011, realized losses increased to $1 billion.

70.     The economic downturn cannot explain the abnormally high percentage of delinquencies, modifications, defaults, foreclosures, and losses observed in the loan pools ultimately backing the notes. Loan pools that were properly underwritten and contained loans with

the represented characteristics would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies.

**B.**    **The Notes Have Experienced Massive Credit Downgrades**

71.    The significant rating downgrades experienced by the notes issued by the Trusts are also strong evidence that the underlying loans were improperly underwritten, and that they did not have the credit risk characteristics the sellers represented and warranted.

72.    Credit ratings are opinions about credit risk published by a rating agency. In issuing its credit ratings for RMBS, the rating agencies consider the quality of the underlying loan collateral and creditworthiness of the borrower to determine relative likelihood that the RMBS may default. At the time of securitization, all of the Trusts' senior tranches were rated "investment grade." Bond rating firms, such as Standard & Poor's, use different designations consisting of upper- and lower-case letters 'A' and 'B' to identify a bond's credit quality rating. "AAA" and "AA" (high credit quality) and "A" and "BBB" (medium credit quality) generally are considered investment grade. An investment grade rating signifies that the bond has a relatively low risk of default and are judged by the rating agencies as likely to meet payment obligations such that banks and institutional investors are permitted to invest in them. Credit ratings for bonds below investment grade designations (*i.e.*, "BB", "B", "CCC", etc.) are considered low credit quality, and are commonly referred to as "junk bonds."

73.    However, as public disclosures revealed the originators' and sponsors' systemic underwriting and securitization abuses and U.S. Bank began reporting severe collateral losses in the Trusts, the Trusts' notes' credit ratings were drastically downgraded. By December 31, 2009, approximately 70% of the senior tranches in the Trusts had been downgraded at least once. Across all Trusts, over 80% of all notes had been downgraded by at least one credit rating agency. Finally, over 50% of the senior notes had been downgraded to junk bond status, a startling number.

C. **The Systemic Disregard Of Underwriting**
   **Standards Was Pervasive During The Relevant Period**

74.     During the height of the mortgage and securitization boom in the U.S. market between 2004 and 2008, originators of residential mortgage loans sold loans securitized in RMBS that violated their stated underwriting guidelines and breached the representations and warranties made to the purchasers of the loan pools.

75.     Government reports and investigations and newspaper reports have uncovered the extent of the loan originators' pervasive abandonment of underwriting standards.  For example, the Permanent Subcommittee on Investigations in the United States Senate ("PSI") released a report detailing the causes of the financial crisis.  Using Washington Mutual ("WaMu") as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets. The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans. These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.[9]

76.     Similarly, in January 2011, the Financial Crisis Inquiry Commission ("FCIC") issued its final report that detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy.[10]  The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics."  "Unfortunately −

---

[9] *Wall Street And The Financial Crisis: Anatomy Of A Financial Collapse*, United States Senate Permanent Subcomm. on Investigations, 112th Cong. 50 (2011).

[10] *Final Report Of The National Commission Of The Causes Of The Financial And Economic Crisis In The United States*, Fin. Crisis Inquiry Comm'n ("FCIC Report") (2011).

as has been the case in past speculative booms and busts − we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis." *Id*. at xxii. The FCIC found:

> [I]t was the collapse of the housing bubble − fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages − that was the spark that ignited a string of events, which led to a full-blown crises in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id*. at xvi.

77.     During the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan. The FCIC Report found "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id*. at xxii. Early Payment Default is a significant indicator of pervasive disregard for underwriting standards. The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards . . . ." *Id*.

78.     Recent landmark settlements between the government and major financial institutions have further detailed the systemic and pervasive disregard of underwriting standards by lenders during the relevant time period, and have confirmed that these practices infiltrated the Trusts. For example, on November 19, 2013, the Justice Department, along with federal and state regulators, announced a $13 billion settlement with JPMorgan − the largest settlement with a single entity in American history − to resolve federal and state civil claims arising out of the packaging, marketing, sale and issuance of 1,128 RMBS offerings by JPMorgan, Bear Stearns and WaMu prior to January 1, 2009, including 13 of the Trusts. As part of the settlement, JPMorgan acknowledged that it regularly included loans within the securitizations "***that did not comply*** with

the originator's underwriting guidelines" and breached the originator's representations and warranties.

79.     On July 14, 2014, the Justice Department, together with federal and state regulators, announced a $7 billion settlement with Citigroup Inc. to resolve federal and state civil claims related to Citigroup's conduct in the packaging, securitization, marketing, sale and issuance of 633 RMBS offerings issued prior to January 1, 2009, including two of the Trusts. The settlement included an agreed upon statement of facts wherein Citigroup acknowledged that significant percentages of the mortgage loans within the securitizations contained material defects.

80.     On August 21, 2014, the Justice Department, together with federal and state regulators, announced a $16.65 billion settlement with Bank of America Corporation, and Banc of America Mortgage Securities, as well as their current and former subsidiaries and affiliates (collectively, "Bank of America") to resolve federal and state civil claims related to Bank of America's conduct in the packaging, securitization, marketing, sale and issuance of 2,000 RMBS offerings issued prior to January 1, 2009, including four of the Trusts. The settlement included an agreed upon statement of facts wherein Bank of America acknowledged that significant percentages of the mortgage loans within the securitizations contained material defects.

**D.      There Is Evidence Of Widespread Breaches Of
        Representations And Warranties By The Trusts' Originators**

81.     Much like other RMBS trusts of the same vintage, the Trusts have been materially and adversely impacted by the loan origination industry's rampant underwriting failures. The originators' systemic and pervasive sale to the Trusts of residential mortgage loans in breach of representations and warranties is confirmed through numerous federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described rampant underwriting failures throughout the period in

-33-

which the Trusts were created and, more specifically, failures by the same originators whose mortgage loans were sold to the Trusts.

82.     Indeed, the mortgage loans underlying the Trusts were originated by some of the worst lenders during the relevant time period, including Aegis, Accredited, Irwin, GreenPoint, Countrywide and Wells Fargo (including Wachovia).  Through public and private investigations and litigation, each of these RMBS lenders have been shown to have systemically abandoned their own underwriting guidelines during the relevant time period, churning out billions of dollars in loans with LTVs, owner occupancy status, title condition and other qualities and characteristics that were materially different than as represented and saddling RMBS trusts, including those at issue here, with significantly impaired collateral.  A summary of testimonial and documentary evidence as to each of these major originators of the mortgage loans to the Trusts is set forth in Exhibit 9.

### E.     The Systemic Disregard Of Prudent Securitization Standards Was Pervasive During The Relevant Period

83.     It is equally well documented that between 2004 and 2008, the sponsors that securitized the residential mortgages and transferred them into the RMBS trusts failed to conduct adequate due diligence reviews of the mortgage pools to ensure the mortgage loans were of the same credit quality as represented and complied with federal and state law, as well as that the purported mortgaged property's appraised value was accurate.

84.     As the FCIC Report noted:

> The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

85.     As made clear in the FCIC Report, in their zeal to keep the securitization machine going and at the behest of originators, RMBS sponsors and their third party due diligence providers failed to analyze adequate sample sizes of the loan pools, sometimes reviewing as little as 2%-3% of the entire loan pools.  Moreover, when the sponsors' and their due diligence firms identified high percentages of mortgage loans in their sample reviews as deficient, sponsors pervasively "waived in" mortgage loans to preserve their business relationships with the originators or to keep the defective loans off their own books.  Consequently, by 2011, it was apparent to all players in the United States mortgage and securitization industry, including U.S. Bank, that the mortgage loans deposited in RMBS trusts issued between 2004 and 2008 materially breached the sponsors' representations and warranties.

**F.      There Is Evidence Of Widespread Breaches Of Representations And Warranties By The Specific Sponsors Of The Trusts**

86.     As with other RMBS trusts of the same vintage, the Trusts have been materially impacted by the sponsors' faulty securitization practices.  The sponsors' systemic and pervasive sale of residential mortgage loans in the Trusts in breach of representations and warranties is confirmed through several federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described endemic due diligence failures throughout the period in which the Trusts were created and, more specifically failures by the same sponsors whose mortgage loans were deposited into the Trusts.

87.     In fact, it is now well-known that in connection with the securitization of loans for RMBS trusts including those at issue here, the Trusts' major sponsors, HomeBanc, Thornburg, Credit Suisse, Bayview Financial, Merrill Lynch and Lehman, systemically disregarded their own and third-party due diligence reports reflecting the defective nature of the underlying mortgage loans, and as a result materially breached representations and warranties contained in the

Governing Agreements.  A summary of testimonial and documentary evidence as to each of the major sponsors of the mortgage loans to the Trusts is set forth in Exhibit 10.

