USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 26, 2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                         :

BLACKROCK CORE BOND PORTFOLIO, et   :
al.,                                      :

                     Plaintiffs,     :       14-cv-9401 (KBF)

                 -v-            :      <u>OPINION & ORDER</u>

                               :

U.S. BANK NATIONAL ASSOCIATION,   :

                     Defendant,    :

------------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

      Plaintiffs Blackrock Core Bond Portfolio, et al. are several dozen investment funds which allegedly suffered losses from their investments in twenty-seven residential mortgage-back securities trusts. Plaintiffs filed their initial complaint in this action on October 24, 2014. (ECF No. 1.) That complaint comprised 642 paragraphs of allegations; while the filing was voluminous (and unnecessarily so), it was nonetheless clear that that it failed to state a claim. The Court allowed plaintiffs a second attempt, but required them to eliminate unnecessary and extraneous allegations and fit their complaint within 75 pages. Plaintiffs filed their Amended Complaint on July 2, 2015. (ECF No. 74.) This filing contained 200 separate paragraphs. This amendment solves certain of the initial deficiencies but perpetuates others. Accordingly, for the reasons set forth below, the motion to dismiss is GRANTED IN PART and DENIED IN PART.

I.    FACTS

Plaintiffs are a group of investors in twenty-seven Delaware statutory trusts created between 2004 and 2007 that issued residential mortgage-backed securities ("RMBS") originally secured by loans valued at more than $19.9 billion at the time of securitization (referred to as the "Trusts"). (Am. Compl. ¶¶ 1, 27.) As of May 1, 2015, the Trusts had a principal balance of $ 4.2 billion, and have suffered total realized collateral losses of $2 billion. (Am. Compl. ¶ 27; id. Ex. 4.) U.S. Bank acts as Indenture Trustee ("Trustee") and administers the Trusts. (Id. ¶ 1.)

The Trusts were created to facilitate the securitization and sale of residential mortgage loans to investors. (Am. Compl. ¶ 2.) The assets of the Trusts consist of the underlying loans. (Id.) The Trust issued classes of notes to investors that represent the obligations of the Trusts, secured by those underlying loans. (Id.)

A number of banking institutions acted as "sponsors" of the RMBS, acquiring the loans from loan originators, and then selecting loans for securitization. The seller of the securitized instruments created trusts, each with a depositor institution into which the loans are deposited for the benefit of the eventual noteholder ("Noteholder"). The sponsor banking institution selected a servicer to collect payments on the loans. (See generally Am. Compl. ¶¶ 2-3, 28-30.) Certain of these same banks also acted as trustees on other sponsor's deals. (Id. ¶ 3.)

Plaintiffs in this action are each Noteholders in one or more of the 27 Trusts (identified in Exhibits 1 and 2 of the Amended Complaint). (Am. Compl. ¶ 19.) U.S. Bank, together with its affiliates, is involved in the RMBS market. (Id. ¶ 21.) It

acts as trustee with regard to more than $1 trillion in RMBS. (Id.) Additionally, U.S. Bank, together with its subsidiary, U.S Bank Home Mortgage, Inc., serves as master servicers of residential mortgage loans; U.S. Bank's master servicing portfolio includes approximately 45,700 loans. (Id. ¶ 22.) U.S. Bank Home Mortgage, Inc. has also acted as a mortgage loan seller of hundreds of millions of dollars of loans that went into RMBS deals between 2004 and 2007. (Id. ¶ 23.)

The Noteholders' rights and U.S. Bank's contractual duties, as the trustee pursuant to indentures (referred to as "Indenture" or "Indenture Agreement") for the RMBS trusts ("Trusts") at issue in this action, are set forth in a series of documents governing all aspects of the securitization, trust, and servicing process (referred to collectively as the "Governing Agreements"). (Am. Compl. ¶ 42.) The first such document, pursuant to which the mortgage loans are purchased, is the Mortgage Loan Purchase and Sale Agreement ("MLPAs"). (Id. ¶ 44.) Next follows the document establishing the trust ("Trust Agreement") into which the loans are then placed to secure the issuance of RMBS notes. (Id. ¶ 51.) Two additional documents cover the servicing of the loans and the collection and distribution of payments on the Notes; the Sale and Servicing Agreement ("SSA") and the Indenture (or similar agreements). (Id. ¶¶ 52-53.)[1] The two most relevant documents to resolution of this action are the Sale and Servicing Agreements and the Indentures, as discussed below.[2]

---

[1] The Governing Agreements for each of the Trusts are separate and were individually negotiated. (Am. Compl. ¶ 43.) However, their terms are substantially similar. (Id.)
[2] Plaintiffs have appended a series of charts as Exhibit 5 to the Amended Complaint, which set forth the key provisions from both agreements. Defendant also has provided a series of charts

A.    The Governing Agreements

1.    The MLPA

The MLPA is a contract between the loan originator and the sponsor, or between the sponsor and depositor; neither U.S. Bank nor the Noteholders were initially parties to the MLPA.  (Am. Compl. ¶ 44, 50.)  The MLPA governs the terms of sale of the mortgage loans acquired for securitization.  (Id. ¶ 44.)  In its capacity as "seller" under the MLPA, the originator or sponsor made extensive representations and warranties concerning the characteristics, quality, and risk profile of the mortgage loans.  (Id. ¶ 44.)  Plaintiffs allege that upon the sale of the mortgage loans to the Trusts, the rights under the MLPAs, including with regard to the seller's representations and warranties, were assigned to U.S. Bank in its capacity as Indenture Trustee.  (Id. ¶ 50.)

Among the representations and warranties of the seller in the MLPA are the following:  the information in the mortgage loan schedule is true and correct in all material respects; each loan complies in all material respects with all applicable local, state and federal laws and regulations at the time it was made; the mortgaged properties are lawfully occupied as the principal residences of the borrowers unless specifically identified otherwise; the borrower for each loan is in good standing and not in default; no loan has a loan to value ratio ("LTV") of more than 100%; each mortgaged property was the subject of a valid appraisal; and each loan was

---

containing key provisions, as well as excerpts of the agreements themselves.  (Decl. of David F. Adler in Supp. of Def.'s Mot. to Dismiss, ECF No. 79 ("Adler Decl.") Exs. A-GG.)

originated in accordance with the underwriting guidelines of the related originator.[3] (Am. Compl. ¶ 45.)  The MLPA contains provisions relating to what, if any, action a seller must take if it is notified of any breach of the representations and warranties that has a material adverse effect of the value of the mortgage loans in the Trust. (Id. ¶ 46.)  Provisions for sellers to repurchase defective loans also known as "putback" clauses, triggered under various scenarios, are among the terms of the MLPA.  (Id. ¶ 47.)

        2.     <u>Trust Agreement</u>

The Trust Agreement is the operative document which creates the Delaware statutory trust; it is a contract between the Depositor (also known as the "Owner Trustee"), and other entities.  (Am. Compl. ¶ 51.)  The Depositor or Owner Trustee becomes the "Issuer" under the Delaware statutory trust. (Id.)

        3.     <u>Sale and Servicing Agreement</u>

The Sale and Servicing Agreement ("SSA") (in certain transactions, known as a Transfer and Servicing Agreement ("TSA")), is a contract between the Depositor, the Master Servicer, the Issuer, the Sponsor, and U.S. Bank in its capacity as Indenture Trustee.  (Am. Compl. ¶ 52.)  Pursuant to this agreement, the Depositor conveyed its right, title and interest in and to the mortgage loans to the Issuer, the Issuer conveyed to the Depositor certificates of the Issuer, and the Master Servicer

---

[3]     Neither party has included an exemplar of an MLPA with its submissions on this motion. The Court relies on the allegations as to the representations and warranties contained in the MLPA contained in the Amended Complaint.

agreed to supervise, monitor and oversee the obligations of the Servicer to service the loans. (Id. ¶ 52.)

###### 4. The Indenture

The Indenture is a contract between the Issuer and U.S. Bank in its capacity as the Indenture Trustee. (Am. Compl. ¶ 53.) Pursuant to this agreement, the Issuer issued notes, which it conveyed to the Depositor, in exchange for the certificates described above. The Issuer pledged its rights relating to the certificates to the Indenture Trustee to secure its payment obligations on the notes. (Id. ¶ 53.) Plaintiffs allege that U.S. Bank, as the Indenture Trustee, holds this pledge on behalf of investors who purchased the notes. (Id. ¶ 53.)

##### B. Duties of U.S. Bank as Indenture Trustee

###### 1. Duties regarding the Servicers

Under the Governing Agreements, U.S. Bank, as Indenture Trustee, has certain duties with respect to enforcing the obligations of the servicers. In particular, where U.S. Bank learns of a Servicer or Master Servicer's failure to observe or perform in any material respect covenants or agreements under the SSAs (which set forth the servicer's obligations), U.S. Bank must provide written notice to the Servicer. (Am. Compl. ¶ 57.)

