I1VTBLAD

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  BLACKROCK ALLOCATION TARGET
   SHARES: SERIES S PORTFOLIO, et
4  al.,

5            Plaintiffs,

6        v.                            14 CV 9401 (PGG)

7  U.S. BANK NATIONAL
   ASSOCIATION,
8
               Defendant.
9
   ------------------------------x
10                                  New York, N.Y.
                                    January 31, 2018
11                                  9:40 a.m.

12 Before:

13               HON. PAUL G. GARDEPHE,

14                                  District Judge

15                   APPEARANCES

16 BERNSTEIN, LITOWITZ, BERGER & GROSSMAN
        Attorneys for Plaintiffs
17 BY:  TIMOTHY DeLANGE
        LUCAS GILMORE
18      BENJAMIN GALDSTON

19 JONES DAY
        Attorneys for Defendant
20 BY:  DAVID ADLER
        LOUIS CHAITEN
21      SHIMSHON BALANSON

22

23

24

25

1            (In open court, case called)

2            THE COURT:  All right.  This case was reassigned to me

3    from Judge Forrest.  It's on my calendar today for purposes of

4    a hearing on plaintiff's motion for class certification.  I'm

5    prepared to rule on the motion.  However, I'm happy to hear

6    anything the lawyers want to say before I do so.

7            Mr. DeLange, is there anything else you want to add to

8    the papers at this point?

9            MR. DeLANGE:  Your Honor, if I could be brief, I would

10   like to add a few points I would like to highlight to our

11   papers.

12           THE COURT:  Go ahead.

13           MR. DeLANGE:  The main point I want to highlight is

14   this is a straightforward motion for class certification under

15   Second Circuit authority and authority in this district.

16   Focusing on the common questions, you focus on liability, and

17   how are we going to prove liability in this case.  This case is

18   brought by hundreds of class members involving claims against

19   U.S. Bank for breach of contract, breach of the Trust Indenture

20   Act.

21           Those questions on U.S. Bank's liability are common to

22   all members of the class.  The answers to those questions will

23   be proven through common evidence.  And specifically, it will

24   be proven through standardized contracts that set forth the

25   exact same responsibilities that U.S. Bank has to every single

I1VTBLAD

member of the class.  There is not a different contract for

individualized members of the class.  It is the exact same

contracts, the exact same duties, the exact same obligations.

It is common to every single member of the class.

          In addition, you will have common evidence that will

show U.S. Bank's -- starting with the existence of breaching

loans within these trusts, common evidence from remittance

reports, from the performance of those loans, from the loan

files, all of that evidence will be used by every single member

of the class to show that there were breaches of

representations and warranties.

          In addition, class members will utilize common

evidence to show U.S. Bank discovered the breaches of

representations and warranties.  That common evidence will be

information from U.S. Bank's files, it will be testimony from

their personnel.  That's how every single class member will

show that U.S. Bank discovered breaches of reps and warranties.

There are no individualized questions with respect to U.S.

Bank's liability.  The same holds true for the servicing

violations.  Every class member will answer the common question

with common evidence showing the common answers.  That's the

focus on class certification.

          We meet each of the elements of Rule 23(a), and we

also meet the elements of 23(b)(3), which is predominance and

superiority.  I want to to focus quickly on predominance, which

1    again focuses on commonality, which I addressed, but it's a

2    deeper dive, and the Court has to look further into whether or

3    not the common questions predominate over any individualized

4    ones.

5            In their papers, U.S. Bank raises certain speculative

6    defenses to the claims, but the key is U.S. Bank raises no

7    individualized questions with respect to core issue the

8    fundamental issue in this case, which is U.S. Bank's liability

9    for breach of contract as the trustee over these indentured

10   trusts.  Those questions will all be answered with common

11   evidence, and those questions predominate over any

12   individualized questions.

13           I want to quickly address a few of their arguments,

14   and then I will open it up if the Court has any questions.

15           First, U.S. Bank argues that New York law doesn't

16   apply to the transfer of these securities, and that the Court

17   is going to have to engage in individualized inquiry and

18   discovery into each individual transfer of the securities,

19   essentially tracing the purchase of these securities all the

20   way back to the initial offering.  That's untrue.

21           General Obligations Law 13-107 applies to this case.

22   It is exactly on point with Judge Koeltl's decision in

23   *Excelsior*.  The notes at issue in this case expressly state

24   that New York law governs.  That was issue before Judge Koeltl

25   in the *Excelsior* case, and he found that New York law applied,

1   General Obligations 13-107 applied, and the claims, rights and

2   remedies transfer with the certificate.

3          U.S. Bank cites to other opinions, the one opinion

4   from Magistrate Netburn most recently that was submitted as

5   recent authority.  That case differs significantly from this

6   case.  And the key distinguishing factor is that class was

7   attempting to certify not only current holders but prior

8   holders.  And if you look at General Obligations Law 13-107,

9   the transferred automatically, and it would require the Court

10  to look into:  Do those prior holders have claims?  What's the

11  residency of those prior holders?  What state law would apply

12  to those prior holders claims?  Those issues that were

13  highlighted and identified and caused concern to Magistrate

14  Netburn not exist in this case.  General Obligations Law 13-107

15  clearly applies.  It's consistent with the authority from

16  courts in this district finding that it does apply.

17          And the Court need only look at U.S. Bank's own

18  arguments.  They're arguing before your Honor that 13-107

19  doesn't apply in this case.  Separately, they have argued in

20  front of other judges in the Oklahoma case that it did apply,

21  and they used that as a shield to prevent them from having

22  liability to prior holders.  They argued it was simple, it was

23  unequivocal that New York law applied and unequivocal that

24  13-107 applied, and they successfully dismissed the claims

25  brought by prior holders.  They now take the exact opposite

I1VTBLAD

position in this litigation arguing that in doesn't apply,

because now it's only current certificate holders who are

bringing these claims.  They can't make one argument in the

courtroom next door and a different argument in this courtroom.

New York law applies, the notes are clear, 13-107 is a transfer

of the claims, and that's common to all members of the class.

        The other argument they raised on individualized

issues is a speculative statute of limitations defense.  And

courts are clear that in order to consider a statute of

limitations defense and whether or not it creates

individualized issues, that claim and defense must be

meritorious.  U.S. Bank has taken no steps to establish its

defense.  It hasn't even identified when it alleges that the

class members' claims accrued.  The only evidence that they

provide is speculation and one example of a potential investor

in Delaware who may have known and if they found out.  That's

not evidence establishing a meritorious statute of limitations

defense.

        We meet each of the elements of Rule 23(a),

numerosity, commonality, typicality, and adequacy.  We

addressed those in the papers, and I will stand on the papers

with respect to that.  We also meet the predominance and

superiority of Rule 23(b)(3).  And unless the Court has any

additional questions for me, I have nothing further other than

to reserve a few minutes on rebuttal.

1          THE COURT:  All right.  Mr. Adler, is there anything

2     you want to add the papers?

3          MR. ADLER:  There is, your Honor, just briefly.  I

4     will talk about why there isn't commonality or predominance

5     here when it comes proving liability, and I will also address

6     the standing issues that Mr. DeLange was talking about when it

7     comes to the application of 13-107, and why in the breach of

8     contract claim they will be overwhelmed by individual issues as

9     we look at standing.

10          And then my colleague, Mr. Chaiten, would like an

11     opportunity to briefly address some of the standing issues that

12     arise out of the Trust Indenture Act claim as well as some of

13     the damages issues, how we don't have any compliance with

14     *Comcast* it also creates individualized issues, and there are a

15     number of conflicts.  And time permitting, your Honor, and if

16     your Honor directs us otherwise, Mr. Chaiten will probably

17     briefly address superiority.

18          What I want to say, your Honor, just on commonality

19     and predominance, and this is addressed in our papers, but we

20     have to look at the Retirement Board case to see that we

21     require loan by loan, trust by trust proof.  And when Judge

22     Forrest applied that standard here, when plaintiffs made their

23     argument for common nucleus of operative facts, she rejected

24     all the arguments they made here today they made in their

25     papers.  She rejected the notion that there could be proof

1    across these 24 different trusts, 130,000 some-odd loans,

2    different originators, different servicers, different types of

3    loans, she rejected all of that, your Honor.

4              And your Honor, if my colleague may approach just for

5    a moment, we prepared a deck that just has a number of slides.

6              THE COURT:  I want to tell you, I have read the

7    papers, they're quite voluminous, I don't really need -- I

8    certainly don't need a PowerPoint presentation.  And I have

9    given you an opportunity to speak, but not an opportunity to

10   repeat all the arguments you made in the briefs, because that

11   would be a waste of time.

12             MR. ADLER:  Fair enough, your Honor, let me address

13   the standing issue.

14             With respect to the note -- and this all came up in

15   plaintiff's reply brief, so we really didn't have an

16   opportunity to address it.  They're really betting the farm on

17   the language of the note, and they're saying New York governing

18   law applies to that note, therefore, it applies to every

19   transfer.  There's nothing in the note that says it applies to

20   the transfers.  And in fact, it would be quite astonishing if

21   it did because these transactions take place all over the

22   world.  And New York has a policy against the extraterritorial

23   application of its laws, so we have transactions between German

24   banks and Irish banks.  All of this is set forth in the expert

25   report of John Dolan.  So it can't apply in those

1    circumstances, and there's nothing in the language of the note

2    that says it does apply.

3          The *Oklahoma Police* case, your Honor, it is correct

4    that we, several years ago in that case, made the argument that

5    because of the governing law provision in the governing

6    agreements we said that the transfer was also governed by New

7    York law.  In light of developments in the law, in light of

8    Judge Nathan's decision, we just don't think that's persuasive

9    anymore.  Ultimately, though, it is an issue of law.

10         And then what I would just add, your Honor, even if

11   13-107 does apply, if it somehow applies to all of these

12   transactions across the world, and the plaintiffs described it

13   as hundreds of thousands of transactions, we still have to do

14   this detailed tracing that both Judge Netburn and Judge Nathan

15   found incompatible with class certification.