> **G.** **Several Of The Trusts Have Been The Subject Of**
> **Litigation Uncovering Evidence Of Rampant Breaches**
> **Of Representations And Warranties By The Sellers**

88.     As reflected by Exhibit 11, at least four of the Trusts have been the subject of significant RMBS litigation which involved or was made known to U.S. Bank: ACCR 2005-3, HEMT 2006-2, HMBT 2005-4 and TMST 2007-1.  In each of these actions, investors provided detailed allegations concerning the sellers' systemic abandonment of underwriting standards that resulted in these Trusts and Noteholders suffering substantial losses.  In several of those actions, the plaintiffs' allegations were substantiated through forensic reviews of loan files for specific loans within the Trusts, which revealed rampant breaches of the sellers' representations and warranties concerning the loans' LTV ratios, owner occupancy, and other material qualities and characteristics.

**X.     U.S. BANK KNEW THAT THE TRUSTS**
**WERE FILLED WITH DEFECTIVE LOANS**

89.     There is ample evidence that beginning in 2009 and by 2011, U.S. Bank knew that each of the Trusts' loan pools contained high percentages of mortgage loans that materially breached the sellers' representations and warranties regarding their characteristics and credit quality.

> **A.     Reports, Investigations And Litigation Involving The Sellers**

90.     As discussed above, since 2009 there has been a steady stream of public disclosures regarding the originators' systemic underwriting abuses and the sponsors' faulty securitization practices.  As a result of the highly publicized government investigations, reports and enforcement actions, as well as high profile RMBS litigation involving the originators, sponsors and the Trusts

themselves, U.S. Bank and its responsible officers knew that the Trusts' loan pools contained high percentages of mortgage loans that materially breached seller representations and warranties.

**B.    U.S. Bank Monitored The Performance Of The Trusts**

91.    U.S. Bank and its responsible officers had discovered by 2009 that the Trusts' loan pools were afflicted by severe and pervasive breaches of seller representations and warranties by virtue of the Trusts' abject performance. As noted above, it was evident by January 2009 that given the extremely high mortgage loan delinquency, modification, default, foreclosure and loss severity rates within the Trusts' loan pools, the mortgage loans sold to the Trusts were not as the sellers had represented and warranted.

92.    U.S. Bank was aware of these events as it monitored the Trusts' performance. For example, it was provided with regular reports regarding the performance of the mortgage loans in each of the Trusts by the servicers and other of its agents. In addition, U.S. Bank itself published monthly reports of the performance of the mortgage loans in each of the Trusts, which included delinquent loans, loans that had gone into foreclosure and those which had realized losses upon the sale of their collateral. Moreover, U.S. Bank was acutely aware of the credit ratings for the Trusts because as part of the rating agencies' ongoing surveillance and monitoring of the Trusts, U.S. Bank fielded inquiries and provided detailed data to the rating agencies so that they could make informed decisions on their grading of the Notes.

**C.    U.S. Bank Received Written Notice Of
Pervasive And Systemic Seller
Breaches From Financial Guaranty Insurers**

93.    U.S. Bank also discovered that the Trusts' loan pools contained high percentages of mortgage loans that materially breached the originators' and sponsors' representations and warranties through its involvement in financial guaranty insurer litigation involving these same originators and sponsors, in its capacity as either trustee or master servicer.

94.     Financial guaranty insurers provide financial guaranty insurance for RMBS issued from many of the Trusts.  Under the Governing Agreements for these insured RMBS, the mortgage loan sellers to the Trusts made numerous representations and warranties concerning the quality and origination practices for the mortgage loans.  The Governing Agreements for the insured RMBS also create a repurchase protocol pursuant to which the monoline insurers must provide notice of a breach of representation and warranty to the responsible mortgage loan seller and the parties to the Governing Agreement (including the Trustee), in order to compel the responsible mortgage loan seller to repurchase loans that breach representations and warranties.

95.     Monoline insurers have initiated at least ten lawsuits against responsible mortgage loan sellers for breach of their representations and warranties in connection with other RMBS trusts to which U.S. Bank serves either as master servicer or trustee.[11]  Prior to filing suit against the originators and/or sponsors, the monoline insurers (unlike noteholders) were often able to obtain access to the specific loan files or conduct a forensic loan level review of the loans, which showed systemic and pervasive breaches of the representations and warranties in securitizations with the same sponsors to the Trusts (*e.g.*, GreenPoint and Credit Suisse); same RMBS labels; same RMBS shelves; same vintage; same loan product type; and/or the same originators (*e.g.*, Countrywide, GreenPoint and Credit Suisse).

---

[11] *See, e.g.*, *CIFG Assurance N. Am., Inc. v. Bank of Am., N.A., et al.*, No. 654028/2012 (N.Y. Sup. Ct.); *Assured Guar. Corp. v. EMC Mortg. LLC*, No. 1:12-cv-01945 (S.D.N.Y.); *Assured Guar. Mun. Corp. v. DLJ Mortg. Capital*, No. 652837/2011 (N.Y. Sup. Ct.); *Ambac Assurance Corp., et al. v. First Franklin, et al.*, No. 651217/2012 (N.Y. Sup. Ct.); *U.S. Bank Nat'l Assoc. v. GreenPoint Mortg. Funding, Inc.*, No. 600352/2009 (N.Y. Sup. Ct.); *MBIA Ins. Corp. v. Credit Suisse Sec. (USA), LLC, et al.*, No. 603751/2009 (N.Y. Sup. Ct.); *Assured Guar. Mun. Corp. v. UBS Real Estate Sec. Inc.*, No. 1:12-cv-01579 (S.D.N.Y.); *MBIA Ins. Corp. v. Morgan Stanley, et al.*, No. 29951/2010 (N.Y. Sup. Ct.); *Fin. Guar. Ins. Co. v. Ally Fin., Inc.*, No. 12-cv-0338 (S.D.N.Y.); and *Assured Guar. Mun. Corp. v. DLJ Mortg. Capital*, No. 652837/2011 (N.Y. Sup. Ct.).

96.     Plaintiffs are informed and believe that consistent with the repurchase protocol under the Trusts' Governing Agreements, U.S. Bank was notified by both the responsible mortgage loan sellers and the parties to the SSAs (including the Master Servicer) of these sellers' systemic and pervasive breaches of representations and warranties.

97.     The monoline insurers' findings from loan level reviews set forth both in their breach notices and subsequent publicly available lawsuits made U.S. Bank and its responsible officers aware of the systemic violation of underwriting and related standards in the mortgage securitization industry between 2004 and 2008, and informed them of specific originators' and sponsors' systemic and pervasive practice of misrepresenting the credit quality and characteristics of mortgage loans to keep the RMBS machine running.  U.S. Bank also discovered that these same defective underwriting and securitization practices applied equally to the other Trusts containing loans originated and securitized by these same originators and sponsors.

**D.     U.S. Bank And Its Responsible Officers
        Received Written Notice From
        Investors Of Pervasive And Systemic Seller Breaches**

98.     In its capacity as trustee to other RMBS trusts, U.S. Bank and its responsible officers received written notice from RMBS investors of breaches of representations and warranties by the very same originators and sponsors that originated and sponsored the loans underlying the Trusts at issue here, including GreenPoint, Lehman, Countrywide, Credit Suisse, and Merrill Lynch.  Based on the sheer volume of the defective mortgage loans identified, together with the systemic and pervasive faulty origination and securitization practices complained of in the investors' breach notices, U.S. Bank and its responsible officers knew that the Trusts' loan pools similarly contained high percentages of defective mortgage loans.

### E. U.S. Bank Selectively Asserted The Trusts' Repurchase Rights Against Insolvent Sellers

99.    U.S. Bank's knowledge of pervasive breaches of representations and warranties by the originators and sponsors at issue herein is also demonstrated by its own actions in 2009. For example, in 2008, Lehman, a sponsor for the Trusts filed for bankruptcy. In connection with Lehman's bankruptcy, U.S. Bank, Wilmington Trust Company, Wilmington Trust, National Association, Law Debenture Trust Company of New York, and Deutsche Bank National Trust Company, in their capacity as trustee, separate trustee or indenture trustee (collectively, the "Lehman Bankruptcy RMBS Trustees"), filed proofs of claims, asserting that Lehman was liable to 405 trusts for breaches of representations and warranties for all 1 million of the mortgage loans underlying these Trusts. U.S. Bank was the trustee for at least 232 of these 405 trusts, two of which are Trusts at issue here. In pursuing these claims, the Lehman Bankruptcy RMBS Trustees undertook a re-underwriting and a detailed review of a sample of nearly 5,000 loans in 255 of the 405 RMBS trusts that suffered a loss. The Lehman Bankruptcy RMBS Trustees' experts found breaches of representations and warranties in approximately 57% of the sampled loans. U.S. Bank was the trustee for 168 of the 255 trusts subject to this review. U.S. Bank made these claims even though Lehman was not liable for all of the mortgage loans in most of those trusts, in fact, there were many other solvent originators to those trusts who had made representations and warranties for those mortgage loans and were thus liable for them. U.S. Bank's "omnibus" claim for breach of representations and warranties as to all of the mortgage loans in all of those trusts, including for mortgage loans that Lehman was not even potentially liable for, and in fact other originators were, demonstrates U.S. Bank's knowledge of pervasive breaches by all of the originators to those trusts. Nonetheless, U.S. Bank has not pursued any of those third party originators to enforce

representation and warranty claims as to the thousands of breaching mortgage loans in Lehman-label Trusts.[12]

100.    Similarly, in the bankruptcy proceedings for Thornburg, *In re: Thornburg Mortgage Inc.*, No. 09-17787 (D. Md.), Bank of America, the predecessor indenture trustee, originally filed proofs of claim for the repurchase of loans in all three Thornburg-label Trusts at issue.  These claims were transferred to U.S. Bank, as indenture trustee for these trusts, on December 9, 2011.  Solvent originators to those trusts similarly made representations and warranties for these mortgage loans and were thus liable for them, including Countrywide and First Republic Bank.  Despite U.S. Bank's knowledge of the defective loans in these trusts, U.S. Bank inexplicably did not pursue repurchase claims against these entities.