The SSAs also set forth U.S. Bank's obligations upon occurrence of a Servicer or Master Servicer "Event of Default." An "Event of Default" is defined as a specified failure of the Servicer or Master Servicer to perform its servicing duties and cure this failure within a specified time period. Such failures may include the

Servicer or Master Servicer's failure to observe or perform in any material respect covenants or agreements in the SSA, including a failure to service the loans in accordance with Accepted Master Servicing Practices and the failure to supervise and oversee the servicing of loans. (Am. Compl. ¶ 58; <u>see also</u> Decl. of David F. Adler in Supp. of Def.'s Mot. to Dismiss ("Adler Decl.") Ex. A (Bayview 2005-A TSA) ¶ 4.01.) If a defined Servicer or Master Servicer Event of Default occurs under the SSA, as to which a responsible officer of U.S. Bank as indenture trustee has received written notice or of which it has actual knowledge, U.S. Bank as Indenture Trustee is required to give prompt, written notice to all Noteholders. (Am. Compl. ¶ 59.) The remedies for uncured Servicer or Master Servicer Events of Default include termination of the servicer and recoupment of Trust assets lost as a result of the servicer's violations. (<u>Id.</u> ¶ 60.)

2.      <u>Duties upon an Indenture Event of Default</u>

There are two types of default which may trigger certain obligations relevant to the issues before this Court: an Issuer Event of Default under the Indenture ("Indenture Event of Default") and a Master Servicer and/or Servicer Event of Default under the SSA ("SSA Event of Default").

The Indenture Agreement defines an Event of Default as follows:

(a) "Event of Default," whenever used herein, means any one of the following events . . . :

(i) . . . default in payment of any interest [when due] . . . ;
(ii) failure to pay the entire principal [when due] . . . ;
(iii) failure to observe or perform any covenant or agreement of the Issuer made in this Indenture . . . or any representation or warranty of the Issuer made in this Indenture . . . proving to have

been incorrect in any material respect as of the time when the same shall have been made, and such default shall continue or not be cured, or the circumstance or condition in respect of which such representation or warranty was incorrect shall not have been eliminated or otherwise cured . . . [after notice to the Indenture Trustee or Issuer] by Holders of at least 25% of the Outstanding Amount of the Notes, a written notice specifying such default or incorrect representation or warranty and requiring it to be remedied and stating that such notice is a notice of Default hereunder;

[ . . . ]

(Adler Decl. (Bayview 2005-A Indenture) § 5.01.)  In order to trigger U.S. Bank's duties, as Indenture Trustee, a "Responsible Officer" of the Trustee must acquire actual knowledge, or receive written notice, of such Event of Default; otherwise, "the Indenture Trustee may conclusively assume that there is no default or Event of Default."  (Id. § 6.01(c)(iv).)

In an Indenture Event of Default, the Indenture Trustee has certain post-default obligations. (Am. Comp. ¶ 64.)  The Indenture contains a provision stating that the Trustee must use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's affairs.[4]  (Id. ¶ 64.)  The Indenture Trustee must also provide notice to the Noteholders of such Event of Default.[5]

---

[4]    The Indenture Agreements for 24 of the 27 trusts contain such a provision.  (Am. Compl. Ex. 5, Chart 13.)

[5]    The Indenture Agreements relating to 21 of the 27 Trusts requires the Issuer, upon learning of an Event of Default, to provide written notice to U.S. Bank of the status of the default and what action the Issuer is taking or proposing to take with respect thereto.  (Am. Compl. Ex. 5, Chart 12.)

3.     <u>Duties upon SSA Event of Default</u>

An SSA Event of Default occurs when a Master Servicer and/or Servicer materially breaches its obligation, receives written notice of such breach, and fails to cure.  (<u>See, e.g.</u>, Adler Decl. Ex. Q (Aegis 2005-1 TSA) §§ 7.1(a), 7.1(f).)  An SSA Event of Default may occur when there has been a failure to service loans in accordance with prudent servicing standards or the failure to supervise and oversee the servicing of mortgage loans, which continues unremedied for sixty days after written notice.  (Am. Compl. Ex. 5, Chart 3; Adler Decl. Ex. S (Chart 6).)  Remedies for an uncured Event of Default include termination of the servicer and recoupment of Trust assets lost as a result of a servicer's violations.  (Am. Compl. Ex. 5, Chart 8.)

Under all but three of the SSAs at issue in this matter, only a <u>Master</u> Servicer Event of Default can trigger the Indenture Trustee's obligations.  (Am. Compl. Ex. 5, Chart 4, at 2 (listing the 8 SSAs that impose no trustee obligations based on Servicer Event of Default); Adler Decl. Ex. U (Chart 7) (listing 14 SSAs that contain only a Master Servicer Event of Default); Adler Decl. Ex. GG (GPHE 2004-2 SSA and GPHE 2004-3 SSA) § 6.01 (listing only Servicer Events of Default but poses no trustee obligations on such defaults).)

Under the remaining three SSAs, a Servicer Event of Default can trigger certain post-Event of Default Indenture Trustee obligations.  However, such

obligations may only arise when a U.S. Bank Responsible Officer has actual knowledge or received written notice.[6]

In addition, for 24 of the 27 Trusts, SSA Events of Default—whether Servicer or Master Servicer—do not trigger the Indenture Trustee's "prudent person" obligations.  (See, e.g., Adler Decl. Ex. Q (Aegis 2005-1 TSA) §§ 7.1(a), 7.1(f).)

C.     Plaintiffs' Claims Regarding the Breaches Here

Without specifying any particular loan, plaintiffs assert that each of the "Trusts loan pools contains a high percentage of loans that materially breached the seller's representations and warranties," adversely affecting the value of those loans and the Trusts' and Noteholders' rights in those loans.  (Am. Compl. ¶ 66.)  In particular, plaintiffs assert that various representations and warranties were "systematically and pervasively false," including the originator's compliance with underwriting standards, owner-occupancy statistics, appraisal procedures, and loan-to-value ratio.  (Id. ¶ 66.)  As evidence of such breaches, plaintiffs point to the following:  high default rate of the mortgage loans; collateral losses suffered by the Trusts; plummeting credit ratings of RMBS generally; sellers' routine abandonment of underwriting guidelines; fabrication of borrower loan information; engagement in predatory and abusive lending; and results of forensic reviews and re-underwriting of loans within the Trusts in other litigation.  (Id. ¶¶ 66.)

---

[6]     Generally, an obligation to terminate the Servicer or Master Servicer arises only under specific circumstances including when a specified percentage of noteholders directs the Trustee to do so.  (See, e.g., Adler Decl. Ex. A § 4.17 (Bayview 2005-A TSA, setting percentage at 51%); Ex. V § 8.01 (HBMT 2005-5 TSA, same).)

With reference to the Trusts here, plaintiffs also point to "[t]he extremely high delinquency, modification and collateral loss rates of the mortgage loans within the Trusts," (Am. Compl. ¶ 67; id. Exs. 4, 8), significant rating downgrades experienced by notes Issued by the Trusts, (Am. Compl. ¶ 71), and general market information regarding laxity in underwriting standards, (id. ¶¶ 74- 80.) As evidence of breaches of representations and warranties plaintiffs refer to the "numerous federal and state government investigations and published reports, well publicized news reports, public and private enforcement actions, and the "the mortgage loans in the Trusts were originated by some of the worst lenders during the relevant timer period." (Id. ¶¶ 81-82.) Plaintiffs allege widespread, actual knowledge of breaches of the representations and warranties by way of general market reports of systemic disregard of prudent securitization standards, (id. ¶ 84-85), and faulty securitization practices, (id. ¶¶ 86-87).

According to plaintiffs, "beginning in 2009 and by 2011, U.S. Bank knew that each of the Trusts' loan pools contained high percentages of mortgage loans that materially breached the sellers' representations and warranties regarding their characteristics and quality." (Am. Compl. ¶ 89-92.) Plaintiffs allege that a "steady stream of public disclosures regarding the originators' systemic underwriting abuses and the sponsors' faulty securitization practices" contributed to U.S. Bank's undoubted knowledge of problems in the loan pool. (Id. ¶ 90.) Plaintiffs then assert that U.S. Bank and its "responsible officers had discovered by 2009 that the Trusts' loan pools were afflicted by severe and pervasive breaches of seller representations

11

and warranties by virtue of the Trusts' abject performance." (Id. ¶ 91.) The rate of loan delinquency, modification, default, foreclosure and loss severity rates within the pools evinced breaches in the representations and warranties. (Id.) According to plaintiffs, as U.S. Bank "monitored the Trusts' performance," it was "aware of these events." (Id. ¶ 92.)

Plaintiffs further allege that U.S. Bank, acting as Indenture Trustee, received written notice of breaches by way of involvement in "financial guaranty insurer litigation." (Am. Compl. ¶¶ 93-97.) Defendant allegedly received additional written notice of similar breaches in other RMBS trusts for which it also served as trustee; that, in effect, notice as to these other trusts indicated such pervasive issues that U.S. Bank had to have known of breaches with respect to the Trusts here. (Id. ¶ 98.)

Finally, plaintiffs allege that U.S. Bank's knowledge is evident from its own actions in connection with the Lehman and Thornburg Bankruptcies, (Am. Compl. ¶¶ 99-100), putback litigation for other RMBS trusts, (id. ¶ 101), the fact that in connection with its acquisition of Bank of America's corporate trust business, U.S. Bank negotiated for certain indemnification and other provisions "purporting to provide protection regarding its successor liability," (id. ¶¶ 102-05), and the fact that its role as master servicer to a portfolio of 45,700 loans unrelated to those here at issue, U.S. Bank had a "front row seat to view mortgage sellers' abusive underwriting and securitization practices." (Id. ¶ 105.)