16         THE COURT:  Your adversary made the argument that this

17   case is very different from the case that was before Judge

18   Netburn and now is in front of Judge Failla for purposes of

19   considering the report and recommendation.  So what do you say?

20         MR. ADLER:  It really isn't different, because while

21   they have defined their class as a class of current holders,

22   the fact is that these current holders are relying on the

23   claims of all the prior holders.  So we still need to do the

24   tracing.  We need to know who the prior holders were.  We need

25   to know the circumstances of their transactions so that we

I1VTBLAD

1    could apply New York choice of law rules, we could apply to

2    decide whether New York really did apply to all of these

3    transfers.  The 13-107 and the language in the note doesn't

4    somehow get them application of New York law in all of these

5    transfers all over the world to show they actually have

6    standing.

7         THE COURT:  Mr. DeLange argued just a moment ago that

8    it's your burden to show that you have a meritorious defense

9    with respect to the statute of limitations.  What do you say

10   about that?

11        MR. ADLER:  Well, your Honor, we have made that

12   demonstration, so were the Delaware statute of limitations were

13   to apply, many of these named plaintiffs themselves, and most

14   assuredly many of the putative class members are Delaware

15   entities, and if the harm occurred in Delaware, that's were the

16   prior holder, the assigner of claim resided at the time, that's

17   where they felt the economic impact, we would be applying a

18   three-year statute of limitations, not New York's six year

19   under CPLR 202.  We have made that showing in our papers, your

20   Honor.  There are also other transactions.  The State of Alaska

21   is a prior holder here as well, three-year statute of

22   limitations; Province of Ontario, two-year statue of

23   limitations.

24        So we have made the demonstration that this would be a

25   meritorious defense, and we need to look then and do all of

I1VTBLAD

1    this detailed tracing to decide which jurisdiction's law is

2    going to apply.

3              THE COURT:  All right.  Go ahead.

4              MR. ADLER:  I'll turn things over to Mr. Chaiten to

5    address a couple of issues.

6              THE COURT:  All right.

7              MR. CHAITEN:  I will be very brief, your Honor.  I

8    wanted to address briefly three issues and how they relate to

9    class cert.  One is the issue of TIA standing, damages, and

10   superiority.

11             On the question of TIA standing, the Court can read

12   *Bluebird*, the Second Circuit's decision, and Judge Mukasey's

13   decision in *LNC*.  They're pretty clear:  If you don't have

14   out-of-pocket losses, you don't have standing for TIA purposes.

15   And for the only named plaintiffs for 20 of these trusts

16   invested in tranches that never had realized losses; not just

17   one they held, but never at any point.  At least in *LNC* and

18   *Bluebird* there were bonds that had realized loss, the question

19   was who actually suffered the loss.  Here for 20 of these named

20   plaintiffs there has never been a realized loss, so there can't

21   be TIA standing.

22             And on the standing issue, I would like to address a

23   few points that they made in the reply brief.  We obviously

24   didn't get a surreply, so those are new issues.  They tried to

25   define the injury as an injury to the trust; say we have

I1VTBLAD

1   increased investment risk, and therefore the out-of-pocket loss

2   requirement shouldn't apply.  But injuries to the trust that

3   don't affect the individual provide no basis for TIA standing

4   for an individual.  It has to have an impact in realized

5   losses, out-of-pocket losses for the individual.  They tried to

6   distinguish *Bluebird* in terms of timing.  They say here the

7   breaches occurred after we brought, which is not true, and we

8   documented that in the expert reports.

9        But in any event, the timing doesn't matter if you

10  invested in a tranche that has had zero realized losses.  They

11  say well, how can you require out-of-pocket losses of us when

12  we're current holders?  But current holders can have

13  out-of-pocket losses; they're realized losses, they're missed

14  principal and interest payments, or they could sell at a loss

15  if they could sell at a loss, but these people would profit if

16  they sold.

17       And finally, they say the Second Circuit hasn't

18  imposed an out-of-pocket loss requirement for other securities

19  laws.  And I don't really have anything to add to Judge

20  Mukasey's discussion of that in *LNC*.  He says that's just not

21  true with a TIA.  He explains why.  There's prudent person

22  obligations speculating about what would have happened and when

23  is inappropriate until -- you really have to cap things, you

24  can't allow recovery for people who haven't had out-of-pocket

25  losses.  And as for the other four trusts where the named

I1VTBLAD

1    plaintiff is invested in a tranche that had out-of-pocket

2    losses, there still is going to be individualized issues

3    determining who within the class has out-of-pocket losses and

4    standing to bring a TIA claim.

5              And then on damages I just wanted to make one quick

6    point.  Their damages model is, as explained in the brief, a

7    trust level model.  It determines what they call trust level

8    damages and just gives them all to current holders.  And that

9    is going to lead to -- first of all, there's a mismatch between

10   that and their theories of liability.  It's not a model for a

11   TIA, it can't be, and they're not going to argue that's a model

12   for the TIA, so there's a mismatch with half of the case there.

13             And then if you just look at some examples, they

14   propose they're going to figure trust level damages, figure out

15   how much is the waterfall as of today, rather than when the

16   money would have gone through the trust to figure out which

17   tranches get the money, and then give every noteholder in the

18   same tranche the same amount of money regardless of when they

19   purchased, regardless of whether they lost or gained.

20             So, for example, the only named plaintiff for one of

21   the trusts in the case, BAYRT 2005-E, PIMCO Income Fund, bought

22   in 2012, seven years after issuance, years after the market

23   upheaval in this case, at $46.  IDC prices, vendor pricing for

24   that note is $86 today.  They want to give that plaintiff, that

25   named plaintiff, the same amount per note as a class member who

I1VTBLAD

1    bought -- an absent class member who bought at issuance at par

2    and has lost money.  That is not an individualized damages

3    model, and it leads to profound conflicts, because what do you

4    think at that absent class member will say about that model?

5    He will say no, the person who profited shouldn't recover, I

6    should recover, I should get the money.  It's a pretty profound

7    conflict.

8            And how do we know this conflict is real?  Their own

9    expert -- and this is discussed in our expert's report,

10   Dr. James' report -- their expert, Dr. Hatzmark, filed an

11   expert report in another RMBS trust fee case, Chicago Police,

12   it was against U.S. Bank, TIA claims and contract claims.  And

13   in that case he came up with a model that said when we're

14   figuring out within a trust within a tranche who is going to

15   recover and who is not, he said those investors with overall

16   gains in their investment, by reference to their current

17   holding position, are not eligible for recovery as to that

18   certificate.  Now today he's representing -- he's retained by

19   people who have actually gained money, and what is he saying?

20   Well, we'll actually divide it up.  Even though we gained,

21   we'll divide up the money.  So it doesn't matter which is

22   right, if any of those approaches are right, the point is that

23   people are going to want to represent their own interests and

24   not have these plaintiffs represent their interests.

25            Lastly, on superiority, just a few words, I mean all

I1VTBLAD

1    the reasons discussed in the brief and discussed today, the

2    predominance issues, the tracing issues, the loan by loan and

3    trust by trust, the conflicts or reasons that a class action is

4    not superior, but another way of looking at this is what

5    happens if you deny class cert?

6         Well, you avoid all those problems.  You avoid all the

7    manageability issues.  As for named plaintiffs, it's not a

8    death knell for them.  They're large sophisticated investors

9    with big investments and they can proceed individually with

10   their claims.  This isn't some consumer class action where

11   they're seeking to recover two dollars for a container of

12   yogurt or something; nor is there any evidence that the courts

13   will be flooded with individual claims.  And Magistrate Judge

14   Netburn explained the reasons.  These are sophisticated

15   investors, and to the extent they agree with these plaintiffs'

16   view of what the trustee should have done, they would have

17   already sued.

18        In fact, Dr. Hatzmark, their expert, identified 272

19   holders in all of these trusts, and 80 of them are already

20   named plaintiffs in this case.  So there's no evidence there's

21   a large number of individual suits beyond whatever has been

22   filed already that is going to suddenly appear if the Court

23   denies class cert.

24        So I respectfully say class certification has nothing

25   left to commend it, and we urge the Court to deny plaintiff's

I1VTBLAD

1    renewed motion for class certification.

2            THE COURT:  Mr. DeLange, did you want to make some

3    additional comments?

4            MR. DeLANGE:  Your Honor, if could briefly respond to

5    a few of the arguments from U.S. Bank.  First, with respect to

6    the damages model, our damages model tracks the theory of

7    liability in this case, and comparing it to another case with a

8    different theory of liability, of course that damage model in

9    another case may differ because there's a different theory of

10   liability.

11           The theory of liability here is that U.S. Bank has

12   breached and is continuing to breach its duties and obligations

13   under the contract.  That includes notice of breaching loans --

14   of loans that breach reps and warranties, it includes ongoing

15   servicing violations.  Our damages model will calculate only

16   those damages caused by U.S. Bank's failure to act.  It will

17   isolate those loans that breach reps and warranties that U.S.

18   Bank discovered and took no action.

19           Those loans and the amount of money of the damages

20   caused by that, yes, it will go to the trust.  But as Judge

21   Forrest recognized in the motion to dismiss opinion, and also

22   as Judge Scheindlin recognized in her motion to dismiss opinion

23   in the *HSBC* case, the trust is a pass-through entity.  The

24   money passes through to the certificate holders.  That's how it

25   was set up and how it was intended.  That's how the damage

1    model will calculate total damages and allocate those damages

2    to the individual current certificate holders.  This is the

3    certificate holder's damage.  It is their claim.  They're

4    bringing those claims.  The damage model is consistent with

5    *Comcast* and follows plaintiff's theory of liability in this

6    action.

7           I want to briefly address the tracing.  They argue

8    that somehow we still have to trace even if General Obligations

9    Law 13-107 applies, which we believe it does, they still claim

10   that they're going to have to trace all of these transactions.