### F.     U.S. Bank Initiated Putback Litigation Against Many Of The Sellers

101.    As reflected by Exhibit 12, U.S. Bank has participated in at least 15 actions to enforce putback rights for other RMBS trusts that involved the same originators, sponsors and servicers as the Trusts at issue in this action.[13]  In each of the putback actions, loan level reviews were conducted which identified breach rates **exceeding 50%** in every offering, including those sponsored by the same sponsors as the Trusts and involving loans originated and sold by the same originators and sponsors as the Trusts.  Based on its involvement in these putback actions, which

---

[12] Given that U.S. Bank filed claims against Lehman in the bankruptcy case for at least two Trusts, Plaintiffs do not allege that U.S. Bank breached the Governing Agreements by failing to make representation and warranty claims against Lehman for the Trusts.  However, Plaintiffs do allege that U.S. Bank breached the Governing Agreements by failing to make representation and warranties claims against the many other responsible parties, including, solvent sellers and solvent servicers to the Lehman-label Trusts.

[13] Trusts at issue in the limited putback claims pursued by U.S. Bank are not included in this action, except for those trusts where putback claims have been adjudged or are subject to dismissal as untimely-filed by U.S. Bank.

alleged pervasive and systemic breaches of representations and warranties, U.S. Bank was aware of similarly pervasive and systemic breaches of representations and warranties in the Trusts.

**G.    U.S. Bank Attempted To Contract
Around Its Liability And Obligations In
Acquiring Bank Of America's Trustee Business**

102.    On November 15, 2010, U.S. Bank announced that it would acquire Bank of America's U.S. and European corporate trust business, including its RMBS trust business.  The $35 million cash transaction closed on or about January 5, 2011, and significantly increased U.S. Bank's market share in the RMBS market.  In addition to providing U.S. Bank with an additional $8 billion in deposits, U.S. Bank's Corporate Trust Services unit absorbed approximately 2,150 active securitization and related transactions, more than 2.4 million residential mortgage cases, and $1.1 trillion in assets under administration.  The acquisition made U.S. Bank the largest RMBS trustee by dollar amount and number of trusts under administration.

103.    Through its acquisition of Bank of America's trustee business, U.S. Bank also inherited the legacy securitization trust business of LaSalle, which Bank of America had previously acquired in October 2007.  Through the transaction, U.S. Bank succeeded to Bank of America and LaSalle as Trustee for certain Trusts.

104.    Upon information and belief, prior to acquiring Bank of America's corporate trust business, U.S. Bank learned that Bank of America faced significant liability for its own and LaSalle's failure to take action to protect the RMBS trusts for which they served as trustees.  In particular, U.S. Bank learned through its due diligence on the transaction (and otherwise) that Bank of America and LaSalle had failed and unreasonably refused to enforce the rights of the trusts with respective defective mortgage loans and deficient loan servicing.  U.S. Bank knew that the loans underlying the trusts were in material breach of representations and warranties and were not being properly serviced, and would thus cause the trusts to incur (and continue to incur) substantial

losses. Nevertheless, U.S. Bank proceeded with the acquisition to solidify its position at the top of the securitization trustee business with the greatest market share. U.S. Bank attempted to avoid the substantial liability of its predecessor trustees and avoid its prospective obligations to the subject trusts and bondholders by negotiating with Bank of America for certain indemnifications and other provisions purporting to provide protection regarding its successor liability. U.S. Bank's attempt to insulate itself from successor liability in connection with the acquisition of the corporate trust business of Bank of America further confirms its knowledge that the Trusts were plagued with defective loans and servicer violations. Furthermore, U.S. Bank's failure to take action against Bank of America to enforce the Trusts rights against Bank of America's and LaSalle's contractual breaches and statutory violations was unreasonable and an additional breach of U.S. Bank's duties and obligations as Trustee for the Trusts.

### H. U.S. Bank Learned Of Widespread Seller Breaches Of Representations And Warranties In Its Capacity As Servicer

105. In addition to acting as a trustee, U.S. Bank is among the largest mortgage loan servicers to the RMBS industry during the relevant period. Indeed, U.S. Bank's master servicing portfolio includes approximately 45,700 loans with an unpaid principal balance of approximately $6 billion as of January 2014. Many of these loans were originated and sponsored by the mortgage loan sellers to the Trusts. In servicing these loans, U.S. Bank was in a front row seat to view mortgage loan sellers' abusive underwriting and securitization practices. For example, as servicer to RMBS trusts containing loan pools originated and securitized by the same mortgage loan sellers to the Trusts, U.S. Bank prepared monthly reports for the trustees detailing the similarly poor performance of the loan pools. Additionally, as servicer, U.S. Bank knew of the credit rating agencies' similar downgrading of these trusts as a result of the poor credit quality of these same originators' and sponsors' loan pools. Further, in servicing and administrating the loans, including

during the modification process, U.S. Bank examined the loan files of mortgage loans originated and sponsored by these entities and in the process discovered systemic and pervasive breaches of representations and warranties in the loan pools.

106.    Because the problems U.S. Bank discovered regarding these common originators and sponsors in its capacity as servicer to other RMBS trusts revealed systemic and pervasive violation of underwriting and securitization guidelines, U.S. Bank knew that these same defective underwriting and securitization practices applied to the Trusts.

## XI.    THE TRUSTS SUFFER FROM PERVASIVE SERVICER VIOLATIONS

107.    In the aftermath of the financial crisis, the mortgage loan servicing industry has received increased scholarly, popular, regulatory and political attention as a result of rampant servicing abuses in connection with the administration of and foreclosing on mortgage loans backing private label RMBS.

108.    Much like other private label RMBS trusts of the same vintage, each of the Trusts suffer from ongoing Servicer Events of Default caused by the servicers' failure to observe and perform, in material respects, the covenants and agreements imposed on them by the Governing Agreements.   The servicers' breach of their covenants is confirmed through federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described RMBS servicers' systemic and pervasive deviation from usual, customary and lawful servicing practices in their administration of mortgages and, more specifically, illegal and illicit servicing activities by the same servicers who service the loans held by the Trusts.

## A. The Servicers Failed To Give Notice Of Seller Breaches Of Representations And Warranties

109.    As with the Trustee, the Indentures require the servicers to give prompt written notice to all parties to the SSAs of a breach of a representation or warranty made by a seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Noteholders in any such mortgage loan, upon the servicer's discovery of such breach.

110.    In many cases, the servicers are affiliates of the sellers because in connection with the sale of a loan pool, the seller secured the retention of servicing rights to loans for its servicing division.  These servicers had actual knowledge of their affiliate mortgage loan sellers' abusive underwriting and securitization practices, and therefore had actual knowledge at the time of the Trusts' purchase of these loans that the sellers included high percentages of defective loans within the loan pools.  These servicers failed to notify parties to the SSAs of the discovery of mortgages that were in violation of applicable representations and warranties at the time they were purchased by the Trusts, and failed to enforce the sellers' repurchase obligations, despite their awareness of loans that were in violation of representations and warranties.

111.    Further, as noted above, the servicers have regularly modified mortgage loans held by the Trusts.  Plaintiffs are informed and believe that in the process of modifying these mortgage loans, the servicers have discovered that specific loans breached applicable seller representations and warranties because the loan modification process involves scrutinizing the underlying origination and mortgage loan files, and any supplemental information provided by the borrower to assess the borrower's ability to pay.  Thus, in the process of performing loan modifications, the servicers had to have discovered breaches of representations and warranties regarding the characteristics of the loan, the creditworthiness of the borrower, the adequacy of the collateral and

the title status of the mortgages. Nevertheless, the servicers systemically failed to notify the other parties of these breaches.

112. As also set forth above, there has been widespread public evidence of the originators' abandonment of underwriting guidelines and the sponsors' faulty securitization practices that made the servicers aware of material seller breaches representations and warranties within the Trusts' loan pools. Nevertheless, the servicers have not notified the other parties to the SSAs of these seller breaches or enforced the sellers' repurchase obligations.