According to plaintiffs, beginning in early 2009 and continuing to the present, U.S. Bank and its responsible officers have known of the failures of the servicers to perform their obligations under the SSAs.  (Am. Compl. ¶¶ 108, 129.)  Plaintiffs allege that this is a breach of U.S. Bank's obligations under the SSAs.  (See id. Ex. 5 (Chart 3).)  As support for the allegation that U.S. Bank knew of the servicer failures, plaintiffs point to "the steady stream of public disclosures regarding the servicers' violations" and U.S. Bank's involvement in other litigations and investigations.  (Id. ¶ 130, et seq.)  The alleged servicer breaches include:  failure to give mandatory prompt written notice to parties to the SSA of breaches of the representations and warranties made by the seller, (id. ¶¶ 109-11), failure to meet their prudent person servicing obligations, (id. ¶¶ 115-17), failure to foreclose upon or convert defaulting mortgages and instead keeping them on their books, (id. ¶¶ 118-21), breaching the SSA by agreeing to modifications of mortgages in order to settle claims levied by various attorneys general, (id. ¶¶ 122-24), and abusing servicing advance obligations to enrich themselves, (id. ¶¶ 125-28.)

Furthermore, plaintiffs allege that the Issuers of the notes held by plaintiffs "have systematically failed to perform material covenants and agreements under the Indentures" including by failing to "enforce the rights to the mortgage loans", "preserve or defend title to the Trust Estate against the claims of all persons and parties" and "failing to provide written notice to U.S. Bank of all defaults and Events of Defaults."  (Am. Compl. ¶ 138.)  According to plaintiffs, the Issuers have breached their obligations under the Indenture to require the sellers to cure,

substitute, or repurchase nonconforming loans, demand that the servicers cure their servicing violations, and provide written notice to U.S. Bank of all defaults and all Events of Default. (Id. ¶ 139.)

Plaintiffs assert that these allegations, taken together, support a liability finding against U.S. Bank; plaintiffs alleges that U.S. Bank knew of the alleged Events of Default because it prepared monthly reports on loan modifications, delinquencies, realized credit losses, and the like in each of the Trusts. (Am. Compl. ¶ 140.) "U.S. Bank knew that there were enormous unresolved problems with the credit quality, servicing and administration of the mortgage loans in the Trusts, that defective mortgage loans were not being repurchases by the Sellers and that the Trusts were not being reimbursed for losses attributable to servicing violations and that the Issuers were not acting to enforce the Trusts' rights as against responsible sellers and servicers." (Id. ¶ 140.) Further, "U.S. Bank breached its contractual and statutory duties under the [Trust Indenture Act, ("TIA")] by failing to provide notice to the servicers of these defaults and Events of Default." (Id. ¶ 144.) Finally, plaintiffs allege that U.S. Bank failed to act diligently to protect the interests of the Trusts as to do so would have conflicted with its own interests. (Id. ¶ 150, et seq.)

D. Plaintiffs' Causes of Action

Plaintiffs' First Cause of Action is for breach of contract. Plaintiffs allege breaches of both the Indentures and SSAs. Plaintiffs allege that U.S. Bank breached its contractual obligations by, once knowing of breaches, failing to provide

prompt written notice to Noteholders or servicers of breaches in representations and warranties made by the seller in respect of mortgage loans that materially and adversely affects the value of the interests of the Noteholder plaintiffs, and failing to take such action with respect to such breach as may be necessary and appropriate to enforce the rights of the Trust.  (Am. Compl. ¶¶ 164-166.)  In paragraph 167, plaintiffs allege that U.S. Bank "fail[ed] to enforce the sellers' obligation to repurchase, substitute, or cure defective mortgage loans; but this is stated more generally in paragraph 171 as failing to act as a prudent person would following an Event of Default.  (Id. ¶ 171.)  Paragraph 172 then asserts that a measure of plaintiffs' damages is what the Trust would have received had there been a cure, repurchase or substitution of defective mortgage loans and that "U.S. Bank's inaction with respect to the sellers has allowed the Trusts to be filled with defective mortgage loans of poor credit quality that have increased the severity of the Trusts' losses.  (Id. ¶ 172.)  Similarly, plaintiffs also argue that after Servicer and Master Servicer Events of Default, defendant failed to meet its obligations to terminate servicers and to provide Noteholders with notice, leading to unnecessary losses.  (Id. ¶¶ 169-70, 172.)

Plaintiffs' Second Cause of Action asserts violations of the Trust Indenture Act of 1939, 15 U.S.C. §§ 77ooo(b) and (c).  Section 315 of the TIA sets for an indenture trustee's duties, and requires, inter alia, that such trustee provide indenture security holders notice of all defaults.  (Am. Compl. ¶ 175.)  In the case of a default, the trustee is to exercise the same degree of care and skill as a prudent

15

man in conducting his own affairs. (Id. ¶ 176.)  Plaintiffs allege that U.S. Bank

violated Section 315 of the TIA by failing to exercise its rights as Indenture Trustee

to enforce sellers' obligations to remediate defective loans and to require servicers

cure all breaches and reimburse the Trusts for losses caused by servicing violations.

(Id. ¶ 176.)

The Third Cause of Action allege a breach of fiduciary duty.  In addition to

referring to the allegations supporting its breach of contract claim, plaintiffs also

assert that defendant was operating under a conflict of interest which prevented it

from acting in the best interests of the Noteholders.  (Am. Compl. ¶¶ 181-83.)

The Fourth Cause of Action alleges breach of extra-contractual duties to

avoid the same conflicts of interest.  Plaintiffs allege that U.S. Bank, in acting as

servicer for other mortgage loans and RMBS trusts, "was involved in the same

wrongful conduct and servicing violations" as "many of the same sellers, servicers,

or their affiliates," and as a result, was loathe to take action against these sellers

and servicers in this action.  (Am. Compl. ¶¶ 191-92.)

## II.     LEGAL STANDARDS

### A.     Standard of Review

Under Rule 12(b)(6), a defendant may move to dismiss a complaint for

"failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

To survive a Rule 12(b)(6) motion, a plaintiff must provide grounds upon which his

claim rests through "factual allegations sufficient 'to raise a right to relief above the

speculative level.'"  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d

Cir. 2007) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)). In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." <u>Starr v. Sony BMG Music Entm't</u>, 592 F.3d 314, 321 (2d Cir. 2010) (quoting <u>Twombly</u>, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).

In applying this standard, the Court accepts as true all well-pled factual allegations, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." <u>Id.</u> The Court will give "no effect to legal conclusions couched as factual allegations." <u>Port Dock & Stone Corp. v. Oldcastle Ne., Inc.</u>, 507 F.3d 117, 121 (2d Cir. 2007) (citing <u>Twombly</u>, 550 U.S. at 555). A plaintiff may plead facts alleged upon information and belief "where the facts are peculiarly within the possession and control of the defendant." <u>Arista Records, LLC v. Doe 3</u>, 604 F.3d 110, 120 (2d Cir. 2010). But, if the Court can infer no more than the mere possibility of misconduct from the factual averments—in other words, if the well-pled allegations of the complaint have not "nudged [plaintiff's] claims across the line from conceivable to plausible"—dismissal is appropriate. <u>Twombly</u>, 550 U.S. at 570; <u>Starr</u>, 592 F.3d at 321 (quoting <u>Iqbal</u>, 556 U.S. at 679).

B.    Duties of an Indenture Trustee

An indenture trustee's duties are "strictly defined and limited to the terms of the indenture."  Elliott Assocs. V. J. Henry Schroder Bank & Trust Co., 838 F.2d 66, 71 (2d Cir. 1988).  An indenture trustee undertakes no obligations other than those explicitly set forth in the agreements.  Id.; see also Cruden v. Bank of New York, 957 F.2d 961, 976 (2d Cir. 1992) (construing indentures as contracts, according to traditional contract interpretation principles).

III.    DISCUSSION

A.    Breach of Contract

1.    The "no-action" clause

As discussed above, each Trust at issue in this action is governed, inter alia, by an Indenture. Each of the Indentures, and seven of the SSAs, contain "no-action" clauses.  The clause is comprised of a number of subparts:

5.06  Limitation on Suits.  (a) Other than as otherwise expressly provided herein in the case of an Event of Default, no Holder of any Note shall have any right to institute any Proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(i)      such Holder has previously given written notice to the Indenture Trustee of a continuing Event of Default;

(ii)     the Holders of not less than 25% of the Outstanding Amount of the Notes have made written request to the Indenture Trustee to institute such Proceeding in respect of such Event of Default in its own name as Indenture Trustee hereunder;

(iii)    such Holder or Holders have offered to the Indenture Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in complying with such request;

(iv)     the Indenture Trustee for 60 days after its receipt of such notice, request and offer of indemnity[,] has failed to institute such Proceeding; and

18

> (v)     no direction inconsistent with such written request has been given to the Indenture Trustee during such 60-day period by Holders of a majority of the Outstanding Amount of Notes.
>
> It is understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes or to obtain or to seek to obtain priority or preference over any other Holders or to enforce any right under this Indenture, except in the manner herein provided.
>
> In the event the Indenture Trustee shall receive conflicting or inconsistent requests and indemnity from two or more groups of Holders of Notes, each representing less than a majority of the Outstanding Amount of the Notes, the Indenture Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provision of this Indenture.