11          There's a problem.  Discovery is over in this case.

12   They had an opportunity to conduct all that discovery.  We

13   provided them with our prior holder information who we obtained

14   the certificates from.  They had the opportunity to trace it

15   all the way back to the beginning if they so choose.  They

16   didn't do that.  And we're beyond discovery.  We're not at a

17   stage where tracing it all the way back is going to become the

18   focus of this litigation or a focus of discovery.

19          I want to address briefly superiority since they

20   touched on it.  The only case they cite is the *Board of*

21   *Trustees of Southern California* finding that a class action was

22   not superior and that the individual sophisticated investors

23   could bring their own claims.  The problem in that case is

24   there were nine potential class members, that's it, only nine.

25   Here you have 272, and as Dr. Hatzmark opines, likely

1    significantly more than 272.

2           Finally, with respect to TS standing, they rely

3    heavily on the *LNC* decision.  As the Court is aware, TIA does

4    not define damages as out-of-pocket losses, it is defined as

5    actual damages.  The judge in *LNC* acknowledged that while he

6    was using out-of-pocket losses in that particular instance,

7    there could be other measures of damages.  And importantly, for

8    standing purposes, recognized that an investor can purchase

9    into a trust knowing that the trustee has breached its duties

10   and still have damages if the trustee continues to breach its

11   duties after the purchase.  And we definitely have that here.

12          With respect to the example of PIMCO purchasing in

13   2012, U.S. Bank had the ability in 2012 and after that purchase

14   to cure the servicing violations, to provide notice of the

15   breaches of reps and warranties.  They didn't do so.  They

16   breached their duties and are continuing to breach their

17   duties, and all the plaintiffs have standing under to TIA to

18   assert their claims.

19          Unless the Court has any additional questions, I have

20   nothing further.

21          THE COURT:  All right.  Mr. Adler, Mr. Chaiten, what

22   do you say to Mr. DeLange's point that discovery is over and

23   nobody paid any attention to finding the tracing during

24   discovery and so this sort of a red herring issue?  What do you

25   say?

I1VTBLAD

1          MR. ADLER:  Your Honor, first, we're talking about

2     standing issues, so it's plaintiff's burden to demonstrate

3     standing for themselves and the putative class.  They haven't

4     done so with all of these issues.  We didn't embark on this

5     detailed tracing obligation that they're trying to somehow now

6     put back on to us.

7          And the other aspect here, your Honor, is were this

8     somehow to fall on us, we still haven't had absent class member

9     discovery in this case.  If a class is certified we're

10    certainly going to be asking for that discovery to deal with

11    some of our defense issues as well.  But bottom line, your

12    Honor, it's their obligation to demonstrate standing, not the

13    reverse.

14          THE COURT:  Let me start with some factual background.

15          Plaintiffs are investors and noteholders in 25

16    Delaware statutory trusts created between 2004 and 2007 that

17    issued residential mortgage-backed securities.  These

18    securities were secured by loans valued at nearly $19.8 billion

19    at the time of securitization. (Citing Am. Cmplt. (Dkt. No. 74)

20    1, 19, 27; as well as the DeLange Decl., Ex. 1 (Dkt. No. 221-1)

21    14-15, and Appendix C at 46)  The current principal balance of

22    these Trusts is $3.35 billion, and the Trusts have suffered

23    total realized collateral losses of nearly $2 billion.  (Id.

24    27, Ex. 3; DeLange Decl., Ex. 1 (Dkt. No. 221-1), and Appendix

25    C at 46).  Defendant U.S. Bank acts as Indenture Trustee, and

1    is responsible for administering the Trusts in the interests of

2    the Noteholders.  (Id. 1, 34-35)

3         The Trusts were created to facilitate the

4    securitization and sale of residential mortgage loans to

5    investors, and the Trusts' assets consist entirely of the

6    underlying loans.  (Id 2)

7         The securitization process is as follows:  An

8    "Originator" – usually, a financial institution – makes

9    mortgage loans to borrowers.  (Id. 3, 10, 36; Chaiten Decl.,

10   Ex. B (Dkt. No. 225-2) paragraph 14)  An entity known as a

11   "Sponsor" then creates a loan pool from mortgages it originated

12   directly or purchased indirectly from other originators.  (Id.

13   36)  Once the loans are selected for securitization, the

14   Sponsor – through an affiliate known as a "Depositor" –

15   transfers the loan pools to the Trusts.  (Id 3, 37; Chaiten

16   Decl., Ex. B (Dkt. No. 225-2) paragraph 14)  The Depositor

17   segments the cash flows and loans in the loan pool into

18   different tranches, which reflect varying levels of risk.  (Id.

19   37; Chaiten Decl., Ex. B (Dkt. No. 225-2) paragraphs 14-15)

20        The Trusts then issue notes to investors that

21   represent the obligations of the Trusts.  (Id. 2, 31)  The

22   notes are collateralized entirely by the underlying mortgage

23   loans held in the Trusts' mortgage pools, and cash flows from

24   the loan pool – derived from principal and interest payments of

25   mortgage borrowers – are paid to investors.  (Id. 2, 31)  Cash

I1VTBLAD

flows from the mortgage loans are allocated to investors in the

different tranches according to prioritization rules — commonly

referred to as waterfall provisions — contained in each

securitization's governing agreements.  (Id. 37; Chaiten Decl.,

Ex. B (Dkt. No. 225-2) paragraphs 14-15)  Cash flows are

generally applied in order of priority, with returns going to

the most senior tranches first.  By contrast, losses to the

loan pool due to defaults, delinquencies, or foreclosure are

applied in reverse order of seniority, affecting the most

junior tranches first.  (Id.)

The Noteholders' rights and U.S. Bank's contractual

duties — as Indenture Trustee — are set forth in certain

securitization agreements, including the Mortgage Loan Purchase

and Sale Agreements, the Trust Agreement, the Sale and

Servicing Agreement, and the Indenture Agreements.  I will

refer to these agreements collectively as the "Governing

Agreements".  (Id. 42)

The Mortgage Loan Purchase and Sale Agreements are

contracts between either the Originator and the Sponsor, or the

Sponsor and the Depositor, and they govern the terms of the

sale of the mortgage loans acquired for securitization.  (Id.

44)  In its capacity as a "Seller" under the Purchase and Sale

Agreements, the Originator or Sponsor agrees to certain

representations and warranties contained in these agreements

regarding the credit quality and risk profile of the mortgage

I1VTBLAD

loans held by the Trust.  (Id. 44-45)  Moreover, upon discovery

or receipt of notice of any breach of the Seller's

representations and warranties that has a material adverse

effect on the value of the loan pools in the Trusts, the Seller

is required to cure, substitute, or repurchase the defective

loans.  (Id. 46-47)

    The Trust Agreement is the operative document that

creates the Delaware statutory trust.  (Id. 51)  It is a

contract between the Depositor – also referred as the "Owner

Trustee" – and other entities. (Id.)  The Trusts acts as the

"Issuer," issuing notes to various investors.  (Id.)

    The Sale and Servicing Agreements are contracts

between the Depositor, the "Servicers," the Issuer, the Sponsor

and U.S. Bank in its capacity as Indenture Trustee.  (Id. 52)

Under these agreements, the Depositor conveys its right, title,

and interest in the mortgage loans to the Issuer – that is, the

Trust – and the Issuer conveys notes to the Depositor, which

are then resold to underwriters, who in turn sell the notes to

investors.  (Id. 38-39, 52)  The Sale and Servicing Agreements

also impose obligations on the "Master Servicers" to supervise,

monitor, and oversee the obligation of the servicer to service

the loans.  (Id.)

    Finally, the Indenture is a contract between the

Trusts – the Issuers – and U.S. Bank as Indenture Trustee,

under which the Issuers issue notes.  (Id. 53)  Under the

Indenture, the Issuer pledges its rights in the notes to the

Indenture Trustee, which is responsible for securing the

payment obligations on the notes on behalf of the beneficial

owners.  (Id.)

Accordingly, the Governing Agreements establish

certain rights and duties of U.S. Bank as Trustee, to be

exercised for the benefit of the Noteholders.  (Id. 50, 54)

With respect to the Sellers/Sponsors, U.S. Bank's

responsibilities include a duty "to give prompt written notice

to all parties upon its discovery of a breach of a

[representation and warranty] made by a seller," and to enforce

the obligations of the seller to cure, substitute, or

repurchase the defective loans.  (Id. 46-47, 56)

Under the Sale and Servicing Agreements, U.S. Bank

also has obligations upon occurrence of a Servicer "Event of

Default," which is defined as a specified failure of the

servicer to perform its servicing duties and cure this failure

within a specified period of time.  (Id. 58)  If a Servicer

Event of Default occurs, and U.S. Bank as indenture trustee has

received written notice of or has actual knowledge of this

default, U.S. Bank is required to give prompt, written notice

to the Servicer and all noteholders.  (Id. 57, 59)  The

remedies for uncured Servicer Events of Default include

termination of the Servicer and recoupment of Trust assets lost

as a result of the Servicer's violations. (Id. 60)

1          The Indentures similarly impose obligations on U.S.

2    Bank, as Indenture Trustee, in the event that it learns of an

3    Event of Default.  (Id. 63)  If U.S. Bank becomes aware of or

4    receives written notice of an Event of Default, it must use the

5    same degree of care and skill in responding to the default as a

6    prudent person would under the circumstances.  (Id. 59, 64)

7    The Indenture Trustee must also provide notice to the

8    Noteholders of any Event of Default of which it becomes aware.

9    (Id. 65)

10          Plaintiffs here assert that each of the "Trusts loan

11   pools contains a high percentage of loans that materially

12   breached the seller's representations and warranties,"

13   adversely affecting the value of those loans and the Trusts'

14   and Noteholders' rights in those loans.  (Id 66)  In

15   particular, plaintiffs assert that various representations and

16   warranties were "systematically and pervasively false,"

17   including the originator's compliance with underwriting

18   standards, owner-occupancy statistics, appraisal procedures,

19   and loan-to-value ratio.  (Id.)  Plaintiffs point to the

20   following as evidence of such breaches:  The high default rate

21   of the mortgage loans; collateral losses suffered by the

22   Trusts; plummeting credit ratings of residential mortgage

23   backed securities generally; sellers' routine abandonment of

24   underwriting guidelines; fabrication of borrower loan

25   information; predatory and abusive lending; and the results of

1   forensic reviews and re-underwriting of loans within the Trusts

2   in other litigation.  (Id.)