113. Further, the servicers have been specifically notified by monoline insurers of pervasive breaches by the sellers. Notwithstanding the servicers' "discovery" of material breaches of representations and warranties, the servicers have not notified the other parties to the SSAs of these breaches.

114. The servicers' systemic and pervasive failure to give notice of the sellers' material breaches of representations and warranties and to enforce the sellers' repurchase obligations have materially affected the rights of the Trusts and all Noteholders in that they have deprived the Trusts of mortgage loans of adequate credit quality, or alternatively funds representing the "Repurchase Price" under the Governing Agreements, with respect to each defective mortgage loan.

**B.    The Servicers Have Violated Their Prudent Servicing Obligations**

115. The SSAs require that the servicer service and administer the mortgage loans for and on behalf of the Noteholders (i) in the same manner in which it services and administers similar mortgage loans for its own portfolio or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) with a view to maximizing the recoveries with respect to such mortgage loans on a net present value basis; and (iii) without regard to, among other things, the right of the servicer to receive compensation or other fees for its services under the SSA, the obligation of the servicer

to make servicing advances under the SSA, and the servicer's ownership, servicing or management for others of any other mortgage loans.

116.    As demonstrated by Exhibit 13, highly publicized government enforcement actions, private litigation and settlements involving the servicers demonstrate that the servicers have systemically and pervasively violated these prudent servicing obligations.

117.    The servicers' systemic and pervasive failure to observe their prudent servicing obligations have materially affected the rights of the Trusts and all Noteholders in that the violations have exacerbated the Trusts' losses and have fostered uncertainty as to the timely recovery of collateral.

### C.    The Servicers Have Violated Their Foreclosure Obligations

118.    The SSAs require the servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing such of the mortgage loans as they come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments.  Moreover, each of the SSAs contemplate that foreclosures and liquidations of defaulted mortgages will proceed forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties.

119.    As demonstrated by Exhibit 13, highly publicized government enforcement actions, private litigation and settlements involving the servicers demonstrate that the servicers have systemically and pervasively violated these foreclosure obligations.

120.    As reflected by Exhibit 14, studies show that the servicers have also routinely kept defaulted mortgages on their books, rather than foreclose or liquidate them.  Indeed, in several states, the average days for delinquent loans in foreclosure in the Trusts have doubled or quadrupled.  The servicers' delay in foreclosing has allowed the servicers to charge unearned and

unwarranted servicing fees, as well as unauthorized fees for default-related services, on mortgages that would have been liquidated but for the servicers' breach of their duties.

121. The servicers' systemic and pervasive violation of their foreclosure obligations have materially affected the rights of the Trusts and all Noteholders in that the Trusts have incurred costs of remedying procedural errors and re-filing affidavits and other foreclosure documents. The Trusts have also been forced to bear costs related to disputes over note ownership or authority to foreclose, and to allegations of procedural violations through the use of inaccurate affidavits and improper notarizations. The Trusts have further incurred losses as a result of delays or other damages caused by the weaknesses in the servicers' foreclosure processes.

### D.     The Servicers Have Violated Their Modification Obligations

122. The SSAs provide that the servicers agree to a modification of any mortgage loan only in certain specified circumstances. When modifications are required to remedy predatory lending or foreclosures violations, the SSAs require that the seller or the servicer – and not the Trusts or the Noteholders – bear the costs to cure such breach.

123. The servicers have breached the SSAs by agreeing to modify loans held in the Trusts for the purpose of settling predatory lending claims made by various attorneys general against their parent companies while breaching their obligation to demand that the offending mortgage seller (their parent companies) bear the costs of curing the violation, as well as the expenses reasonably incurred in enforcement of the seller's obligation to cure predatory mortgages. The servicers have also breached the SSAs by agreeing to modify loans held in the Trusts for the purpose of settling claims related to their wrongful servicing and foreclosure practices made by various attorneys general.

124. The servicers' violation of their modification obligations have materially affected the rights of the Trusts and all Noteholders in that the servicers and their parent companies have

-48-

been unjustly enriched to the detriment of the Trusts and Noteholders by using Trust collateral to settle claims that are not, and could never be, made against the Trusts.

E.    **The Servicers Have Abused Their Servicing Advances Obligations**

125.    The SSAs provide that the servicers are to advance P&I on a loan only if they determine that the advance payment is recoverable.  The SSAs further provide that the servicers may only recover servicing advances that are customary, reasonable and necessary out-of-pocket costs and expenses incurred in the performance by the servicers of their servicing obligations.

126.    The servicers have abused their advancing obligations to enrich themselves to the direct detriment of the Trusts.  In particular, the servicers have manipulated the recoverable designation to their advantage.  During low interest rate environments, the servicers have designated severely delinquent loans as recoverable so that the loans would be kept in the Trusts' loan pools and the servicers could continue to earn their servicing fees on these loans, which exceed the relatively low cost of financing the advances on these delinquent loans.  However, when interest rates have increased, the servicers have strategically switched the mortgage loans' designation from recoverable to unrecoverable.  The switch in designation enables the servicers to recoup all prior advances as a senior claim of the Trusts.

127.    The Trusts and their Noteholders are harmed by the servicers' manipulation of the recoverable designation because the Trusts incur more interest rate risk exposure than expected since the servicers' recoverability designations are strategically determined as a function of interest rates, as opposed to the value of the mortgaged property as required under the SSAs.

128.    Finally, despite the requirement that servicing advances were to be incurred only for reasonable and necessary out-of-pocket costs, the servicers instead utilized affiliated vendors – who marked up their services to a level 100% or more above the market price – to provide services related to the preservation, restoration, and protection of mortgaged property, in a

fraudulent, unauthorized, and deceptive effort to supplement its servicing income. These improper servicing advancing have exacerbated the Trusts' losses.

## XII. U.S. BANK HAS KNOWN OF SERVICER VIOLATIONS PLAGUING THE TRUSTS

129. There is ample evidence that, beginning in early 2009 and continuing to the present, U.S. Bank and its responsible officers have known of the above described widespread and severe failures on the part of the servicers to observe or perform in material respects their obligations under the SSAs.

### A. Reports, Investigations And Litigation Involving The Servicers

130. U.S. Bank and its responsible officers knew of the servicers' improper servicing practices from the steady stream of public disclosures regarding the servicers' violations.

### B. U.S. Bank Was Involved In Government Enforcement Actions And Private Litigation Stemming From The Servicers' Violations

131. U.S. Bank and its responsible officers knew of the servicers' improper servicing practices because, as described in greater detail below (Section XVI. A.), U.S. Bank and its affiliates, in their capacity as servicers to other RMBS trusts, were targets – together with many of the servicers for the Trusts – in highly publicized government investigations, prosecutions and settlements. For example, along with thirteen other of the nation's largest servicers, the government agencies found deficiencies in U.S. Bank's servicing and foreclosure processes, brought a formal enforcement action against U.S. Bank, and participated in a joint settlement including Aurora, Bank of America, Citibank, Goldman, HSBC, JPMorgan, MetLife Bank, Morgan Stanley, PNC, Sovereign, SunTrust, U.S. Bank, and Wells Fargo. U.S. Bank's involvement in such proceedings would have made it acutely aware of the deficiencies of each of the other servicers subject to these actions.

132.     U.S. Bank and its responsible officers also knew of the servicers' improper servicing practices through its involvement in litigation highlighting servicing failures, such as in judicial foreclosure proceedings exposing the servicers' failure to correct irregularities in the chain of title.   For example, courts across the country have repeatedly prohibited U.S. Bank from foreclosing on mortgaged properties due to irregularities in the chain of title of loans serviced by Wells Fargo, the largest servicer of the Trusts.   *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Duvall*, No. 94714, 2010 Ohio App. LEXIS 5461 (Ohio Ct. App. Dec. 30, 2010) (court affirmed dismissal of U.S. Bank's action to foreclose on grounds that affidavits by servicer Wells Fargo were insufficient to prove U.S. Bank owned mortgage at the time it filed the foreclosure action); *U.S. Bank Nat'l Ass'n v. Nelson*, No. 2013AP755, 2014 Wis. App. LEXIS 168 (Wis. Ct. App. Feb. 27, 2014) (reversing summary judgment of foreclosure in favor or U.S. Bank due to insufficient affidavit of servicer Wells Fargo demonstrating the declarant lacked personal knowledge concerning how foreclosure records were created); *U.S. Bank Nat'l Ass'n v. De Los Rios*, No. 09-37317, 2014 N.Y. Misc. LEXIS 218, at *11 (N.Y. Sup. Ct. Jan. 9, 2014) (denying U.S. Bank's motion for summary judgment in part, based on insufficient affidavit from servicer Wells Fargo, which provided no explanation "as to why a different version of the note" was produced at different times during the litigation);  *Bank of Am. N.A. v. Lam*, No. 0115035/2009, 2013 N.Y. Misc. LEXIS 6239 (N.Y. Sup. Ct. Dec. 9, 2013) (Successor trustee U.S. Bank's motion for summary judgment denied on grounds that servicer Wells Fargo's affidavit was defective); *U.S. Bank Nat'l Ass'n v. Maynard, et al.*, No. 18007/2006 (N.Y. Sup. Ct., Kings Cnty. Nov. 26, 2007) (U.S. Bank's motion for judgment of foreclosure denied on grounds that servicer Wells Fargo's affidavits and limited power of attorney were "defective" and raised issue whether Wells Fargo affiant "might be engaged in a subterfuge").