(Adler Decl. Ex. B (Bayview 2005-A Indenture) § 5.06; see also Ex. Z (Chart 8).)

Defendant argues that plaintiffs have failed to comply with various portions of this provision, including the written notice requirement of subpart (i), the two requirements from subpart (ii)—that the Holders of not less than 25% make a written request to the trustee to commence suit, and the requirement in subpart (iii) of satisfactory indemnification. According to defendant, while the Second Circuit's decision in Cruden v. Bank of New York, 957 F.2d 961 (2d Cir. 1992), excused a portion of subpart (ii) requiring a written demand on the trustee, (because, as here, that would be making a demand on the trustee to sue itself), Cruden does not excuse the remaining requirements. In particular, defendant focuses on the requirement in subpart (i) requiring written notice of continuing Events of Default, and subpart (ii) requiring that plaintiffs marshal the support of 25% of the Noteholders with certain interests. According to defendant, the

requirement for 25% support before commencing suit is particularly important because it prevents unpopular litigation from reducing trust assets.

Defendant seeks support for their position in Rule 23.1 of the Federal Rules of Civil Procedure, which governs derivative actions. That rule requires that to prevent would-be plaintiffs who would tilt at windmills (or engage in simply unpopular but meritorious litigation), a pleading must recite a pre-suit demand on the board of directors, that he/she will fairly and adequately represent the interests of the shareholders, and was a shareholder at the time of the events giving rise to the suit. There is no basis, according to defendant, to allow a would-be derivative plaintiff whose demand is excused on the basis of futility from pleading the remaining requirements of adequate representation and timely shareholder interest. Thus, excusal from the demand requirement does not excuse remaining requirements. Defendant argues that <u>Royal Park</u> and <u>Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.</u>, 837 F. Supp. 2d 162 (S.D.N.Y. 2011), cited by plaintiffs for the proposition that no-action clauses are inapplicable altogether as against an indenture trustee, did not grapple with these arguments. Having reviewed the particular no-action clauses before this Court as well as the cases cited, this Court agrees with defendant that these cases do not explicitly or clearly resolve the issue here.[7] However, the principles in <u>Cruden</u> nevertheless lead the

---

[7] The Court notes that these arguments do not appear to have been briefed and argued in these cases, as they were here.

Court to conclude that the no-action clause is unenforceable in suits against trustees and does not bar plaintiffs' claims here.

### a. The limits of Cruden

In Cruden v. Bank of New York, 957 F.2d 961, 968 (2d Cir. 1992), the Second Circuit held that no-action clauses are "strictly construed" contractual provisions. A holder subject to a no-action clause is, by virtue of that contractual language, on notice that his rights are restricted and conditioned by the provisions of the indenture. Id.; see also Friedman v. Chesapeake & Ohio Ry. Co., 261 F. Supp. 728, 730 n.1 (S.D.N.Y. 1966), aff'd 395 F.2d 663 (2d Cir. 1968). Cruden applies general principles of contract interpretation to the provisions of the indenture at issue. 957 F.2d at 976 ("Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language that they have employed . . . . A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous . . . . Further, the entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency. With these principles in mind, we turn to the facts of this case." (citations omitted throughout)); see also Quadrant Structured Products Co. v. Vertin, 23 N.Y.3d 549, 559, 16 N.E.3d 1165 (2014) ("A trust indenture is a contract, and under New York law interpretation of indenture provisions is a matter of basic contract law." (internal quotation marks and alterations omitted)).

A threshold issue is whether <u>Cruden</u> in fact answers the question posed by defendant as to whether the entirety of the no-action clause is inapplicable to suits against trustees. Despite a view repeated in a number of cases to the contrary, it does not.

In <u>Cruden</u>, several banks acted as indenture trustees. After a number of years, the obligor on the debentures defaulted, and a complicated series of restructurings followed. Eventually, there was a final default. <u>Id.</u>, 957 F.2d at 965. Several lawsuits were brought against the indenture trustees. <u>Id.</u> Plaintiffs asserted claims, inter alia, for breach of the indentures and the TIA. <u>Id.</u> The heart of plaintiffs' claim was that the restructuring was part of a fraudulent scheme to siphon profits from the obligor. Defendant trustees moved to dismiss. The relevant question before the district court and then the Second Court principally concerned when the statute of limitations began to run. The Second Circuit determined that its interpretation of the no-action clauses contained in the governing indentures was "central" to this question. <u>Id.</u>, 957 F.2d at 967. In both the district court and Second Circuit, the no-action clause was being used affirmatively by plaintiffs to excuse their delay in filing suit. <u>Id.</u>; <u>Cruden v. Bank of New York</u>, Nos. 85 Civ. 4170, 4219, 4570 (JFK) & No. 87 Civ. 5493, 1990 WL 131350 *7 (S.D.N.Y 1990). According to the debenture holder plaintiffs there, the statute of limitations could not have commenced at a time when the no-action clause would have, by its terms, prevented suit. <u>Cruden</u>, 957 F.2d at 968; <u>Cruden</u>, 1990 WL 131350 at *7;

The district court's discussion of the no-action clause is neither extensive nor based in the text of the full contractual provision. <u>See</u> <u>Cruden</u>, 1990 WL 131350 at *7. Rather, there is a passing reference to the fact that compliance with the no-action clause would require written notice and a demand on the trustee, and then a statement in which the court agreed with the defendant's argument that it would be absurd to require the debenture holders to obtain permission from the trustees before the trustees could be sued for breach. <u>Id.</u>, 1990 WL 131350 at *7. Based on this rationale, the court concluded, "The no-action and other provisions preventing debenture holders from suing applies to the right to sue the issuer for non-payment of principal and interest until default." <u>Id.</u> And, because the allegations against the trustees were not for that type of default—but rather were for separate breaches of the indenture, the court concluded that the no-action clause did not apply. The court used extremely broad language—which is properly understood as part of its rationale and not a separate holding—that "[t]he no-action provision has never been held to bar actions against indenture trustees." <u>Id.</u> The result of this interpretation was that certain of plaintiffs' claims there were untimely.

The Second Circuit focused its initial discussion of the statute of limitations on the no-action clause. It noted that, as drafted, the no-action clauses in <u>Cruden</u> appeared to prevent holders of various debentures from bringing an action upon the indenture unless all of the following occurred: there was an event of default (which included breach of the indenture), **and** the debenture holders gave written notice of that event to the trustee, **and** at least 25 percent in aggregate principal amount of

debenture holders made a request of the trustee to institute suit in his own name as trustee, **and** the holders offered the trustee indemnity, and 30 or 60 days (depending on the indenture) had passed without the trustee initiating suit.  Both the district court and Second Circuit focused their attention on the demand requirement which included that "25%" of the holders had to join in such a demand.  Cruden, 957 F.2d at 968.

The Second Circuit noted, "These [no-action] clauses are strictly construed."  Id.  The Court then turned to language in the indenture, which provided that notwithstanding the "no-action" clause, the debenture holders had an absolute right to institute suit after nonpayment of principal and interest.  Thus, debenture holders injured by a failure to make payment could sue after either complying with the provisions of the no-action clause or a upon a payment default.  Id.  The Court then noted that the claims in that case against the trustee were not for non-payment but rather concerned the trustees' alleged breach of the indenture by agreeing to a "supplemental" indenture which, inter alia, altered certain payment terms.  Id. at 966.  In this context, the Court focused on the demand requirement, and affirmed the district court's holding that the no-action clause properly applied to debenture holders as against the issuer/guarantor (a company called Levin-Townsend Computer Corporation), but did not apply against the indenture trustees as "it would be absurd to require the debenture holders to ask the Trustee to sue itself."  Id. at 968.

24

While the Court focused on the demand requirement (and thus only a subpart of the clause), its affirmance of the district court on this point referred to "§ 9.04" (that is, the no-action clause generally).  It provided no rationale, however, as to why or even whether the remainder of the clause is unenforceable.  It did not need to reach that issue in that case.  Futility of the demand requirement was the focus of plaintiffs' affirmative use as a reason why the limitations period had not run.  On its face, it is not clear that its analysis is sufficient to support a broader application.  And, as defendants here urge, it is not immediately clear from reading Cruden alone that it should preclude application of all provisions of no-action clauses to all claims against trustees.

Plaintiffs cite Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n, 109 F. Supp. 3d 587, 597 (S.D.N.Y. 2015) as recent support for their position.  In Royal Park, plaintiffs, holders of RMBS, sued HSBC Bank USA, N.A. ("HSBC") for breach of its duties as indenture trustee with regard to three RMBS trusts.  109 F. Supp. 3d. at 597.  The district court found that the trustees duties were strictly limited by the terms of the governing agreements, id., including the indentures, stating, "An indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement," id. (quoting Meckel v. Cont'l Res. Co., 758 F.2d 811, 816 (2d Cir. 1985); accord AG Capital Funding Partners, L.P. v. State Street Bank & Trust Co., 11 N.Y.S. 3d 146, 157 (2008).