3          The Amended Complaint goes on to allege that as a

4   result of delinquencies, loan modifications, borrower defaults,

5   and foreclosures, the Trusts incurred large collateral losses.

6   (Id. 69)  By January 1, 2009, collateral losses amounted to

7   more than $500 million, and an average of one in every five

8   loans in the Trusts was delinquent.  (Id. 7, 69)  Nine Trusts

9   had delinquency rates exceeding 20%, and three Trusts had

10  delinquency rates of more than 40%.  (Id. 7)  By January 1,

11  2011, realized collateral losses amounted to $1 billion.  (Id.)

12  And by the start of 2010, nearly all of the securities issued

13  by the Trusts had been reduced to "junk" status.  (Id.)

14         Plaintiffs allege that "beginning in 2009 and by

15  2011," U.S. Bank was aware that each of the Trusts' loan pools

16  contained high percentages of mortgage loans that materially

17  breached the representations and warranties.  (Id. 89)  Despite

18  this knowledge, U.S. Bank failed to comply with its obligations

19  under the Governing Agreements to protect the Trusts and

20  Noteholders.  (Id. 141)  According to Plaintiffs, U.S. Bank's

21  alleged breaches have harmed the Trusts by depriving the Trusts

22  of valuable remedies that would have prevented the Trusts from

23  incurring substantial losses.  (Id. 161, 172)  Plaintiffs also

24  claim that the Noteholders suffered injury because U.S. Bank's

25  breaches "diminished the value of the notes held by the

Noteholders" and "prevented the Noteholders from protecting the
rights of the Trusts."  (Id. 173)

        As a result of Judge Forrest's rulings on a motion to
dismiss, only the First and Second Causes of Action of the
Amended Complaint remain.  The First Cause of Action is a
breach of contract claim in which Plaintiffs allege that U.S.
Bank violated its obligations under the Governing Agreements.
(Id. 163-173).  According to Plaintiffs, U.S. Bank had
knowledge and notice of triggering Events of Default and did
not give proper notice of the default to, among others, the
noteholders.  Plaintiffs also claim that U.S. Bank did not take
appropriate steps to enforce the rights of the Trusts with
respect to the breach.  (Id. 166, 170-171)

        In the Second Cause of Action, Plaintiffs allege that
U.S. Bank breached its duties and responsibilities under the
Trust Indenture Act by failing to provide notice of defaults,
and by failing to act prudently to enforce the Indenture
Trustee's rights to, among other things, enforce the seller's
obligations to repurchase, substitute, or cure defective
mortgage loans, and to require the servicers to cure all
servicing breaches and reimburse the Trusts for losses caused
by servicing violations.  (Id. 175-176)

        Pending before the Court is Plaintiffs' motion for
class certification.  (Dkt. Nos. 218-227)  Plaintiffs have
moved to (1) certify "a class of all individuals who purchased

I1VTBLAD

or otherwise acquired a beneficial interest in a security

issued from the Trusts . . . between the date of offering and

60 days from the final order certifying the class and who hold

that beneficial interest in the security through the date of

final judgment in the District Court, and who were damaged as a

result of Defendant U.S. Bank['s] . . . alleged breaches of

contract and violations of the [Trust Indenture Act]"; (2)

appoint Plaintiffs as Class Representatives for the respective

Trusts in which they hold notes; and (3) appoint Bernstein

Litowitz Berger & Grossman LLP as Class counsel.  (Pltf. Br.

(Dkt. No. 219) at 7)

        Defendant opposes the class certification motion,

noting that this case involves "holders in 25 different trusts

comprising 227 unique securities trusts backed by 46 separate

loan groups and more than 100,000 loans originated by 19

different originators and 23 different servicers."  (Def. Br.

(Dkt. No. 224) at 8)

        In opposing class certification, Defendants contend

that:  (1) because there is no "common nucleus across the

trusts," Plaintiffs' claims require loan-by-loan and

trust-by-trust proof and, as a consequence, individualized

questions predominate and the class lacks commonality; (2)

Plaintiffs' lack of actual injury under the Trust Indenture Act

deprives this Court of subject matter jurisdiction over 21 of

the Trusts; (3) Plaintiffs' rely on prior noteholders' claims

1  and injuries, necessitating individualized hearings and tracing

2  of note ownership that independently precludes class

3  certification; (4) Plaintiffs' damages model provides no basis

4  for class certification; (5) intra-class conflicts preclude

5  certification because the proposed class representatives are

6  inadequate representatives with interests antagonistic to the

7  class; and (6) Plaintiffs have failed to meet their burden of

8  establishing ascertainability, numerosity, and superiority.

9  (Def. Br. (Dkt. No. 224))

10          I conclude that the motion for class certification

11  should be denied because Plaintiffs are required to demonstrate

12  out-of-pocket losses for purposes of their Trust Indenture Act

13  claim, and have not done so with respect to notes issued by 21

14  of the Trusts.  Plaintiffs thus lack standing to pursue these

15  claims, and this Court lacks subject matter jurisdiction to

16  hear them.  The damages model proffered by Plaintiffs also

17  provides no basis for granting class certification here.

18          I will begin with the standing issue.  In opposing the

19  motion for class certification, Defendant argues that

20  Plaintiffs have not demonstrated actual injury.  (Def. Br.

21  (Dkt. No. 224) at 18-27)  Defendants note that it is undisputed

22  that each named Plaintiff is a current Noteholder in the

23  Trusts, and that many of the named Plaintiffs bought their

24  notes recently – long after the 2008 financial crisis – and

25  have profited from their investments.  (Id. at 11, 18; see also

I1VTBLAD

Pltf. Reply (Dkt. No. 219) at 12 ("Plaintiffs' liability theory
extends only to current Noteholders, for whom out-of-pocket
losses are inapplicable.")

    Plaintiffs contend, however, that as current
Noteholders, they have standing to assert the claims of prior
holders under New York General Obligations Law § 13-107's rule
of automatic assignment. (Pltf. Reply (Dkt. No. 222) at 8;
Pltf. Ltr. (Dkt. No. 132) at 1-2)

    Defendant responds that the General Obligation Law
does not apply to the Trust Indenture Act, that the Trust
Indenture Act requires "actual damages," and that Plaintiffs
lack standing under the Trust Indenture Act. In this regard,
Defendant notes that Plaintiffs have suffered no out-of-pocket
losses related to their holdings in 21 of the Trusts. (Def.
Br. (Dkt. No. 224) at 24-25) Defendant further contends that
Plaintiffs' alleged lack of standing under the Trust Indenture
Act and Article III deprives this Court of subject matter
jurisdiction over claims relating to 21 trusts, and requests
that this Court decline to exercise supplemental jurisdiction
over the state law breach of contract claims relating to these
trusts. (Id. at 24-26)

    Standing is, of course, a "'threshold question in
every federal case, determining the power of the court to
entertain the suit[;]'" it derives from Article III's
case-or-controversy requirement. *Denney v. Deutsche Bank AG*,

443 F.3d 253, 263 (2d Cir. 2006).  "The filing of suit as a

class action does not relax this jurisdictional requirement."

(Id.)  Accordingly, "[i]f plaintiffs lack Article III standing,

a court has no subject matter jurisdiction to hear their

claim."  *Cent. States Se. & Sw. Areas Health & Welfare Fund v.*

*Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir.

2005).

         "In a class action, '[t]he initial inquiry is whether

the lead plaintiff individually has [Article III] standing.'"

*Indergit v. Rite Aid Corp.*, No. 08 CIV. 9361 (PGG), 2009 WL

1269250, at *3 (S.D.N.Y. May 4, 2009).  In order to demonstrate

individual standing, "every federal plaintiff [must] establish,

for each claim he seeks to press, a [(1)] personal injury [(2)]

that is fairly traceable to the defendant's conduct and [(3)]

likely to be redressed by the requested relief[.]"  *Ret. Bd. of*

*the Policemen's Annuity & Ben. Fund of the City of Chicago v.*

*Bank of New York Mellon*, 775 F.3d 154, 159 (2d Cir. 2014).

"'The burden to establish standing rests on the party asserting

its existence.'"  *In re AOL Time Warner, Inc. Sec. & ERISA*

*Litig.*, 381 F. Supp. 2d 192, 245 (S.D.N.Y. 2004).

         In order to establish injury-in-fact for purposes of

Article III standing, "'a party must allege "a distinct and

palpable injury to himself', and 'cannot rest his claim to

relief on the legal rights or interests of third parties[.]'"

*Bluebird Partners, L.P. v. First Fid. Bank, N.A. New Jersey*, 85

F.3d 970, 973 (2d Cir. 1996).  However, it is also
well-established that a valid "assignment of claims transfers
legal title or ownership of those claims and thus fulfills the
constitutional requirement of an 'injury-in-fact.'"  *W.R. Huff
Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100,
108 (2d Cir. 2008).

      Separate and apart from Article III's standing
requirements for the named plaintiffs to sue in their own
right, the named plaintiffs must also have "class standing" to
sue on behalf of absent class members.  *NECA-IBEW Health &
Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 158 (2d Cir.
2012).  In *NECA*, the Second Circuit explained that even though
the plaintiff "ha[d] Article III standing . . . in its own
right" as to certain certificates it had purchased, the
plaintiff "clearly lack[ed] [individual] standing to assert
such claims" related to "[c]ertificates from other [o]fferings,
or from different tranches . . . because it did not purchase
those [c]ertificates."  (Id.)  Accordingly, the question of a
named plaintiff's "'class standing' to bring claims related to
. . . certificates that it had not purchased on behalf of the
absent class members who had purchased them" requires a
separate inquiry.  *Retirement Board*, 775 F.3d, 160.