133.     These and other public enforcement actions and private litigation highlighting the servicers' improper servicing practices were well known throughout the RMBS industry, including by U.S. Bank and the other principal financial crisis-era trustees.  For example, in October 2010, Deutsche Bank – which serves as trustee for more than 1,000 RMBS trusts – issued a notice to all RMBS investors in trusts for which Deutsche Bank served as trustee confirming Deutsche Bank's awareness of ongoing government investigations into improper servicing practices.  Deutsche Bank's notice acknowledged that it had been "widely reported in the news media" that "several major U.S. loan servicers" had "suspended certain foreclosures in some or all states" due to allegations and investigations regarding "defects in foreclosure practices, procedures and/or documentation."  Also in October 2010, Deutsche Bank sent an "urgent and time sensitive" memorandum to all servicers of mortgage loans included in any RMBS trust for which Deutsche Bank acts as trustee.  In the memorandum, Deutsche Bank discussed "an urgent issue requiring your [the servicers] immediate attention" – specifically, the same "serious . . . defects in foreclosure practices, procedures and/or documentation" discussed in Deutsche Bank's notice. The memorandum referred to the expansive scope of the reported servicer deficiencies, and admitted that foreclosure abuses such as the execution and filing by servicers or their agents of documents containing untrue assertions of fact "would constitute a breach of that Servicer's obligations under the [Governing Agreements] and applicable law."

**C.     U.S. Bank And Its Responsible Officers Received Written Notice
From RMBS Investors Of Pervasive And Systemic Servicer Breaches**

134.     In its capacity as trustee to other RMBS trusts that are not the subject of this action, U.S. Bank and its responsible officers repeatedly received written notice from RMBS investors of the same systemic servicing violations described above perpetrated by the very same servicers for the Trusts.  Based on the systemic and pervasive practices complained of in the RMBS investors'

breach notices, U.S. Bank and its responsible officers knew that servicers were engaged in the same wrongful conduct in connection with their servicing of the loans for the Trusts.

135.    For example, on January 5, 2012, an investor group directed U.S. Bank and another RMBS trustee to investigate, among other things, Wells Fargo's violative servicing practices for over $19 billion of RMBS issued by various affiliates of Wells Fargo.  Similarly, on January 31, 2012, an investor group directed U.S. Bank and Wells Fargo, in their capacity as trustees, to investigate, among other things, Wells Fargo's and others' deficient loan servicing for Morgan Stanley-sponsored RMBS.  On September 19, 2012, an investor group sent a Notice of Non-Performance ("September 19, 2012 Notice") to U.S. Bank and other RMBS trustees, as well as Wells Fargo, the servicer, identifying breaches by Wells Fargo of specific servicing covenants in the Governing Agreements for 149 Morgan Stanley- and Wells Fargo-sponsored RMBS.  The September 19, 2012 Notice alleged that each of these servicing failures had materially affected the rights of the bondholders and constituted ongoing events of default in the servicer's performance under the relevant Governing Agreements.  The January 5, 2012, January 31, 2012, and September 19, 2012 Notice put U.S. Bank on notice of systemic deficient master servicing and servicing practices by Wells Fargo, which is the largest servicer for the Trusts, as well as other of the Trusts' subservicers.

136.    Similarly, on January 23, 2015, holders in 119 RMBS trusts issued a Notice of Non-Performance to US Bank and four other entities in their capacity as trustees, securities administrators, and/or master servicers, regarding the material failures of Ocwen as Servicer and/or Master Servicer, to comply with its covenants and agreements under those trusts' governing agreements.  The holders' Notice of Non-Performance detailed systemic servicing failures by Ocwen, a major servicer of the Trusts.  Such servicing failures included (i) using trust funds to

"pay" Ocwen's required "borrower relief" obligations under a regulatory settlement, through implementation of modifications on trust-owned mortgages that have shifted the costs of the settlement to the trusts and enriched Ocwen unjustly; (ii) employing conflicted servicing practices that enriched Ocwen's corporate affiliates, including Altisource and Home Loan Servicing Solutions, to the detriment of the trusts, investors, and borrowers; (iii) engaging in imprudent and wholly improper loan modification, advancing, and advance recovery practices; (iv) failing to maintain adequate records, communicate effectively with borrowers, or comply with applicable laws, including consumer protection and foreclosure laws; and (v) failing to account for and remit accurately to the trusts' cash flows from, and amounts realized on, trust-owned mortgages. The holders further alleged that these claimed defaults and deficiencies in Ocwen's performance have materially affected the rights of the holders and constitute an ongoing Servicing Event of Default under the applicable governing agreements. The January 23, 2015 Notice put U.S. Bank on notice of systemic deficient servicing practices by Ocwen, which is one of the largest servicer for the Trusts.

### D.    U.S. Bank Had Knowledge Of The Servicers' Failures Through The Monthly Servicer And Remittance Reports

137.    U.S. Bank and its responsible officers also knew of the servicers' improper servicing practices through the servicers' servicing reports and the monthly remittance reports, which U.S. Bank itself published. These reports detailed not only the Trusts' increasing modifications, staggering losses and write-downs due to the poor credit quality of the loans but also that, despite this strong indicia of breaches of representations and warranties, the servicers were failing to enforce the sellers' repurchase obligations. The reports also reflected the servicers' abuse of servicing advances.

## XIII.  NUMEROUS INDENTURE EVENTS OF DEFAULT HAVE OCCURRED

138.    The Issuers have systemically failed to perform material covenants and agreements under the Indentures, including by failing to: (i) "enforce the rights to the mortgage loans"; (ii) "preserve or defend title to the Trust Estate and the rights of the Indenture Trustee and the Noteholders in such Trust Estate against the claims of all persons and parties"; and (iii) failing to provide written notice to U.S. Bank of all defaults and Events of Defaults.

139.    Based on the abject performance of the Trusts and widespread public evidence of the originators' abandonment of underwriting guidelines, the sponsors' faulty securitization practices, and the servicers' failures to perform material covenants and agreements under the SSAs, the Issuers have known of material seller breaches representations and warranties within the Trusts' loan pools.  The Issuers have breached their obligations under the Indenture to (i) require the sellers to cure, substitute, or repurchase nonconforming mortgage loans; (ii) demand that the servicers cure their servicing violations; and (iii) provide written notice to U.S. Bank of all defaults and Events of Defaults.

## XIV.  U.S. BANK HAS KNOWN OF THE OCCURRENCE
## OF NUMEROUS INDENTURE EVENTS OF DEFAULT

140.    Beginning in early 2009 and continuing to the present, U.S. Bank and its responsible officers have known of the above described Indenture Events of Default.  Each month, U.S. Bank, as Indenture Trustee, prepared cash distribution summaries that detailed the growing rate of mortgage loan delinquencies, modifications, defaults, foreclosures, servicing advances and fees, and realized credit losses in each of the Trusts.  These summaries were also required to identify any mortgage loan that had been repurchased by a responsible seller, or received a credit from the responsible servicer. However, because no mortgage loans were repurchased by sellers for having been underwritten in violation of the represented underwriting standards, or received

credits by the servicer for improper servicing violations, U.S. Bank knew that there were enormous unresolved problems with the credit quality, servicing and administration of the mortgage loans in the Trusts, that defective mortgage loans were not being repurchased by the Sellers, that the Trusts were not being reimbursed for losses attributable to servicing violations, and that the Issuers were not acting to enforce the Trusts' rights as against responsible sellers and servicers. U.S. Bank also knew that the Issuers were failing to carry out their obligations to provide notice of all known defaults.

## XV. U.S. BANK FAILED TO DISCHARGE ITS CRITICAL PRE- AND POST-DEFAULT DUTIES

141. Despite U.S. Bank's knowledge of the Trusts' high default rates and poor performance, breaches of representations and warranties made by the originators, sellers, depositors, and sponsors, servicer violations, and issuer breaches, U.S. Bank failed to perform its duties as Trustee to protect the Trusts and Noteholders.