With regard to the no-action clauses, however, the <u>Royal Park</u> court noted that while such a clause would appear to prohibit commencement of suit without a demand on HSBC as the indenture trustee, <u>Cruden</u> was binding precedent which required that such demand be excused. <u>Id.</u>, 2015 WL 3466121 at \*10 ("[A] No-Action Clause does not apply to debenture holder suits against the indenture trustee, as it would make little sense to ask the trustee to sue itself. The same logic holds true in these cases.") Here, again, the court was asked to construe one portion of a no-action clause (the demand requirement), but phrased its determination as to inapplicability to the clause as a whole. The Court did note further, however, that "HSBC had provided no authority to permit the court to ignore <u>Cruden</u>." <u>Id.</u>, 2015 WL 3466121 at \*10.

The parties' briefing on the motion to dismiss in <u>Royal Park</u> referenced the entirety of the no-action clause, but again focused only on the demand and indemnity provisions. <u>See</u> Mem. in Supp. of Mot. to Dismiss, <u>Royal Park Inv. SA/NV v. HSBC Bank USA, Nat. Ass'n</u>, No. 14 Civ. 8175 (S.D.N.Y. Jan. 23, 2015) (ECF No. 27), at 26; Reply Mem. in Supp. of Mot to Dismiss, <u>Royal Park</u>, No. 14 Civ. 8175 (S.D.N.Y. Feb. 23, 2015) (ECF No. 35), at 21. Plaintiffs in <u>Royal Park</u> cited three cases, in addition to <u>Cruden</u>, in opposition to this argument and seemingly for the proposition that as against trustees, defendant may not parse the provisions of the clause: <u>Peak Partners, L.P. v. Republic Bank</u>, 191 Fed. Appx. 118, 126 n. 11 (3d Cir. 2006), <u>Sterling Fed. Bank, F.S.B. v. DLJ Mortg. Capital, Inc.</u>, No. 09 Civ. 6904, 2010 WL 3324705, at \*4 (N.D. Ill. Aug. 20, 2010) (cited for a rejection of an attempt

to parse), and <u>Bankers Ins. Co. v. DLJ Mortg. Capital, Inc.</u>, 2011 WL 2470226, at *2 (M.D. Fla. June 21, 2011) (cited for a rejection of an attempt to sever the demand requirement from the remaining requirements of the clause). <u>See</u> Mem. in Opp. to Def.'s Mot. to Dismiss, <u>Royal Park</u>, No. 14 Civ. 8175 (S.D.N.Y. Feb. 13, 2015) (ECF No. 32), at 38-39.

In <u>Peak Partners</u>, the Third Circuit affirmed in a footnote the district court's refusal to apply a no-action clause to a suit against an indenture trustee (also U.S. Bank) since to do so would, in effect, require the trustee to sue itself.  191 Fed. App'x at 126, n.11.  The Third Circuit did not address "parsing" the provisions of the no-action clause, and affirmed the district court's dismissal on the basis that plaintiffs did not satisfy the demand that U.S. Bank as indenture trustee sue the servicer, and therefore failed to meet the threshold requirements of the no-action clause.  <u>Id.</u>

In <u>Sterling</u>, the district court in the Northern District of Illinois referenced a defendant's argument that notwithstanding the inapplicability of the demand requirement in a no-action clause, the required endorsement of "25%" of the holders, should remain applicable.  2010 WL 3324705 at *4.  The court stated that "defendants have not attempted to distinguish <u>Cruden</u>" and "have not cited any authorities that support parsing the no-action clause's requirements in this fashion. And by implication, at least, the authorities they rely upon have rejected that approach."  <u>Id.</u>, (citing <u>Cruden</u> and <u>Peak Partners</u>).

27

And in <u>Bankers Insurance</u>, the district court for the Middle District of Florida also rejected a provision-specific approach to the no-action clause. The court noted that defendant Bank of New York Mellon ("BNYM") had also argued in <u>Sterling</u> that the other requirements of the no-action clause should remain, and the argument had been rejected. 2011 WL 2470226 at *1. The court noted that the magistrate to whom the matter was referred for Report & Recommendation on the motion had also rejected BYNM's argument that <u>Sterling</u> cited <u>Cruden</u> and <u>Peak Partners</u>, neither of which analyzed the argument regarding parsing other no-action clause requirements. <u>Id.</u> The court further noted that after the <u>Bankers Insurance</u> magistrate had issued the Report & Recommendation, the court in <u>Sterling</u> issued a second opinion, further analyzing the argument. <u>Id.</u> In that second <u>Sterling</u> decision, 2011 WL 1792710, at *2 (N.D. Ill. May 11, 2011), the court acknowledged that neither <u>Cruden</u> nor <u>Peak Partners</u> had addressed whether no-action clauses should be applied in "piecemeal fashion" and that both simply held that the clauses did not apply. Without rationale, the court dismissed the BNYM argument by stating, "we agree." <u>Id.</u> The court added that "If the parties had wanted to impose such a restriction on suits against the trustee, they should have done so explicitly." <u>Id.</u>

Taken together, these cases demonstrate the powerful effect of an echo chamber. That is, none of these cases—from <u>Cruden</u> on down—analyzed as a matter of contract interpretation the non-demand provisions of no-action clauses

should or can apply to actions against the trustee.  All of the cases depend on Cruden—and Cruden addresses the issue at best obliquely.

The argument that the no-action clause may apply in part, if not foreclosed in whole, is certainly not a frivolous one.  There are three points which this Court will analyze in this regard:  (1) whether the principles which underpin Cruden excuse a would-be plaintiff's compliance with all provisions of a no-action clause when the contemplated suit is against the indenture trustee,  (2) if not, whether there is any reasoned basis to read the 25% requirement of the no-action clause's subparagraph (ii) as a freestanding requirement, apart from the remainder of subparagraph (ii)'s demand provision, and (3) if not, whether the written notice requirement of subpart (i) nonetheless continues to apply.[8]

Taking the second issue first, Cruden implicitly resolved the "25%" requirement against defendants.  The no-action clause in Cruden contained a similar provision combined in a single paragraph with the demand requirement. 957 F.2d at 967-68.  It is true that in Cruden the Second Circuit did not explicitly address whether the 25% requirement as it appears in that portion of paragraph remained in force, as all focus was on excusal of the demand.  However, the Second Circuit was clear that interpretation of an indenture is done according to principles of contract interpretation.  Id., 957 F.2d at 976.  The "25%" requirement and the demand requirement are part of a single, integrated sentence and provision in paragraph (b).  The requirement is that "holders of not less than twenty-five percent

---

[8]        The remaining subparts of the no-action clause are not here at issue.

in aggregate principal amount of the Debenture then outstanding" must make a demand. Id., 957 F.2d 967-68. Thus, the subject of the provision is the Holders, the 25% is a further definition applied to Holders, and the demand is the act that is required. There is no principle of contract interpretation that allows the 25% as used here to be divorced from the act of demand. When the Second Circuit affirmed the district court in Cruden—and refused to require a demand against the trustee, there is no textual basis to retain the 25% requirement. Cruden is therefore on point and binding on this Court with regard to that portion of the no-action clause.

But the question of whether Cruden in fact contained the additional holding for which it is so often cited is another matter altogether. What principle of contract law would require that when one provision in a multi-part section is deemed inapplicable / unenforceable, the entire provision must be deemed inapplicable / unenforceable? This Court must turn back to basic principles of contract interpretation to answer this question.

### b. Analysis of the Indenture language

The instruction from Cruden is clear—a trust indenture is a contract, and the court must interpret a written contract "so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." 957 F.2d at 976. It must not, under the guise of interpretation, rewrite a contract term or "redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." Id. It must read the contract as a whole and reconcile all parts "if possible, in order to avoid inconsistency." Id.

This leads us to the question at hand: does the structure of the no-action clause indicate the parties' intent to have it rise or fall as a whole? In other words, is there a contractual intent expressed through a reading of the entire provision, including all sub-parts, that indicates that if one aspect falls, the others must as well? The short answer is "yes." The Court's analysis of the textual structure and content leads to this conclusion.

The "no-action" clause is constructed with a number of subparts, (i)—(v), separated by semi-colons. (Adler Decl. Ex. B (Bayview 2005-A Indenture) § 5.06.) To determine whether these are standalone provisions or required steps, one looks to the presence or absence of certain language. The inclusion of the word "or" would plainly indicate the subsections are alternatives; the inclusion of the word "and," that they are integrated. Here, the final two subparagraphs are separated by the word "and." (Id. § 5.06.)

Thus, the no-action clause is constructed to require the completion of all indicated steps. That fact alone is not, however, necessarily dispositive of the issue before this Court. There is a "Separability" provision, Section 11.09, which generally allows (but of course, does not require) one provision to be struck or deemed unenforceable and all others to survive. The issue must therefore be resolved based on whether the parties intended such a result with regard to this provision. On the one hand, as a matter of contract construction, a multi-subpart provision could include separate subparts that do not have required dependence upon each other. Alternatively, this type of textual construction could reflect

intentional sequential building blocks; that is, subparts that build on one another and that rise and fall together.

For convenience, the Court repeats the key portion of the Indenture's Section 5.06 on which it is focused:

> no Holder shall have any right to institute any Proceeding . . . with respect to this Indenture . . . or for any remedy hereunder . . . unless:
>
> (i)      such Holder has previously given written notice to the Indenture Trustee of a continuing Event of Default;
>
> (ii)    the Holders of not less than 25% of the Outstanding Amount of the Notes have made written request to the Indenture Trustee . . . ;
>
> (iii)   such Holder or Holders have offered to the Indenture Trustee reasonable indemnity . . . [for] complying with such request;
>
> (iv)   for 60 days after its receipt of such notice, request and offer of indemnity[, the Indenture Trustee] has failed to institute such Proceeding; and
>
> (v)    no direction inconsistent with such written request has been given to the Indenture Trustee during such 60-day period by [a majority of Noteholders]

(Id. § 5.06.)