      The Second Circuit has "distilled a two-part test for
class standing . . . derive[d] from constitutional standing
principles[:]"

1          [I]n a putative class action, a plaintiff has class

2     standing if he plausibly alleges (1) that he personally has

3     suffered some actual injury as a result of the putatively

4     illegal conduct of the defendant, and (2) that such conduct

5     implicates the same set of concerns as the conduct alleged to

6     have caused injury to other members of the putative class by

7     the same defendants.

8          Id. at 161 (quoting *NECA*, 693 F.3d at 162).  The first

9     prong of the "class standing" test is duplicative of the

10     requirement that the named Plaintiffs have individual standing.

11     *See NECA*, 693 F. 3d at 158, 162.

12          With respect to the second prong, the named Plaintiffs

13     need not demonstrate identical injuries as those to whom they

14     are seeking to represent.  *See NECA*, 693 F.3d at 162 (holding

15     that the district court erred in requiring *NECA* to demonstrate

16     that its injuries were "the same" as those allegedly suffered

17     by purchasers of other certificates).  However, plaintiffs must

18     establish that "the named plaintiff[s'] claims implicated the

19     'same set of concerns' as absent class members' claims[,]" such

20     that one could "conclude that the named plaintiff had the right

21     incentives." *Retirement Board*, 775 F.3d at 161.  In making

22     this determination, courts must consider whether "the proof

23     contemplated for all of the claims would be sufficiently

24     similar."  (Id.)  (Holding that the named plaintiffs lacked

25     "class standing" on behalf of the trusts in which they had not

invested because the trustee's "misconduct must be proved loan-by-loan and trust-by-trust"); see also *NECA*, 663 F.3d at 164 (holding that the certificates' tranches and "varying levels of payment priority [did not] raise such a 'fundamentally different set of concerns' as to defeat class standing because "all of the Certificate-holders' cash flows within any such Offering . . . derive from loans originated by some of the same originators[,]" and "each Certificate-holder within an Offering . . . backed by loans originated by similar lenders has the same 'necessary stake in litigating' whether those lenders . . . abandoned their underwriting guidelines").

Once the named plaintiffs establish the requisite standing, "there is no requirement that [each] member of the class also proffer such evidence." *Denney*, 443 F.3d, 264. "At the same time, no class may be certified that contains members lacking Article III standing." (Id.) Accordingly, "[t]he class must . . . be defined in such a way that anyone within it would have standing." (Id.)

Finally, there is the requirement of so-called "statutory standing." Although sometimes referred to as an aspect of "prudential standing," the "Supreme Court has since clarified that 'statutory standing' involves the scope of the cause of action authorized by Congress and is not an element of standing under Article III." *Retirement Board*, 775 F.3d at 160 n. 5 (citing *Lexmark Int'l, Inc. v. Static Control Components,*

1    *Inc.*, 134 S. Ct. 1377, 1388 n. 4 (2014)).  Statutory standing

2    asks "[w]hether a plaintiff comes within the zone of interests

3    [protected by the statute] . . . using traditional tools of

4    statutory interpretation" that is, "whether this particular

5    class of persons ha[s] a right to sue under this substantive

6    statute."  *Lexmark*, 134 S. Ct. at 1387-88.

7              I will now discuss Article III and statutory standing

8    as it applies to Plaintiffs' Trust Indenture Act Claims,

9    beginning with what I believe to be the applicable law.

10             As noted above, in order to demonstrate individual

11   Article III standing, "every federal plaintiff [must]

12   establish, for each claim he seeks to press," injury-in-fact.

13   *Retirement Board*, 775 F.3d at 159.  Although a valid assignment

14   can satisfy injury-in-fact for purposes of Article III standing

15   *(see W.R. Huff*, 549 F.3d at 108), the *Bluebird* case

16   demonstrates that New York General Obligations Law § 13-107

17   does not apply to claims arising under the Trust Indenture Act.

18   *See Bluebird*, 85 F.3d at 973 (finding Section 13-107

19   inapplicable because "federal law governs the assignability of

20   claims under the federal securities laws").  Under federal law,

21   "federal securities law claims are not automatically assigned

22   to a subsequent purchaser upon the sale of the underlying

23   security."  (Id. at 974.)

24             Accordingly, in order to satisfy individual Article

25   III standing requirements for their Trust Indenture Act claim,

1    Plaintiffs must establish a traditional injury-in-fact.  "An

2    injury-in-fact must be 'distinct and palpable,' as opposed to

3    'abstract,' and the harm must be 'actual or imminent,' not

4    'conjectural or hypothetical.'"  *Denney*, 443 F.3d at 264.  In

5    cases involving Trust Indenture Act claims similar to those

6    raised here, courts have found injury-in-fact where the

7    plaintiffs alleged that the Indenture Trustee's breaches

8    deprived them of payments of principal and interest due on

9    notes, or diminished the value of the notes while the

10   plaintiffs held them, causing the notes to be sold at a loss.

11   *See Retirement Board*, 914 F. Supp. 2d 422, 427 (S.D.N.Y. 2012)

12   ("Plaintiffs contend that [the Indenture Trustee's] alleged

13   conduct caused the value of their notes to drop, and they claim

14   to have sold [the] notes . . . at a significant loss. . . .

15   [These] damages allegations are sufficient to confer

16   standing[.]"), aff'd in rel. part, 775 F.3d at 161 ("In this

17   case, there is no dispute that Plaintiffs have . . . adequately

18   pled that they have personally suffered an actual injury as a

19   result of [the Indenture Trustee's] putatively illegal

20   conduct."); *also, Policemen's Annuity & Benefit Fund of City of*

21   *Chicago v. Bank of Am.*, 907 F. Supp. 2d 536, 546 (S.D.N.Y.

22   2012) ("Plaintiff asserts that the decline in the value of its

23   certificates means that it sold the certificates at a loss and

24   thereby suffered damages. . . . [T]hat alleged damage [is]

25   sufficient to meet the injury-in-fact requirement[.]").

1          To demonstrate "statutory standing," that is, that the

2     named Plaintiffs are entitled to bring a cause of action under

3     the Trust Indenture Act, Plaintiffs must establish that they

4     fall "within the zone of interests protected by the [statute]."

5     *See Lexmark*, 134 S. Ct. at 1387-88, 1393.  "The securities laws

6     were enacted to protect those who have been injured, not

7     treasure hunters shrewd or lucky enough to have put [their]

8     hands on a security that once belonged to a person who was

9     defrauded.'"  *Bluebird Partners, L.P.*, 896 F. Supp. 152, 157.

10          Consequently, "to have standing to assert a claim for

11     breach of the Trust Indenture Act, plaintiffs must show "that

12     they relied on the trustees to exercise their powers and duties

13     under the indenture as a prudent person would, that the

14     trustees breached the prudent person standard and that

15     plaintiffs were injured thereby."  *LNC Investments, Inc. v.*

16     *First Fid. Bank*, No. 92 CIV. 7584 MBM, 1997 WL 528283, at

17     *12-13 (S.D.N.Y. Aug. 27, 1997).  "[T]he trustee [must also]

18     owe a duty [to the plaintiff] at the time of the alleged

19     breach."  Id. at 13.  Furthermore, while the Trust Indenture

20     Act's requirement of actual damages does not "bear on the type

21     of damages that must be alleged in the Complaint[,]" it is well

22     established that Plaintiffs must still demonstrate "a

23     cognizable injury under the [Act]" and Plaintiffs' "eventual

24     recovery [is limited] to their actual damages."  *See Royal Park*

25     *Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d

587, 612 (S.D.N.Y. 2015); 15 U.S.C. § 77www(b) ("[N]o person

permitted to maintain a suit for damages under the provisions

of this subchapter shall recover, through satisfaction of

judgment in one or more actions, a total amount in excess of

his actual damages on account of the act complained of.").

Accordingly, in *Bluebird*, the Second Circuit found

that plaintiffs who purchase notes "at a discount" after the

alleged breaches and injury occur lack "standing" under the

Trust Indenture Act.  *Bluebird*, 85 F.3d at 972-73, 975; *see*

*also LNC Investments*, 1997 WL 528283, at *10 ("[P]laintiffs

have no standing to assert [Trust Indenture Act] claims arising

from misconduct that occurred and injury that was sustained

before they purchased their certificates.").  Where plaintiffs

"purchase [their] certificates after all the alleged breaches

transpired. . . and after the adverse consequences to

certificate holders became painfully apparent[,] [m]arket

forces assured that the price plaintiff paid for certificates

which would never be wholly redeemed reflected their diminished

value." *Bluebird*, 896 F. Supp. at 157.  "The injury was

sustained by the sellers who parted with these certificates at

a reduced price, not by plaintiff[s] who purchased them at [a

discount rate]," and plaintiffs lacked standing under the Trust

Indenture Act.  (Id.)

Likewise, where plaintiffs have purchased notes at a

discount and profited on that investment, they do not fall

I1VTBLAD

within the zone of interests protected by the Trust Indenture

Act.  See *LNC Investments*, 1997 WL 528283, at *13 (noting that

plaintiff "made a profit on its investment in . . .

certificates and cannot argue that as to those certificates it

was injured[.]"); *see also, In re AOL Time Warner, Inc. Sec. &

ERISA Litig.*, 381 F. Supp. 2d 192, 246 (S.D.N.Y. 2004) (finding

that plaintiffs lacked both Article III and statutory standing

under Section 11(e) of the Securities Act where the bonds

purchased by the lead plaintiff increased in value, and were

trading at a higher rate than when they were purchased.)

          Under certain circumstances, however, plaintiffs may

have standing under the Trust Indenture Act to recover on a

"continuing breach theory" "for injury sustained after they

purchased their [notes]," even where they purchased their notes

at a "discounted price."  *LNC Investments*, 1997 WL 528283, at

*10.  The LNC court explained that in contrast to the injury in

securities cases – which "flow[s] from a one-time [discrete]

misrepresentation . . . immediately reflect[ed in the purchase

price] once fact of the misrepresentation is made public" –

"the injury flowing from [a Trust Indenture Act] claim . . . is

not so discrete, and occurs over the course of [time] as the

collateral decreases in value."