### A. Failure To Enforce The Trusts' Repurchase Rights Against Responsible Sellers

142. As set forth above, beginning in 2009 and by 2011, U.S. Bank and its responsible officers discovered the Trusts contained loans that materially breached the sellers' representations and warranties, which adversely affected the value of those mortgage loans and the Trusts' and Noteholders' interests in those mortgage loans. U.S. Bank breached its contractual and statutory duties under TIA and was negligent by failing to (i) provide notice to the parties to the Governing Agreements and/or the responsible sellers upon its discovery of these breaches, and (ii) take any action to enforce the sellers' repurchase of the defective mortgage loans.

### B. Failure To Provide Notice To The Servicers Of Servicer Events Of Defaults

143. As set forth above, beginning in 2009 and continuing to the present, U.S. Bank and its responsible officers knew of failures on the part of the servicers to observe or perform in

material respects their covenants or agreements in the SSAs, including the servicers' (i) failure to give notice to the other parties of seller breaches of representations and warranties upon discovery thereof and enforce the sellers' repurchase obligations; (ii) violations of prudent servicing obligations; (iii) violations of foreclosure obligations; (iv) violations of modification obligations; and (v) improper servicing advances. U.S. Bank knew that these servicers' breaches were material and that they could give rise to "Events of Defaults" as defined by the SSAs.

144.    U.S. Bank breached its contractual and statutory duties under the TIA by failing to provide notice to the servicers of these defaults and Events of Defaults and terminating the servicers.

### C.    Failure To Act Prudently Subsequent To Indenture Events Of Defaults

145.    As set forth above, beginning in 2009 and continuing to the present, U.S. Bank and its responsible officers have known of uncured and continuing Indenture Events of Default as a result of the Issuers' numerous breaches under the Indentures. Consequently, under the Indentures, U.S. Bank had and continues to have the obligation to exercise the rights and powers vested in it by the Governing Agreements, and to use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

146.    A prudent person would have taken action to protect the Trusts and their Noteholders from the known seller breaches of representations and warranties by exercising all of its rights under the Governing Agreements to enforce the sellers' repurchase obligations, including timely conducting an investigation to determine all of the materially breaching mortgage loans and bringing suit against the sellers for specific performance to compel their repurchase of those loans. U.S. Bank breached its contractual, statutory and fiduciary duties by failing to act prudently and take these actions.

147.    A prudent person would have also taken action to protect the Trusts and their Noteholders from the known servicer violations by exercising all of its rights under the Governing Agreements to enforce the servicers' prudent servicing obligations, including ensuring that all Servicer Events of Default were cured, terminating the servicers, substituting itself as the substitute servicer or replacing the servicers, and enforcing the servicers' obligations to reimburse the Trusts for losses caused as a result of their breaches through suit if necessary.  U.S. Bank breached its contractual, statutory and fiduciary duties by failing to act prudently and taking these actions.

### D.    Failure To Provide Notice To Noteholders Of The Uncured Indenture Events Of Defaults

148.    As set forth above, known Indenture Events of Default occurred, remained uncured for the requisite period of time and are continuing.  Consequently, under the Indentures, U.S. Bank also had and continues to have the obligation to provide all Noteholders with notice of these Indenture Events of Default.

149.    U.S. Bank had no good faith reason for failing to provide notice of these Indenture Events of Defaults to the Noteholders.  Consequently, U.S. Bank breached its contractual, statutory and fiduciary duties by failing to provide all Noteholders with notice of these Indenture Events of Default.

## XVI.   U.S. BANK FAILED TO PROTECT THE TRUSTS DUE TO ITS CONFLICTS OF INTEREST

150.    U.S. Bank failed and unreasonably refused to discharge its critical pre- and post-default duties owed to the Trusts and Noteholders because acting to diligently protect the interests of the Trusts would have conflicted with U.S. Bank's own interests.

A. **U.S. Bank Was Engaged In The Same Wrongful Servicing Activities**

151. U.S. Bank failed and unreasonably refused to take action to protect the Trusts and their Noteholders against seller breaches and servicer violations because it would have exposed that U.S. Bank itself was engaged in the same servicing misconduct in its role as servicer for other mortgages and RMBS trusts.

152. As noted above, during the fourth quarter of 2010, government agencies conducted on-site reviews of the adequacy of controls and governance over servicers' foreclosure processes at U.S. Bank. The reviews uncovered significant problems in foreclosure processing at U.S. Bank, including "critical weaknesses in [U.S. Bank's] foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys."[14]

153. On April 13, 2011, based on the deficiencies in the review and the risk of additional issues as a result of weak controls and processes, the Federal Reserve Board initiated formal enforcement actions requiring U.S. Bancorp, the corporate parent of U.S. Bank, to address its pattern of misconduct and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing. According to the Federal Reserve Board press release, "[t]hese deficiencies represent significant and pervasive compliance failures and unsafe and unsound practices at [U.S. Bancorp]." The enforcement action required U.S. Bancorp to improve its residential mortgage loan servicing and foreclosure practices.

---

[14] *See* Interagency Review of Foreclosure Policies and Practices (Apr. 2011), *available at* http://www.federalreserve.gov/boarddocs/rptcongress/interagency_review_foreclosures_201104 13.pdf.

154.    As part of the enforcement action, U.S. Bank entered into a consent order with the Federal Reserve Board, which found that U.S. Bank had engaged in "unsafe or unsound practices with respect to the manner in which [U.S. Bank] handled various foreclosure and related activities."

155.    In addition, the OCC entered into consent orders with U.S. Bank and several other servicers (the "OCC Consent Orders").    In the OCC Consent Order with U.S. Bank, the government found, among other things, that beginning in 2009 U.S. Bank filed false or otherwise defective affidavits in connection with foreclosure proceedings and failed to exercise adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training for its foreclosure-related services.

156.    Despite pledging to reform its servicing misconduct and foreclosure abuses four years ago, U.S. Bank has still failed to comply with applicable federal regulatory standards.    On June 17, 2015, the OCC announced that it was imposing further restrictions on the mortgage servicing operations of U.S. Bank and five other banks, including Wells Fargo & Co. – the largest servicer for loans in the Trusts – for failing to meet the requirements of the prior consent orders and "continu[ing] to engage in unsafe and unsound practices" in violation of the prior consent orders.[15] Among other penalties imposed under amended consent orders, U.S. Bank, Wells Fargo and the other banks are prohibited from (i) acquiring new servicing rights on existing securitizations; (ii) entering into new contracts to perform residential mortgage servicing for other parties; (iii) outsourcing or sub-servicing new residential mortgage servicing activities to other

---

[15] *See* Press Release, Office of Comptroller of Currency, *OCC to Escheat Funds from the Foreclosure Review, Terminates Orders Against Three Mortgage Servicers, Imposes Restrictions on Six Others* (June 17, 2015), *available at* http://www.occ.gov/news-issuances/news-releases/2015/nr-occ-2015-85.html.

parties; (iv) off-shoring new residential mortgage servicing activities; and (v) making any new appointments of senior officers responsible for residential mortgage servicing or residential mortgage servicing risk management and compliance.

157.    In short, because U.S. Bank itself was engaging in the same illicit and improper acts as the servicers for the Trusts, U.S. Bank failed to enforce the servicer violations, or even alert the Noteholders to the servicers' misconduct.

**B.    U.S. Bank Originated Defective Loans**

158.    U.S. Bank, as an originator for other RMBS trusts, sold hundreds of millions of dollars of loans, many of which materially breached representations and warranties.  Many of the same banks or their affiliate entities that act as servicers to the Trusts, similarly act as servicers to these trusts backed by U.S. Bank loans, including MSM 2004-5AR, MSM 2004-6AR, MSM 2005-4, and SARM 2007-4.  All of these trusts, like the Trusts at issue in this action, have suffered write-downs and are afflicted by high delinquency rates.

159.    Accordingly, because U.S. Bank itself faced enormous repurchase liability for hundreds of millions of dollars of loans sold in breach of representations and warranties, including U.S. Bank-originated loans in RMBS trusts serviced by the same servicers as the Trusts, U.S. Bank was disincentivized to take any action against the servicers for the Trusts, or even alert the Noteholders to servicer misconduct.

**C.    U.S. Bank Was Economically
        Beholden To The Mortgage Loan Sellers**

160.    Trustees are selected by the sponsor, which is often an affiliate of the servicer.  While U.S. Bank was charged with representing the interests of the Trusts and all Noteholders, it was economically beholden to the sponsors.  Indeed, U.S. Bank had close, repeat business relationships with most, if not all, of the sponsors.  For example, U.S. Bank received

$394.2 billion, approximately 30%, of its private-label residential mortgage securitization trusteeship appointments from banks that are sponsors to the Trusts, including Lehman ($208.4 billion), Credit Suisse ($124.6 billion), Merrill Lynch ($33.6 billion), Thornburg ($24.6 billion), GreenPoint ($12.3 billion), Bayview Financial ($7.9 billion), and HomeBanc ($7.4 billion). In short, U.S. Bank failed to protect the Trusts because it did not want to risk losing significant business from the sponsors of the Trusts.