The Court concludes that the content of the no-action clause evinces an intent to have all subparts read as sequential building blocks, each necessary to construct an integrated whole. Subpart (i)'s written notice requirement—that "previous" to commencing suit, a would-be plaintiff must provide written notice to the trustee of a continuing Event of Default—is a preliminary step to the demand requirement in subpart (ii), as it would apprise the Trustee that a demand may be forthcoming. The indemnification provision of subpart (iii) follows only after a demand has been made pursuant to (ii)—indeed, it would not make sense if a demand for suit had not—and need not have—been made. The waiting period in subpart (iv) and the "no

32

direction inconsistent" provision in subpart (v) similarly make sense only when one follows the steps that have preceded.

There can be no real doubt that once subsection (ii) is eliminated (e.g., in claims involving a trustee), the provisions that follow from subsection (ii) make no sense. Thus, when the Second Circuit in <u>Cruden</u> determined that subsection (ii)'s demand requirement did not apply to claims / suits against trustees, it impliedly determined that subsections (iii) through (v) would not apply either. In <u>Cruden</u>, the Second Circuit eliminated one of the legs of a stool; the entire clause was thereby rendered unenforceable.

But the notice requirement in subsection (i) is arguably situated differently. It appears first, before the other provisions. Might it nonetheless survive? As a matter of logic alone, there is no reason a notice of Event of Default cannot play a role separate from the demand; it is certainly possible to require notice, even if the remaining requirements are no longer enforceable. But did the parties intend this? The Court has carefully considered whether the written notice provision serves a purpose independent from the demand requirement that follows—and rejects the interpretation that would read either provision as independent of the other. Such a reading is unsupported by the text of the contract.[9] Of course, written notice of an

---

[9] The Court notes that this issue is irrelevant to most RMBS suits. Most cases seeking redress for breaches of representations and warranties in RMBS (and a trustee's associated breach) have proceeded on the basis of specific loan files. That is, plaintiffs have known of one or more (typically many more) loan files as to which they have claims. It is then on the basis of such specific information that they proceed. There are a variety of writings that one could imagine could constitute notice including a complaint. Here, that is not so. Here, plaintiffs have attempted to proceed based solely on circumstantial evidence (<u>e.g.</u>, general information about RMBS broadly,

Event of Default conceivably serves an independent legitimate purpose. It might, for instance, alert the Trustee to specific issues; an ensuing dialogue could then lead to some action, possibly a change of position by a Holder, or the Trustee, or it could be remedied in another manner. Those issues are not rendered "absurd" by the fact that the claim might be directed at the Trustee. However, read in its entirety, and taking into account this subpart's position as the first step, it is clear that the purpose of this provision is to provide the foundational step necessary to set up the process which follows. All of the steps, read together a part of a sequential whole. The purpose of the first step—the written notice of Event of Default—is to alert the Trustee as to the possibility of a suit demand; it is not as a "notice and cure" provision.[10]

The Court concludes that when the demand requirement falls, the entire provision falls, including the written-notice requirement. There could have been alternative structures drafted to lead to a different result, but the structure here can only lead to a "one and all" reading of the subparts under the no-action clause in the Indenture.

---

about other loan pools, decreasing credit ratings, governmental investigations and other lawsuits, etc.). The lack of specificity separates this new breed of case from the loan-specific cases.

[10]    There are written notice provisions elsewhere in the Indenture that serve other purposes contemplated by the parties to the Indenture. For example, Section 5.01 requires the Issuer to "deliver to the Indenture Trustee, within five days after the occurrence, written notice . . . of any event which the giving of notice and lapse of time would become an Event of Default under clause (iii) [regarding failure to observe or perform any covenant and incorrect representations or warranties]" (Adler Decl. Ex. B § 5.01.)

## 2.    Rule 8 and the breach of contract claim

Defendant also raises a number of additional issues in support of dismissal. The Court considers them now.

Plaintiffs' breach of contract claims requires two (broad) steps.  First, plaintiffs must adequately plead breaches of the indenture and second, that defendant as the Indenture Trustee, failed to take appropriate action once notified (or acquired knowledge) of such breach.  As to both of these steps, defendant argues that the breach of contact claim lacks the necessary particularity to support a plausible claim under Fed. R. Civ. P. 8 and Twombly.  According to defendant, a plausible claim requires that at least some specific detail as to deficient loans securing the specific RMBS here at issue.  At this pleading stage, the Court disagrees.

This Court reviews the adequacy of a pleading pursuant to Rule 8 of the Federal Rules of Civil Procedure and Twombly.  Together (and they must be read together and consistently), they do not require a level of proof reserved for summary judgment or trial, nor do they require certainty as ultimate victory.  Rather, they require that plaintiffs' allegations, construed as a whole, put forward sufficient facts to allege a plausible violation of the law.  As to the specificity aspect of the Amended Complaint, plaintiffs have done this much (though there are separate deficiencies addressed in this decision.)

While it is certainly better practice to perform some form of loan specific analysis at the outset, see Blackrock Allocation Target Shares et al. v. U.S. Bank

<u>Nat. Ass'n</u>, No. 14 Civ. 9401 (KBF), 2015 WL 2359319, at *4, n.7 (S.D.N.Y. May 18, 2015), a claim may (as a pleading matter) pass muster without such detail. Thus, plaintiffs' failure to refer to particular loans and particular representations and warranties breached with respect thereto, is not alone fatal as a pure pleading matter. In other words, the non-loan-specific pleading passes muster at this stage.

The allegations in the Amended Complaint, including the variety of information relating to originators and servicers with which the RMBS here at issue are associated, is certainly suggestive of issues with representations and warranties. On a motion to dismiss, plaintiffs are entitled to all inferences drawn in their favor, and this includes that the same originators who accumulated pools of loans with pervasive evidence of breaches followed their routine practices with regard to the RMBS in the pools here. The same is true with regard to actions by servicers and other participants: plaintiffs may rely on an inference that they acted here as they have been shown to act elsewhere.

To be clear, this statement is not some universal proposition which can be generally applied to all pleadings. There are certainly many situations in which past practice is sui generis, or limited by a host of circumstances. And it is not a general principle that because one has committed an error elsewhere a court must assume that the same is true in the situation before it. Rather, the RMBS context provides a rather unusual set of circumstances in which there has been significant litigation and investigations into the practices—broadly construed—of a variety of actors, and findings made. Those findings are of course ultimately specific to the

36

facts investigated—but when the question is one of plausibility of allegations, plaintiffs may ride the coattails of some of this work. Down the road, at trial, they will be put to their proof. At that point, relying on wrongs elsewhere demonstrated would be insufficient.

In addition to relying on public data for breaches of representations and warranties, plaintiffs also rely on such information to plead requisite knowledge. The Court's reasoning is, in this rather unique area in which there has been so much public discussion over now a number of years, the same. Plaintiffs may—at this pleading stage and as to the three SSAs as to which servicer conduct might form the basis for a claim, rely on broad knowledge as to what was known, including an inference as to the low likelihood that the pool of loans here was different, to pass the knowledge requirement for pleading.[11] Plaintiffs are advised that they will need more at trial—and perhaps even for summary judgment.

3. Allegations regarding post-Event of Default enforcement obligations

As discussed above, plaintiffs' breach of contract claim is grounded in loan file deficiencies which allegedly triggered an Event of Default under the Indenture. Building on this foundation, plaintiffs allege that once defendant had notice of such

---

[11]     For similar reasons, as a pleading matter, the Court finds that plaintiffs' allegations as to knowledge of an Event of Default are sufficient to pass muster at this stage. The Court has analyzed the extensive arguments on the "knowledge" issue. Adequacy of allegations for purposes of stating a claim requires less than defendants suggest. No fact must be proven at this stage and the Court concludes that all of the allegations read together, including the materials incorporated by reference, render plausible the requisite knowledge.

deficiencies,[12] it was obligated under the Indenture to take certain actions, which it failed to do. These are referred to as "post-default enforcement obligations."

Defendant asserts that the Court should dismiss this claim because plaintiffs failed to plead plausible allegations of such breaches. Defendant focuses most of its briefing on the notice and knowledge requirements for obligations to attach under Events of Default, which, this Court has already accepted for the purposes of the pleadings stage. The Court now turns to the other arguments. Before proceeding, it is useful to remind ourselves how this claim is pled.

Plaintiffs list alleged post-Event of Default breaches in Section XV of their Amended Complaint. Among the breaches discussed are: failure to act prudently after Indenture Events of Default—including enforcing repurchase obligations, (id. ¶¶ 142, 145-146), failure to provide notice to noteholders of Events of Default, (id. ¶ 148), failure to act prudently after servicer Events of Default, (id. ¶ 147), and failing to terminate servicers and enforce servicers' reimbursement obligations, (id.).