          When plaintiffs purchased their certificates, the

market could not have accounted for future misconduct and

future injury.  The market had discounted the [notes] to

reflect the risk, at that time, that the [note] holders would

not receive full recovery, but could not have predicted that

later trustee action would increase that risk.  Accordingly, to

the extent that plaintiffs purchased [the notes] during the

period before . . . the alleged misconduct generated increasing

injury and the market was not yet fully informed of the

consequences of [that risk], they have standing.  (Id. at 11)

Thus, to the extent trustee misconduct "and the

claimed injury – the [further] decline in the collateral's

value – both occurred after plaintiffs bought their

certificates, plaintiffs have standing under *Bluebird*."  (Id.

at 10)  In contrast, "[a]ny [note] holders who purchased after

[the trustee misconduct was disclosed] lack standing under

Bluebird because the market insured that the price they paid

reflected the diminished value of the certificates."  (Id. at

12)

Even where a plaintiff proceeds under continuing

breach theory of standing, however, it is well-established that

"benefit of the bargain" damages do not constitute "actual

damages" under the Trust Indenture Act, and that "plaintiffs'

damages are limited to out-of-pocket losses."  (Id. at *37-38)

The LNC court reasoned as follows:

Here, all of plaintiffs' certificates were purchased

at a discount, and all of the certificates sold after January

18, 1991, when the effect of the trustees' misconduct was

I1VTBLAD

1    disclosed to the market, were sold at even greater discount.

2    Plaintiffs purchased only that probability of full payment

3    which was reflected in the purchase price.  The market price at

4    the time of purchase reflected the risk that the certificates

5    would not be fully redeemed, and plaintiffs cannot argue that

6    they expected full redemption.  If the trustees' conduct

7    resulted in a further decrease in the probability of full

8    redemption, plaintiffs' damages are limited to that decrease

9    that resulted from the trustees' breach, which would be

10   reflected in the further decline of the [notes]' market price

11   or would be apparent at maturity.  Plaintiffs are not entitled

12   to full payment on the certificates.

13        If, in the event of a breach of the prudent person

14   standard the trustee became liable for the full principal

15   amount of a certificate, regardless of the discounted purchase

16   price for the certificate, the trustee would become the

17   guarantor of the debt underlying the certificate.  An indenture

18   trustee does not, however, guarantee the underlying debt. . . .

19   Effectively, when the debt issuer defaults under the indenture,

20   the trustee promises to do what it can – exercise its rights

21   prudently – to protect the certificate holders.  If the trustee

22   breaches that duty, which breach causes the certificates to

23   decline in value or reduces the amount of principal

24   recoverable, the [certificate] holders can recover what they

25   lost:  The difference between what they paid and what they

received.   The indenture does not represent a bargain with the

trustees or a promise that the trustees will ensure a full

recovery on the certificates. . .   There is no bargain on which

to base benefit-of-the-bargain damages.   Plaintiffs' claims

rest on a tort theory of recovery, which mandates an

out-of-pocket measure of damages, rather than on a contract

theory of recovery.  (Id. at *35, 37)

        Accordingly, where, as here, a lawsuit has moved past

the motion to dismiss stage, plaintiffs must demonstrate a

"cognizable injury" under the Trust Indenture Act and any

proposed damages model must reflect the Trust Indenture Act's

actual damages requirement.  *See* id. at *33 (dismissing the

claims of certain plaintiffs on standing grounds where they had

not demonstrated actual damages; granting defendants' motion

for summary judgment to limit the remaining plaintiffs' damages

under the Trust Indenture Act "to out-of-pocket losses

attributable directly to the trustee defendants' breach of the

prudent person standard.").

        Here, Plaintiffs assert a "continuing breach" theory,

contending that they satisfy both Article III and Trust

Indenture Act standing requirements "because U.S. Bank's

misconduct - its continuing failure to enforce Seller and

Servicer claims - and the resulting injury - decline in the

Trusts' assets and increased investment risk - both occurred

after Plaintiffs bought their notes."  (Pltf. Reply (Dkt. No.

I1VTBLAD

222) at 11)

Article III requires a "personal injury" that is not speculative or abstract, however, *see, for example, Retirement Board*, 775 F.3d at 159; *Denney*, 443 F.3d at 264, and here the evidence demonstrates that Plaintiffs have not suffered any injury related to their holdings in the vast majority of the Trusts.

As in *LNC Investments*, 1997 WL 528283, at *3, Plaintiffs seek to recover under a "benefit of the bargain" theory, claiming that they are entitled to the entire "portion of the Trusts' (and in turn investors') losses caused by U.S. Bank's failure to perform its duties," "regardless of when the certificates were purchased[.]"  (Pltf. Reply (Dkt. No. 222) at 12-13).  Indeed, Plaintiffs concede that most of the current noteholders have suffered no out-of-pocket losses.  Plaintiffs contend, however, that they are entitled to recover the entire amount of the damages attributable to U.S. Bank's alleged wrongdoing under a "benefit of the bargain" theory.  (See Pltf. Reply (Dkt. No. 222) at 12 ("Plaintiff's liability theory extends only to current Noteholders, for whom out-of-pocket losses are inapplicable."); Am. Cmplt. (Dkt. No. 74) at 78; DeLange Decl., Ex. 1 (Hatzmark Expert report) 22 ("Plaintiffs seek to be put in the same position today that they would have been in had the Trustee fulfilled its obligation.  Therefore . . . [the] damages methodology compensates Class Members for the

I1VTBLAD

loss of the benefits they bargained for."))

    As I discussed a moment ago, however, it is well-established that the Trust Indenture Act's "actual damages" provision limits Plaintiffs' recovery to out-of-pocket losses, and that noteholders can only "recover what they lost: The difference between what they paid and what they received." *LNC Investments*, 1997 WL 528283, at *35.

    With respect to 21 of the 25 Trusts at issue here, there is no evidence of any type of cognizable injury under the Trust Indenture Act. *Cf. Retirement Board*, 914 F. Supp. 2d at 427 (drop in value of notes, and subsequent sale at a loss satisfies injury-in-fact); *Oklahoma Police Pension*, 291 F.R.D. at 56-57 (plaintiff's claim of "millions of dollars in losses" deriving from loss of payment on the principal and interest and diminution in value of the notes satisfies injury-in-fact). Plaintiffs have suffered no out-of-pocket losses related to their holdings in these 21 trusts.  Indeed, Plaintiffs' notes in 18 of these Trusts have increased in value since Plaintiffs purchased them.  (See Chaiten Decl., Ex. A (James Expert Report) (Dkt. No. 225-1) 49 n. 46, 54, Ex. 4 at 112-14 ("Exhibit 4 shows that Plaintiffs currently hold notes that are priced by Interactive Data Corp. . . above what they paid in 18 Trusts."))

    Acknowledging that the *LNC* court held that a "decline in the collateral's value" could suffice for standing purposes

I1VTBLAD

where the trustee's alleged wrongdoing and plaintiff's injury

occurred "after plaintiffs bought their certificates," *LNC*

*Investments*, 1997 WL 528283, at *10, the evidence here

demonstrates that Plaintiffs have suffered no realized loss of

principal in 21 of the trusts in which they hold notes.  See

Chaiten Decl., Ex. A (James Expert Report) (Dkt. No. 225-1) 49

n. 46, 53, Ex. 4 at 112).  Because "Plaintiffs point to no

concrete harm that actually has occurred or is imminent, and,

moreover, the challenged transactions produced an economic

benefit [as to eighteen of the Trusts], they have not suffered"

a cognizable injury under the Trust Indenture Act.  *Waxman v.*

*Cliffs Nat. Res. Inc.*, 222 F. Supp. 3d 281, 289 (S.D.N.Y. 2016)

(plaintiffs lacked Article III injury-in-fact to bring Trust

Indenture Act claims where the bonds largely increased in

value, and plaintiffs demonstrated no concrete harm); *LNC*

*Investments*, 1997 WL 528283, at *10, 13 (no standing under the

Trust Indenture Act where plaintiffs profited from their

investment, or where plaintiffs suffered no injury after they

purchased their notes).

Because this Court's subject matter jurisdiction is

predicated solely on Plaintiffs' Trust Indenture Act claim,

this Court lacks subject matter jurisdiction to the extent that

Plaintiffs' claims are premised on notes issued by these 21

trusts.  For purposes of clarity, I will now list those 21

trusts:  (1) AABST 2004-6, (2) AABST 2005-1, (3) AABST 2005-3,

I1VTBLAD

(4) ACCR 2004-2, (5) ACCR 2005-3, (6) BAYRT 2005-E, (7) BAYV

2005-A, (8) GPHE 2004-2, (9) GPHE 2004-3, (10) HEMT 2006-2,

(11) HMBT 2004-1, (12) HMBT 2004-2, (13) HMBT 2005-1, (14) HMBT

2005-3, (15) HMBT 2005-4 (16) HMBT 2005-5, (17) HMBT 2006-2,

(18) IRWHE 2004-1, (19) IRWHE 2005-1, (20) LABS 2005-1 and (21)

NYMT 2005-2.  (See Chaiten Decl., Ex. A (James Expert Report)

(Dkt. No. 225-1), Ex. 4 at 112-14.)

        With respect to these 21 trusts for which Plaintiffs

lack standing to assert claims under the Trust Indenture Act,

Plaintiffs ask that this Court exercise supplemental

jurisdiction over Plaintiffs' state law claim.  (Pltf. Reply

(Dkt. No. 222) at 12)  Pursuant to 28 U.S.C. § 1367(c),

however, "a district court may decline to exercise supplemental

jurisdiction if it has dismissed all claims over which it has

original jurisdiction."  *Schaefer v. Town of Victor*, 457 F.3d

188, 210 (2d Cir. 2006).  And "when all federal claims are

eliminated in the early stages of litigation, the balance of

factors generally favors declining to exercise pendent

jurisdiction over remaining state law claims and dismissing

them without prejudice."  *Tops Mkts., Inc. v. Quality Mkts.,*

*Inc.*, 142 F.3d 90, 103 (2d Cir. 1998)

        I see no reason to deviate from the normal rule here.