## XVII. <u>CAUSATION</u>

161.    U.S. Bank's failure and unreasonable refusal to enforce the Trusts' and Noteholders' rights against the sellers and servicers, and its violations of its other contractual, statutory, fiduciary and independence duties, along with its negligence, have directly and proximately caused billions of dollars in Trust assets to waste away. The mortgage loans conveyed to the Trusts did not comply with seller representations and warranties, but were instead of a lower quality, which increased the risk of defaults in the P&I payments owed to the Trusts. Moreover, servicer violations have exacerbated the Trusts' losses. Had U.S. Bank performed its duties as Indenture Trustee, in particular, had it adequately enforced the obligations of the sponsors and originators to cure, substitute, or repurchase mortgage loans that breached representations and warranties, it would have prevented the Trusts from incurring substantial losses and Trust assets from wasting away. Had U.S. Bank enforced the Trusts' rights against servicers for reimbursement of losses caused by their misconduct as required, it would have benefited the Trusts and their Noteholders.

## XVIII. <u>DAMAGES</u>

162.    The Trusts have incurred substantial damages attributable to U.S. Bank's breaches of its contractual, statutory, fiduciary, and common law duties. In particular, the Trusts' loan pools are filled with loans of inadequate credit quality, which increased the risk of delinquency. As a result of the loans' poor credit quality, the Trusts have experienced enormous delinquency rates,

collateral write-downs, and losses, and have incurred and continued to incur significant losses in connection with servicer violations. Damages incurred by the Trusts and caused by the Indenture Trustee's violation of law will be the subject of expert testimony for proof at trial.

## XIX. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Breach Of Contract)**

163. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

164. The Governing Agreements are valid contracts that memorialize the issuance of notes of beneficial interests in the Trusts, and establish U.S. Bank's contractual duties and obligations, in its capacity as Indenture Trustee, to the Trusts and their Noteholders. Each of the relevant contractual provisions is substantively similar, if not identical, in all of the Governing Agreements, and imposes substantially the same, if not identical, duties and obligations on U.S. Bank in its capacity as Indenture Trustee.

165. As current holders of Notes issued by each of the Trusts, Plaintiffs are express, intended third party beneficiaries under the Governing Agreements entitled to enforce the performance of the Trustee.

166. Under each of the Governing Agreements, U.S. Bank owed a duty to the Trusts and all Noteholders (i) to give prompt written notice to all parties to the Governing Agreements of a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Noteholders in any such mortgage loan, upon U.S. Bank's knowledge of the breach; and (ii) to take such action with respect to the breach as may be necessary or appropriate to enforce the rights of the Trusts with respect to the breach.

167.     As set forth above, U.S. Bank materially breached each Governing Agreement by (i) failing to provide prompt written notice to all parties to the Governing Agreements and related responsible parties of breaches of the sellers' mortgage loan representations and warranties, upon U.S. Bank's discovery of the breaches; and (ii) failing to enforce the sellers' obligation to repurchase, substitute, or cure such defective mortgage loans.

168.     The SSAs define a Servicer "Event of Default" to include the failure by the servicer to observe or perform in any material respect the covenants or agreements by the servicer set forth in the SSAs, which continues unremedied for no more than thirty to sixty days after written notice of the failure has been given to the servicer by the indenture trustee requiring the same to be remedied, or actual knowledge of the failure by a "Servicing Officer" of the servicer, whichever is earlier.

169.     As set forth herein, Servicer Events of Default have occurred, remained uncured for the applicable period of time, and are continuing as a result of the servicers' failure to observe and perform, in material respects, the covenants and agreements imposed on them by the SSAs.

170.     U.S. Bank and its responsible officers had knowledge of these and other defaults by the servicers through, among other things, public reports, lawsuits, exception reports, remittance reports, and the increasing delinquency and loss rates for the Trusts.  Nevertheless, U.S. Bank failed to deliver written notices to the servicers of the defaults or terminate the servicers. Similarly, U.S. Bank failed to provide Noteholders with notice of these Servicer Events of Default. By failing to take these actions, U.S. Bank materially breached the SSAs.

171.     As set forth herein, Indenture Events of Default have occurred, remained uncured for the applicable period of time, and are continuing as a result of the issuers' defaults in their performance of their obligations under the Indentures.  U.S. Bank and its responsible officers had

knowledge of these and other defaults by the issuers through, among other things, public reports, lawsuits, exception reports, remittance reports, and the increasing delinquency and loss rates for the Trusts.  Consequently, under the Indentures, U.S. Bank had and continues to have the obligation to exercise the rights and powers vested in it by the Governing Agreements, and to use the same degree of care and skill in their exercise as a prudent person would use under the circumstances in the conduct of the person's own affairs.  A prudent person would have exercised all of the indenture trustee's rights to recover for these Indenture Events of Default, and would have done so promptly.  Similarly, U.S. Bank failed to provide Noteholders with notice of these Indenture Events of Default.  By failing to take these actions, U.S. Bank materially breached the Indentures.

172.    U.S. Bank's material breaches of the Governing Agreements have directly and proximately caused damages to the Trusts and Noteholders in that they have deprived the Trusts of valuable remedies and allowed billions of dollars of the Trusts' assets to waste away.   For example, had U.S. Bank protected the rights of the Trusts and Noteholders by enforcing the sellers' obligation to cure, repurchase, or substitute mortgage loans affected by breaches of representations and warranties, the Trusts would have received either cured or substitute mortgage loans of adequate credit quality or funds representing the "Repurchase Price" with respect to each defective mortgage loan.  U.S. Bank's inaction with respect to the sellers has allowed the Trusts to be filled with defective mortgage loans of poor credit quality that have increased the severity of the Trusts' losses.  Similarly, had U.S. Bank enforced the servicers' prudent servicing obligations, the Trusts would have been able to avoid incurring unnecessary losses and expenses.  U.S. Bank's inaction with respect to the servicing violations has exacerbated losses experienced by the Trusts.

173.    U.S. Bank's material breaches of the Governing Agreements have injured all Noteholders, including Plaintiffs and the Class, in that they have caused Plaintiffs' losses and have

diminished the value of the notes held by the Noteholders and have prevented the Noteholders from protecting the rights of the Trusts.

## SECOND CAUSE OF ACTION
### (Violation Of The Trust Indenture Act Of 1939, 15 U.S.C. §§ 77ooo(b) And (c))

174.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

175.    Section 315 of the TIA sets out the duties and responsibilities of the indenture trustee, such as U.S. Bank.  Section 315(b) states that the "trustee shall give to the indenture security holders . . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof", unless the indenture trustee believes withholding such notice is in the best interests of the Noteholders.  15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)).  Here, there were numerous defaults, including (i) the failure of originators and sponsors to repurchase or substitute defective or nonconforming loans in the Trusts; (ii) the failure on the part of the servicers to observe and perform covenants and agreements set forth in the SSAs, including failing to provide notice of known breaches of the sellers' representations and warranties and servicing and failing to administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers; and (iii) the failure on the part of the issuers to perform their obligations under the Indentures.  Given the great importance of those defaults to the Noteholders' interests, U.S. Bank had no good faith reason for failing to provide notice of those defaults.  Accordingly, by failing to provide this notice, U.S. Bank violated Section 315(b) of the TIA.

176.    Section 315(c) of the TIA states that an indenture trustee is to "exercise in case of default (as such term is defined in such indenture)" all of the powers available to it under the indenture agreement, using "the same degree of care and skill in their exercise, as a prudent man

would exercise" in conducting his own affairs. 15 U.S.C. § 77ooo(c). Again, given the obvious importance of the defaults set forth in the preceding paragraph, which impaired the rights of the Trusts and Noteholders, any prudent person under those circumstances would have exercised all of the Indenture Trustee's rights to, among other things, (i) enforce the sellers' obligation to repurchase, substitute, or cure defective mortgage loans, and a prudent person would have exercised those rights promptly; and (ii) require the servicers' cure all servicing breaches and reimburse the Trusts for losses caused from servicing violations. By failing to exercise its rights in those circumstances, U.S. Bank violated Section 315(c) of the TIA.

177. U.S. Bank's violations of the TIA have directly and proximately caused actual damages to the Trusts and Noteholders in that they have deprived the Trusts of valuable remedies and allowed billions of dollars of the Trusts' assets to waste away. For example, had U.S. Bank protected the rights of the Trusts by enforcing the sellers' obligation to cure, repurchase, or substitute mortgage loans affected by breaches of representations and warranties, the Trusts would have received either cured or substitute mortgage loans of adequate credit quality or funds representing the "Repurchase Price" of the defective mortgage loans. U.S. Bank's inaction with respect to the sellers has allowed the Trusts to be filled with defective mortgage loans of poor credit quality that have increased the severity of the Trusts' losses. Similarly, had U.S. Bank enforced the servicers' servicing obligations, the Trusts would have been able to avoid unnecessary losses. U.S. Bank's inaction with respect to the servicers has exacerbated losses experienced by the Trusts.