Plaintiffs then weave these alleged breaches into their first cause of action for breach of contract. Paragraph 171 of the Amended Complaint contains plaintiffs' allegations regarding post-Indenture Event of Default enforcement obligations:

> [U]nder the Indentures, U.S. Bank had and continues to have the obligation to exercise the rights and powers vested in it by the Governing Agreements, and to use the same degree of care and skill in their exercise as a prudent person would use under the circumstances in the conduct of the person's own affairs. A prudent person would have exercised all of the indenture trustee's rights to recover for these Indenture Events of Default, and would have done so promptly. Similarly, U.S. Bank failed to provide Noteholders with notice

---

[12] See n.12, <u>supra</u>, for the Court's determination as to knowledge at the pleading stage.

of these Indenture Events of Default. By failing to take these actions, U.S. Bank materially breached the Indentures.

(Am. Compl. ¶ 171.)

The following paragraph, 172, describes damages arising from defendant's failures to meet post-Indenture Event of Default enforcement obligations, and uses the failure to repurchase as an example:

> U.S. Bank's material breaches of the Governing Agreements have directly and proximately caused damages to the Trusts and Noteholders in that they have deprived the Trusts of valuable remedies and allowed billions of dollars of the Trusts' assets to waste away. For example, had U.S. Bank protected the rights of the Trust and Noteholders by enforcing the sellers' obligations to cure, repurchase or substitute mortgage loans affected by breaches of representations and warranties, the Trusts would have received either cured or substitute mortgage loans of adequate credit quality or funds representing the "Repurchase Price" with respect to the defective mortgage loan . . .

(Id. ¶ 172.)

In paragraph 169-170 in Count One, plaintiffs allege that U.S. Bank had certain obligations after SSA Events of default, and that though U.S. Bank had knowledge and notice of such events of default, it

> failed to deliver written notices to the servicers of the defaults or terminate the servicers. Similarly, U.S. Bank failed to provide Noteholders with notice of these Servicer Events of Default. By failing to take these actions, U.S. Bank materially breached the SSAs.

(Id. ¶¶ 169-70.)

Paragraphs 172 also contains further discussion of U.S. Bank's alleged failure to satisfy obligations after SSA Event of Default, and damages caused:

> Similarly, had U.S. Bank enforced the servicers' prudent servicing obligations, the Trusts would have been able to avoid incurring unnecessary losses and expenses.

(Id. ¶ 172.)

### a. Alleged breaches of prudent-person obligations

In its opening brief, defendant argues that all but three of the SSAs do not impose a prudent-person obligation after Event of Default, and that in any event, prudent-person obligations do not require the Trustee to act outside the scope of the indenture. (Def.'s Mem. of Law in Support of Mot. to Dismiss ("MTD Br."), at 13, 20.) Defendant also posited that it had no duty under the Governing Agreements to pursue repurchase proceedings—one of the obligations highlighted by plaintiffs. (Id. at 11-12.)

Plaintiffs responded to this argument in a single paragraph in their opposition brief. (Pl.'s Mem. of Law in Opp. to Mot. to Dismiss ("Opp. Br."), at 15-16.) Perhaps unsurprisingly, plaintiffs take a contrary view of the contracts, asserting that "all of the Indentures at issue state that the Trustee 'shall exercise its rights and powers' under the Indenture as a prudent-person would." (Opp. Br. at 15.) It is of no moment, according to plaintiffs, that this "prudent person" obligation is contained in the Indenture and not the SSA. (Id. at 15-16.) Thus, according to plaintiffs, there is a specific, contractual requirement to act in some manner—that is, as a prudent person. Left to another day is determination of the precise listing of such acts. Notably, plaintiffs do not assert that the Indenture Trustee's sole way of fulfilling its obligation in this regard is "putting back" deficient loans.

Defendant's reply brief develops its argument further, but in so doing, alters its argument.[13] Again reiterating that only three of the SSAs impose prudent-person standards, defendant now argues that the Amended Complaint only alleges putback obligations arising from the SSA (as opposed to the Indenture or MPLA.) (Def.'s Reply Mem. in Support of Mot. to Dismiss ("Reply Br.") at 5.)

Defendant reads the Amended Complaint in a manner that is narrower than how the allegations are in fact drafted. As an initial matter, the Amended Complaint does not limit the allegations as to putback obligations as strictly arising from SSAs. (See, e.g., Am. Compl. ¶¶ 146, 172.) Furthermore, while certain allegations in Count One relate to putback obligations—and plaintiffs certainly emphasize these obligations in the Amended Complaint, others—such as those relating to providing notice to Noteholders and generally acting as a prudent person would—do not. As set forth in the block quotes above, the actual allegations in paragraphs 171 and 172 of the Amended Complaint are broader. Indeed, plaintiffs only use the putback obligation as an example of a breach leading to damages. (Am. Compl. ¶ 172.) It may come to pass, at a later stage of this litigation, that defendant correctly defines plaintiffs' ultimate intent here, but in the meantime, plaintiffs are entitled to the benefit of the breadth of their pleading language. At this stage, however, it is sufficient.

---

[13] The Court notes that defendant's briefing on these issues is disjointed, as identical arguments appeared in two different portions of each brief, and other relevant arguments elsewhere still. (MTD Br. at 11, 13, 20; Reply Br. at 5, 11.)

So long as there is, in fact, a prudent person obligation in the Indentures or SSAs or other Governing Agreements that apply to defendants, this Court's inquiry is done. Rule 8 would allow the pleading to pass muster. In this regard the discussion in the parties' respective papers as to whether 17 of 27 agreements require repurchase, or not, and whether those or other agreements assign that responsibility to U.S. Bank or another entity, is not relevant. Given the Court's textual reading of the language in the Amended Complaint, it need not reach these issues.[14]

Despite the back and forth on this issue, the Indentures contain a clear and unmistakable post-default prudent person obligation. For instance, the Bayview 2005-A Indenture contains the following provision:

> Section 6.01. Duties of the Indenture Trustee. (a) If an Event of Default has occurred and is continuing, the Indenture Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

---

[14] Bearing this in mind, the Court does note that there are nonetheless arguments which would be worthy of a later stage, close examination. For instance, defendant argues that 17 of the 27 agreements do not expressly require U.S. Bank to enforce the seller's, sponsor's or originator's obligation to repurchase or replace deficient mortgages. They further cite four Trusts which specifically assign that obligation to a party other than U.S. Bank. (See, e.g., Adler Decl. Ex. J § 2.04 ("In the event of discovery of a breach of any representation, warranty or covenant of the Seller assigned to the Issuer, the Issuer shall enforce its rights under the Sale and Assignment Agreement for the benefit of Noteholders."); Ex. K § 2.03 ("The related Servicer, upon its discovery of such a breach or after notification of such a breach by another party…shall promptly notify the Seller of such breach and request that, pursuant to the terms of the Loan Repurchase Agreement, the Seller" either cures, or repurchases the loan.); see also Adler Decl. Ex. L § 2.09; Ex. M § 2.08.) And as to the remaining Trusts, defendant notes that the Governing Agreements do not state which party may have such obligations. See, e.g., Ex. O § 6.01(a). According to defendant, case law limiting the indenture trustee's obligations to the indenture is fatal to plaintiffs' attempt to impose such obligations. Elliott Associates, 838 F.2d at 71 ("[T]he duties of an indenture trustee are strictly defined and limited to the terms of the indenture."); see also Cruden 957 F.2d at 967-68.

(Adler Decl. Ex. B § 6.01.)  At least 20 other Indentures include substantially

identical language.  (Am. Compl. Ex. 5, Chart 13; <u>see also</u> Adler Decl. Exs. F

(Thornburg 2007-1 Indenture), O (HBMT 2005-3 Indenture), Y (Accredited MLT

2004-2 Indenture), CC (Aegis 2005-1 Indenture), § 6.01.)  As defendant

acknowledges, some SSAs also provide for the prudent person obligation upon

Master Servicer or Servicer Events of Default.  For example, the Thornburg MST

2007-3 SSA contains the following provision:

> SECTION 7.05 <u>Action Upon Master Event of Default</u>  If an Event of Default
> has occurred (which has not been cured or waived) of which a Responsible
> Officer has actual knowledge, the Indenture Trustee shall exercise such of
> the rights and powers vested in it by this Agreement, and use the same
> degree of care and skill in their exercise, as a prudent man would exercise or
> use under the circumstances in the conduct of his own affairs . . . .

(Adler Decl. Ex. X (TMST 2007-3 SSA) § 7.05; <u>see also</u> <u>id.</u> Exs. G (TMST 2007-1

SSA) § 7.05; W (TMST 2007-2 SSA) § 7.05.)

The allegations, broadly read, combined with the inclusion of a prudent

person obligation for conduct following an Event of Default, is sufficient to support

the breach claim in the Amended Complaint.  <u>See</u> <u>also</u> <u>Royal Park v. HSBC</u>, 2015

WL 3466121, *8.

### b. <u>Alleged breaches of obligations as to Servicers and Master Servicers</u>

The parties largely gloss over the obligations that may attach to the

Indenture Trustee in the event of SSA events of default.  However, there are

sufficient examples in their submission for the Court to determine that the claims survive as to at least some SSAs.[15]

First, defendant argues that the SSAs require a percentage of noteholders to direct the Indenture Trustee to terminate the servicer, and plaintiffs have failed to plead that the prerequisite was met.[16] Although the SSAs do appear to have the noteholder percentage requirement, at least one SSA appended by defendant to its Motion to Dismiss does not require noteholder approval for <u>all</u> forms of Master Servicer Events of Default. (<u>See</u> Adler Decl. Ex. T § 6.01, at 37.) Therefore, to the extent that any SSA does not impose a noteholder vote requirement across the board, plaintiffs' claims survive as to failure to terminate the servicer.