Because plaintiffs' claims concerning the 21 trusts I listed

above, there's no basis for subject matter jurisdiction over

them, the motion for class certification will be denied.

I1VTBLAD

1          Because Plaintiffs may choose to renew their class

2    certification motion as to the four remaining trusts, I want to

3    alert the parties to my concerns about two other matters.  I

4    believe that Plaintiffs' proposed damages model is improper.  I

5    will address that in a moment.  First, however, I want to share

6    my concerns about Rule 23(b)(3)'s predominance requirement as

7    it relates to Plaintiffs' breach of contract claim and reliance

8    on General Obligations Law § 13-107, and whether individual

9    inquiries and note-tracing would be necessary to determine

10   timeliness.

11         With respect to their breach of contract claim,

12   Plaintiffs rely on General Obligation Law § 13-107's rule of

13   automatic assignment to assert the claims of prior noteholders

14   for standing purposes.  (See Pltf. Reply (Dkt. No. 222) at 8)

15   Defendant argues, however, that (1) the Trust Indenture Act

16   precludes application of Section 13-107; and (2) even if the

17   Trust Indenture Act did not preempt application of Section

18   13-107, individualized inquiries and note-tracing related to

19   application of Section 13-107's application would preclude

20   class certification; and (3) even if this Court ruled that

21   Section 13-107 applies in all instances, individualized

22   inquiries and note-tracing would still be required to determine

23   standing and timeliness.  (Def. Br. (Dkt. No. 224) at 18-24)

24   According to Defendant, the necessity of individualized

25   inquiries demonstrates that Rule 23(b)(3)'s predominance

1    requirement is not met.  (Id.)

2         I will address only one aspect of Defendant's

3    arguments concerning Plaintiffs' state law breach of contract

4    claim:  Whether individualized inquiries and note tracing would

5    be required to determine timeliness.

6         Defendant argues that this Court would have to trace

7    each individual note to determine whether putative class

8    members' claims are time-barred, "because 'even if § 13-107

9    applies, there is 'no reliable means of collectively

10   determining' which claims are timely."  (Def. Br. (Dkt. No.

11   224) at 23)  As to timeliness, New York's borrowing statute

12   "requires the cause of action to be timely under the limitation

13   periods of both New York and the jurisdiction where the cause

14   of action accrued."  *Global Fin. Corp. v. Triarc Corp.*, 715

15   N.E.2d 482, 484 (N.Y. 1999).  For assigned claims, the cause of

16   action accrues where the assignor's claim accrued, that is,

17   "'where the [assignor] resides and sustains the economic impact

18   of the loss.'"  (Def. Br. (Dkt. No. 224) at 23 (quoting

19   *Portfolio Recovery Assocs., LLC v. King*, 927 N.E.2d 1059, 1061

20   (N.Y. 2010)).  According to Defendant, this would require this

21   Court to (1) identify when each claim accrued; and (2) identify

22   the holder of the note at that point.  (Id.)  Defendant argues

23   that this inquiry is "far too individualized for class

24   treatment," and that multiple states' limitations periods would

25   apply.  (Id.)  Defendant further argues that the only way to

I1VTBLAD

avoid this kind of individualized tracing is to limit the class

to those that have held notes from the time of the earliest

breach through judgment (that is, to select a class definition

that requires "continuous ownership" from the date of the

earliest breach).  Plaintiffs' proposed class definition,

however, reflects no such limitation.  (Id. at 23-24)  In

support of its argument, Defendant cites to Judge Netburn's

recent decision in *Royal Park Investments SA/NV v. Wells Fargo*,

No. 14 Civ. 9764 (KPF) (SN) (S.D.N.Y. Jan. 10, 2018), at 29-30,

which relied on variations in the viability of statute of

limitations defenses across class members as one basis for

denying class certification.

Plaintiff counters that this Court need not trace note

ownership to resolve statute of limitations questions, "because

the Governing Agreements and Notes mandate that New York

procedural and substantive law govern."  Plaintiffs also argue

that U.S. Bank has not shown that variations in the statute of

limitations "would pose an insuperable obstacle to class

certification."  (Pltf. Reply (Dkt. No. 222) at 10)  Plaintiff

also points out that Judge Netburn's Report and Recommendation

in *Royal Park* has not yet been adopted by the District Court,

and argues that Judge Netburn "overlooked a critical body of

law requiring that before an affirmative defense may be

considered a factor in the class action calculus, the defendant

must establish that such a defense is meritorious."  (Pltf.

I1VTBLAD

1    Ltr. (Dkt. No. 250) at 3)  Plaintiff further argues that

2    "[c]ourts have been nearly unanimous . . . in holding that

3    possible differences in the application of a statute of

4    limitations to individual class members, including the named

5    plaintif[f], does not preclude certification of a class action

6    so long as the necessary commonality and, in a 23(b)(3) class

7    action, predominance are otherwise present.'"  (Pltf. Reply

8    (Dkt. No. 222) at 11 (quoting *Steinberg v. Nationwide Mut. Ins.*

9    *Co.*, 224 F.R.D. 67, 78 (E.D.N.Y 2004)).

10           It is true that the existence of individualized

11    defenses across a class does not necessarily demonstrate that

12    Rule 23(b)(3)'s predominance requirement is not met.  *See, In*

13    *re Nassau Cty. Strip Search Cases*, 461 F.3d at 225.

14    ("[A]lthough 'a defense may arise and may affect different

15    class members differently, [this occurrence] does not compel a

16    finding that individual issues predominate over common ones.'")

17    Rather, "[s]o 'long as a sufficient constellation of common

18    issues binds class members together, variations in the sources

19    and application of a defense will not automatically foreclose

20    class certification.'"  (Id.)  Nevertheless, such individual

21    issues are 'factor[s] that we must consider in deciding whether

22    issues susceptible to generalized proof 'outweigh' individual

23    issues,' even though 'standing alone, [they are not] sufficient

24    to defeat class certification.'"  *Johnson v. Nextel Commc'ns*

25    *Inc.*, 780 F.3d 128, 138 (2d Cir. 2015).  The ultimate "question

for certifying a Rule 23(b)(3) class is whether 'resolution of
some of the legal or factual questions that qualify each class
member's case as a genuine controversy can be achieved through
generalized proof' and whether 'these particular issues are
more substantial than the issues subject only to individualized
proof.'"  (Id.)

"[P]utative class actions involving the laws of
multiple states are often not properly certified pursuant to
Rule 23(b)(3) because variation in the legal issues to be
addressed overwhelms the issues common to the class."  *In re
U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 126-27.
"[T]hese concerns are lessened[, however,] where the states'
laws do not vary materially[,]" and the limited variances that
exist can be effectively managed through "'certification of
subclasses embracing each of the dominant legal standards[.]'"
(Id. at 127)  Hence, "the crucial inquiry is not whether the
laws of multiple jurisdictions are implicated, but whether
those laws differ in a material manner that precludes the
predominance of common issues."  (Id.)

"Under New York law, a claim for breach of contract
must be filed within six years of when the claim accrues."
*Muto v. CBS Corp.*, 668 F.3d 53, 57 (2d Cir. 2012) (citing N.Y.
C.P.L.R. § 213(2)).  However, "in its borrowing statute, [N.Y.
C.P.L.R.] § 202, New York law also provides that 'when a
nonresident plaintiff sues upon a cause of action that arose

I1VTBLAD

1   outside of New York, the court must apply the shorter

2   limitations period . . . of either: (1) New York; or (2) the

3   state where the cause of action accrued.'" (Id.) And,

4   contrary to Plaintiffs' assertions (see Pltf. Reply (Dkt. No.

5   222) at 10), a governing New York law provision does not

6   preclude application of the New York borrowing statute. *See*,

7   2138747 *Ontario, Inc. v. Samsung C & T Corp.*, 144 A.D.3d 122,

8   127 (N.Y. App. Div. 2016) ("The borrowing statute is itself a

9   part of New York's procedural law and is a statute of

10   limitations in its own right, existing as a separate procedural

11   rule within the rules of our domestic civil practice,

12   addressing limitations of time . . . Thus, applying the

13   borrowing statute is perfectly consistent with a broad

14   choice-of-law contract clause that requires New York [law] to

15   apply to the parties' disputes.").

16          Accordingly, "'[w]hen a nonresident sues on a cause of

17   action accruing outside New York, [C.P.L.R. §] 202 requires the

18   cause of action to be timely under the limitation periods of

19   both New York and the jurisdiction where the cause of action

20   accrued[.]'" *Portfolio Recovery Assocs., LLC v. King*, 14

21   N.Y.3d 410, 416. "If the claimed injury is an economic one,

22   the cause of action typically accrues 'where the plaintiff

23   resides and sustains the economic impact of the loss[.]'"

24   *Portfolio Recovery Assocs., LLC*, 14 N.Y.3d at 416. Moreover,

25   "when a claim has been assigned, the Section 202 analysis

1   focuses on the statute of limitations of the jurisdiction in

2   which the claim accrued to the assignor." *IKB Int'l S.A. v.*

3   *Bank of Am.*, No. 12 CIV. 4036 LAK, 2014 WL 1377801, at *6

4   (S.D.N.Y. Mar. 31, 2014).

5           In order to determine whether each individual claim is

6   time-barred, this Court would have to (1) identify when each

7   claim accrued; (2) trace the note ownership to identify who the

8   noteholder was at the time the claim accrued and where the

9   noteholder resided; and (3) identify and apply the limitations

10  period of the applicable jurisdiction.  To state the obvious,

11  this would be no simple task.  Institutional investors that

12  purchased residential mortgage backed securities include

13  entities headquartered throughout the world.  (See Chaiten

14  Decl., Ex. B (Dolan Expert Report) (Dkt. No. 225-2)  24)

15  Indeed, Defendant has offered evidence that the institutional

16  investors who held the notes at issue here include entities

17  located in Germany, Luxembourg, Canada, and the United Kingdom.