178. U.S. Bank's violations of the TIA have caused actual damages to all Noteholders, including Plaintiffs and the Class, in that they caused Plaintiffs' losses and have diminished the

value of the notes held by the Noteholders and have prevented the Noteholders from protecting the rights of the Trusts.

### THIRD CAUSE OF ACTION
**(Breach Of Fiduciary Duty)**

179.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

180.    Under New York law, after the occurrence of an Event of Default, U.S. Bank's duties expanded to include a fiduciary duty owed to the Trusts and all Noteholders, regardless of any limitations or exculpatory provisions contained in the Indenture.  This fiduciary duty included the obligation to exercise its contractually conferred rights and powers in good faith and to bring all available claims for the benefit of the Trusts and the Noteholders following an Event of Default. Following the Events of Defaults described above, U.S. Bank breached its fiduciary duties to the Trusts and all Noteholders in several respects.

181.    First, U.S. Bank, in its capacity as Indenture Trustee, had standing under the Governing Agreements to bring claims against the sellers of the Trusts for breach of their representations and warranties under the Governing Agreements.  At the time of the Indenture Events of Default, meritorious claims existed against the sellers for breach of their representations and warranties under the Governing Agreements.  U.S. Bank, however, failed to promptly enforce the sellers' obligation to cure, repurchase, or substitute mortgage loans that had defective mortgage files or were affected by breaches of the sponsors' and originators' representations and warranties, including by filing suits on behalf of the Trusts against the sellers.  Moreover, U.S. Bank failed to provide notice to the Noteholders of the breaches or of its intention not to enforce the sellers' obligation to cure, repurchase, or substitute the loans with defective mortgage files and breaches of representations and warranties.

-68-

182.     U.S. Bank's failure to promptly enforce the sellers' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the sellers' representations and warranties, as well as its failure to provide notice to the Noteholders of its intention not to promptly enforce the sellers' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the sellers' representations and warranties, constituted breaches of U.S. Bank's post-Event of Default fiduciary duty to all Noteholders.

183.     Second, U.S. Bank, in its capacity as Indenture Trustee, presently has standing to bring meritorious claims against the servicers to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the SSAs, including to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers.  U.S. Bank, however, has refused and continues to refuse to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the SSAs, including by filing suits on behalf of the Trusts against the servicers for compensatory and injunctive relief for harm caused to the Trusts and Noteholders as a result of servicing violations.  Moreover, U.S. Bank has failed to provide notice to the Noteholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the SSAs.  U.S. Bank's failure to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the SSAs, as well as its failure to provide notice to the Noteholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the SSAs, constitutes breaches of U.S. Bank's post-Event of Default fiduciary duty to all Noteholders.

184. U.S. Bank's breach of its fiduciary duty has directly and proximately caused damages to the Trusts. Specifically, the Trusts' injury includes the loss of verdicts, settlements, or awards, and the interest that the Trusts would have recovered against the sellers and servicers but for U.S. Bank's breach of its fiduciary duty.

185. U.S. Bank's breaches of its fiduciary duty have injured all Noteholders, including Plaintiffs and the Class, in that they caused Plaintiffs' losses and have diminished the value of the notes held by the Noteholders and have prevented the Noteholders from protecting the rights of the Trusts.

## FOURTH CAUSE OF ACTION
### (Breach Of Duty To Avoid Conflicts Of Interest)

186. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

187. Under New York law, U.S. Bank, as Indenture Trustee, had certain extra-contractual duties to the Trusts and all Noteholders, including the duty to avoid conflicts of interest. This duty to avoid conflicts of interests applies notwithstanding the terms of the instrument that purports to define the duties of the trustee.

188. Under each of the Governing Agreements, U.S. Bank holds the loans for the benefit of the Trusts and all Noteholders, including Plaintiffs and the Class.

189. Under each of the Indentures, U.S. Bank had the discretion to enforce the sellers' repurchase obligations and to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans that U.S. Bank held for the benefit of the Trusts and all Noteholders.

190. As alleged in detail above, U.S. Bank knew of seller breaches of representations and warranties and that the servicers were engaging in activities outside of customary and usual

standards of practice of prudent mortgage servicers with regard to their servicing and administration of the mortgage loans in the Trusts.

191.   As alleged herein, in its capacity as servicer with regard to other mortgage loans and RMBS trusts, U.S. Bank was involved in the same wrongful conduct and servicing violations in which many of the same sellers, servicers or their affiliates were serving as servicers or trustees. In addition, in their capacity as a seller with regard to other mortgage loans and RMBS trusts, U.S. Bank's affiliates had sold loans in breach of specific representations and warranties to RMBS trusts in which many of the same sellers, servicers or their affiliates were serving as servicers or trustees. Moreover, U.S. Bank was economically beholden to the sellers.

192.   Because U.S. Bank faced liability for its wrongful servicing practices and for the sale and securitization of its own loans in breach of its specific representations and warranties, and since it was economically beholden to the sellers, U.S. Bank failed to take any action against the servicers and sellers, or even notify the Noteholders that the servicers or sellers were engaged in this misconduct.

193.   U.S. Bank's breach of its duty to avoid conflicts of interests has directly and proximately caused damages to the Trusts and Noteholders.  For example, had U.S. Bank not been conflicted, it would have enforced the sellers' repurchase obligations and exercised its discretion to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans.  U.S. Bank's inaction has relieved the sellers' of their repurchase liability, and allowed the servicers to charge improper fees that have been passed along to the Trusts and to delay in foreclosing on mortgage loans, which has increased the costs of foreclosure.

194.    U.S. Bank's breaches of its duty to avoid conflicts of interests have injured all Noteholders, including Plaintiffs and the Class, in that they caused Plaintiffs' losses and have diminished the value of the notes held by the Noteholders and have prevented the Noteholders from protecting the rights of the Trusts.

## XX.    CLASS ACTION ALLEGATIONS

195.    Plaintiffs bring this action as a class action on behalf of themselves and a class consisting of all current owners of notes issued by the Trusts (the "Class") that have suffered damages as a result of U.S. Bank's misconduct alleged herein.   Excluded from the Class are Defendant U.S. Bank, the sellers and the servicers, and, for each of them, their respective officers and directors, legal representatives, successors or assigns, and any entity in which they respectively have or had a controlling interest.

196.    The members of the Class are so numerous that joinder of all members is impractical.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained though appropriate discovery, Plaintiffs believe that there are at least hundreds of members of the proposed Class.  Record beneficial owners and other members of the Class may be identified from records maintained by U.S. Bank or third parties and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

197.    Plaintiffs' claims are typical of the claims of the members of the Class as (i) Plaintiffs and the members of the Class all acquired notes issued by the Trusts, and held them at or after the time of U.S. Bank's misconduct; (ii) all the claims are based upon the Governing Agreements, which are substantially in the same form, common law and the TIA; (iii) U.S. Bank's alleged misconduct was substantially the same with respect to all Class members; (iv) and all Class members suffered similar harm as a result.  Thus, all members of the Class are similarly affected

by U.S. Bank's statutory, contractual, and common law breaches and violations that are alleged of herein.

198. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and asset-backed securities litigation.

199. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether U.S. Bank breached its contractual and common law duties to Plaintiffs and the Class under the Governing Agreements.

- Whether U.S. Bank violated the TIA.

- Whether and to what extent Plaintiffs and members of the Class have suffered damages as a result of U.S. Bank's breaches of its statutory, contractual, and common law duties and the proper measure of damages.

200. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. There will be no difficulty in the management of this action as a class action.

## XXI. RELIEF REQUESTED

**WHEREFORE**, Plaintiffs demand judgment as follows:

(a) Determining this action to be a proper class action under Fed. R. Civ. P. 23, certifying Plaintiffs as Class Representatives, and appointing Bernstein Litowitz Berger & Grossmann LLP as Class Counsel;

(b)     Awarding damages in favor of Plaintiffs and the Class against U.S. Bank for all damages sustained as a result of U.S. Bank's wrongdoing;

(c)     Requiring U.S. Bank to take corrective actions, including taking all necessary actions to reform and improve its internal policies and procedures to comply with its Indenture Trustee obligations under the Governing Agreements and applicable laws, and to protect the Trusts and the Noteholders from a repeat of the damaging events described herein;

(d)     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(e)     Granting any other and further relief that the Court deems just and proper.

## XXII.  <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury.

Dated: July 2, 2015

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP

*/s/ Blair A. Nicholas*
BLAIR A. NICHOLAS

BLAIR A. NICHOLAS (admitted *Pro Hac Vice*)
TIMOTHY A. DELANGE (admitted *Pro Hac Vice*)
BENJAMIN GALDSTON (admitted *Pro Hac Vice*)
DAVID R. KAPLAN (admitted *Pro Hac Vice*)
LUCAS E. GILMORE (admitted *Pro Hac Vice*)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323

*Counsel for Plaintiffs and the Class*