Second, at least some SSAs provide that the Indenture Trustee must give notice of Servicer or Master Servicer events of default to Noteholders. (<u>See</u> Am. Compl. Ex. 5, Chart 6.) Defendant appears to acknowledge this when it counters that four SSAs do not contain such a provision. As to the SSAs that do, however, this claim survives.

B. <u>The TIA Claim</u>[17]

Plaintiffs' Second Cause of Action asserts violations of Sections 315(b) and 315(c) of the TIA. Defendant argues that there is no private right of action under

---

[15]    As stated above, there are at least three SSAs that provide for trustees to take on prudent-person obligations upon SSA Events of Default.

[16]    Plaintiffs appear to acknowledge this argument in their opposition brief. (Opp. Br. at 15.).

[17]    The Trusts governed by PSAs have previously been dismissed. Therefore, this Court need not address the Second Circuit precedent finding the TIA inapplicable to PSA trusts as such precedent is inapposite here. <u>See</u> <u>Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon</u>, 775 F.3d 154, 163 (2d Cir. 2014).

the TIA and that, in any event, for the same reasons as argued elsewhere, plaintiffs have failed plausibly to allege specific Events of Default or the requisite knowledge. The Court disagrees.

While the Second Circuit has left open the question as to whether there is a private right of action under the TIA, the Third Circuit and other district courts in this Circuit have carefully analyzed the statutory text and legislative history to conclude that Sections 315 (b, c) do provide private rights of action. See Zeffiro v. First Pennsylvania Banking & Trust Co., 623 F.2d 290, 296-301 (3d Cir. 1980); Fixed Income Shares: £ Series M v. Citibank N.A., No. 14 Civ. 9373 (JMF), 2015 WL 5244707, at *4 (S.D.N.Y. Sept. 8, 2015); Ret. Bd. of the Policemen's Annuity v. The Bank of New York Mellon, No. 11 Civ. 5459 (WHP), 2015 WL 9275680, at *3 (S.D.N.Y. Dec. 18, 2015). Defendant's main argument appears to be that "the TIA limits trustees; it does not confer rights on investors." (MTD Br. at 21.) However, Section 315 does not fall into the category of statutes that "focus on the person regulated rather than the individuals protected," which would not confer a private right of action. Alexander v. Sandoval, 532 U.S. 275, 289 (2001). Instead, Section 315 imposes "specific fiduciary duties, which necessarily implies corresponding rights in the beneficiaries." Ret. Bd. of the Policemen's Annuity, 2015 WL 9275680, at *3; see also Fixed Income Shares, 2015 WL 5244707, at *6 (S.D.N.Y. Sept. 8, 2015).

In addition, a number of cases—including by the Second Circuit—have implicitly accepted such a right of action. See, e.g., In re Bankers Trust Co., 450

F.3d 121, 127 (2d Cir. 2006) (holding that defendant had duties to comply with "§ 315(b) to take action with respect to known defaults"); LNC Investments, Inc. v. Nat'l Westminster Bank, N.J., 308 F.3d 169, 175 (2d Cir. 2002) (affirming district court's instructions in second jury trial where one of plaintiff's claims was violations of § 315(c) of the TIA requirements for prudence); Cruden v. Bank of New York, 957 F.2d 961, 967 (2d Cir. 1992) (affirming grant of summary judgment for defendants on § 315(a)'s pre-default duties based on good faith reliance on opinion of counsel); Phoenix Light SF Ltd. v. Bank of New York Mellon, No. 14 Civ. 10104 (VEC), 2015 WL 5710645, at *10 (S.D.N.Y. Sept. 29, 2015) (holding that plaintiffs' allegations as to trustees' failure to give notice are sufficient to overcome motion to dismiss); Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n, 109 F. Supp. 3d 587, 612 (S.D.N.Y. 2015) ("[P]laintiffs have adequately alleged violations of the TIA under sections 315(b) and 315(c)."); Policemen's Annuity & Benefit Fund of City of Chicago v. Bank of Am., NA, 907 F. Supp. 2d 536, 558 (S.D.N.Y. 2012) (holding that plaintiffs' TIA claim based on failure to provide notice to certificateholders of defaults was adequately pled); VNB Realty, Inc. v. U.S. Bank, N.A., No. CIV. 2:13-04743 WJM, 2014 WL 1628441, at *5 (D.N.J. Apr. 23, 2014) (holding that violations of the TIA's notice and prudent person requirements were adequately pled); Dresner Co. Profit Sharing Plan v. First Fid. Bank, N.A., New Jersey, No. 95 CIV. 1924 (MBM), 1996 WL 694345, at *3 (S.D.N.Y. Dec. 4, 1996) (holding that plaintiffs adequately pled a violation of the prudent man requirement under § 315(c)).

In terms of sufficiency of allegations, the Court applies it reasoning above here as well.

C.    The Fiduciary and Extra Contractual Duties Claims

Plaintiffs' Third and Fourth Causes of Action are for breaches of fiduciary and extra-contractual duties. To the extent the breach of fiduciary duty claim simply repeats the breach of contract claim, it fails. Clark-Fitzpatrick, Inc. v. Long Isl. Rail Road Co., 70 N.Y. 2d 382, 389-90 (1987) ("a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated."); OP Solutions, Inc. v. Crowell & Moring, 900 N.Y.S. 2d 48, 49 (App. Div. 2010)(same).

Parallel fraud and contract claims may be maintained, however, if plaintiffs allege (1) a legal duty separate from a contractual duty to perform, (2) a fraudulent misrepresentation that is collateral or extraneous to the contract, and (3) special damages unrecoverable as contract damages.[18] Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 183 (2d Cir. 2007) (citing Bridgestone/Firestone Inc. v. Recovery Credit Servs., 98 F.3d 13, 20 (2d Cir. 1996)), accord, Clark-Fitzpatrick, 521 N.Y.S.2d at 656. Under New York law, routine duties to avoid conflicts of interest and to perform duties with due care in connection with performance of contractual responsibilities are not considered fiduciary duties. AG Capital Funding Partners, L.P., 11 N.Y.3d at 157. However, following an Event of Default, a trustee takes on a

---

[18]    To the extent that the breach of fiduciary duty and breach of "extra-contractual duties" claims are duplicative, the latter is dismissed at the outset in favor of the former. See Snyder v. Wells Fargo Bank, N.A., 594 F. App'x 710, 713 (2d Cir. 2014); Stefatos v. Frezza, 95 A.D.3d 787, 787, 945 N.Y.S.2d 297, 298 (2012). The Court's analysis hereafter is, nevertheless, applicable to both.

special duty to secure the assets of the trust act with undivided loyalty to trust beneficiaries.  <u>Beck v. Manufacturers Hanover Trust Co.</u>, 632 N.Y.S.2d 520, 528 (App. Div. 1995).

The essence of plaintiffs' fiduciary duty claim is that following the Event of Default, U.S. Bank did not act with undivided loyalty as it was operating under a conflict; this conflict is alleged to have prevented it from performing its enforcement obligations.  So far, so good:  these allegations do not entirely overlap with the contract claims.  At the next step, however, the claim encounters difficulty.

The damages plaintiffs allege in connection with their fiduciary duty claims arise entirely from defendant's obligations under the Indenture Agreement (e.g. repurchase, substitution, etc.).  Recovery on these claims is barred by the economic loss doctrine—that "a contracting party seeking only a benefit of the bargain recovery may not sue in tort notwithstanding the use of familiar tort language in its pleadings."  <u>17 Vista Fee Associates v. Teachers Ins. & Annuity Ass'n of Am.</u>, 693 N.Y.S.2d 554, 559 (1999).  Plaintiffs' allegations for damages arising from conflict of interest sound in defendant's failure to take contractual actions—for example, "enforce[ing] the sellers' repurchase obligations and exercise[ing] its discretion to prevent the servicers from engaging in activities outside of the customary and usual standards of practice," both of which arise from obligations "[u]nder each of the indentures."  (Am. Compl. ¶¶ 189, 193.)  Thus, while the cause of action for breach of fiduciary duty may arise from common law duties and not from the contractual agreements, "the injury" and "the manner in which the injury occurred and the

damages sought persuade us that plaintiffs' remedy lies in the enforcement of contract obligations," and are barred by the economic loss doctrine. <u>Bellevue S. Associates v. HRH Const. Corp.</u>, 78 N.Y.2d 282, 293 (1991); <u>see also</u> <u>BNP Paribas Mortg. Corp. v. Bank of Am., N.A.</u>, 949 F. Supp. 2d 486, 505 (S.D.N.Y. 2013). Plaintiffs' breaches of fiduciary duty and extra-contractual duty claims fail for this reason.

IV.    CONCLUSION

This Court has considered parties' other arguments in relation to this motion and finds that they are without merit.  For the reasons set forth above, defendant's motion to dismiss is DENIED as to Counts I and II and GRANTED as to Counts III and IV.  The Clerk of Court is directed to terminate the motion at ECF No. 77.

SO ORDERED.

Dated:    New York, New York
          February 26, 2016

_____
        KATHERINE B. FORREST
        United States District Judge