18  (Id.)  Moreover, as the Dolan Report points out, there is no

19  unique identifier for separate holdings within an RMBS tranche;

20  instead, "each securitization is subdivided into multiple

21  tranches identified by a CUSIP number," which applies

22  universally to all of the interests within a given tranche.

23  (Id. 27)  Moreover, RMBS securities are typically held in "book

24  entry" form, meaning that The Depository Trust Company's

25  ownership records would typically only list the names of the

participant institutions, and only the participant institutions

would know the name of the individual beneficial owners.  (Id.

30–31)

       As other courts have acknowledged, the nature of the

notes at issue here, in particular the lack of "unique

identifiers corresponding to individual investors' ownership

interests," the geographic dispersion of broker dealers, "with

ownership interests likely at times being sold off in pieces to

multiple investors and individual purchase orders likely at

times being filled by holdings previously acquired from

multiple different sources[,]" and the absence of a "'central

repository of trade history to follow changes in ownership over

time,'" is such that "'reconstructing the chain of ownership of

any given [note] can only be ascertained through [a] highly

detailed and individualized inquiry.'"  *See Deutsche Bank*, 2017

WL 1331288, at *6; *Royal Park*, No. 14 Civ. 9764, (S.D.N.Y. Jan.

10, 2018) at 30 (finding that determining the statute of

limitations of the jurisdiction in which the claim accrued to

the assignor would require "piecing together multiple sales and

periods of ownership for just one investor, a daunting task

given the lack of unique identifiers and the piecemeal trading

and selling of the RMBS at issue; concluding that such an

effort would require "the Court to engage in . . .

individualized inquiries . . . [that] predominate over any

common issues shared by the class").  It is also apparent that

I1VTBLAD

the statute of limitations periods vary widely across
jurisdictions.  Compare Alaska Stat. § 09.10.053 (three-year
statute of limitations) with N.Y. C.P.L.R. 213(2) (six-year
statute of limitations period).

        While Plaintiffs are correct that the question of when
the alleged breaches occurred is a common question subject to
"common evidence, that is, when U.S. Bank breached the
contract[,]" (see Pltf. Ltr. (Dkt. No. 250) at 3), Plaintiffs
do not meaningfully address the fact that determining the
governing limitations period will require determining who the
holder of the note was at the time of the alleged breach.  And
identifying prior holders requires the kind of individualized
inquiries and note tracing that other courts have found
incompatible with class treatment.

        Moreover, Plaintiffs' argument that "U.S. Bank has
failed to show how such variations would pose an insuperable
obstacle to class certification" misstates the law and appears
to reflect an effort to shift Plaintiffs' burden of proof onto
Defendant.  It is not Defendant's burden to show that
variations in jurisdictions' limitations laws pose an
insuperable obstacle to class certification.  Instead, as I
noted above, "[t]he party seeking class certification bears the
burden of establishing by a preponderance of the evidence that
each of Rule 23's requirements have been met." *Johnson*, 780
F.3d at 137; *see also, In re U.S. Foodservice Inc. Pricing*

1   *Litig.*, 729 F.3d at 127 ("'[N]ationwide class action movants

2   must credibly demonstrate, through an 'extensive analysis' of

3   state law variances, 'that class certification does not present

4   insuperable obstacles.''")  Here, "plaintiffs have offered no

5   reliable means of collectively determining how many class

6   members' claims are time-barred." *McLaughlin v. Am. Tobacco*

7   *Co.*, 522 F.3d 215, 234 (2d Cir. 2008) (finding that Rule

8   23(b)(3)'s predominance requirement was not satisfied because

9   "numerous issues are not susceptible to generalized proof [and]

10  would require a more individualized inquiry[.]").

11          Accordingly, this Court has grave concerns that the

12  individualized inquiries necessary to determine whether each

13  class member's claim is time-barred might preclude class

14  certification.

15          Finally, Defendant contends that Plaintiffs' damages

16  model "does not even purport to" measure damages under the

17  Trust Indenture Act, and is insufficient under *Comcast Corp. v.*

18  *Behrend*, 569 U.S. 27 (2013).

19          Defendant complains that Plaintiffs' damages model

20  does not properly measure damages under the Trust Indenture Act

21  because it is premised on a "benefit-of-the-bargain"

22  methodology.  (Id.)  As discussed above, Defendant is correct

23  that Plaintiffs' damages under the Trust Indenture Act are

24  limited to out-of-pocket losses.  Plaintiffs may not recover on

25  a "benefit of the bargain" theory.

1              In *Comcast*, the Supreme Court stated that "a model

2      purporting to serve as evidence of damages in [a] class action

3      must measure only those damages attributable to [a claim's]

4      theory [of liability]." *Comcast*, 569 U.S. 27, 35.  "If the

5      model does not even attempt to do that, it cannot possibly

6      establish that damages are susceptible of measurement across

7      the entire class for purposes of Rule 23(b)(3)."  (Id.)

8              Here, Plaintiffs' damages model does not reflect the

9      Trust Indenture Act's actual damages limitation.  Indeed, in

10     his rebuttal to Defendant's experts' reports, Plaintiffs'

11     expert, Dr. Hatzmark, does not even attempt to measure

12     out-of-pocket losses; instead, he defends his damages model on

13     the grounds that "Plaintiffs' theory of liability extends only

14     to current Noteholders," and that therefore a

15     "benefit-of-the-bargain damages methodology" is appropriate.

16     (DeLange Decl. II, Ex. 2 (Hatzmark Expert Rebuttal Report)

17     (Dkt. No. 223-2) 7-8)  Plaintiffs' damages model also does not

18     account for or allocate recovery according to each investor's

19     actual damages, that is, their out-of-pocket losses.  Instead,

20     Dr. Hatzmark's model calculates "Trust-level damages (that is,

21     aggregate defective and servicing losses [suffered by] each

22     Trust)".  Dr. Hatzmark then distributes these damages to

23     current noteholders in the Trust on a pro rata basis based on

24     the number of notes held by each investor, regardless of when

25     these noteholders purchased their notes or whether these

noteholders suffered any actual out-of-pocket losses. (*See*
DeLange Decl. II, Ex. 1 (Hatzmark Supplemental Expert Rebuttal
Report) (Dkt. No. 223-1) 8; Chaiten Decl., Ex. A (James Expert
Report) (Dkt. No. 225-1), 51-52 ("Such a pro rata allocation
does not measure individual holders' damages.  Dr. Hatzmark's
model assumes that the alleged economic harm is spread evenly
across investors in a particular tranche regardless of when
they purchased and how much they lost."))  Because Plaintiffs'
damages model does not allocate damages in a manner consistent
with their Trust Indenture Act claim, Plaintiffs' damages model
precludes class certification. *See Comcast*, 569 U.S. at 35
("[A]t the class-certification stage (as at trial), any model
supporting a 'plaintiff's damages case must be consistent with
its liability case[.]'").

Defendant also argues that Plaintiffs' damages model
is not sufficient under *Comcast* because it treats U.S. Bank not
as an indenture trustee, with the duties alleged in the
Complaint and set forth in the governing agreements, but rather
as a guarantor against all losses attributable to loans with
representations and warranties breaches and servicer problems.
(Def. Br. (Dkt. No. 224) at 28)  Indeed, Plaintiffs' model
seeks to measure damages based on a "but-for world."  In this
"but-for world," "but-for" the Trustee's "fail[ure] to act
consistently with [its] duties . . . by enforcing the sellers'
obligation to cure, repurchase or substitute mortgage loans

affected by breaches of the representations and warranties,"
class members "would own Notes that would have supporting
collateral pools which would have held and would currently hold
no defective loans." (DeLange Decl., Ex. 1 (Dkt. No. 221-1)
(Hatzmark Amended Expert Report) 21-22; DeLange Decl. II, Ex. 2
(Hatzmark Expert Rebuttal Report) (Dkt. No. 223-2) 15)

      "An indenture trustee does not, however, guarantee the
underlying debt." *LNC Invs.*, 1997 WL 528283, at *35. Rather,
"an indenture trustee merely acts for the certificate holders
when their rights to recovery are threatened." (Id.) "[W]hen
the debt issuer defaults under the indenture, the trustee
promises to do what it can – exercise its rights prudently – to
protect the certificate holders." If the trustee's breach of
that duty "causes the certificates to decline in value or
reduces the amount of principal recoverable, the [certificate]
holders can recover what they lost[.]" Certificate holders
cannot require the trustee to redeem the full value of the
certificates, however, irrespective of the actual losses caused
by the trustee's breaches.

      Thus, an appropriate model of damages would have to
account for: (1) whether and when U.S. Bank discovered the
breaches; (2) whether the seller would have been in the
financial position to repurchase or substitute the loan had
U.S. Bank acted; (3) if not, whether litigation would have been
appropriate; (4) for any litigation, whether it would have

I1VTBLAD

1  succeeded and whether any damages would have been collectible.

2  (*See* Chaiten Decl., Ex. A (James Expert Report) (Dkt. No.

3  225-1) 109-121)  Plaintiffs' damages model does not address any

4  of these issues.  Accordingly, Plaintiffs' damages model fails

5  to correspond to their theory of liability and runs afoul of

6  *Comcast*, and thus provides another basis for denying

7  Plaintiffs' motion for class certification.

8          For all these reasons, the motion for class

9  certification is denied.  I am going to ask Plaintiffs to

10  consider this ruling, as well as my concerns about the statute

11  of limitations issue, and send me a letter by February 16

12  telling me how they wish to proceed in this matter.

13          Is there anything further?

14          MR. DeLANGE:  Nothing further from plaintiff.  Thank

15  you, your Honor.

16          MR. ADLER:  Nothing further, your Honor, thank you.

17                       o0o

18

19

20

21

22

23

24

25